FILED: 8/1/2018 1:25 PM
SHERRI ADELSTEIN
Denton County District Clerk
By: Cameron Welter, Deputy

## CAUSE NUMBER: 17-10418-158

| | | |
|---|---|---|
| BARBARA MEIER | § | IN THE DISTRICT COURT |
| Petitioner, | § | |
| | § | |
| v. | § | NO. 158 |
| | § | |
| MAYHILL HOSPTIAL, and | § | |
| UHS OF DELAWARE, INC. | § | |
| Respondents. | § | DENTON COUNTY, TEXAS |

### FIRST AMENDED PETITION

MAY IT PLEASE THE COURT:

Now into court, through undersigned counsel, comes Petitioner, BARBARA MEIER, who presents this her *First Amended Petition* against Respondents, Mayhill Hospital, Inc, and United Health Services ("UHS") of Delaware, Inc. for violations more fully described below. Petitioner seeks damages and compensation for the injuries even more fully discussed below. specifically and as may be more completely developed by discovery. Moreover, Petitioner reserves the right to amend or replead if new or additional claims and/or issues arise upon further development of the facts, as permitted by law. In support thereof, Petitioner respectfully represents as follows:

### I . BRIEF INTRODUCTION TO THE CASE

1.    The Respondent United Health Services, Inc. is a national corporation that administers hundreds of behavioral health centers across the country. Over the course of many years they and their affiliates, like the Mayhill Hospital in this case, have been sued by the federal and state governments, insurance companies and private individuals for fraud. Specifically, these parties have developed a pattern and practice to have people admitted to their facilities in Texas, without satisfying threshold legal requirements pursuant to Texas Health & Safety Code, Chapter 164, a violation of the Texas Business & Commerce Code, Chapter 17

(regarding *Deceptive Trade Practices*). Once admitted, the person is kept against their will violating the patient's rights pursuant the *Texas Mental Health*, see Texas Health & Safety Code, Chapters 571-577 with a private cause of action pursuant to Chapter 321. The conspiracy of these Respondents also violates federal law, including but not limited to the *Racketeering Influenced and Corrupt Organizations Act*, 18 U.S.C. §1961-1968 ("RICO") and *Section 504 of the Rehabilitation Act of 1973*, 29 U.S.C. §794 ("Section 504"). Moreover, the acts and omissions of these Respondents likewise violate Chapter 74 of th Texas Civil Practices & Remedies Code, as well as various common law claims, including but not limited to false imprisonment, civil conspiracy, fraud, breach of contact and negligence. As the facts will more fully show below, Petitioner is a victim of such acts and omissions by Respondents, and has viable causes of action, as noted above.

## II. DISCOVERY

2.     Petitioner shows that the amount sought in recovery is in excess of $100,000. Discovery is intended to be conducted under Level 3 of the Texas Rules of Civil Procedure 190.4. Petitioner requests that the court order a Level 3 discovery plan establishing the applicable discovery rules, schedule and deadlines to apply to this case.

## III. JURISDICTION

3.     Petitioner, Barbara Meier, is a resident of and domiciled in Colin County, Texas. The last three digits of Petitioner's driver's license are 594. The last three digits of Petitioner's social security number are 762.

4.     Respondent Mayhill Hospital is a corporation authorized to do business and doing business in the State of Texas with a place of business located in Denton County, Texas.

5.   Respondent UHS of Delaware, Inc. is a corporation authorized to do business and is doing

business in the State of Texas with a place of business located at Universal Corporate Center,

P.O. Box 61558, 367 South Gulph Rd., King of Prussia, PA 19406.

## IV.  VENUE

6.   The acts, commissions and omissions forming the cause of action upon which this petition

is based occurred in Denton County, Texas.  As such, Venue is proper in this Court pursuant

to the mandatory provisions of the Texas Civil Practices and Remedies Code Chapter

15.011.

## V.  PARTIES

7.   Petitioner resides in Collin County, Texas and may be served at 926 Springwood Lane,

Wylie Texas 75098.

8.   Respondent Mayhill Hospital is a corporation chartered by the State of Texas and doing

business in Denton County, Texas.  It has been served with process through its registered

agent Dilip Pranav at 2351 West Northwest Hwy, Dallas, Texas 75220.

9.   Respondent UHS of Delaware, Inc. is a corporation with a principal place of business in the

State of Pennsylvania at Universal Corporate Center, P.O. Box 61558, 367 South Gulph Rd.,

King of Prussia, PA 19406.  In addition it is doing business in Denton County, Texas. It may

be served with process through its registered agent Corporation Service Company doing

business as CSC-Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620,

Austin, Texas 78701-3136.

## VI. **STATEMENT OF FACTS**

A.   ABOUT UHS

10.   Respondent Universal Health Services ("UHS") is an American Fortune 500 company based in King of Prussia, Pennsylvania and is of the largest hospital management companies in the United States, reporting $9.8 billion in sales in 2017 according to Forbes, of which $702 million was profit.

11.   UHS has more than 83,000 employees and through its subsidiaries operates more than 326 inpatient acute care hospitals and behavioral health facilities, and 32 outpatient and other facilities in the United States, Puerto Rico, the U.S. Virgin Islands and the United Kingdom.[1] In fact, UHS is the largest facility-based behavioral health provider [psychiatric facilities] in the U.S. – providing approximately 20% of all inpatient behavioral health services.

12.   In order to effectuate a scheme to increase profits, the UHS have persons that "crunch the numbers" so that every single service provided, becomes a profit center. Further, Administrators and other key personnel at each facility are taught as to how best increase profits for each single service provided.

13.   It starts with admission. Profits are based upon getting people admitted to the facility, whether they need to be admitted or not.

14.   Once there, they are kept in the hospital as long as their insurance pays for the coverage, whether they need to be there or not.

15.   In addition, and commensurate with each individual's particular insurance company coverage, the person's medical record reflects that services were provided, even when they

---

[1]   https://www.linkedin.com/company/uhs

are not, so as to increase profits.

16.    Further, the insurer is billed for services for a certain time period where services are supposedly provided, but it is of a lesser time period.

17.    Insurance coverage is often based upon a system where a patient is given a certain code and payment by the insurer is related to the code. The more intense and severe the need, the higher the reimbursement and accordingly, codes are manipulated to increase profits.

18.    Patients are billed for individual therapy when they are in groups.

19.    Patients are billed for group therapies that are provide by persons not licensed or credentialed to provide such services, again in order to increase profits (because the UHS facility can pay the provider a lower rate than the professional.

20.    Or a service was provided but was billed for more times than it actually was.

21.    Or a service requires a face-to-face contact whether by law, or by insurance carrier requirements, and it is not provided.

22.    Additionally, patients are often billed for diagnostic services, lab services, physician and other medical professional services, medications and other items, even if they have not received such services or items.

23.    Medications are ordered for a person and billed, but never administered.

24.    Medications are billed at a higher rate when the generic drugs are actually administered.

25.    When medications are ordered for a patient but not administered, they are re-used for another patient.

26.    Physicians and other medical professionals are given inducements to increase referrals, increase admissions and increase lengths of stay.

27. The UHS and its member hospitals will enter in joint ventures with physicians, predicated upon increasing referrals, increasing admissions and increasing lengths of stay.

28. Often the UHS will offer a physician or other professional reduced rates in an office building that UHS owns or leases, for the physician to have an outpatient practice. In a related vein, the UHS will provide at a reduced rate or even for free services that the physician would otherwise be required to pay like training, billing services, travel expenses for conferences, insurance

29. The biggest way in which UHS and its affiliates illegally increase profits is by limiting the number of staff available to serve patient needs.

30. In order to effectuate profits the UHS has a pattern and practice of teaching individuals at the various facilities about all the above ways to induce referrals, increase admissions, increase length of stays and manipulate insurance coverage availability in the manners and particulars noted above.

31. In the last decade the UHS and its member facilities have been sued by both the federal government and by dozens of state governments for insurance and health care fraud numerous times. The allegations mirror all the types of fraud noted above.

32. The message clearly is that it better for profits for UHS to continue in their fraudulent ways, and pay the fines and judgments when they occur, then to stop the fraud.

B. ABOUT MAYHILL HOSPITAL

33. Respondent Mayhill Hospital is a private, for profit, psychiatric hospital licensed by the State of Texas, pursuant to the Texas Health and Safety Code, title 7, Subtitle C [Texas Mental Health Code, hereinafter referred to as the MH Code], Chapter 577 [Private Mental

Health Hospitals], Texas Health and Safety Code section 577.001. It is required to follow various rules and standards promulgated by the relevant state regulatory authorities involved in the oversight of such facilities including and specifically related to those laws and regulations regarding the admission of a person to a psychiatric facility.

34.     Among other things Respondents have a duty to follow the requisites of Section 164, Health and Safety Code, Treatment Facilities Marketing Practices Act. Specifically they must fully disclose in writing prior to admission the estimated average daily charge for inpatient treatment to the proposed patient. Further, the proposed patient must receive notice they will be billed separately for services provided by medical staff, certain services and other mental health professionals. Moreover, they must be given the name of the attending physician. Last, prior to admission they must be given a copy of the current "patient's bill of rights." Moreover, after admission, if a patient wants to leave the hospital they cannot be threatened.

C.      ABOUT BARBARA MEIER PRIOR TO ADMISSION

35.     BARBARA MEIER PRIOR TO ADMISSION

36.     Barbara Meier was born on July 12, 1948. She does have a history of depression. She also suffers from Multiple Sclerosis (MS).

37.     During the first half of December 2015, Ms. Meier was experiencing some depression due to the fact she stopped taking her medication for a time period of approximately three weeks.

38.     In and around Friday, December 18, 2015, Ms. Meier's husband Vern took her to see her primary care physician at the Senior Healthcare Clinic in Lewisville, Texas, who recommended that Ms. Meier check herself into a hospital until her medication could get "back on track."

39.    That same day around 7:00 p.m., Ms. Meier *walked* on her own through the doors of Mayhill
       with her husband to assess whether or not this facility would be able to serve her unique and
       individualized needs. At that time she had all her self-help skills and was able to
       independently take care of all her own needs.

40.    Mayhill staff was very quick to admit her. There was no assessment, only paperwork.

41.    Mayhill staff took Ms. Meier's walking cane away from her at this time.

42.    There is nothing in the medical record that evidences anyone from Mayhill spoke to her
       about care or daily routine or schedule.

43.    There is nothing in the medical record that evidences anyone from Mayhill discussed the
       availability of her insurance coverage.

44.    There is nothing in the medical record that evidences anyone from Mayhill informed her of
       the expected daily costs of staying at the hospital or what part of the hospital costs she would
       be responsible for.

45.    There is nothing in the medical record that evidences anyone from Mayhill told her who
       would be the attending physician providing her care.

46.    There is nothing in the medical record that evidences anyone from Mayhill informed Ms.
       Meier that she could be billed separately by the doctors or other medical professionals and
       services at the hospital.

47.    There is nothing in the medical record that evidences anyone from Mayhill verbally advised
       her of the Patient's Bill of Rights.

48.    There is nothing in the medical record that evidences anyone from Mayhill actually provided
       a written copy of the Patient's Bill of Rights nor did anyone have her sign a form stating that

First Amended Petition                                                                              8

she was advised of those rights.

49. Likewise, there is nothing in the medical record that evidences anyone from Mayhill gave Ms. Meier information, either verbally or in written form, on what specific rights she had during an inpatient stay at the hospital under the Mental Health Code.

50. Mrs. Meier was purportedly given a "Pre-Admission Physical Exam" by Dr. Qingguo Tao, M.D., though he was not present at the time the examination was performed.

51. Moreover, she was actually admitted to the hospital and brought back to a locked area, before te examination.

52. Petitioner reasonably believes the examination was a sham.

53. There is nothing in the medical record evidencing she ever agreed to the admission.

54. There is nothing in the medical record evidencing she ever received informed consent as to any of the medications she was prescribed.

D. BARBARA MEIER AFTER ADMISSION

55. On Saturday, December 19th, just one day after being admitted, husband Vern Meier and daughters Cindy and Holly Meier were "stunned" to see a different person brought out by staff for visitation. Ms. Meier was pushed to them in a wheelchair. She was dirty with drool hanging from the side of her mouth and was unable to communicate well. She was also hungry.

56. A nurse spoke with the family and made notes in Ms. Meier's file that, due to her MS, she needed help carrying her food tray, she needed her food cut in bite sizes as well as help with showering.

57. The nurse suggested we bring in more clothes because Ms. Meier's belongings may have

"found feet and walked away."

58. However, many of the family's important questions could not be answered.

59. When asked what medication Ms. Meier was on and if that was the reason she couldn't communicate they were told there was no medication change listed in her file.

60. The nurse also explained that the first of what would be many falls over a four (4) day period.

61. The family was also told that Ms. Meier would not be evaluated until the following Monday, more than 48 hours after she had been admitted.

62. Despite having nervous reservations, the family left feeling a little more comfortable after the nurse promised her needs would be met.

63. There was no visitation on Sunday, December 20th. The family did receive a call from a staff person that Ms. Meier had another fall but "seemed" okay.

64. Monday, December 21st the family arrived at the hospital at 6:00 p.m. for visitation. Ms. Meier finally arrived in the visitation room at approximately 6:45 p.m.

65. She was being pushed in a wheel chair because of her fall history. She still had vomit down the front of her shirt. She told her family that the pills the staff is giving are making her sick.

66. The family remembers that Petitioner was now having problems communicating and that she seemed to be "high" on something because she kept saying over and over again she needed to remember "apple, apple, apple" because if she can, it means "she no longer has dementia."

67. Because of my Ms. Meier's significantly deteriorated state, her husband Vern and daughter Cindy Meier insisted on talking to someone. They eventually were able to speak with a patient advocate named "Brett."

First Amended Petition                                                                                    10

68. The family asked Brett why Ms. Meier was in her current "high" like condition to which he stated that it was because the program was working and her outlook was changing.

69. When they mentioned that Ms. Meier told them she had not seen a doctor nor had an evaluation, they were told by Brett that "just because it wasn't in her folder didn't mean it didn't happen."

70. When they questioned Brett on why Ms. Meier still did not have clean clothes he mentioned it was because she was not following protocol by putting her clothes outside her bedroom door. Apparently, she was supposed to follow this protocol despite repeated falls, being a wheel chair, having limited motor skills, and being highly medicated.

71. The family asked Brett why she had not taken a shower in over three days to which he said it was because she never had walked down to the desk to get her "hygiene bucket."

72. After the ten (10) minute conversation with Brett he promised he would call the family first thing in the morning and give us an update on Mom's condition, though he never did call.

73. On Tuesday, December 21st around 1:30 a.m. Mr. Meier received a call from the hospital stating Ms. Meier had another fall. Staff stated that this fall was a bad one and they would have someone staying with her for the next 24 hours and would be doing x-rays to make sure nothing was broken.

74. At this point Mr. Meier told the nurse he wanted to see his wife first thing next morning but staff only told him it was not a visitation day. He refused to take 'no' as an answer and was finally told he could show up in the morning to try and get a doctor's approval for a visitation. He was informed that the doctor would arrive between 7:00 and 9:30 a.m.

75. Mr. Meier up at around 6:00 a.m. on Tuesday, December 22nd and waited until around 10:00

a.m. before he was allowed to visit with his wife.

76. She had worsened again. At this point both her eyes were swollen with burst blood vessels in both as well as her eyelids. She also a swollen forehead. Mr. Meier requested to talk to her doctor but the request was denied.

77. After seeing Ms. Meier's condition Mr. Meier, who had her Power of Attorney (POA), decided he was going to move her to a new facility.

78. However, Mayhill staff said that the POA was not valid at this point in time.

79. After the family made arrangements to move her to Haven in Frisco, Texas, Cindy Meier called Mayhill and requested to speak to a nurse, social worker, or doctor. She was told all staff were busy and could not take her call. She then stated the family was having her mother transferred and they were coming to get her.

80. Cindy was then quickly transferred to Brett who immediately apologized for not calling her back right away in the morning like he promised. He said things at the hospital got busy and they were not able to update her mother's file.

81. He then said Ms. Meier was doing "great."

82. Cindy told him not to worry about updating her file and that they were just wanting to transfer her to Haven, a facility that deals with 55 or over patients.

83. Brett's attitude then changed drastically. He told Cindy that the family had "no say" on whether Ms. Meier stayed as it was her choice and until she literally spoke the words to staff, nothing could legally be done about transferring her to a new facility legally. Brett then said he would have to get back to the family later in the day.

84. Approximately fifteen (15) minutes later Brett called Mr. Meier and had Ms. Meier on

speaker phone. The phone conversation consisted of Brett telling my Mom what a good job she was doing in different therapy sessions and asking her if everyone was nice to her. He then made several comments about how Ms. Meier didn't want to leave and then proceeded to tell Ms. Meier, "We are treating you good and you like it here. You don't want to leave do you Barb? Your family is trying to take you away!"

85.    Fortunately, despite being heavily medicated Ms. Meier was able to clearly state, "I will go wherever my family wants me to go."

86.    A short time later Cindy called Brett back. This time he said one of Mayhill's attorneys had looked at the POA and confirmed it was for medical and could be used to initiate the transfer.

87.    Nevertheless, Brett went on to say that these transfers "took weeks." In response, Cindy told Brett she had already talked to Haven who informed her that transfers take hours, not days or weeks. She also informed him that Medicare had already approved the transfer.

88.    Ms. Meier arrived at Haven later that night on December 22nd.

E.     BARBARA MEIER AFTER RELEASE

89.    Medical records from Haven show that Ms. Meier was inpatient from December 22 – February 6, 2016.

90.    The records also note that upon arrival at Haven, she was having severe vegetative symptoms and was hearing voices.

91.    Her face remained bruised and her eyes were red from broken blood vessels for over a month after leaving Mayhill.

92.    She had to be wheelchair-bound during her entire inpatient stay at Haven.

93.  Additionally she stayed at Hollymead Rehabilitation Center in Flower Mound, Texas, from February 6 – March 3, 2016, in an effort to regain functions after her falls at Mayhill Hospital.

94.  Over two years later Ms. Meier continues to struggle feeding herself and she never regained the ability to walk with a cane since her stay at Mayhill.

## VII.  VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

95.  Beginning well-before Petitioner's admission to the Mayhill Hospital, and continuing thereafter, Respondent UHS entered into an agreement with Respondent Mayhill, and other co-conspirators, named and unnamed, to commit the offenses of illegal remuneration for patient referrals, and use of the mail or any facility in interstate commerce to promote unlawful activity, in violation of Title 18, United States Code, Section 1952.

96.  In order to induce such referrals, Respondents and others entered into agreements to provide marketing services, including advertising, crisis counseling centers and "1-800 telephone hotlines" to refer patients to Respondent UHS Hospitals and treatment programs throughout the United States, including Texas and including Respondent Mayhill Hospital, to pay that corporation for such services.

97.  Respondents associated together to function as a continuing unit for the common purpose of committing acts of commercial bribery, fraud and insurance health care insurance fraud.

98.  The continuing unit formed by that association in fact constituted a RICO "enterprise" within the meaning of 18 U.S.C. §1961(4) engaged in and affecting interstate commerce.

99.  It was an integral part of the agreement between Respondents and other co-conspirators, named and unnamed, that participating professionals, would receive remuneration, either

directly or indirectly, from Respondents in exchange for the admission of potential psychiatric patients to hospitals operated by Respondent UHS.

100. In addition, it was an integral part of the agreement between Respondents and other co-conspirators that participating professionals would receive remuneration, either directly or indirectly, from Respondents in exchange for the retention of psychiatric patients to hospitals operated by Respondent UHS.

101. UHS, Mayhill, and other facilities, when extending the length of stay of such patients in violation of Texas and Federal Law, the regulations promulgated thereunder and standards set by the Centers For Medicare and Medicaid, knowingly violated such laws of the State of Texas and the United States.

102. It was also an integral part of the agreement between Respondents that parties to the agreement would place long distance telephone calls in interstate commerce, travel in interstate commerce, and cause others to travel in interstate commerce with the intent to promote, manage, establish and carry on these unlawful activities, knowing that such unlawful activity violated the laws of the State of Texas and the United States.

103. During the existence of the agreement between Respondents, the above noted predicate acts, were knowingly committed in order to accomplish the unlawful acts described above.

104. Petitioner was injured by the illegal conspiracy between Respondents and has a private cause of action pursuant to RICO thereby.

## VIII. VIOLATIONS OF THE REHABILITATION ACT

105. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and its implementing regulations require that any program or activity receiving Federal financial assistance may

First Amended Petition                                                                                           15

not discriminate against an otherwise qualified individual with a disability. Programs or activities covered by Section 504 include corporations or private organizations principally engaged in the business of providing healthcare, 29 U.S.C. §794(b)(3). Under the ADA Amendment's Act, the definition of a disability for purposes of the Rehabilitation Act of 1973 conforms to the definitions of disability under the ADA, 29 U.S.C. §705(20)(B).

106. The Respondent is a corporation which is principally engaged in the business of serving individuals with mental health issues, and as such, may not discriminate against a person because of their disability, pursuant to Section 504.

107. The facts as previously described identify Petitioner as a qualified individual with a disability.

108. The facts as previously described demonstrate violations of Section 504 of the Rehabilitation Act, 29 U.S.C. §794 by the Respondent against Petitioner, because of her disability.

109. Such acts, omissions and failures by Respondents, caused injuries to Petitioner.

## IX. VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT

110. Chapter 164 of the Texas Health and Safety Code requires an inpatient mental health facility, like Respondent UHS, to make certain disclosures to a prospective patient before, the prospective patient may be admitted to the facility. Specifically, hospital staff was required to provide Petitioner the following, the availability of her insurance coverage to pay for services, the expected daily costs of staying at the hospital or what part of the hospital costs she would be responsible for; who would be the attending physician providing her care; that she would be billed separately by the doctors or other medical professionals and services at the hospital; notice of Patient's Bill of Rights; a copy of such rights and the duty to obtain

a signature from the prospective patient that she had received such rights. Moreover, once admitted the patient cannot be threatened or mislead about their right to leave the facility. *See* Texas Health & Safety Code §164.009.

111.   Such failures rise to the level of a violation of the *Texas Deceptive Trade Practices Act*, Texas, *see* Texas Health & Safety Code §164.013; Texas Business & Commerce Code, §17.46(b); §17.50(h).

112.   Petitioner seeks treble damages for this cause of action accordingly.

113.   In addition, and unlike the other causes of action noted herein, Petitioner only need show that such acts and omissions of the Respondents was a producing, not proximate cause of the injuries suffered herein.

## X. VIOLATIONS OF THE TEXAS MENTAL HEALTH CODE

114.   Petitioners contend that in addition to, and in the alternative to the foregoing, every one of the various allegations of acts and omissions, separate and apart from the above, and regardless of whether or not the Respondent Hospital is negligent or has acted intentionally as to other theories of recovery, constitutes violations of Petitioner's general patient rights under the Texas Mental Health Code, see Tex. Health & Safety Code, Title 7, Subtitle C, and the 25 Texas Administrative Code; Chapter 404.

115.   In addition, and in the alternative Petitioner contends that her rights pursuant to Title 2, Article 3, Subchapter L, of the Tex. Health & Safety Code, relative to "Abuse, Neglect and Exploitation," and specifically found at the Texas Health & Safety Code § 576.021(5); 25 TAC 404.154(3) and 404.154(24) were likewise violated by Respondents.

116.   In consideration of these various statutory and regulatory violations by the Respondent

First Amended Petition                                                                17

Hospital, pursuant to Title 4, Subtitle G, Chapter 321, § 321.003 of the Tex. Health & Safety Code, Petitioner brings forth a private cause of action predicated upon the violation of her *Patient Rights* by the Hospital Respondent.

117.    The Respondent Hospital, by and through its agents, contractors and employees, failed to provide Petitioner services commensurate with her Patient Rights, which proximately caused injury to Petitioner.

## XI. FALSE IMPRISONMENT

118.    Petitioner alleges that the Respondent Hospital, acting through its directors, officers, employees and agents, and contract services, wilfully admitted Petitioners without following the standards set forth in Texas Health & Safety Code, Chapter 164 and as such her admission to the hospital and subsequent detention was wrongful, without legal authority or justification.

119.    As a direct and proximate result of Respondent's willful, unjustified, and irresponsible detention and confinement of Petitioner, she suffered a loss of her freedom, severe humiliation, embarrassment, fear, frustration and mental anguish.

120.    As a direct and proximate result of Respondent's willful, unjustified and irresponsible detention and confinement of Petitioner she has incurred unnecessary medical expenses and was subjected to unnecessary and unwarranted medical services.

## XII. CIVIL CONSPIRACY

121.    Respondents all met with each other for an unlawful purpose or in addition and in the alternative, a lawful purpose but used unlawful means, and had a meeting of the minds on these unlawful objectives, committed an overt act in furtherance of such objectives and

Petitioner suffered an injury as a proximate result of such wrongful act.

122.    The reason for the conspiracy between the Respondents was to increase profits for both the corporate entity- UHS and the local affiliate- Mayhill Hospital.   In order to effectuate the conspiracy, Respondent UHS provided financial, administrative, and technical support as well as supervision and staff training on how local staff at the Mayhill Hospital could increase admissions and lengths of stay for potential patients, to the financial benefit of both Respondents and to the detriment of patients, like Petitioner in this cause.

123.    Petitioner alleges that the Respondent UHS and the Respondent Mayhill Hospital, acting in concert with each other, and with intent to commit civil conspiracy, and by and through its directors, officers, employees and agents, and contract services, wilfully conspired to admit Petitioner without following the standards set forth in Texas Health & Safety Code, Chapter 164 and violating Section 504 of the Rehabilitation Act of 1973 thereby.

124.    Additionally, Petitioner alleges that the Respondent UHS and the Respondent Mayhill Hospital, acting in concert with each other, and with intent to commit civil conspiracy, and by and through its directors, officers, employees and agents, and contract services, wilfully conspired to treat Petitioner without following the standards set forth in Texas Health & Safety Code, Chapter 571-577 and Chapter 321.

125.    Petitioner further alleges that the Respondent UHS and the Respondent Mayhill Hospital, acting in concert with each other, and with intent to commit civil conspiracy, and by and through its directors, officers, employees and agents, and contract services, wilfully conspired to treat Petitioner without following the standards set forth in Texas Health & Safety Code, Chapter 571-577 and Chapter 321.

First Amended Petition                                                    19

126. Petitioner additionally alleges that the Respondent UHS and the Respondent Mayhill Hospital, acting in concert with each other, and with intent to commit civil conspiracy, and by and through its directors, officers, employees and agents, and contract services, wilfully conspired to falsely imprison Petitioner.

127. As a direct and proximate result of Respondents conspiracy, Petitioner suffered injuries.

128. As a direct and proximate result of Respondents civil conspiracy Petitioner incurred unnecessary expenses.

## XIII. FRAUD

129. Petitioners would further show that the Respondent UHS made false and misleading representations to Petitioner, with the knowledge of their falsity or with reckless disregard to the truth, with the intention that such misrepresentations would be relied upon and acted upon by Petitioners, and she did so, to her detriment.

130. Petitioners would further show that the Respondent UHS concealed or failed to disclose material facts within the knowledge of Respondent, which Respondent knew Petitioner did not have the knowledge of the same, and did not have equal opportunity to discover the truth, and that Respondent intended to induce Petitioner into the transaction made the basis of this suit by such concealment or failure to disclose.

131. As a proximate cause of such fraudulent representations, Petitioner sustained the damages noted herein.

## XIV. BREACH OF CONTRACT

132. Petitioner would further show that the acts and omissions of Respondent UHS, described above, constitute a breach of contract, which proximately cause the direct and consequential

damages noted herein.

## XV. NEGLIGENCE OF THE RESPONDENT HOSPITAL

A.    MEDICAL NEGLIGENCE

133.   Petitioner alleges that the Respondent Hospital, acting through its directors, officers, employees and agents, and contract services, violated the duty of care it owed to Petitioner to exercise that degree of care, skill, supervision, and diligence ordinarily possessed and used by other mental health treatment centers and hospitals, under the same or similar circumstances.

134.   Petitioner alleges that the Respondent Hospital was negligent in their capacity as a health care provider when providing inpatient mental health, such failure a violation of the relevant professional standards for a reasonable and prudent mental health and substance abuse treatment facility operating in Denton County, Texas.

B.    COMMON LAW NEGLIGENCE

135.   Petitioner incorporates by reference all of the above related paragraphs, as well as those below, with the same force and effect as if fully set forth herein.

136.   Petitioner contends that in addition to, and in the alternative to the foregoing, the Respondent Hospital was generally negligent under the common law, in the above referenced respects and particulars.

C.    GROSS NEGLIGENCE

137.   Petitioner would show that the acts or omissions of Respondent complained of above constituted gross negligence. These acts were representative of conscious indifference to the welfare of Petitioner, and as such, she seeks recovery of exemplary damages against

Respondent, by way of example and of punishment in order to discourage future misconduct by those similarly situated to Respondent.

## XVI. INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS

138. The Respondents engaged in conduct and made statements which caused Petitioners severe mental distress and anguish.

139. Such actions and statements were done and made intentionally to cause her emotional distress and anguish, or, alternatively, were made recklessly and with an entire want of care.

140. As a direct and proximate result of Respondents actions and statements, Petitioner has endured shame, embarrassment, humiliation and mental anguish in an amount within the jurisdictional limits of this Court.

141. Respondents intentional infliction of emotional distress upon Petitioner was done intentionally, with an entire want of care, and with conscious indifference to the rights and welfare of Petitioner.

## XVII. PROXIMATE CAUSE

142. Each and every, all and singular of the foregoing acts and omissions, on the part of the Respondents, jointly and severally, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XVIII. RATIFICATION

143. The Respondents have ratified the acts, omissions and customs of all their administrators, personnel, professional and nonprofessional and staff. As a result, these Respondents are responsible for the acts and omissions of all those persons thereby. These Respondents are

First Amended Petition

22

further jointly and severally liable for the negligent acts and omissions of its employees,

contractors and agents, under the doctrine of <u>Respondeat</u> <u>Superior</u>.

## XIX. DAMAGES

144. As a direct and proximate result of the Respondents' conduct, Petitioner has suffered injuries

and damages, which he may seek compensation thereby, all within the jurisdictional limits

of this court, including but not limited to the following:

145. Mental anguish in the past;

146. Mental anguish in the future;

147. Physical pain in the past;

148. Physical pain in the future;

149. Loss of consortium in the past;

150. Loss of consortium in the future;

151. Past medical expenses;

152. Future medical expenses;

153. Disfigurement in the past;

154. Disfigurement in the future;

155. Past economic losses;

156. Future economic losses;

157. Out-of pocket costs;

158. Loss of opportunity.

159. By reason of the above, the subject of this lawsuit, Petitioner has suffered losses and

damages in a sum within the jurisdictional limits of the Court and for which this lawsuit is

brought.

## XX. <u>EXEMPLARY DAMAGES</u>

160. Further, that the above-described conduct of Respondent was willful and malicious especially in regard to the illegal detention and false imprisonment of Petitioner.

161. Moreover, the above-described conduct of Respondent was willful and malicious as the intent to provide hospital care to Petitioner was not based upon Petitioner's clinical needs but rather the self-serving financial needs of the Respondent.

162. As a result, she is entitled to recover exemplary damages to deter such cruel and improper conduct in the future. Respondents actions caused Petitioner suffering of immeasurable dimensions, as well as significant expenses, including those enumerated above, and attorneys' fees incurred in the investigation and prosecution of this action. Accordingly, Petitioner requests that exemplary damages be awarded against Respondent's in a sum sufficient to deter similar future actions by them and those similarly situated.

## XXI. <u>ATTORNEYS FEES AND COSTS</u>

163. Further, that the above-described conduct of Respondent was willful and malicious especially in regard to the illegal detention and false imprisonment of Petitioner.

164. It was necessary for Petitioner to hire the undersigned attorneys to file this lawsuit. Upon judgment, Petitioner is entitled to an award of attorney fees and costs pursuant to the Rehabilitation Act, 42 U.S.C. § 2000d et seq. and Chapters 164 and 321 of the Texas Health & Safety Code and Chapter 17 of the Texas Business & Commerce Code.

## XXII. <u>DEMAND FOR A JURY TRIAL</u>

165. Pursuant to Federal Rule of Civil Procedure 38(b), Petitioner demands a trial by jury of all

issues triable of right by a jury pursuant to his rights as guaranteed by the Seventh

Amendment to the United States Constitution and by corresponding provisions of state law.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Petitioner prays for judgment against

Respondents in the manner and particulars noted above, and in an amount of damages adequate to

fully and completely compensate her for the injuries and damages suffered including but not limited

to treble damages, attorney fees and costs incurred pursuant to Section 504 and Chapter 164 of the

Texas Health and Safety Code; together with pre- and post-judgment interest, court costs and just

other relief as the Court may deem just and proper in law or in equity.

> Respectfully submitted,
>
> Cirkiel & Associates, P.C.
> /s/ Martin J. Cirkiel
> Mr. Martin J. Cirkiel, Esq.
> State Bar No.: 00783829
> 1901 E. Palm Valley Boulevard
> Round Rock, Texas 78664
> (512) 244-6658 [Telephone]
> (512) 244-6014 [Facsimile]
> marty@cirkielaw.com [Email]

## CERTIFICATE OF SERVICE

This is to certify that a copy of the above and foregoing pleading has been transmitted to the following counsel and parties in accordance with the Texas Rules of Civil Procedure including electronic filing and notice in addition to those methods of notice shown below:

Dilip Pranav
2351 West Northwest Hwy
Dallas, Texas 75220
REGISTERED AGENT FOR RESPONDENT MAYHILL HOSPITAL

UHS of Delaware, Inc.
Corporation Service Company DBA CSC-Lawyers Incorporating Service Company
211 E. 7th Street, Suite 620
Austin, Texas 78701-3136
REGISTERED AGENT FOR RESPONDENT UHS OF DELAWARE, INC.

*s/Martin J. Cirkiel*

Martin J. Cirkiel, Esq.