IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| BARBARA MEIER; MADISON HOUGH; | § | |
| JASON HOUGH; GOVINDA HOUGH; | § | |
| TIFFANY YOUNG; SANDRA STOKES; | § | |
| YOLANDA MCPHERSON; TROY HARVEY; | § | |
| BILL CROWELL; DIANE CREEL; | § | |
| LYNN CREEL; AND JALISA GREEN | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 4:18-cv-00615-ALM |
| | § | |
| UHS OF DELAWARE, INC.; | § | |
| UNIVERSAL HEALTH SERVICES, INC.; | § | |
| MAYHILL BEHAVIORAL HEALTH, LLC; | § | |
| SABAHAT FAHEEM; | § | |
| KENNETH CHAD ELLIS; | § | |
| MILLWOOD HOSPITAL LP; | § | |
| SEJAL MEHTA; GARY MALONE | § | |
| BEHAVIORAL | § | |
| HEALTH MANAGEMENT,  LLC | § | |
| D/B/A BEHAVIORAL HOSPITAL OF | § | |
| BELLAIRE; JAMAL RAFIQUE; | § | |
| HICKORY TRAIL HOSPITAL, LP; | § | |
| UNIVERSAL PHYSICIANS, P.A.; | § | |
| DR. SAYS LLC; MD RELIANCE, INC.; | § | |
| OFFICEWINSOME, LLC; | § | |
| YU-PO JESSE CHANG; | § | |
| QUINGGUO TAO; TIMOTHY TOM; | § | |
| HARMANPREET BUTTAR; | § | |
| YUNG HUSAN YAO; | § | |
| BEHAVIORAL HEALTH CONNECTIONS, | § | |
| INC.; WENDELL QUINN; | § | |
| JAN ARNETT, | § | |
| | § | |
| *Defendants*. | § | |

---

## PLAINTIFFS' SECOND AMENDED ORIGINAL COMPLAINT

---

COME NOW, Plaintiffs BARBARA MEIER; MADISON HOUGH; JASON HOUGH; GOVINDA HOUGH; TIFFANY YOUNG; SANDRA STOKES; YOLANDA MCPHERSON; TROY HARVEY; BILL CROWELL; DIANE CREEL; LYNN CREEL; AND JALISA GREEN (collectively, "Plaintiffs") and file this Second Amended Original Complaint against Defendants UHS OF DELAWARE, INC.; UNIVERSAL HEALTH SERVICES, INC.; MAYHILL BEHAVIORAL HEALTH, LLC; SABAHAT FAHEEM; KENNETH CHAD ELLIS; MILLWOOD HOSPITAL LP; SEJAL MEHTA; GARY MALONE; BEHAVIORAL HEALTH MANAGEMENT, LLC D/B/A BEHAVIORAL HOSPITAL OF BELLAIRE; JAMAL RAFIQUE; HICKORY TRAIL HOSPITAL, LP; UNIVERSAL PHYSICIANS, P.A.; DR. SAYS LLC; OFFICEWINSOME, LLC; YU-PO JESSE CHANG; QUINGGUO TAO; HARMANPREET BUTTAR; TIMOTHY TOM; MD RELIANCE, INC.; YUNG HUSAN YAO; BEHAVIORAL HEALTH CONNECTIONS, INC.; WENDELL QUINN; and JAN ARNETT ("Defendants").  In support thereof, Plaintiffs state the following:

### SUMMARY

1.      This case was initially filed on December 8, 2017 in Denton County state court by Plaintiff Barbara Meier against Mayhill Hospital, an acute care hospital specializing in mental health services.  See Dkt. No. 6.  On August 1, 2018, Meier amended her state court petition to name UHS of Delaware, Inc. as a defendant and asserted 12 causes of action relating to her four-day stay at Mayhill in December 2015.  See Dkt. No. 7.  Because Meier alleged violations of federal statutes, UHS of Delaware, Inc. removed the suit to this Court on August 28, 2018.  Dkt. No. 3.  On October 1, 2018, new counsel appeared for Plaintiff and filed an amended complaint to name eight new plaintiffs and 21 new defendants.  Dkt. No. 11.  The primary claim in Plaintiffs' amended complaint is violations of the RICO statute.  Namely, Plaintiffs allege that

Defendants engaged in racketeering activities and conspired to fraudulently admit and detain patients in four hospitals.  Plaintiffs also allege, in the alternative, violations of the Rehabilitation Act, violations of the Texas Deceptive Trade Practices Act, violations of the Texas Mental Health Code, false imprisonment, civil conspiracy, respondeat superior, negligence, gross negligence, and sexual exploitation by mental health services providers.  Plaintiffs seek RICO damages for injury to property or business, actual damages, exemplary or punitive damages, attorneys' fees and costs, treble damages under the RICO statute, and personal injury damages. Plaintiffs also asked for relief in equity and have disclosed that they intend to seek disgorgement under RICO.

2.       Plaintiffs timely made their disclosures under Rule 26(a)(1). Plaintiffs have produced over 11,000 pages of documents in an attempt to produce the information referenced on page 4 of the Court's Order Governing Proceedings. Plaintiffs, with exception of the newly-added Plaintiffs, have provided Defendants with their authorizations described in Local Rule CV-34. Plaintiffs anticipate additional supplementation of material as the case progresses.

3.       Apart from the one additional Defendant that has been added, all Defendants timely made their disclosures under Rule 26(a)(1). However, Plaintiffs have requested and are still awaiting production of the materials and information referenced in the Defendants' initial disclosures. A significant amount of information has been requested and Plaintiffs have been told that the information will be forthcoming, but that information has not been produced. Plaintiffs have requested dates for multiple depositions, and they have not been provided any dates. Apart from medical records from the Hospital Defendants and records produced by the Chang Defendants, Plaintiffs have not received any additional materials referenced on page 4 of the

Court's Order Governing Proceedings from any of the Defendants but have discussed this matter with the Defendants' counsel yet the documents have not been produced.

4.      In this Second Amended Original Complaint, there are three additional Plaintiffs: Diane Creel, Lynn Creel, and Jalisa Green; and there is one additional Defendant: Timothy Tom.

## I.
## PARTIES

5.      Plaintiffs are individuals and citizens of the state of Texas, who reside in various Texas counties.

a.  Plaintiff Barbara Meier resides in Wylie, Collin County, Texas.

b.  Plaintiff Madison Hough is an individual residing in Denton, Denton County, Texas.

c.  Plaintiff Jason Hough is an individual residing in Red Rock, Bastrop County, Texas.

d.  Plaintiff Govinda Hough is an individual residing in Red Rock, Bastrop County, Texas.

e.  Plaintiff Bill Crowell is an individual residing in Pearland, Brazoria County, Texas.

f.  Plaintiff Troy Harvey is an individual residing in Arlington, Tarrant County, Texas.

g.  Plaintiff Yolanda McPherson is an individual residing in Mansfield, Tarrant County, Texas.

h.  Plaintiff Sandra Stokes is an individual residing in Carrollton, Denton County, Texas.

i.  Plaintiff Tiffany Young is an individual residing in Mansfield, Tarrant County, Texas.

j.  Plaintiffs Diane Creel and Lynn Creel are individuals residing in Fort Bend County, Texas.

k.  Plaintiff Jalisa Green is an individual residing in Dallas County, Texas.

6.      Defendant UHS of Delaware, Inc. has appeared, answered, removed this case to federal court, and has filed a motion to dismiss.

7.     Defendant Universal Health Services, Inc. ("UHS") has waived service, appeared, and filed a motion to dismiss.

8.     Defendant Mayhill Behavioral Health, LLC ("Mayhill") has waived service, appeared, and filed a motion to dismiss.

   a.  Defendant Sabahat Faheem has waived service, appeared, and filed a motion to dismiss.

   b.  Defendant Kenneth Chad Ellis has waived service has waived service, appeared, and filed a motion to dismiss.

9.     Defendant Millwood Hospital LP ("Millwood") has waived service, appeared, and filed a motion to dismiss.

   a.  Defendant Sejal Mehta has agreed to waive service but has yet to appear. Plaintiffs serve this Second Amended Original Complaint by and through her attorneys, Stan Thiebaud, Thiebaud Remington Thornton Bailey LLP, Two Energy Square, 4849 Greenville Avenue, Suite 1150, Dallas, Texas 75206.

   b.  Defendant Gary Malone has been served, has appeared, and has filed a motion to dismiss.

10.    Defendants Universal Physicians, P.A.; Dr. Says LLC; MD Reliance, Inc.; Officewinsome, LLC are all companies that are the alter ego of Defendant Yupo Jesse Chang (the "Chang Defendants").

   a.  Defendant Yupo Jesse Chang operates a number of businesses out of a residential address in the neighborhood of Tanglewood, City of Houston, Harris County, Texas. He is listed on the staff at Millwood as someone who does patient intakes, but what occurs is that he, along with other doctors, generate reports for Millwood and other

UHS hospitals that allow the other defendants to illegally detain and bill citizens of the state of Texas and/or their payors (private health insurance, Medicare, Tricare, etc.) to make money. All Defendants in the immediately preceding paragraph have been served with process or have waived service, have appeared, and have filed a motion to dismiss.

b.  Defendant Yung Husan Yao is a notary who works for Yupo Jesse Chang and assists in the enterprise to generate false preadmission assessment reports and other documents used to unlawfully detain Texas citizens in facilities owned and operated by UHS and its affiliates. She has been served with process or has waived service, has appeared, and has filed a motion to dismiss.

c.  Defendant Quingguo Tao has been served with process or has waived service has appeared, and has filed a motion to dismiss.

d.  Defendant Harmanpreet Buttar has been served with process or has waived service, has appeared, and has filed a motion to dismiss.

e.  Defendant Timothy Tom is an individual residing in the state of Nevada who works with the Chang Defendants. He is licensed to practice medicine in the state of Texas and is engaging in business in the State of Texas within the meaning of Section 17.042 of the Texas Civil Practice and Remedies Code.  He committed a tort in whole or in part in the State of Texas and caused injury to a Texas resident. Upon information and belief, Timothy Tom has had continuous and systematic contacts with the State of Texas and has contracted with Texas residents over multiple years. He may be served with citation at his last known address, 1840 CLAUDINE DR, LAS VEGAS NV 89156-7102.

11.     Defendant   BEHAVIORAL   HEALTH   MANAGEMENT,   LLC   D/B/A BEHAVIORAL HOSPITAL OF BELLAIRE (BHB) has waived service, has appeared, and has filed a motion to dismiss.

    a.  Defendant Jamal Rafique is the medical director for BHB. He has waived service, has appeared, and has filed a motion to dismiss.

12.     Defendant Hickory Trail Hospital, LP has waived service, has appeared, and has filed a motion to dismiss.

13.     Defendant Behavioral Health Connections, Inc. has waived service, has appeared, and has filed a motion to dismiss.

    a.  Defendant Jan Arnett has waived service, has appeared, and has filed a motion to dismiss.

    b.  Defendant Wendell Quinn has waived service, has appeared, and has filed a motion to dismiss.

## II.
## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over the Defendants. This court has subject matter jurisdiction over this suit based on federal question jurisdiction and removal jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1441. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States because this action alleges violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964, and violations of Section 504 of the Rehabilitation Act (as amended), 29 U.S.C. §§ 794, 794a. This court has subject matter jurisdiction under Texas Health and Safety Code Section 576.001, which extends the protections of the laws and Constitution of the United States

to people in mental health care facilities. This Court has supplemental subject matter jurisdiction over the claims that do not raise a federal question.

15.     Venue is proper in this District under 28 U.S.C. § 1391 (a)–(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District. This Court has RICO venue over all Defendants under 18 U.S.C. § 1965 because each defendant resides, transacts his affairs, or has an agent in this district.

16.     At all times relevant to these claims, Defendants had continuing and systematic contacts with the State of Texas and this judicial district by delivering services and products into the stream of commerce with the expectation that they would reach the State of Texas and this judicial district.  Further, Defendants had minimum contacts with Texas and this judicial district and were doing business in Texas and this judicial district by, among other things, distributing, marketing, and selling their services and products to residents of the State of Texas and this judicial district.  Plaintiffs' claims arise from such contacts and business.

### III.
### CONDITIONS PRECEDENT

17.     All conditions precedent to Plaintiffs' right to recover the relief sought herein have occurred or have been performed.

### IV.
### FACTUAL SUMMARY

18.     UHS is an American Fortune 500 company based in King of Prussia, Pennsylvania. UHS is one of the largest hospital management companies in the world.

19.     Defendants Mayhill, Millwood, Hickory Trail, and BHB (collectively, "Hospital Defendants") are mental health facilities owned and operated by UHS. Not unlike an all-

inclusive hotel, these facilities charge by the day. The longer someone stays at one of these facilities, the more money is charged.

20.     Defendant Behavioral Health Connections, Inc. ("the Connection") is a wholly owned subsidiary of UHS. UHS utilizes the Connection as a dispatch company, whereby a representative of the Connection personally visits a prospective patient and coordinates the intake of that patient to a UHS-owned facility. Part of that process involves securing a Preadmission Assessment, which is better explained in the following paragraph.

21.     Defendants Universal Physicians, P.A.; Dr. Says LLC; MD Reliance, Inc.; and Officewinsome, LLC are all companies that are the alter ego of Defendant Yupo Jesse Chang. These defendants generate or facilitate the generation of preadmission assessments to meet a legal requirement so that a person can be admitted to one or more UHS facilities. These defendants also generate sworn documents via a notary, Defendant Yung Husan Yao, that are filed with courts to obtain detention orders. The documents are not actually witnessed. This system enables an ability to place and keep people in UHS facilities, whether they need to be there or not. Interviews that are purported to occur really don't occur and are a sham to secure the admission of a patient into a UHS facility or to keep a patient in a UHS facility.

22.     Defendants Jamal Rafique, Gary Malone, Sejal Mehta, and Sabahat Faheem. Are facility doctors. They are sued in their capacity as medical directors.

23.     Through the use of coordinated document generation efforts using the mail and wires, UHS and its affiliates have developed a pattern and practice to have people admitted to its facilities in Texas without satisfying threshold legal requirements. This coordinated effort operates as a criminal enterprise, in that it involves the ongoing and repeated violation of a number of state and federal laws.

24.     The enterprise works to admit people to facilities, whether they need to be admitted or not. Then, once admitted, the enterprise goes to extraordinary lengths to ensure that a patient is kept as long as a payor will pay or, upon suspicion and belief, until such time as a replacement patient or set of patients can be obtained. In furtherance of this scheme, admission documents are forged; documents to secure that a patient will remain in a facility are falsely notarized and then filed into the state court system; and, in some cases, a person's medical record is written to reflect that services were provided or that certain events occurred, when, in fact, they did not occur.

25.     The enterprise uses intimidation, manipulation, and fear via personnel employed or working at the facilities or under the ostensible agency of the facilities to keep voluntary and involuntary patients from leaving the facilities. Here we are talking about doctors, nurses, counselors, social workers, and technicians.

26.     Further, upon information and belief Defendants seek to improperly boost profits in some of the following ways:

a.   Insurers are improperly billed for services that require a specific amount of face to face time, but those services are not provided;

b.   Insurance coverage is often based upon a system where a patient is given a certain code and payment by the insurer is related to the code.  The more intense and severe the need, the higher the reimbursement and accordingly, codes are manipulated to increase profits;

c.   To effectuate a scheme to increase profits, UHS has persons that "crunch the numbers" so that every single service provided becomes a profit center;

d.  Further, Administrators and other key personnel at each facility are taught how to best increase profits for each single service provided;

e.  Patients are billed for individual therapy when they are in groups;

f.  Patients are billed for group therapies that are provide by persons not licensed or credentialed to provide such services, and in this way, a UHS facility can pay a technician a lower rate than it would pay a licensed professional;

g.  Services are provided but are billed to reflect that the services occurred more times than it actually did occur or a service may require a face-to-face contact whether by law, or by insurance carrier requirements, and it is not provided;

h.  Patients are billed for diagnostic services, lab services, physician and other medical professional services, even if they have not received such services or items;

i.  Physicians and other health care workers are given inducements to increase referrals, increase admissions and increase lengths of stay;

j.  UHS and its affiliates will enter in clandestine joint ventures with physicians, predicated upon increasing referrals, increasing admissions and increasing lengths of stay;

k.  UHS will offer a physician or other professional reduced rates in an office building that UHS owns or leases, for the physician to have an outpatient practice;

l.  UHS will provide, at a reduced rate or even for free, services that the physician would otherwise be required to pay like training, billing services, travel expenses for conferences, and insurance;

m. UHS and its affiliates increase profits by limiting the number of staff available to serve patient needs in such a way to understaff its facilities;

n. To amplify profitability, UHS engages in a pattern and practice of teaching individuals at its various facilities about these and other illicit ways to induce referrals, increase admissions, increase length of stays and manipulate insurance coverage availability in the manners and particulars noted above and more fully described in this lawsuit and as will be more fully developed at trial;

27.     In the last decade, UHS and its affiliates have been sued by both the federal government and by dozens of state governments for insurance and health care fraud, some of which is mirrored in the preceding paragraph. UHS prefers to pay a fine rather than stop the abusive practices, because it is better for business.

28.     Some detailed allegations of UHS's wrongdoing are compiled at http://uhsbehindcloseddoors.org/, and the websites of various US Attorneys' offices, including the Western District of Texas,  and the contents of those websites are incorporated herein as if set forth in full.

**BARBARA MEIER**

29.     Barbara Meier ("Ms. Meier") was born on July 12, 1948.  She does have a history of depression.  She also suffers from Multiple Sclerosis (MS).

30.     Her statute of limitations has been tolled and continues to be tolled as a result of her disability.

31.     During the first half of December 2015, Ms. Meier was experiencing some depression because she stopped taking her medication for about three weeks.

32.     In and around Friday, December 18, 2015, Ms. Meier's husband, Vern, took her to see her primary care physician who recommended that Ms. Meier check herself into a hospital until her medication could get "back on track."

33.     That same day, around 7:00 p.m., Ms. Meier *walked* on her own through the doors of Mayhill with her husband to assess whether or not this facility would be able to serve her unique and individualized needs. At that time, she had all her self-help skills and was able to independently take care of all her own needs.

34.     Mayhill quickly admitted Ms. Meier and failed to perform any assessment on Meier prior to her admission, apart from some paperwork.

35.     Mayhill staff then took possession of Ms. Meier's walking cane.

36.     There is nothing in the medical record that evidences anyone from Mayhill spoke to her about care or daily routine or schedule.

37.     There is nothing in the medical record that evidences that anyone from Mayhill discussed the availability of her insurance coverage.

38.     There is nothing in the medical record that evidences anyone from Mayhill informed her of the expected daily costs of staying at the hospital or what part of the hospital costs she would be responsible for.

39.     There is nothing in the medical record that evidences anyone from Mayhill told her who would be the attending physician providing her care.

40.     There is nothing in the medical record that evidences anyone from Mayhill informed Meier that she could be billed separately by the doctors or other medical professionals for services at the hospital.

41.     There is nothing in the medical record that evidences anyone from Mayhill verbally advised her of the Patient's Bill of Rights.

42.     There is nothing in the medical record that evidences anyone from Mayhill actually provided a written copy of the Patient's Bill of Rights nor did anyone have her sign a form stating that she was advised of those rights.

43.     Likewise, there is nothing in the medical record that evidences that anyone from Mayhill gave Meier information, either verbally or in written form, on what specific rights she had during an inpatient stay at the hospital under the Mental Health Code.

44.     Meier was purportedly given a "Pre-Admission Physical Exam" by Defendant Quingguo Tao, M.D., though he was not present at the time the examination was performed. Moreover, she was actually admitted to the hospital and brought back to a locked area, before the examination. Meier reasonably believes the examination was a sham.

45.     There is nothing in the medical record evidencing that she ever agreed to the admission.

46.     There is nothing in the medical record evidencing she ever received informed consent as to any of the medications she was prescribed.

47.     On Saturday, December 19th, just one day after being admitted, husband Vern Meier and daughters Cindy and Holly Meier were "stunned" to see a different person brought out by staff for visitation.

48.     Ms. Meier was pushed to them in a wheelchair. She was dirty, with drool hanging from the side of her mouth and was unable to communicate well. She was also hungry.

49.     A nurse spoke with the family and made notes in Ms. Meier's file that, due to her MS, she needed help carrying her food tray, she needed her food cut in bite sizes, and needed help with showering.

50.     The nurse suggested that the family bring in more clothes because Ms. Meier's belongings may have "found feet and walked away."

51.     However, many of the family's important questions could not be answered.

52.     When asked what medication Ms. Meier was on and if that was the reason she couldn't communicate, they were told there was no medication change listed in her file.

53.     The nurse also told the family about the first of what would be many falls over a four (4) day period.

54.     The family was also told that Ms. Meier would not be evaluated until the following Monday, more than 48 hours after she had been admitted.

55.     Despite having nervous reservations, the family left feeling a little more comfortable after the nurse promised her needs would be met.

56.     There was no visitation on Sunday, December 20th. The family did receive a call from a staff person that Ms. Meier had another fall but "seemed" okay.

57.     On Monday, December 21st, the family arrived at the hospital at 6:00 p.m. for visitation. Ms. Meier finally arrived in the visitation room at approximately 6:45 p.m.

58.     Ms. Meier was pushed into the room in a wheel chair. She wore a vomit-stained shirt. The family remembers that Ms. Meier was now having problems communicating and that she seemed to be "high" on something. Ms. Meier told her family that the pills the staff provided were making her sick, and she kept repeating that she needed to remember "apple, apple, apple," because if she could, it would mean that "she no longer has dementia."

59.     Because of Ms. Meier's significantly deteriorated state, her husband Vern and daughter Cindy Meier insisted on talking to someone. They eventually were able to speak with a patient advocate named "Brett."

---

60. The family asked Brett why Ms. Meier was in her current "high" like condition, to which he stated that it was because the program was working and her outlook was changing.

61. When they mentioned that Ms. Meier told them she had not seen a doctor nor had an evaluation, they were told by Brett that "just because it wasn't in her folder didn't mean it didn't happen."

62. When they questioned Brett on why Ms. Meier still did not have clean clothes, he mentioned it was because she was not following protocol by putting her clothes outside her bedroom door. Apparently, she was supposed to follow this protocol despite repeated falls, being in a wheel chair, having limited motor skills, and being highly medicated.

63. The family asked Brett why she had not taken a shower in over three days to which he said it was because she never had walked down to the desk to get her "hygiene bucket." Brett promised to call the family and follow up the next day, but he never did.

64. On Tuesday, Mr. Meier received a call from the hospital stating Ms. Meier had another fall.  Staff stated that this fall was a bad one, and they would have someone staying with her for the next 24 hours and would be doing x-rays to make sure nothing was broken.

65. At this point, Mr. Meier told the nurse he wanted to see his wife first thing next morning, but staff told him it was not a visitation day. He refused to take 'no' for an answer and was finally told he could show up in the morning to try and get a doctor's approval for a visitation, which he did.

66. She had worsened again.  Her eyes, eyelids, and forehead were swollen with burst blood vessels. Mr. Meier requested to talk to her doctor, but that request was denied.

67. After seeing Ms. Meier's condition, Mr. Meier, who had her Power of Attorney (POA), decided he was going to move her to a new facility.

68.     However, Mayhill staff said that the POA was not valid.

69.     After the family made arrangements to move her to Haven in Frisco, Texas, Cindy Meier called Mayhill and requested to speak to a nurse, social worker, or doctor. She was told all staff were busy and could not take her call.  She then stated the family was having her mother transferred and that they were coming to get her.

70.     Cindy was then quickly transferred to Brett who immediately apologized for not calling her back right away in the morning like he promised. He said things at the hospital got busy, and they were not able to update her mother's file.

71.     He then said Ms. Meier was doing "great."

72.     Cindy told him not to worry about updating her file and that they just wanted to transfer her to Haven, a facility that deals with 55 or over patients.

73.     Brett's attitude then changed drastically.  He told Cindy that the family had "no say" on whether Ms. Meier stayed, as it was Ms. Meier's choice. Mayhill's position was that unless and until Ms. Meier literally spoke the words to staff, nothing could legally be done about transferring her to a new facility.  Brett then said he would have to get back to the family later in the day.

74.     Approximately fifteen (15) minutes later, Brett called Mr. Meier and had Ms. Meier on speaker phone.  The phone conversation consisted of Brett telling Ms. Meier what a good job she was doing in different therapy sessions and asking her if everyone was nice to her. He made several comments about how Ms. Meier didn't want to leave and then proceeded to tell Ms. Meier, "We are treating you good and you like it here. You don't want to leave do you Barb? Your family is trying to take you away!"

75.     Fortunately, despite being heavily medicated, Ms. Meier was able to clearly state, "I will go wherever my family wants me to go."

76.     A short time later, Cindy called Brett again. This time, Brett said one of Mayhill's attorneys had looked at the POA and confirmed it was for medical and could be used to initiate the transfer.

77.     Nevertheless, Brett went on to say that these transfers "took weeks."  In response, Cindy told Brett that she had already talked to Haven, and the facility informed her that transfers take hours, not days or weeks.  She also informed Brett that Medicare had already approved the transfer.

78.     Ms. Meier arrived at Haven later that night on December 22nd.

79.     Medical records from Haven show that Ms. Meier was inpatient from December 22 – February 6, 2016. The Haven records also note that upon arrival, she was having severe vegetative symptoms and was hearing voices.

80.     For over a month after leaving Mayhill, her face remained bruised, and her eyes were red from broken blood vessels from the repeated falls at Mayhill. During her entire inpatient stay at Haven, she was wheelchair bound.

81.     Additionally, Ms. Meier stayed at Hollymead Rehabilitation Center in Flower Mound, Texas, from February 6 – March 3, 2016, in an effort to regain functions after her falls at Mayhill.

82.     Barbara Meier has RICO damages in that she sustained an injury to her personal property as a proximate cause of Defendants' RICO violations. Her cane was taken and never returned. Her clothes were taken, and they were never returned. She had to pay money out of pocket as follows: 4/6/16 $1,260.00 check #2444 Mayhill; 5/31/16 $38.51 Bret Bentz Mayhill.

Medicare paid Mayhill $8,600. To the extent that property damage is recoverable for subsequent care:  Dec 22-Jan 5 $18,200.00 Medicare paid; Jan 5-31 $16,450.00 Medicare paid. Barbara Meier paid out of pocket an additional approximately $150.00 out of pocket.

83. Over two years later, Ms. Meier continues to struggle feeding herself, and she never regained the ability to walk with a cane since her stay at Mayhill.

## THE HOUGH FAMILY CASE

84. Madison Hough was a college freshman at TWU. Madison's roommate was going through a gender transformation and falsely reported that Madison attempted to overdose on ibuprofen. Madison was taken from TWU to Medical City Denton.

85. From Medical City Denton, Madison rode in an ambulance across the street to Mayhill.

86. Madison got off the gurney from the ambulance at Mayhill. Madison immediately went into intake, with Mayhill staff telling her that she was being admitted, despite her saying, "no" and that she "wanted to go home."

87. Evidently, Mayhill was so desperate to fill an empty bed that Madison was admitted into the geriatric unit, despite being a college freshman.

88. At Mayhill she was informed that the psychiatrist would not be there until the morning, and there was no medical doctor there that night to help her. Mayhill staff said, "Stay here while we get stuff ready."

89. In the meantime, her parents drove up to Mayhill from Bastrop County. Her parents were able to meet with Madison before she left, but her parents were placed under the false impression that Madison was on a 24-48 hour hold, so they both thought that it was mandatory that she stay there.

90.     Once her parents left, Madison went through some doors and was stripped down naked and touched, without her consent, under the guise of looking for things she was hiding. She was on her period at that time, and she was told she had to squat and push down, even though she was on her period and had no sanitary napkins to replace what she currently had. In response, the Mayhill staffer basically shrugged her shoulders and said, "this is what we need to do."

91.     She was not given her bill of rights until after the strip search, and only one of 4 pages were provided to her.

92.     Although the receptionist behind the desk told Madison's mother that a toothbrush, toothpaste, towels, and pads would all be provided to her, none of this was provided by Mayhill.

93.     Phone calls could only be made in the hallway. No cell phones were allowed. There was no door to the bathroom and no door to the bedroom. It was a coed floor, she was in a room by herself, but she was concerned about the male who kept coming in at night.

94.     She could hardly sleep at night because there would be screaming in the middle of the night from people, and the nurses would just scream back at them. She could not understand all the voices and all the yelling.

95.     She did complain, "You're not giving me meds, why am I here?" Yet, she was afraid to even say that, but she did, and the medical records don't reflect that she was taking any medications.

96.     In Mayhill, she felt like she had no power and no say in anything.

97.     She repeatedly asked to go home verbally, but was told that if she signed a request for release, she would be placed on a 24-hour hold and she could be there 3 weeks to 90 days.

98.     However, Madison did end up requesting to leave AMA. When she filled out her AMA form, she was being watched by the Mayhill staff. She wrote some positive things because the Mayhill staff were right there watching her fill out the document.

99.     Nevertheless, Defendant Chad Ellis stated that he was going to call Dr. Faheem to put her on a 24-hour hold for her filling the form out. There was no 24-hour hold placed on her, but she was still kept in the facility.

100.     Defendant Chad Ellis has a lengthy criminal history, including convictions for evading arrest, police chase, theft, felony forgery and several DWIs. In fact, Defendant Chad Ellis had failed a drug test a matter of days prior to Madison's experience at Mayhill. Chad Ellis was the head nurse at Mayhill.

101.     A trained peace officer, Mr. Hough helped her daughter to escape from Mayhill. The incident was captured on video, and was the subject of some media attention.

102.     As a result of Madison's escape, Mayhill did everything it could in its power to harm the Hough family, including a malicious prosecution. In fact, Madison's medical records were forged and a "late entry" was made to make an attempt to show that the hospital had the right to detain Madison.

103.     The state investigation found that the Hough family's claims were substantiated. The prosecution of Mr. Hough was dropped. The hospital failed to ensure that the notice of rights requirements was met for Plaintiff Madison Hough. The hospital failed to discharge Madison within four hours after a physician signed the discharge order at 0900. Through observation of the hospital video footage, Madison Hough did elope the facility at 1400, due to the hospital failing to discharge the patient with the assistance of her family.

104.    But irreparable harm has been done to this family. As a result of her experience with Mayhill, Madison felt that she was not safe at TWU. She really did not feel safe with anyone other than her brother or her parents. She left TWU and moved to Galveston where her brother was residing.

105.    Madison Hough has RICO damages in that she sustained an injury to her personal property. Her feminine hygiene products were taken. She had to pay out of pocket $214. She was forced to move to Galveston. She was unable to go back to a semester of school that was already paid for.

106.    Govinda Hough has RICO damages in that she sustained an injury to her personal property. She purchased items for Madison, provided those items to Mayhill, but those items were never provided to Madison. Her vehicle sustained $1,800 in hail damage while at Mayhill because Mayhill would not let her go out to move her car on Sunday March 26, 2017. More specifically, the Hough family's out of pocket expenses include: Travel to Mayhill (first time) $250.00; Day's Inn 3/25/17 $84.74; Hilton Garden Inn 3/26/17 - 3/28/17 $579.37; Misc. expenses 3/25/17 - 3/27/17 $487.93; Travel Miles to Retrieve items at Mayhill       $250.00; Mortgage Attorney fees to save their house $3,600.00. Govinda's Lost income $67,666.00; Out of Pocket Medical Expenses 2017: $1,898.31; Out of Pocket Medical Expenses 2018 $2,430.15.

107.    Jason Hough has RICO damages in that he sustained an injury to his personal property and business as a proximate cause of Defendants' RICO violations. Defense Attorney fees for Jason $8,500.00; Bail Bond for Jason $350.00; Hours Job Suspension for Jason $2,757.10. Hours of OT and Off Duty loss $10,000.00. Travel Miles for Jason's Defense: $1,000.00; Hotel for Court Appearance Dates $289.68; 12 Days missed Work for Jason $4,135.56. Jason Hough sustained an injury to his personal property and business. Jason Hough

had to incur attorney's fees to defend against a malicious prosecution. This nearly cost Mr. Hough his job. In fact, he was placed on administrative duty, required to sit out for a significant number of hours, was not allowed to work overtime, and could not carry a gun. Although he was tackled at Mayhill, the loss of compensation was not caused by a personal injury. He wanted to work, but he was not allowed to work as a proximate cause of the RICO violations not of any injury to his neck or back.

108.    Nevertheless, the Hough family sustained personal injuries. The family has been devastated by what happened to them at Mayhill.

### SANDRA STOKES

109.    She has two degrees from the University of North Texas where she graduated *summa cum laude* each time. She has been a successful statistician. In fact, she worked for banking giant, Citi, for eight years prior to transitioning into a role as a private consultant in 2014.

110.    On May 14, 2017, she walked into the ER at Baylor Carrollton with a complaint of altered mental status. She felt anxiety over work as well as a recent job change. She had personality changes. Her behavior had been erratic with compulsive internet shopping, misplacing items, leaving oven or stove on, doors open. She had a history of a car crash and a mirror hitting her head in the previous month. She presented with an unsteady gait, insomnia, and mismanaging her medications.

111.    She was not suicidal.

112.    In fact, a UHS-owned facility that is not a party to this lawsuit refused to accept her based on unsteady gait, altered mental status, and the potential to accidentally hurt herself that was not related to being suicidal.

113.     After an assessment, Ms. Stokes eventually agreed to go voluntarily to Mayhill.

114.     At Mayhill, Ms. Stokes denied any suicidal intent at intake but was deemed to be at a high risk for a fall.

115.     Ms. Stokes reported that her confusion was clearing up.

116.     Indeed, the following day, she requested to leave Mayhill. She signed an AMA form. She reported that the conditions at Mayhill as cold, a little dirty, and "no rails on bed."

117.     Rather than discharge her after four hours, she was kept against her will.

118.     Rather than being at home and safe, she fell and hit her head in Mayhill.

119.     After the fall at Mayhill, Stokes was discharged to a different medical facility in Denton with no explanation provided in the medical records.

120.     Stokes spent the next fifteen days in the hospital. She developed a seizure disorder. She then underwent significant medical treatment and multiple hospitalizations. She is not the same.

121.     Sandra Stokes sustained RICO damages in that she was damaged in property and business as a proximate cause of Defendants' RICO violations. Total losses: $119,750. Health Care Deductibles 2017 $6,000, 2018 $6,000; Ambulances: Mayhill to Denton $1,600; Athens to ETMC $1,500; Carrollton To Lewisville $1,450; Lewisville to Carrollton $1,600 Loss on sale of 2017 Acura $13,000. Loss of Income: Annual income prior to Mayhill was $130,000 per year.

### YOLANDA MCPHEARSON

122.     Yolanda McPhearson went to the ER.

123.     A representative from the Connection was dispatched to the ER. That representative was Defendant Wendell Quinn who recommended Millwood.

124.    Prior to sending Yolanda McPhearson to Millwood, an ER doctor allegedly spoke to Defendant Hermanpreet Buttar who was represented to be with Millwood.

125.    Millwood is in North Texas.

126.    Defendant Buttar resides near Houston.

127.    Defendant Buttar signed a report where she performed a preadmission assessment at the ER, but Defendant Buttar was never at the ER.

128.    Upon information and belief, Defendant Buttar worked with Defendants Universal Physicians, P.A.; Dr. Says LLC; MD Reliance, Inc.; Officewinsome, LLC and Defendant Yupo Jesse Chang to generate false documents to secure Ms. McPherson's admission into Millwood.

129.    Yolanda McPherson was sent to Millwood.

130.    At Millwood, the admission documents were not signed by McPhearson, who was on the phone with her husband. Instead, the admission documents were signed by an employee of Millwood. She was never given a bill or rights and never signed a voluntary admission form.

131.    At Millwood, Yolanda McPherson was intimidated and forced into a voluntary commitment.

132.    At Millwood, Yolanda McPherson made repeated verbal requests to leave for 9 consecutively days to leave the facility. But they failed to release her until the 9th day. Eventually, McPherson was able to get her husband to help her to get out.

133.    Prior to her leaving, they required her to sign a promissory note stating that she would pay all charges not covered by insurance.

134.    Mrs. McPherson did not see a psychiatrist until less than 24 hours prior to her discharge.

135.     Although she was there voluntarily, she was treated like a prisoner. She was strip searched, bed checks were 15 minutes throughout the night, and she was unable to even sleep. She had to sleep with the door open. There was a lot of noise outside including arguments and fights among individuals.  She went into the group sessions, and everyone's full name patient-wise is on a door. Conversely, the staff's names are just an initial, there are no full names for the staff yet that courtesy of confidentiality is not extended to the patient.

136.     Yolanda McPherson sustained RICO damages in that she was damaged in property and business as a proximate cause of Defendants' RICO violations. She had to pay a hundred dollars before she was allowed to leave the facility, and she was forced to sign a promissory note to pay all charges not covered by insurance. (¶123). The amount that Millwood says she still owes them is $3,531.20. While in the facility, she was unable to perform her job tutoring, which paid her $95 per day. Her total lost wages related to Millwood equals $1,520.00.

137.     Yolanda McPherson continues to suffer from the experience at Millwood.

**T**ROY **H**ARVEY

138.     Troy Harvey was born on June 3, 1965.

139.     He served in the United States Air Force from 1986 to 2013, including service in Afghanistan.

140.     He is a teacher and a coach at Mansfield ISD.

141.     He had an operation on his knee in the past. He experienced knee pain in September of 2016, and he was prescribed a Medrol doespak. On 09/20/2016, Mr. Harvey filled a prescription for methylprednisolone 4 mg prescribed by Joseph Berman, MD. On that same date, he was also given Naproxen 500 mg.

142.     After Mr. Harvey had taken the methylprednisolone, he began to have problems at work and abruptly quit his job. The concern was that the methylprednisolone led to his mental changes.

143.     On October 3, 2016, Mr. Harvey visited the ER at USMD hospital.

144.     A representative of the Connection was dispatched to the ER. That representative was Defendant Jan Arnett, who recommended Millwood.

145.     Defendant Jan Arnett lists that she is the intake coordinator for Millwood on her LinkedIn, although this was never disclosed to Mr. Harvey.

146.     Mr. Harvey believed that he would only be at Millwood for 24 hours and that he could leave at any time, but that was not true.

147.     Mr. Harvey first requested to leave on 10/04/2016 at approximately 8:30 a.m. This request was written.

148.     Mr. Harvey was not released until 10/05/2016 at 1:30 p.m. He states that he visited the hospital with the intention of voluntarily admitting himself. He wanted them to do a 24-hour observation.

149.     Mr. Harvey was not verbally advised of the Patient's Bill of Rights but was provided with a written copy, which he did sign.

150.     Mr. Harvey's assessment process was deceptive or misleading. He was told that he would have his own room and that after he saw a doctor in the morning he could go home, and that simply was not the case. No one had mentioned a 24-hour hold or observation.

151.     He feels he was threatened by Dr. Malone, the psychiatrist, by inferring that if he left the insurance company would not pay his bill or that he would be secluded. Also, if he left AMA, he would have to be held for 7 to 10 days.

152.    Mr. Harvey took contemporaneous notes while in the custody of Millwood. His notes for October 3rd reflect that he thought he would just be there 24 hours to allow the additional time for the medicine that he had been taking to leave his system. Around midnight on October 3'd going into October 4th, he was woken up and told he was moving to another room where he would share a room because they needed the empty room, but he spent part of the night in the day room.

153.    On October 4, he could not have any of his questions answered, even though he asked. He had no idea how his day was supposed to work and where he was supposed to be, but his questions were ignored. It was the other patients who helped show him around. Eventually, he was able to get his wife to help him from the outside.

154.    He had requested prior to his meeting with Dr. Malone to fill out an AMA request. When he saw Dr. Malone around 11:00 a.m. on Tuesday, they were together no more than 10 minutes. Dr. Malone continued to cut him off and tell the patient that he thought it was the medication, but that there was a more serious issue as to why he was in the hospital.

155.    Dr. Malone also said that Mr. Harvey had attempted suicide multiple times, which was completely incorrect and not part of his past medical history. He felt Dr. Malone was being a bully. He told him his options and said that if he requested to leave, that he could either stay for 7 to 10 days at Millwood or he could proceed with the AMA, which would lead to a 24-hour hold, a judge placing him involuntarily, and that he had one hour to rescind the "AMA request." Mr. Harvey did rescind it because he was not sure what the doctor was capable of doing to him.

156.    His records reflect a discharge date of 10/05/2016 and the reason for discharge as AMA. It also states that he would be going home to his family and being driven by his wife.

157.    Rather than get better at Millwood and be watched for 24 hours, he was subject to a hostile environment. After his experience at Millwood, Mr. Harvey missed 6 weeks of work and suffered severe panic attacks. His medical record is also permanently stained by a false diagnosis of Bipolar disorder.

158.    Troy Harvey has RICO damages in that he sustained an injury to his personal property and business as a proximate cause of Defendants' RICO violations. He had to pay no more than $500 in out of pocket money for costs directly associated with RICO. He missed six weeks of work. Additionally, his medical records were injured. They diagnosed him with bipolar disorder, which was false, and the doctor explained multiple suicide attempts that never occurred.

## TIFFANY YOUNG

159.    In early November 2017, Tiffany Young spent three days at Hickory Trail Hospital in DeSoto, Texas. Staff physician leadership on the Hickory Trail website reflects Rajinder Shiwach, MD, Medical Director; Farida Ali, MD; Shahzad Allawala, MD; and Kusi Fordjour, MD.

160.    Ms. Young is a real estate investor. She is married and has 3 children.

161.    During the first week of November 2017, she was very busy at work getting ready to put houses on the market that she was flipping. Her oldest son ran away from home. They found him later that night, but it was extremely stressful for her. She said she hadn't slept in several days.

162.    During the night, she was having chest pain and numbness in her chin and pain in her shoulder. She got out of bed and went to Arlington Memorial Hospital without telling her husband, because she just felt like something was wrong. She arrived at Arlington and they did

an EKG which she said was normal, and they took her right back since she said she thought she had chest pain. She said someone came in to talk to her and asked if she had stress, and she said she had tremendous stress in her life. This person asked if she had thought about ending her life. She said her reply was, "If you're going to honest, I'm sure everyone has at one point or another. And I never have had a plan of what I would have done, but if I would have done it, I would have done it today. But instead I came here for help."

163.    Another person came in to talk to her.

164.    Someone came in to give her something for sleep in the emergency room and she said it knocked her out. When she woke up, there was a male bearded gentleman who asked her questions about her mental health. She answered, "No, I do not want to end my life. Yes, I am depressed. Yes, I want help." He asked if she wanted inpatient or outpatient, to which she was thinking staying the night in the hospital here at Arlington would be fine so she said she wanted to spend the night. She said she thought it would be heavenly to have uninterrupted sleep for an entire night.

165.    She said she slept a long time and then EMS came to the hospital to take her to where she was going. She asked to go home. She was essentially told, "No, sorry, no, you're going to the hospital." By this time, she had been able to call her husband who came to the emergency room. He said he wanted to leave with his wife but was told she going to take the ambulance to DeSoto.

166.    She arrived in Desoto at Hickory Trail and her husband followed EMS to this facility. She walked into the facility herself. Her husband was not there yet. Upon arrival at Hickory Trail she was put in a plain room that was a lockdown room. She said she told the people at the hospital, the people in EMS the ambulance, as well as the check-in person at the

reception area, and the intake person lady—all of them—that she had changed her mind, she wanted to go home, she did not want to go to or stay at Hickory Trail.

167.    But she was clearly in a locked room. Her husband at some point was told, "No, you can't get her out of here. This is a locked facility." Someone answered the husband's question, "No, it's not against the law, but you can't leave."

168.    The next thing she knows, she's going down a hall to a locked facility and saying goodbye to her husband. They took her purse. They cut zippers and strings out of all her clothes. She started to cry when she realized what type of facility she was in.

169.    Two workers came into what was going to be her room. They had the door wide open and performed a strip search. The entire time she was crying as she was very modest and not used to being naked in front of strangers. The staff also had the door wide open. The staff said they had to keep the door open to watch other people as well.

170.    The hospital has insufficient staff if they cannot simultaneously search someone and watch a hallway full of people.

171.    They strip searched her and put their hands in places that she did consent to be touched. She was extremely concerned during this time, as this was a coed facility with men walking up and down the hall. Standing naked, she could see the men there, which she believes means the men could see her as well. She asked to see a physician.

172.    They told her, "No, you're going to have to wait 24 hours. That is our policy and you are staying here." One patient befriended her and told her she had to get control of herself or they were going to count it against her, so she did. Someone told her that she was in this part because the census was low in the other part, and she was in the part with the addicts and homeless people. It was only she and one other person that had insurance and a home. She said

there were 12-15 folks in this section. The other girl that was there had very deep cuts in her wrists.

173.    She was extremely uncomfortable. They took her bra because it had an underwire in it, and they forced her to wear sheer gown with no bra.

174.    She went with a group to the cafeteria because she said she didn't want anything to eat, but someone told her it would be held against her. So she ordered something to eat and a girl came up to her and looked at her and said that she "must be cold." Apparently, the other person was inferring that because Ms. Young didn't have enough clothing on, the other person could see goose bumps on her body in various places that would normally be covered with a bra. This same lady came up to her and started playing with herself while looking at Tiffany.

175.    There was also a man there that continued to make passes and was aggressive towards her. This occurred throughout her entire stay.

176.    She ate and then went outside because they made everyone go outside for a smoke break even though she did not smoke. She said it was very cold this time of the year. No one had coats, and they were freezing. They weren't allowed to separate the group in half because they had to watch the staff altogether, so everyone had to go out in the cold together. When she got back in, she asked to have her clothing back because she was so cold. She got some of it back but it was all cut up.

177.    She went to bed that night and she was sharing a room with a sweet lady that was addicted to meth. She went up to close the door and her roommate said, "No, you cannot do that. They won't let you do that."

178.    Tiffany went to the nurse to explain that she wanted to close the door, and the nurse said you have to keep it open. She gave Tiffany a pill to sleep, and she went to sleep. In the

middle of the night, a man was in her room with a flashlight looking under her covers. It woke her up out of a sound sleep.

179.    She still had not seen any doctors by the next day. She went to two or three group sessions a day and then they had group play like with games. They couldn't even play Pictionary because that required a pencil. They wouldn't allow her to have pen or paper. They did not give her a toothbrush, just some type of makeshift item to clean her teeth with. That day there was an incident with the prostitute on the unit having sex with a schizophrenic and it put the hallway in a frenzy while the staff was trying to take care of that.

180.    The man that was bothering her was still bothering her every day.

181.    When she finally saw a doctor she told him, "I do not belong here. I do not know what happened." She said "I'm a Sunday School teacher. I work. I own my own business. I have my own family." The doctor said she tested positive for amphetamines and she couldn't even imagine how that could be.

182.    She wanted to be released because her 8 year old was leading chapel in the morning at his school. The doctor said he could not let her go. He said you will stay another night and it may be as long as 2 weeks. She tried to give the doctor the name of her son's counselor who she was going to counseling with that was running away from home, or names of character witnesses, and he declined to take any of that information or contact any of those individuals.

183.    She said you can make one phone call at night on the hall phone. They tried to limit the calls to 5 minutes each because so many people want to make a phone call. There were 2 phones in the hallway. Her husband told her that that night her middle son and oldest son got in a fight. Her middle son blamed the older son because of the mom being in the hospital, and the

older son was so upset he ran away again. She went to bed thinking her son was missing. It wasn't until the next morning that she was told that he was at a grandparent's house and he was actually alright.

184.   The second full day in the facility, she went to a counselor named Lemeita, who told her and kept asking her, "Why are you here?" She also said she wanted to help her get out of there. Tiffany said that she made a call and they asked the husband to tell the staff that he would be responsible for Tiffany in order for her to be released. This was noted in the notes but the physician did not approve, and she was just going to have to spend another night at the facility.

185.   That night, a media piece on psychiatric facilities came on TV and they all watched it, including the staff.

186.   She asked to leave the next day and was told that "If you do that, you'll be in here even longer." She said that there was someone there named Lameeka, who said, "Nope, you're going to be here longer if you do that." On this day, another RN called a case manager, who came up, and he told her she shouldn't be in there. She felt like she could speak frankly to him and he is the one that told Tiffany that they closed the other facility because they didn't have enough census and that's why she was in this facility. The case manager read paperwork to Tiffany that said that she stated to someone that she was going to slit her wrists in the shower or come here for help. That is not in the context of what she actually said.

187.   She wanted the doctor to speak to her and she stood at the counter, but he would never speak to her and never acknowledged her. There was an unwritten rule you could not speak to the doctor. The doctor could only speak to you.

188.     In the group sessions, they never talked about addiction or depression or anything. Basically, they just gave people more meds and more meds. There was just no help to cope that was provided. She feels like this is a broken system.

189.     The Patient's Bill of Rights was posted in the room but only in Spanish.

190.     She asked at least 12 times to be released—she asked every person she came in contact with, including the person that opened the door for the smoke breaks.

191.     She asked for an AMA release form, and she never got the form.

192.     She saw patients with tracks and didn't understand what tracks were, and just couldn't believe she was in this environment.

193.     Only after seeing a special on mental health facilities produced by WFAA and with the persistence and support of her family leveraging a number of resources was she able to leave.

194.     She was really affected by the horrible conditions of the facility. She brought clothes and cigarettes up to the facility after her stay because she felt so badly for these individuals with no family. It is a wonder how people ever get out without the support of family.

195.     Tiffany Young has RICO damages in that she sustained an injury to her personal property and business as a proximate cause of Defendants' RICO violations. Her clothes were taken from her and damaged. She was also unable to perform her work as a real estate investor, and this injury is at least $500.00.

196.     Unbeknownst to her until her records were produced in this lawsuit, Quingguo Tao says he performed a preadmission assessment on her to get her admitted into the facility. But that never actually occurred.

**BILL CROWELL**

197.    Crowell was held at BHB. Crowell reported what happened to him to the Texas Department of Health and Human Services. Crowell was informed that all of the allegations that he made in his report were substantiated.

198.    In the fall of 2014, Crowell's health began to fail. Ultimately, it was discovered that his lower back was in the process of a slow disintegration. He has been and continues to be disabled because of his back. He has undergone three prior back surgeries. When he found out that his beloved daughters were not going to be coming to Thanksgiving dinner, in a moment of desperation, he sent some tweets, which referred to his despondent state. This led to his arrest into protective custody.

199.    His wife came home from shopping, and he was having a tear-filled discussion in the living room. He was angry and hurt and needed her terribly. She was helping. He did not have any weapons at hand, he had not stated that his ideation was immediate.

200.    However, he was told that, because he had health insurance, they were trying to place him in a hospital for further treatment. He was taken to BHB. He was held in isolation in Unit 4.

201.    He was called into an examination room where he was interviewed by a young, female doctor, who asked cursory questions about his health but did not perform an examination. She asked for a list of medications and he recited to the best of his ability from memory. He informed her that his wife had secured his firearms, had contacted his psychiatrist, and that they were waiting for him to be released back to their custody and care. He was under the assumption that she would determine that any crisis was over and that he would be returned to his wife and to the care of his own psychiatrist. But that was not to be the case.

202.     When going through the list of medications, he disclosed that he was prescribed Norco for severe back pain - that it was prescribed by a pain-management specialist who was working with his back surgeon and that he was in the midst of receiving a series of spinal injections and anticipating yet more surgery. Indeed, he had had a spinal injection on October 23.

203.     She promptly informed him that Dr. Rafique, the medical director, has a policy of not allowing opioids for all patients admitted to BHB. She would enter the information, but he would remove them from his treatment during his time at BHB.

204.     BHB is divided into a number of "units," and each unit appeared to have a specific population. Unit 4 had people who are suffering from serious mental impairments and some of whom are physically violent. It is a loud and unnerving place to be if one is a quiet introvert, like Crowell.

205.     He was 3 days into this ordeal, and in extreme back pain.

206.     The next morning he was interrogated by Defendant Jamal Rafique, the medical director. Dr. Rafique saw that he had taken anti-anxiety medications as well as pain killers and immediately diagnosed him as a drug addict. Rafique refused listen to any medical history, dosing instructions or any other piece of information.

207.     Seizing upon the moment of the opioid epidemic, Rafique diagnoses him as an addict and determines that he will detox him for his own good. Knowing that insurance is not likely to reject coverage for this, the intent was to keep Crowell for as long as possible under the pretext of addiction, despite the fact that he had not taken a single pain killer in the past three days, has never had an addiction, and initially was admitted for situational depression.

208.     Rafique examined Crowell's insurance benefits and then informed him that he was keeping Crowell for 8 days to detox off the anxiety medication and the pain killers. Nothing

was said about Crowell's depression on the day in question. Nothing was asked about his physical condition. Crowell attempted to convey the medical information to Rafique, but it fell on deaf ears.

209.    It became clear to Crowell that he was being used as a raw-material in an insurance racket. The standard of care for suicidal discussion is treatment of about 3 days' time and release back to family when out of imminent danger. There was no medical or psychiatric reason for incarcerating him for more than 3 days, and he had already been incarcerated for over 3 days.

210.    Crowell knew that the only way he could escape was through the front door and with Dr. Rafique's signature. The following week became a test of wills. Rafique called him into the office each morning. Rafique would yell at him and call him an addict, and Crowell would reply that  he was not.

211.    Subsequently, he was presented with paperwork indicating that he would owe BHB $910 in coinsurance payments. Crowell considered himself under duress.

212.    BHB is very much a prison. The security features are impressive. There is little in the way of natural sunlight in the Units. The windows are frosted with only a few inches of clear glass at the very top so it is not possible to assess what is beyond them. The doors have both heavy-duty latches and extremely powerful magnetic locks tied to a card-key system. The "beds" are plywood boxes with a top of 4" of foam rubber encased in vinyl. They are secured firmly to the wall and floor. This place of rest caused massive amounts of pain on his back.

213.    Each room has a bathroom with a toilet, sink, and shower. The sink is activated with a timer and dispenses only cold water. The shower has hot water when available and the spray hit him squarely in the chest.

214.    The orderlies want everyone out in the day-room. This is a larger room that is brightly lit with florescent lights and with rigid chairs and "love seats" around a large, flat-screen TV. Said TV is kept running from 7AM to 10PM and is kept loud. There is a defined routine of being awakened, going to the cafeteria for breakfast, going for a smoke break (despite being a nonsmoker it is the only chance to be outside), watching more TV, participating in "group therapy" sessions where one's attendance is mandatory for release. There is lunch, more smoke breaks and then evening dinner. It is a sad monotony. In all the time Crowell was there, he spent a total of 20 minutes speaking with a counselor.

215.    There was a "group" meeting in the day-room area of Unit 8 with one of the staff. She explained some of the mechanics of the system. She discussed the admission papers and our "rights." One of our enumerated rights is called the "4 hour letter." This is a letter composed to the doctor stating that you wish to be evaluated within a 4 hour window and released if you were OK. He and other patients were told that writing said letter is not a good thing.

216.    During his stay, he was pursued by a female. She kept telling him that he had "pretty eyes" and otherwise made sexual advances at him. He was careful not to provoke her by responding strongly as she would explode into a tirade at the slightest perceived offense. She kept placing her body in "sexy" positions attempting to get his attention. He brought this up with each of the duty nurses for several shifts to no effect.

217.    He finally obtained paper and a golf pencil and wrote a letter to Defendant Rafique stating that he was dealing with violent people and was being sexually harassed. He submitted this letter to nurse Tonya. He asked for a copy of it for his own records. He repeatedly asked for his copy and has yet to receive it. Finally, he was informed that he would be moved to Unit 8, and he was told to keep quiet and not tell anyone.

218.     The means of communicating with the outside world is extremely limited. There is 1 shared telephone right near the TV set. The TV is on from 7AM until 10PM, and everyone has to share it. It is impossible to have a private conversation, and yet Crowell becomes entirely dependent on people on the outside for assistance.  He resolved to simply observe and wait for his insurance benefits to run out and to make the best of the time there. He spoke with other people and helped them cope with a difficult situation.

219.     Crowell witnessed what happened in this facility if one requested to sign a 4-hour letter. If one sends a 4-hour letter to Dr. Rafique, he immediately goes to a judge to have one kept involuntarily.

220.     Crowell believes that BHB is committing insurance fraud on an industrial scale. This extends to Medicare, and he submitted a complaint to the Center for Medicare and Medicaid Service Inspector General's office.

221.     Crowell believes that a proper investigation will find that the stays are a function of insurance benefits, that fees are most likely substantially overcharged, and that people's lives are being ruined by fraudulent diagnosis codes. Had he admitted to Dr. Rafique of being an "opioid addict," this would be on his permanent record and would damage him for years to come.

222.     One has to wonder about the interaction of Dr. Rafique with the courts. He finds it surprising that the 4-hour letter appears to come with a bench warrant in all cases. Again, he believes that further investigation is warranted.

223.     Upon information and belief, Millwood and Mayhill have similar practices and rates of detention upon the submission of a 4-hour letter.

224.     Crowell spent the past 30 years as an analyst, programmer and developer of practice management and electronic health records systems. He has been the CTO of two

technology firms and has sat on the ANSI Standards committee for electronic health claims. His last post in healthcare was as the Senior Professional Claims Analyst for Novant Medical Group where he was responsible for the processing of claims for 1400 doctors. Being able to analyze the BHB operation for an entire week was extremely revealing to him.

225.    BHB and Rafique irreparably damaged him. He was nearly killed by gross negligence. He was given antidepressant medication without his informed consent. His legal rights were denied. He was deprived of necessary and lawfully prescribed medications by board-certified specialists. He suffers nightmares from the experience, and his wife has suffered greatly at the injustices inflicted upon him.

226.    Crowell was threatened by personnel at BHB, and was discouraged to requesting a letter to leave the facility. Crowell witnessed a 100% warrant rate for the people who sought to leave the facility under a 4 hour letter.

227.    Bill Crowell has RICO damages in that he sustained an injury to his personal property and business that were proximately caused by Defendants' RICO violations. Crowell was billed for coinsurance in the amount of $910. He is out of pocket $74.01 in priority mail fees related to correspondence regarding his stay. His medical records were damaged when he was diagnosed as a drug addict. He wrote a note and asked to get a copy, and it was never provided. Crowell observed Medicare fraud, which he has standing to assert as a taxpayer.

### DIANE CREEL & LYNN CREEL

228.    Diane Creel and Lynn Creel are wife and husband. Lynn Creel is an American small business owner; his wife Diane works for his business in sales. Dianne Creel was held at BHB. She reported what happened to her to the FBI and the U.S. Department of Health and

Human Services and was interviewed in person by Special Agent Brady Ipock. She was informed that all the allegations that she made were substantiated.

229.    In the summer of 2017, Diane Creel was undergoing a period of depression following the sudden and dramatic death of a friend and co-worker. She felt some guilt over the death. The man died in a hit and run traffic wreck on the way to work on a Sunday, while covering for Diane and Lynn while they took a weeks' vacation to celebrate Diane's birthday. Diane felt that had they not gone on the trip, Don would still be alive.

230.    On Friday, August 4, 2017, Diane determined that it was a day that she needed to take off from work.

231.    Home Depot Credit called the Creel residence looking for a past due payment. Diane wasn't in the mood to put up with a rude collection agent and told the lady that they would be paid in full from the insurance settlement resulting from Diane killing herself by taking a bunch of pills and wine. The lady on the other end of the phone line could not know that this was not a serious threat, so shortly after Diane ended the collection call, the Sugar Land police were knocking on the front door. As the Police arrived for the wellness check, Diane was on the phone with Lynn telling him about the Home Depot call. When she told him that the police were there to check on her, he immediately left the office and headed to the house. By the time Lynn arrived, EMS had arrived to assess Diane's mental state. They explained the situation to the police and paramedics. After checking Diane's vitals and mental state, they agreed that she was not a threat to herself or others. They offered to take her to the closest hospital, Methodist, to see about getting some grief counselling, but the Creels opted to check out Memorial Hermann on their own, as that is where her insurance was based.

232.     The whole experience had left Diane shaken, and she decided that she wanted to pursue some group grief counselling in addition to her weekly therapy sessions. They went to the Memorial Hermann ER to see what services they offered. Once checked into the ER, she was given a tox screening and seen by the attending Resident. The tox screen came back clean. The Resident decided to schedule a telemedicine consult. It took hours to get this in place, but again, the counselor proclaimed Diane no threat to herself or others and they were released without treatment or instructions. Unfortunately, what they did find was that Memorial Hermann no longer provided psychiatric care, so the visit was nonproductive. It did however, prove that Diane had not taken any pills or alcohol and had not attempted to harm herself.

233.     On Saturday, Diane went about her normal weekend activities of shopping and visiting estate sales without incident.

234.     On Sunday, August 8th, Diane Creel spoke to her daughter-in-law, who is a psychiatrist at Stanford University and recommended that she seek outpatient grief counseling. Dianne and her husband found a link to Behavioral Hospital of Bellaire from her insurance list. It stated that it had group grief counselling, and the website talked extensively about women only group therapy. It appeared to be exactly what she was looking for so they decided to go check it out.

235.     At BHB, they were shown back through locked doors to an empty waiting area. Nurse Christine McDonald came to speak to them.  Diane Creel explained they were there to inquire about the out-patient grief counseling.   McDonald repeatedly tried to get Diane to admit to having "suicidal ideation" and strongly pushed for Diane to consent to being voluntarily admitted for inpatient care, but they told McDonald that they didn't feel the program she was

pushing was acceptable. After a time, the Creel's determined that this may not be the right place and told McDonald they were leaving.

236.    McDonald excused herself to "make a few phone calls". When she returned, she informed them that she had gotten an emergency detention order for Diane and that she would be admitted involuntarily. They were both distraught by this news. Diane had been freezing the entire time they were in the intake room, so they unlocked the door for Lynn to go to the car and get a jacket for Diane. When Lynn returned to the building, he was told that he could not go back to see Diane and that he needed to leave.

237.    What actually happened was that McDonald called the head of the hospital, Colby Wright, and the Head of the Psychiatric Unit, Jamal Rafique. Rafique ordered McDonald to "admit patient involuntarily". Furthermore, a doctor named Timothy Tom in Las Vegas, Nevada, was provided by the Chang Defendants. Timothy Tom filled out an 8-page report that verified that he did a 15-minute interactive audio video assessment of Creel and signed a request for Involuntary Emergency Detention Warrant that was notarized by Yung Husan Yao and filed with a court. Diane Creel never had any contact with Timothy Tom.

238.    Creel refused to sign intake papers, and the nurse put down Patient refused to sign. She was taken against her will and held at the hospital for 6 days. She was physically taken back through doors, and when the man came to get her, it was the first time that she realized there were men in the hospital. She understood that it was a woman-focused hospital. As the man took me down the hall we passed a group of men that they had stand to the side of the wall, it was like they were a chain gang, and not to be trusted to even move while I was in the hall with them. After she was ushered past them, she went through another door, and it felt completely unsafe. It was very loud; there was a lot of yelling and a person walking around dazed. She

started crying and was distraught. While she cried and screamed "where is my husband", no one answered.  Diane Creel found a phone on the wall and called 911 several times only to be told that there was nothing they could do.

239.    After a time, they told her that if she calmed down, they would take her to another unit of all women.  At a point Diane Creel was transferred and brought to a room, where they wished to do a strip search, which Diane Creel refused.   The rooms were so cold that her teeth were chattering, but they said that she could only have a blanket if she consented to the strip search.  Hours later they provided her 2 blankets.  During the night, Diane Creel had to use the toilet, not finding one and no staff around she located a cup and proceeded to use the cup, but urine spilled out over the top.  There was a sink in the hall where Diane Creel was able to dispose of the urine and found paper towels to clean the floor.

240.    Morning came and a Dr. Jamal Rafique came to speak to her.   He was rude, cold and uncaring.  He belittled the death of her friend with a shrug of his shoulders.   He told her that he anticipated keeping her at least 30 days.    He asked why she was on Clonazepam (a Benzodiazepine), and she told him it was prescribed for her R.E.M. Disorder.  Rafique told Diane Creel that a barbiturate was found in her blood, and that he was putting her on a Detox program for drugs and alcohol.    The barbiturate was the prescribed tablet of Fiorinal for migraines that she took on Friday.    No other drugs were found in her system nor was any alcohol.  Diane Creel became very upset with Rafique.

241.    Requests for another doctor, requests for second opinion, and requests for transfer to another hospital were all disregarded.  Diane Creel was denied her medication regimen. Rather than titration, they stopped them all abruptly. She became sick, had diarrhea and nausea and was unable to eat. The temperature was held at a very low level, requiring patients to wear layers of

clothes to keep modestly warm. At a point her blood pressure rose to 197/115, and little was done to help with this. The next day they had a doctor come in and prescribed to me some BP medication. One dose, and I was unable to walk across the floor, they never gave me another, and had her sit and drink water the remainder of the day.

242.     There were women in the unit who appeared they needed to be hospitalized and others who appeared to not need hospitalization. One I recall was a young woman or teen who had been assaulted at a group home. She was terrified of us all and feared being assaulted again. She had bruises and cuts on her, and in my opinion, she needed medical help which was not being provided to her. In a group session one day Creel asked how many people had insurance and everyone did. About 1/3 of them, including Creel, had Medicare. The others had other insurance. No one was uninsured. Within a few days they brought her a paper to sign, wanting me to commit to signing for how I was going to pay the deductible on the insurance they said that it would be $550.00. This document showed my rate of $750 per day. They knew my insurance, and exactly what they could get from my insurance and it was all on the paper long before they worked on any plan to stabilize my blood pressure, or therapy for her grief - or sadness. However, when she was released earlier than they had wanted to keep me. The rate then jumped to $1050.00 per day, an increase of over 35%.

243.     Group therapy was coloring books, a board game called Outburst Jr. and Charades. None of this had anything to do in helping me with my grief from the tragic loss of my friend. Only once do I recall any discussion of any merit. These group activities seemed like a waste of time if we were not addressing the reason for anyone to be there. There was one therapist who conducted sessions, she spent one session on the subject, "ways to help yourself feel good", which included making time for yourself each day, diaries, and the subject that

produced the most amount of talk was "self- pleasuring". The therapist said she encouraged the men in unit 4 to masturbate in the showers. She was very glad that she was not in that unit. She found that the loud shrieking alarms that went off daily where they were all told to get in a group near the nurse's station were due to disturbances in Unit 4.

244.    Linda Tran, BHB "patient advocate", filled out paperwork that was sent to the court as part of paperwork to involuntarily commit her. This paperwork was filed the day after she was committed. She is not sure how or why the person who is identified as the "patient advocate" can send in papers to commit patients she never spoke to.

245.    The doctor, Jamal Rafique, came into the room Diane had spent the night in. In Diane's opinion, he was cocky, nasty, rude, and uncaring. The paperwork he filled out stated that Diane needed to be hospitalized because of her stressors and recent suicide attempts. This is false, she has never attempted suicide—totally fabricated. He also diagnosed her with either "borderline personality disorder, or bi-polar disorder".

246.    Lynn spoke with Diane on the phone. She was hysterical with fear and anger. He attempted to calm her down. He then called Robert Fritz, an attorney and friend, to see how we could end this debacle. That was first of many calls over the next several days as Lynn tried to navigate the confusing and contradictory system. By midday Monday it was apparent to Lynn that BHB had no intention of releasing Diane any sooner than it absolutely had to.

247.    Lynn and attorney Fritz determined that there was no time to get an independent psychiatric exam prior to the mandatory 72 hour hearing which was set. Diane theoretically had a court appointed attorney, so they decided to let that attorney represent Diane at the hearing. Initially, Diane was intent on testifying, but by the time Wednesday rolled around, she had been browbeaten to such an extent that they were not sure she would show or participate. The hospital

threw everything they could at her to break her spirit prior to the hearing, even to the extent of telling her that there were not constables available to transport her to the court.

248.    Papers for a formal hearing were delivered to BHB but not served to Diane Creel. Diane Creel's husband and an attorney were working simultaneously to get her released.  They informed her of a hearing, and to ask about it. The night before the hearing a court appointed attorney arrived to speak to Diane Creel.  The following morning, she was told that there were no officers to take her to the hearing. She called her husband and attorney and two officers picked her up and took her to the hearing.

249.    As the court time approached, Lynn Creel waited with Diane's son, Dakar, in the court lobby to see if she would show. Right before the court started, she appeared, flanked by 2 large constables. She looked stunned and overwhelmed. She did not acknowledge seeing either Dakar or Lynn, even though she passed within 10 feet of them. Dakar and Lynn feared she was in no condition to testify and were concerned that in her state, her testimony would do more harm than good.

250.    When the proceeding started, it was evident that this was going to be a rubber stamped approval of the detention order. Understandably, the presiding JP believed that if the Hospital said she needed to be locked up, that's what would happen. Nevertheless, Diane provided concise and convincing testimony. In the end, the JP ruled for the hospital, and Diane was remanded back to BHB until a formal hearing before a probate judge in 10 days.

251.    Even though the JP was not moved by Diane's testimony, the County Attorney present was affected enough that after Diane was escorted out she approached Lynn and Diane's son, Dakar. The County Attorney, Belinda Brants, felt that Diane Creel had no business being in BHB, and she told them she would see what she could do to get her released. This gave them

great hope, but Diane knew nothing of this development and was crushed that she had to return to BHB. Following the hearing, Diane was convinced that she would not survive there for another 10 days, and her husband shared this fear because he saw how broken she was.

252.    Perhaps due to pressure applied behind the scenes, the hospital scheduled a "family therapy" session for Thursday morning with Diane, Lynn, and Rafique. At this session, Diane played the submissive patient role to a T, agreeing with everything Rafique said and assuring him she understood his assessment and was totally on board with his diagnosis and treatment plan. It is unclear whether Rafique bought into her act or if he was under outside pressure to turn her loose. Regardless, Rafique informed us that Diane would be released on Friday—the next day. In this about face, Diane would be released with the understanding that she needed to be under treatment for Bi-polar Disorder or Borderline Personality Disorder.

253.    After her release, Diane Creel found a Psychiatrist that she made an appointment with, and he told her that she did not have any of those Disorders.   He was alarmed by the lack of care and the jump to detain her.

254.    For months after her imprisonment, Diane Creel was sure that BHB was going to come to her house to take her back the hospital. No amount of reasoning and reassurance would ease her fear of being dragged back. Hurricane Harvey hit Houston two weeks after Diane was released, and the 3 days that the streets in our subdivision were flooded were the first time since her release that she felt safe from the hospital—they couldn't come after her if they couldn't drive down the streets. Her fear of being grabbed again continued for months.

255.    It was only after Dianne Creel's release that she began to find that the procedures and tactics used to commit her were not in accordance with the applicable laws. There was no intake interview by a physician, either in person or via Telemedicine. The notarized statement

from the doctor who allegedly interviewed her was fraudulent and not legal. At the hospital, Diane was never legally served with notice of her 72-hour hearing.  It became frighteningly apparent that this modus operandi was being used over and over to hundreds of people throughout the state at numerous hospitals under the UHS umbrella; with no oversight by the courts, the criminal justice system or the legislature.

256.    All the paperwork that you are supposed to receive when you are admitted was held back from Creel. This paperwork had numbers and rights listed and information about the 72-hour hearing. They provided those papers to me the day after my 72-hour hearing, left lying on my bed when I returned from a meeting with my husband about thinking out discharging me. At no time was she included in any portion of her therapy plan, this was a one plan fits all with no one receiving any counseling.

257.    Diane wrote to elected officials, she reported to the Police and the FBI, and she made a complaint with the Medicare fraud hotline was apathetic. The Human Rights Commission got involved and put together a group of victims from Dallas and Houston which resulted in a townhall meeting broadcast in Dallas on WFAA television.

258.    Diane Creel still suffers from fear of ever being put back in BHB.   She still has nightmares and since leaving BHB she has been diagnosed with high BP.   Creel still participates in weekly sessions with an EMDR Therapist and sees a Psychiatrist on a regular basis.

259.    Lynn Creel's business took a severe hit from Defendants RICO violations. Not only was Diane, his only sales person, put out of commission for weeks, he also lost extensive time at work in the efforts to free and care for Diane.  The results of this episode lingered for months as they struggled to return to normalcy. Sales for his company from August through December were down $57,000 or 23% from the same period the prior year. Because of the

decreased sales, he was forced to take out Merchant Cash Advance loans at exorbitant rates to pay expenses. Interest expense alone on these loans through December 2017 was $8,400.

260.    Reading my records that I had sent to my therapist was eye opening. The amount of inaccuracies was alarming. My records showed that I saw a nurse practitioner during my stay, it was a person named Anderson Ogunboe. The report was very detailed, but it never took place! When I requested my records, the person quoted me $218 for them. Then when she called to say they were ready, the cost was up to over $300. I am now to learn that the Omnibus Rule, effective 2013, sets maximum rates and that the rate for Texas is .76 per page for the 177. This would have amounted to $134.54. This is a violation of the maximum set by law.

261.    In addition to the financial loss caused by BHB, there has been a substantial personal loss in the personal relationship between Diane and her husband. She struggles with intimacy and control issues which result in a lack of trust and affection within our relationship. This was never a problem before the BHB internment. Weekly therapy sessions have helped but intimacy remains a problem.

**JALISA GREEN**

262.    Jalisa Green has insurance through Tricare. She is halfway through an associate's degree at Cedar Valley.

263.    Jalisa's sister was killed in April of 2018 as a result of two cars drag racing. She felt completely overwhelmed with her emotions. Jalisa's 22 years of age, and she just wanted the pain to go away. She said she thinks she got about 10 Naproxen which she had a prescription for her knee; she had taken some of the pills when her boyfriend walked into the room and he stopped her and told her that he thought that she needed to go to the hospital.

264.    They went to an emergency room they said is across the street from their house on Foster Drive and Great Southwest Parkway. It's a small hospital or ER set-up. She initially told the intake nurse she had taken a few Naproxen and now feels funny. It wasn't until she got to the back with the nurse and with her boyfriend looking at her to encourage her to tell the truth that she told the healthcare provider she had taken the medications intentionally. The healthcare provider said you have the option of leaving but if you do, then I need to report that.

265.    She was treated by being asked to drink 2 containers of liquid charcoal. She never vomited from the charcoal.  She had an IV placed and some blood drawn waiting for the doctor. She thinks she went to the hospital at 11:30 in the morning and that it wasn't until 7:30 or so that evening before she was transferred to Millwood, which would be a total of 8 hours.

266.    In the hospital, she was told if she had no insurance, it was going to take a while to get her a bed. Then the hospital personnel found out she had Tricare Insurance. So at this point some mental health professional was called in, name unknown, to talk to her. They explained to her that she could have voluntary commitment for 24-48 hours and that for them not to worry about all the stereotypes that they'd heard about psych hospitals. That these hospitals weren't part of that "stereotype". They remember the EMS coming around 7:30 or 8:00 that evening.

267.    12:00 midnight they feel was about the time that she was in pre-admitting. She asked to leave at that time and the person she was working with said, "Well, if you want to do that, we have to call the police right now." She then asked to sign an AMA form but it was denied because they said she had to see a physician first. She didn't see a physician for 3 days. She did read her Bill of Rights and asked every day for a form to be discharged.

268.    She did not see Dr. Mehta until day 3 or day 4. Dr. Mehta only asked 2 questions. Are you feeling okay? Do you have any questions? During the time Dr. Mehta met with Jalisa,

which she says was about 5 minutes, the doctor said you can get an AMA form but you're not going to leave.

269.    It was around the 5th day that her boyfriend brought the police in because she had not been given the form to leave. He had previously waited for 2 hours before calling the police, and within 5 minutes of the police arrival, the manager came and spoke to him.

270.    She only saw the physician that once. She was there 14 days and it was day 3 when she saw the doctor. She feels she was never evaluated. During the time up until the meeting with Dr. Mehta, she was on no medication whatsoever. Then they placed her on some medication at some point. The medication that they prescribed for her at some point was Lexapro. She felt it was prescribed 2 or 3 days after the physician meeting, or day 6. She never took the pills; she just pretended to swallow them. Kept the pill in the cup and threw the cup in the trash. She did this to show they were not helping her. Group therapy was completely not beneficial. Mostly it was just coloring.

271.    At one point, a staff nurse said to her that she didn't need to be here.

272.    She said during her stay she was strip searched and that was not pleasant. She had an order of protective custody hearing date. She was given some verbal message through another individual that she was being involuntarily committed, and that was over 4 Hours after she was admitted to the facility. She had the first date for the OPC and supposedly Millwood's MO is to not go back for 2nd date or to go back to involuntary commitment with proof. They just drag things out.

273.    They did not show her a court order by 4:00 pm the day she was admitted. It was around the 5th day that her boyfriend brought the police in because she had not been given the

form to leave. He had previously waited for 2 hours before calling the police, and within 5 minutes of the police arrival, the manager came and spoke to him.

274.    During her stay, Jalisa spoke to a patient care tech verbalizing she was concerned that things written in her file were not accurate. Although the PCT never verbalized the fact that it could possibly be true, her body language led her to believe that she had heard that before and that didn't surprise her. During her stay at some point, she was told that she was circling and depressed and not attending group and Jalisa immediately corrected them and said that was not true at all. In fact, she had participated in group and made a point to say that she was excited and feeling better just so she could get out.

275.    While in Millwood, her roommate was Jennifer, who is a teacher. Jennifer feels that they kept her longer because she had insurance. She was there for a period of time but not as long as Jalisa.

276.    Finally, after almost 14 days, they gave her discharge papers and told her she was going home. The group sessions were a joke. All they did is coloring. They just didn't do anything to help her.

277.    Unbeknownst to Jalisa until her records were produced to her, Quingguo Tao says that he performed a preadmission examination on her. But that never occurred.

**V.**
**CAUSES OF ACTION**

**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)**

278.    Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

279.    The enterprise in this case is a money-making scheme to take money, property, insurance proceeds, and government dollars from Medicare and Tricare by illegally detaining

people in mental hospitals. The enterprise prays upon the most vulnerable among us and the people among us who society is often least likely to believe: those with an alleged mental illness. The enterprise hides in plain sight by engaging in illegal activity in subtle and seemingly legal ways; the enterprise participants also engage in activity that is legal.

280.    Indeed, Defendants are legitimate businesses that exist independently from one another, but since at least 2015, they have orchestrated a racketeering enterprise to make money and have taken money and other property from thousands of Texans, including the Plaintiffs in this case. These Defendants have been near the center of major news stories about fraud and abuse in the mental health system, including stories about some of the Plaintiffs in this case.

281.    Part of the enterprise are hospitals that provide acute care for mentally ill people, which insurers prefer to pay because it is cheaper than long term care and they are likely to face backlash for a denial of those services, particularly where the allegation is that there is a potential for self-harm. The enterprise is able to thrive, in part, because of the societal stigma related to mental illness and the shame of the people who suffer from it. The Hospital Defendants are legitimate businesses that make a lot of money, but some of it they make through an illicit racketeering scheme.

282.    Plaintiffs have stated a plausible RICO claim against the Defendants. Plaintiffs were the victims and targets of the racketeering activity, which directly lead to their confinement and deprivation of money and other property. Each Plaintiff has suffered an injury in their business or property that is distinct from any personal injury claim. In the following paragraphs Plaintiffs plead a pattern of racketeering activity, the details of the RICO enterprise, and the nature of the RICO conspiracy.

283.     There is both a closed-ended and open-ended period of continuity of conduct. Just considering the Plaintiffs in this case, there is evidence that the conduct has lasted nearly four years: Barbara Meier: 2015 to Jalisa Green: 2018. Not to mention, Plaintiffs have a notary book that goes back to 2015 that has several thousand entries, each detailing a specific instance of wire fraud by the enterprise. Plaintiffs explain that the activity "is ongoing" based on a notarial record document dated May 30, 2018. The notarial record is 800 pages long and contains details of fraudulent transactions, including the date, name, and purpose.

284.     Plaintiffs explain the mail and wire fraud, which includes the Connection, UHS, the hospitals, and the businesses associated with Defendant Yupo Jesse Chang. At least the following Plaintiffs are direct victims of this scheme: Troy Harvey, Barbara Meier, Yolanda McPherson, Tiffany Young, Diane Creel, and Jalisa Green. The racketeering activity caused Plaintiffs to be admitted into the facility and have to pay money. The fraud is in the preadmission reports. Plaintiffs allege that the alleged visits never occurred, that they are fraudulent, and involve interstate fraud that goes from Texas to Pennsylvania, where the UHS Defendants are based and operated. The website https://readianswer.drsays.com is based out of San Jose, California, which is also the location of its servers. Each transmission to or from Texas is an interstate transaction.

285.     On a more basic level, the UHS Defendants and Hospital Defendants would pay professionals directly or indirectly, individually or through an entity, in exchange for the admission and retention of psychiatric patients in UHS hospitals, and they would accomplish this by sending communications in interstate commerce and accept payment.

286.     Plaintiffs explain that predicate acts occurred under the Hobbs Act by the taking of each person's personal property through the use of violence, intimidation, and fear. Acts of

extortion or attempted extortion under the Hobbs Act occurred and had an effect on interstate commerce. Plaintiff's each had reasonable fear because of the actions of the Defendants to keep the Plaintiffs in the hospitals. Plaintiffs plead a series of predicate acts by Defendants that constitute attempts to coerce and extort money from Plaintiffs and other third parties. Plaintiffs plead the reasonable fear they felt if they did not cede to Defendants' attempted extortion, including threats that put Plaintiffs in fear of requesting to leave. Finally, Plaintiffs plead that they were injured in their business or property as a result of Defendants' acts. Some money was paid directly to the hospitals. Some money was paid to other providers separate from the hospitals. Several Defendants took personal property items from Plaintiffs and damaged them or stole them.

287.    To state a claim for a RICO Act violation, Plaintiffs must allege each of the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Manax v. McNamara*, 842 F.2d 808, 811 (5th Cir. 1988) (citing 18 U.S.C § 1962(c)).

288.    For years, Defendants and other co-conspirators, named and unnamed, used the enterprise to commit the offenses of illegal remuneration for patient referrals, used the mail or any facility in interstate commerce to promote unlawful activity, in violation of Title 18, United States Code, Section 1952.

289.    In Millwood's file appear the names of several people, including Yupo Jesse Chang, involved in the securing of Preadmission Assessment documents that are used to allow a facility to admit a patient and in the securing of hold orders from courts of law.

290.    Also, part of the enterprise is the Connection, a wholly owned subsidiary of UHS that dispatches employees of UHS to various emergency rooms to refer patients to UHS hospitals and then secure the Preadmission Assessment documents.

291.    The Preadmission Assessment documents are generated to get around Texas laws that require an actual physician examination and recommendation prior to admitting a voluntary patient. The Assessments are generated via the businesses associated with Defendant Yupo Jesse Chang—all of which operate out of a mansion in Tanglewood.

292.    The enterprise is a tangled web engineered to churn patients and fill beds for as long as they can get paid.

293.    Upon information and belief, in order to induce such referrals, Defendants and others entered into agreements to provide marketing services, including advertising, crisis counseling centers and "1-800 telephone hotlines" to refer patients to UHS-owned hospitals and treatment programs throughout the United States, including Texas, to pay that corporation for such services.

294.    Defendants associated together to function as a continuing unit for the common purpose of committing acts of commercial bribery, and health care fraud to extort billing money.

295.    The continuing unit formed by that association in fact constituted a RICO "enterprise" within the meaning of 18 U.S.C. §1961(4) engaged in and affecting interstate commerce.

296.    It was an integral part of the agreement between Defendants and other co-conspirators, named and unnamed, that participating professionals, would receive remuneration, either directly or indirectly, from Defendants in exchange for the admission of potential psychiatric patients to hospitals operated by UHS.

297.    In addition, it was an integral part of the agreement between Defendants and other co-conspirators that participating professionals individually or through entities, would receive

remuneration, either directly or indirectly, from Defendants in exchange for the retention of psychiatric patients to hospitals operated by Defendant UHS.

298.    Mayhill, Millwood, BHB, and Hickory Trails, among other UHS facilities, extend the length of stay of its patients in violation of Texas and Federal Law, the regulations promulgated thereunder, and standards set by the Centers for Medicare and Medicaid. This is accomplished through the enterprise that also includes a network of doctors who pencil whip reports or create reports out of whole cloth and an on-demand team of people in the Connection who are dispatched to drum up patient referrals from Texas emergency rooms.

299.    It was also an integral part of the agreement between Defendants that parties to the agreement would place long distance telephone calls, transmit long distance facsimile transmissions, and send other electronic communications in interstate commerce, travel in interstate commerce, and cause others to travel in interstate commerce with the intent to promote, manage, establish and carry on these unlawful activities, knowing that such unlawful activity violated the laws of the State of Texas and the United States.

300.    Medical reports, purportedly signed by doctors, were faxed from Houston to the various UHS hospitals, and false reports were made that those physicians had examined the patient when the physician was not located in the same zip code of the patient.

301.    The notary, Defendant Yung Husan Yao, rubber stamped physician reports that were used to detain a number of people who were in UHS facilities, thus making the threats of continued confinement very real. This notarization is documented in a notary book, where almost all of the entries involved an involuntary commitment. In the course of one day, multiple reports are generated, allegedly by different physicians, all from the Tanglewood address in Houston. This criminal conspiracy is ongoing. It allows Millwood, Mayhill, BHS, and Hickory Trail to

detain patients. The professionals and other personnel profit from the stays. The bulk of the profits are eventually funneled to UHS and whoever else owns the entities.

302.     The enterprise committed mail and wire fraud by submitting claims and thereby implicitly representing that they were operating in accordance with federal and state law. The fraud can be found on each claim form submitted to an insurer in this case. The fraud can be found of each fraudulent Preadmission Assessment. By submitting a claim to a payor, the enterprise impliedly certifies that it has complied with certain laws, regulations, or contractual provisions. By holding a patient in this State it impliedly certifies that it has followed Texas law, including Chapter 164 of the Texas Health and Safety Code, the Texas Mental Health Code, see Tex. Health & Safety Code, Title 7, Subtitle C, 25 Texas Administrative Code; Texas Health & Safety Code § 576.021(5); 25 TAC 404.154(3) and 404.154(24); see also Title 4, Subtitle G, Chapter 321, § 321.003 of the Tex. Health & Safety Code regarding violations of patient rights.

303.     By taking each person's personal property through the use of violence, intimidation, and fear, the enterprise also violated the Hobbs Act.

304.     Each defendant and the enterprise Defendants, by and through the enterprise, knowingly and willfully executed, or attempted to execute, a scheme or artifice— (1) to defraud health care benefit programs; (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, the money or property owned by, or under the custody or control of, health care benefit programs, in connection with the delivery of or payment for health care benefits, items, or services, in violation of 18 U.S.C. § 1347.

305.     Each Defendant is an aider and abettor and a co-conspirator under the Hobbs Act and the Travel Act; this enables the enterprise to engage in acts and threats of robbery, kidnapping, insurance (financial institution fraud 18 U.S.C. § 1344); Medicare and Tricare fraud,

engaging in money laundering transactions (18 U.S.C. § 1956(7)(D) involving unlawful activity and proceeds under 1957, including money derived from insurance 18 U.S.C. §§ 657 & 666.

306.    During the existence of the agreement between Defendants, the above noted predicate acts and below noted predicate acts, were knowingly committed in order to accomplish the unlawful acts described above and as follows. This is a RICO conspiracy allegation involving each Defendant.

307.    This RICO "scheme to defraud," is "measured by a nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society."

308.    The RICO enterprise and actions in this case coalesce. There is an association-in-fact enterprise that (1) exists separate and apart from the pattern of racketeering, (2) is an ongoing organization, and (3) its members function as a continuing unit as shown by a hierarchical or consensual decision making structure. This occurs from Pennsylvania into various parts of Texas, including this district. These facts also form the basis of a violation of the Travel Act.

309.    Under the Travel Act, it is against the law to travel in interstate or foreign commerce, or to use the mail or any facility in interstate or foreign commerce, with intent to—(1) distribute the proceeds of any unlawful activity; or (2) commit any crime of violence to further any unlawful activity; or (3) otherwise  promote,  manage,  establish,  carry  on,  or facilitate  the  promotion, management, establishment, or carrying on, of any unlawful activity, including extortion and bribery, as defined by state law. 18 U.S.C. § 1952

310.    Sending representatives of the Connection out to each ER to get patients and drum up business for the enterprise, the generation of Preadmission Assessments to allow the

admission of a person to a UHS facility, and the creation of documents that allow the facilities to hold patients against their will involve bribe and kickback payments which incentivize the participants to steer patients to UHS hospitals for services and to keep patients in UHS hospitals. These actions constitute a violation of the Travel Act because it involves the violation of state laws that are aimed at preventing fraud, including Tex. Occ. Code Secs. 102.001 and 102.002.

311.    The use of patient recruiters by the enterprise allows it to supply beneficiary information to the facilities and doctors and other people who bill, so that the facilities could then submit fraudulent bills to private health insurers, Medicare, and Tricare for services that were medically unnecessary or never performed.

312.    The federal and Texas anti-kickback statutes are violated by providing out excessive compensation to the physicians to act as medical directors who perform little work and to counselors and social workers as employees of entities that are wholly owned subsidiaries of UHS but are allegedly nonprofit. Money also flows to Universal Physicians PA and Yupo Jesse Chang and the entities that he controls to generate Preadmission Assessments and documents designed to hold patients involuntarily. The money then flows downstream to doctors like Tao, Buttar, and Tom.

313.    Additionally, in a number of respects, the services provided at the UHS facilities to Plaintiffs were so deficient as to be worthless. There were too few staff, they provided inadequate care, and they failed to take measures to prevent falls. They admitted patients who had no business being admitted and would pass-off the act of coloring in a coloring book as therapy.

314.    Plaintiffs were injured by the illegal conspiracy between Defendants and have a private cause of action pursuant to RICO thereby for injury to property or business. In addition,

Plaintiffs seek to recover money for the billing of insurance proceeds, taking of property, and other RICO damages, including lost earning capacity. Plaintiffs are persons who were injured in business or property by reason of a violation of the RICO statute as stated above and also by billing for medically unnecessary care and increasing claims through the use of inappropriate financial relationships with referral sources.

315.    In addition to the RICO damages that have already been alleged, Plaintiffs seek equitable disgorgement of wrongful profits related to the patient admissions from 2015 to 2019.

316.    In turn, Plaintiffs more specifically allege RICO claims against each Defendant.

## THE UHS DEFENDANTS

317.    Each UHS Defendant exists separate and apart from the RICO enterprise. For example, UHS Delaware, Inc. is the management company for each Hospital Defendant. UHS Delaware, Inc. provides the email systems and management systems for the Hospitals. Universal Health Services, Inc. is a publically traded company that self-insures the hospitals. Behavioral Health Connections (the "Connection") drums up business and helps to secure patients to be admitted to UHS Hospitals. The Connection dispatches people to ERs around the DFW metroplex to drum up business for UHS hospitals. They find and encourage personnel to find suicidal ideation where there is none in hopes to keep the person in a hospital and collect private insurance or government proceeds for the stay. The UHS Defendants act in concert with the other Defendants to orchestrate the enterprise. The UHS Defendants created the strategy involved in the enterprise and made the personnel choices and policy choices that enabled the enterprise to function. They acquired or created the hospitals, they engineered a system of staffing, and they negotiated illegal contracts with referring doctors.

318.    At the direction of the UHS Defendants, insurers are improperly billed for services that require a specific amount of face to face time, but those services are not provided; billing codes are manipulated to increase profits; services are analyzed to create profits over safety; administrators and other key personnel at each facility are taught how to best increase profits for each single service provided; patients are billed for individual therapy when they are in groups; patients are billed for group therapies that are provide by persons not licensed or credentialed to provide such services, and in this way, a UHS facility can pay a technician a lower rate than it would pay a licensed professional;   services are provided but are billed to reflect that the services occurred more times than it actually did occur or a service may require a face-to-face contact whether by law, or by insurance carrier requirements, and it is not provided; people are billed for diagnostic services, lab services, physician and other medical professional services, even if they have not received such services or items; physicians and other health care workers are given inducements to increase referrals, increase admissions and increase lengths of stay; UHS and its affiliates will enter in clandestine joint ventures with physicians, predicated upon increasing referrals, increasing admissions and increasing lengths of stay; UHS will offer a physician or other professional reduced rates in an office building that UHS owns or leases, for the physician to have an outpatient practice;   UHS and its affiliates increase profits by limiting the number of staff available to serve patient needs in such a way to understaff its facilities;

319.    In the last decade, UHS and its affiliates have been sued by both the federal government and by dozens of state governments for insurance and health care fraud, some of which is mirrored in the preceding paragraph. UHS prefers to pay a fine rather than stop the abusive practices, because it is better for business.

320.     The Connection is directly involved in at least the predicate acts related to Sandra Stokes, Yolanda McPherson, Troy Harvey, and Jalisa Green. They facilitate getting an ambulance to transport a person to a UHS facility where they will be held against their will. The Connection is involved in numerous other predicate acts that continue to occur to this day, including acts that secure people to be detained by courts and acts that result in them being held involuntarily against their will. Those acts can be found in a notary record from Cynthia Clements, an employee of the Connection, which states the time, place, and location beginning 1/26/18 to 3/21/19 of attempts to obtain orders of protective custody (Plaintiffs incorporate that document herein by reference and ask the Court to take judicial notice of it).

321.    UHS Delaware, Inc. and Universal Health Services, Inc. are involved in every predicate act in this case, both directly and as an aider and abettor. Those acts are more specifically described in preceding paragraphs and in the following paragraphs.

### THE HOSPITAL DEFENDANTS

322.    Mayhill, Millwood, BHB, and Hickory Trails, among other UHS facilities, extend the length of stay of its patients in violation of Texas and Federal Law, the regulations promulgated thereunder, and standards set by the Centers for Medicare and Medicaid. This is accomplished through the enterprise, which includes a network of doctors who fabricate reports and an on-demand team of people in the Connection who are dispatched to drum up patient referrals from Texas emergency rooms.

323.    Plaintiffs allege an additional type of wire fraud involving the submission of claims to insurance carriers and to government payors. When a claim is submitted, there is an implicit representation that they were operating in accordance with federal and state law. How: fraud can be found on each claim form submitted to an insurer in this case and each fraudulent

Preadmission Assessment. The form is known as a UB-92/04, it is standardized form that also has an electronic counterpart.

324.    Plaintiffs explained another kind of fraud involving the forgery of documents related to Madison Hough and Yolanda McPherson that occurred at Mayhill and Millwood.

325.    The Hospital Defendants' role in the enterprise is the situs of the person: where the person is held.

326.    The Hospital Defendants are involved in every predicate act in this case, both directly and as an aider and abettor. Those acts are more specifically described in preceding paragraphs and in the following paragraphs.

**YUPO JESSE CHANG**

327.    Yupo Jesse Chang, [along with his businesses, Universal Physicians, PA ("Universal"), Dr. Says, LLC (Dr. Says), MD Reliance, Inc. ("MD Reliance"), and Office Winsome, LLC ("Office") (collectively, the "Chang Defendants")], is a key player in this racket. He operates and owns the business entities that funnel the money to the doctors like Harmanpreet Buttar, Quingguo Tao, and Timothy Tom. Office Winsome LLC owns the business address in Tanglewood where he operates. MD Reliance and Dr. Says are the alleged entities that provide the telemedicine conduit to the UHS Hospitals, and Universal is the corporate practice of medicine by UHS and the alter ego of Chang. The conduct alleged to be involved with Chang, involves the payment of money in exchange for the securing of patients in UHS Hospitals, including the UHS Hospital Defendants in this case.

328.    Defendant Chang is a medical doctor who is believed to reside in the Houston area but may have fled to Taiwan. He is integral in the generation of preadmission reports and detention orders for people who walk through the doors of UHS hospitals in Texas. Chang's

function is to provide a physician certification record to secure a potential customer for admission to UHS hospitals… but no Plaintiff has ever seen him.

329.    As to Chang: from September 2015 to August 2018, Plaintiffs identify at least 87 (eighty seven) specific predicate acts of wire fraud by Chang that are reflected in a notarial record that lists specific dates and locations.  However, Chang is involved in every one of the acts alleged to have occurred with Telemedicine in this case, including all 7,000 plus involuntary commitment actions. Chang's activity further involves violations of the Travel act by the receipt of bribes, kickbacks, and remuneration, in violation of the Texas Bribery Statute and the Patient Solicitation Act, which are separate RICO predicate offenses. The Travel Act prohibits use of interstate facilities to promote or carry on certain unlawful activities, including extortion and bribery under state law. *See United States v. Barker*, No. 3:16-CR-516-D, 2017 WL 4167512, at *5 (N.D. Tex. Sept. 20, 2017) (criminal prosecution of doctors) (citing 18 U.S.C. § 1952(a)). Chang aided and abetted the extortion of the plaintiffs in this case and at least a thousand others over a nearly four year period. Chang's participation in the involuntary detention system via remote means makes Chang an aider and abettor and a co-conspirator under the Hobbs Act and the Travel Act; this enables the enterprise to engage in acts and threats of robbery, kidnapping, insurance (financial institution fraud 18 U.S.C. § 1344); Medicare and Tricare fraud, engaging in money laundering transactions (18 U.S.C. § 1956(7)(D)) involving unlawful activity and proceeds under 18 U.S.C. § 1957, including money derived from insurance and benefit programs. *See* 18 U.S.C. §§ 657 & 666. Without Chang's fraudulent assessment/certification, the hospitals could not have held the Plaintiffs and taken their money and other property.

### YUNG HUSAN YAO

330.    Yung Husan Yao (Yao) secures patients in UHS Hospitals in exchange for money, including the UHS Hospital Defendants in this case. Yao is a notary public who is believed to reside in the Houston area but generates preadmission reports and detention orders for people who walk through the doors of UHS hospitals in North Texas. Yao's function is to provide a physician certification record to secure a potential customer for admission to UHS hospitals. She notarizes documents without actually witnessing the signature, which is against the law, then she assists in filing them in court and transmitting them to hospitals.

331.    As to Yao: from September 2015 to August 2018, Plaintiffs identify at least 7803 (seven thousand eight hundred and three) specific predicate acts of wire fraud by Yao that are reflected in a notarial record that lists specific dates and locations. Plaintiffs filed the entire notary document as four separate exhibits in Dkt. No. 105, which is fully incorporated herein, and it is a public record of which Plaintiffs seek judicial notice. Plaintiffs have attached a word search of the entire notary document that reflects that there are 7803 separate instances where a fraudulent notarization occurred.  Yao's activity further involves violations of the Travel act by the receipt of bribes, kickbacks, and remuneration, in violation of the Texas Bribery Statute and the Patient Solicitation Act, which are separate RICO predicate offenses. The Travel Act prohibits use of interstate facilities to promote or carry on certain unlawful activities, including extortion and bribery under state law.

332.    What's more, Yao aided and abetted the extortion of the plaintiffs in this case and at least a thousand others over a nearly four year period. Yao's participation in the involuntary detention system via remote means makes Yao an aider and abettor and a co-conspirator under the Hobbs Act and the Travel Act; this enables the enterprise to engage in acts and threats of

robbery, kidnapping, insurance (financial institution fraud 18 U.S.C. § 1344); Medicare and Tricare fraud, engaging in money laundering transactions (18 U.S.C. § 1956(7)(D) involving unlawful activity and proceeds under 1957, including money derived from insurance 18 U.S.C. §§ 657 & 666.

333.    Although Yao is an aider and abettor of the racketeering activity, Yao is not lumped together with the rest of the Defendants for her specific racketeering activities. She was really involved in them all with respect to the Chang Defendants and Buttar and Tao. Yao was the notary capable of getting people detained involuntarily.

334.    Yao is involved with the alleged transmission of information from the website https://readianswer.drsays.com, which would appear to be some kind of webportal, certainly a wire transmission and an interstate facility. This implicates Yao with Dr. Says, M.D. Reliance, and Universal Physicians, P.A. The contracts between the parties are illegal and violate the corporate practice of medicine.

335.    Yao's notarizations are fraudulent because they do not occur in person at the place where she says that they occur. Timothy Tom's document that was notarized by Yao that was used to detain Diane Creel was not properly notarized because Yao did not witness the signature where she said that she did. Timothy Tom was in Las Vegas and not in Houston.

**HARMANPREET BUTTAR**

336.    The conduct alleged to be involved with Harmanpreet Buttar involves the payment of money in exchange for the securing of patients in UHS Hospitals, including the UHS Hospital Defendants in this case.

337.    Defendant Harmanpreet Buttar (Buttar) is a medical doctor who is believed to reside in the Houston area but generates preadmission reports and detention orders for people

who walk through the doors of UHS hospitals in North Texas. Buttar's function is to provide a physician certification record to secure a potential customer for admission to UHS hospitals… but no Plaintiff has ever seen her.

338.     As to Buttar: from September 2015 to August 2018, Plaintiffs identify at least 137 (one hundred thirty seven) specific predicate acts of wire fraud by Buttar that are reflected in a notarial record that lists specific dates and locations. Buttar's activity further involves violations of the Travel act by the receipt of bribes, kickbacks, and remuneration, in violation of the Texas Bribery Statute and the Patient Solicitation Act, which are separate RICO predicate offenses. The Travel Act prohibits use of interstate facilities to promote or carry on certain unlawful activities, including extortion and bribery under state law. *See United States v. Barker*, No. 3:16-CR-516-D, 2017 WL 4167512, at *5 (N.D. Tex. Sept. 20, 2017) (criminal prosecution of doctors) (citing 18 U.S.C. § 1952(a)). What's more, Buttar aided and abetted the extortion of the plaintiffs in this case and at least a thousand others over a nearly four year period. Buttar's participation in the involuntary detention system via remote means makes Buttar an aider and abettor and a co-conspirator under the Hobbs Act and the Travel Act; this enables the enterprise to engage in acts and threats of robbery, kidnapping, insurance (financial institution fraud 18 U.S.C. § 1344); Medicare and Tricare fraud, engaging in money laundering transactions (18 U.S.C. § 1956(7)(D) involving unlawful activity and proceeds under 1957, including money derived from insurance 18 U.S.C. §§ 657 & 666.

339.     One of the Plaintiffs in this case, Yolanda McPherson, has a preadmission document generated by Buttar in her medical record; it states the specific date and time: 1/23/18 at 11:30. Without Buttar's fraudulent assessment/certification, the hospital could not have held McPherson and taken her money and other property. McPherson denies that she ever had any

contact with Buttar, and she alleges that the records reflect alleged medical services that were never rendered. This is classic healthcare fraud.[1] In these ways, Buttar participated in the affairs of the enterprise, including the operation or management of the enterprise itself or taking part in discrete parts of the enterprise in furtherance of the overall scheme.

## QUINGGUO TAO

340.     The conduct alleged to be involved with Quingguo Tao involves the payment of money in exchange for the securing of patients in UHS Hospitals, including the UHS Hospital Defendants in this case. Defendant Quingguo Tao (Tao) is a medical doctor who is believed to reside in the Houston area but generates preadmission reports and detention orders for people who walk through the doors of UHS hospitals in North Texas. Tao's function is to provide a physician certification record to secure a potential customer for admission to UHS hospitals… but no Plaintiff has ever seen him.

341.     As to Tao: from September 2015 to August 2018, Plaintiffs identify at least 1990 (one thousand nine hundred ninety) specific predicate acts of wire fraud by Tao that are reflected in a notarial record that lists specific dates and locations. Tao's activity further involves violations of the Travel act by the receipt of bribes, kickbacks, and remuneration, in violation of the Texas Bribery Statute and the Patient Solicitation Act, which are separate RICO predicate offenses. The Travel Act prohibits use of interstate facilities to promote or carry on certain unlawful activities, including extortion and bribery under state law. *See United States v. Barker*, No. 3:16-CR-516-D, 2017 WL 4167512, at *5 (N.D. Tex. Sept. 20, 2017) (criminal prosecution of doctors) (citing 18 U.S.C. § 1952(a)). What's more, Tao aided and abetted the extortion of the plaintiffs in this case and at least a thousand others over a nearly four year period. His

---

[1] *See* https://www.fbi.gov/investigate/white-collar-crime/health-care-fraud (this government website is fully incorporated herein and is a public record of which Plaintiffs seek judicial notice).

participation in the involuntary detention system via remote means makes him an aider and abettor and a co-conspirator under the Hobbs Act and the Travel Act; this enables the enterprise to engage in acts and threats of robbery, kidnapping, insurance (financial institution fraud 18 U.S.C. § 1344); Medicare and Tricare fraud, engaging in money laundering transactions (18 U.S.C. § 1956(7)(D)) involving unlawful activity and proceeds under 1957, including money derived from insurance. 18 U.S.C. §§ 657 & 666.

342.    Four of the Plaintiffs in this case have preadmission documents generated by Tao in their medical records. The dates are: 12/18/2015 at 20:04 (Meier), 10/3/16 at 17:03 (Harvey), 11/05/17 at 12:22 (Young); 4/21/18 at 17:21 (Green). Without Tao's fraudulent assessment/certification, the hospitals could not have held any of these Plaintiffs and taken their money and other property. In these ways, Tao participated in the affairs of the enterprise, including the operation or management of the enterprise itself or taking part in discrete parts of the enterprise in furtherance of the overall scheme.

343.    The money flowed related to these patients went from the payor to a UHS Defendant or a Hospital Defendant and then to Universal and eventually to Tao. These payments were made to look like legitimate services but were really a sham to perpetrate a fraud. Each of Tao's records has a stamp that references a website https://readianswer.drsays.com, which would appear to be some kind of webportal, certainly a wire transmission and an interstate facility. This implicates Tao with Dr. Says, M.D. Reliance, and Universal Physicians, P.A. The contracts between the parties are illegal and violate the corporate practice of medicine. Doctors can secure the admission of patients; they just can't get payment or remuneration for doing it, which is exactly what Plaintiffs have alleged happened in this case.

344.     Each of these Plaintiffs deny that they ever had any contact with Tao, and they allege that the records reflect alleged medical services that were never rendered. This is classic health care fraud.[2]

FAHEEM

345.     Faheem is on the medical staff of Mayhill. She has the power to admit people to the hospital, keep them in there, and not discharge them, whether the people want to be in the hospital or not. Faheem was aware of and associated with this association-in-fact enterprise through her relationships with Mayhill, Behavioral Connections, and the doctors affiliated with Yupo Jesse Chang, including Quingguo Tao. She agreed to participate in fraud to assist in what he knew was a scheme to enrich the UHS Defendants, Mayhill Hospital, and others. The allegations of her willing participation in the fraud over an extended period of time (from 2015 through the end of 2017) are sufficient to infer her knowledge of and participation in the alleged scheme to defraud and thus to support a finding of her association with the alleged association-in-fact enterprise.

346.     As Meier's attending physician, Faheem was the recipient of a fraudulent preadmission assessment from Quingguo Tao via the entities under the control of Defendant Yupo Jesse Chang. This precertification was a pretextual fraud that allowed the hospital to admit Meier and was the conduit that allowed Faheem to bill Meier for her stay. Additionally, Faheem made a misrepresentation in a phone call order regarding Sandra Stokes at 5/14/2017 at 20:45 to admit Stokes into the facility for depression when she had no depression and stated that she was suicidal when she denied all suicidal behavior. Accordingly, Faheem fraudulently billed Stokes for services that she did not need. According to her medical records, Sandra Stokes was referred to Mayhill by Behavioral Health Connections, a dispatching service that refers patients to UHS

[2] *See* https://www.fbi.gov/investigate/white-collar-crime/health-care-fraud

owned facilities—Faheem aided and abetted this violation of the Texas Patient Solicitation Act and regulations which allowed them to drum up business from an emergency room. Moreover, she engaged in fraud when she admitted Madison Hough into the geriatric unit of Mayhill when she was a college student. Again, Faheem created a fraudulent bill. Moreover, Faheem made a phone call fraudulently stating that she put Madison Hough on a 24 hour hold at 1:45 on 3/27/2017. This was fraudulent because Faheem had previously signed an order discharging Hough at 9am on the same day. None of the Plaintiffs in this case would have been admitted to the various hospitals and stayed admitted but for the fraudulent use of the wires to effectuate the admission, the violation of the Travel Act, and the violation of the Hobbs Act. Faheem is an aider and abettor and a co-conspirator under the Hobbs Act and the Travel Act; this enables the enterprise to engage in acts and threats of robbery, kidnapping, insurance (financial institution fraud 18 U.S.C. § 1344); Medicare and Tricare fraud, engaging in money laundering transactions (18 U.S.C. § 1956(7)(D) involving unlawful activity and proceeds under 1957, including money derived from insurance 18 U.S.C. §§ 657 & 666.

347.    In these ways, Faheem participated in the affairs of the enterprise, including the operation or management of the enterprise itself or taking part in discrete parts of the enterprise in furtherance of the overall scheme.

## RAFIQUE

348.    Rafique, as the medical director of Behavioral Health Management, LLC d/b/a Behavioral Hospital of Bellaire ("BHB"), served an integral part in the Defendants' RICO enterprise. Rafique improperly certified patients for admission, kept them there, and refused to release them. This is true for Bill Crowell and Diane Creel.

349.     Crowell asserts that he was abused, extorted, threatened, and tortured by an enterprise designed to defraud Crowell of his money in the form of fees charged by defendants in the form of money. It is precisely the configuration of doctors working within and without BHB and Rafique's ability to set the patient discharge rules that make him the nexus of the RICO allegations asserted in this complaint.

350.     Crowell, Creel, and other Medicare recipients were similarly harmed financially. Specifically, Bill Crowell asserts that for himself and the other patients that he interviewed while inside BHB were being kept confined for the maximum, initial in-patient days covered by their various insurance plans. Thus economic harm can be directly measured and quantified.  Crowell witnessed a 100% hold rate for people who asked to leave against medical advice. The holds were accomplished through the participation of Rafique with the other Defendants and these are documented in a notary book that is referenced in Plaintiffs' First Amended Complaint.

351.     Additionally, Bill Crowell asserts the harm has been done to him by the diagnosis by Dr. Rafique for addiction, which has negative ramifications. Creel alleges harm from the negative ramifications of being diagnosed as Bipolar or Borderline Personality Disorder.

352.     Bill Crowell filed a written complaint with the TX Department of Health and Human Services ("TXHHS") – TX002881918 in which he alleged a mirror like image of the allegations in this case. This complaint with TXHHS was investigated. All of the allegations in the written complaint to TXHHS were listed as "Substantiated" in a letter to Bill Crowell dated June 30, 2018 and signed by Edward Lang, DC, RN.

353.     Rafique has BILLED BCBSTX and Bill Crowell directly for his professional services. Rafique has also billed other similarly situated persons who have been held against their will, including Medicare patients like Diane Creel.

354.     A pattern of racketeering activity is also demonstrated via the actions that Dr. Rafique took towards Diane Creel, who was detained at BHB via a fraudulent telehealth appointment facilitated by Yupo Jesse Chang, including a facsimile transmission on August 6, 2017, where on a Sunday, Rafique was able to get a court order to detain her at BHB in an amount of time that is so short as to seem unbelievable. Dr. Rafique is the medical director of BHB, he has the power to admit people to the hospital, keep them in there, and not discharge them, whether the people want to be in the hospital or not. In these ways, Rafique participated in the affairs of the enterprise, including the operation or management of the enterprise itself.

355.     Crowell was never treated for the depression that was used as the basis to admit him. His preadmission assessment was fraudulent. Dr. Rafique made a misrepresentation over the wires when he obtained precertification information for Crowell for treatment that he did not need. Rafique then fraudulently billed Blue Cross Blue Shield for treatment provided to Crowell for services that he did not need. He enabled the billing of Medicare for other patients for services that were essentially worthless. Rafique was a willing participant in the fraud involving the Connection and the Yupo Jesse Chang entities and associated doctors, which and allowed patient to be admitted on the basis of an examination that never took place and detained based on an examination that never took place.  With respect to Creel, the fraud went to Medicare via her health plan.

356.     Rafique was aware of and associated with this association-in-fact enterprise through his relationships with BHB, Behavioral Connections, and the doctors affiliated with Yupo Jesse Chang and that he agreed to participate in fraud to assist in what he knew was a scheme to enrich the UHS Defendants, BHB, and others. The allegations of his willing participation in the fraud over an extended period of time (from 2015 through present) are

sufficient to infer his knowledge of and participation in the alleged scheme to defraud and thus to support a finding of his association with the alleged association-in-fact enterprise.

**MEHTA**

357.    Mehta is the Medical Director of the Connection and is also a Medical Director at Millwood, for C&A units, Geriatric unit and Excel centers. Mehta was aware of and associated with this association-in-fact enterprise through her relationships with Millwood, the Connection, and the doctors affiliated with Yupo Jesse Chang. She agreed to participate in fraud to assist in what she knew was a scheme to enrich the UHS Defendants, Millwood, and others. The allegations of his willing participation in the fraud over an extended period of time (from 2015 through present) are sufficient to infer her knowledge of and participation in the alleged scheme to defraud and thus to support a finding of her association with the alleged association-in-fact enterprise.

358.    Mehta was the physician for Yolanda McPherson. As McPherson's attending physician, Mehta was the recipient of a fraudulent preadmission assessment from Harmanpreet Buttar via the entities under the control of Defendant Yupo Jesse Chang. This precertification was a pretextual fraud that allowed the hospital to admit McPherson and was the conduit that allowed Mehta to bill McPherson.

359.    Mehta was the physician for Jalisa Green. As McPherson's attending physician, Mehta was the recipient of a fraudulent preadmission assessment from Quingguo Tao via the entities under the control of Defendant Yupo Jesse Chang. This precertification was a pretextual fraud that allowed the hospital to admit Green and was the conduit that allowed Mehta to bill Green. Green requested to leave multiple times.  Rather than discharge Green, who had Tricare, Mehta, in coordination with Millwood's "court coordinator" Candice Gordon, detained Green

involuntarily, against her will. Candice Gordon's email is candice.gordon@uhsinc.com. They had Morgan Wilson notarize the document, which they filed with the court.

360.    Mehta was a willing participant in the fraud involving the Connection and the Yupo Jesse Chang entities and associated doctors, which allowed two Plaintiffs to be admitted on the basis of an examination that never took place and detained based on an examination that never took place. Mehta is an aider and abettor and a co-conspirator under the Hobbs Act and the Travel Act; this enables the enterprise to engage in acts and threats of robbery, kidnapping, insurance (financial institution fraud 18 U.S.C. § 1344); Medicare and Tricare fraud, engaging in money laundering transactions (18 U.S.C. § 1956(7)(D) involving unlawful activity and proceeds under 1957, including money derived from insurance 18 U.S.C. §§ 657 & 666.

## MALONE

361.    As the Director of Adult Chemical Dependency at Millwood, Malone served an integral part in the Defendants' RICO enterprise. Malone aided and abetted the fraudulent certification of patients for admission, ensured that patients were kept at Millwood, and he refused to release them. Malone's activity further involves violations of the Travel act by the receipt of bribes, kickbacks, and remuneration, in violation of the Texas Bribery Statute and the Patient Solicitation Act, which are separate RICO predicate offenses. The Travel Act prohibits use of interstate facilities to promote or carry on certain unlawful activities, including extortion and bribery under state law. Malone also used threats of intimidation and coercion to create fear for patients. Malone's participation in the involuntary detention system of voluntary patients makes Malone an aider and abettor and a co-conspirator under the Hobbs Act and the Travel Act; this enables the enterprise to engage in acts and threats of robbery, kidnapping, insurance (financial institution fraud 18 U.S.C. § 1344); Medicare and Tricare fraud, engaging in money

laundering transactions (18 U.S.C. § 1956(7)(D)) involving unlawful activity and proceeds under 18 U.S.C. § 1957, including money derived from insurance and benefit programs. *See* 18 U.S.C. §§ 657 & 666.These allegations are true for Troy Harvey, and the specific allegations related to what happened to him and Malone's role are: As Harvey's attending physician, Malone was the recipient of a fraudulent preadmission assessment from Quingguo Tao via the entities under the control of Defendant Yupo Jesse Chang. This is predicate act one. This precertification was a pretextual fraud that allowed the hospital to admit Harvey and was the conduit that allowed Malone to bill Harvey. Additionally, Malone made a misrepresentation regarding Harvey who entered the hospital to only stay for 24 hours when Malone noted that Harvey would be there "at least a week." This is predicate act two. Malone upcoded Harvey's diagnosis to include suicidality, he diagnosed him as bipolar. This is predicate act three. Malone fraudulently documented that Harvey was suicidal when he said the exact opposite to a nurse and his wife repeatedly called to explain this—she begged to get him out of there. This is predicate act four. Harvey has alleged injury to property, including an allegation that he is out that he is out no more than $500 in money that he had to spend out of his pocket as a direct and proximate result of the RICO violations. In these ways, Malone participated in the affairs of the enterprise, including the operation or management of the enterprise itself.

## COUNTS IN THE ALTERNATIVE: VIOLATIONS OF THE REHABILITATION ACT

362.    Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

363.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and its implementing regulations require that any program or activity receiving Federal financial assistance may not discriminate against an otherwise qualified individual with a disability.

Programs or activities covered by Section 504 include corporations or private organizations principally engaged in the business of providing healthcare, 29 U.S.C. §794(b)(3). Under the ADA Amendment's Act, the definition of a disability for purposes of the Rehabilitation Act of 1973 conforms to the definitions of disability under the ADA, 29 U.S.C. §705(20)(B).

364.    Each defendant is principally engaged in the business of serving individuals with mental health issues, and as such, may not discriminate against a person because of their disability, pursuant to Section 504.

365.    The facts as previously described identify Plaintiffs as qualified individuals with a disability.

366.    The facts as previously described demonstrate violations of the regulations promulgated pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. §794. Such acts, omissions and failures by Defendants, caused injuries to Plaintiffs.

367.    Plaintiffs were discriminated against by the facilities and facility doctors, including by the alleged use of telemedicine to admit and detain Plaintiffs. The entire concept of utilizing telemedicine and clandestine doctors to secure patient's admissions violated the Rehabilitation Act.

368.    Each Defendant is a recipient of, directly or indirectly, of federal money, including Medicare dollars.

369.    At the time that each Plaintiff arrived at Defendant's facility, they suffered from a cognitive disability, including but not limited to: documented anxiety, depression and MS; all of which severely impaired the Plaintiffs' cognitive abilities. Each Defendant was part of a conspiracy to subject Plaintiffs to alleged telemedicine when each Defendant should have had

policies in place that would require doctors see the people in person, this allowed them to take advantage of Plaintiffs.

370.    Each Plaintiff suffered from a disability that was wholly unrelated to the alleged reason for their purported treatment, and each was entitled to an in person medical consult. Defendant's discriminatory conduct occurred before any treatment was provided and on the basis of an unrelated disability that had no bearing on the type of purported benefit or service that Defendants forced on Plaintiffs. In this way, Defendants took advantage of each Plaintiff, especially through the telemedicine system. When the diagnosis and treatment often hinges on behavior that must be visually observed, telephonic medicine has a discriminatory effect on the patient.

## COUNTS IN THE ALTERNATIVE: VIOLATIONS OF TEXAS DECEPTIVE TRADE PRACTICES ACT; TIE-IN STATUTE CHAPTER 164 OF THE TEXAS HEALTH AND SAFETY CODE

371.    Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

372.    Chapter 164 of the Texas Health and Safety Code requires an inpatient mental health facility to make certain disclosures to a prospective patient before the prospective patient may be admitted to the facility. Specifically, hospital staff was required to provide Plaintiffs the following: the availability of insurance coverage to pay for services, the expected daily costs of staying at the hospital or what part of the hospital costs they would be responsible for; who would be the attending physician providing her care; that the patient would be billed separately by the doctors or other medical professionals and services at the hospital; notice of Patient's Bill of Rights; a copy of such rights and the duty to obtain a signature from the prospective patient that she had received such rights. Moreover, once admitted the patient cannot be threatened or mislead about their right to leave the facility. See Texas Health & Safety Code §164.009.

373.    Chapter 164 of the Texas Health and Safety Code comprises the Treatment Facilities Marketing Practices Act. Tex. Health & Safety Code §§ 164.001 et seq. A person may bring suit under the DTPA for a violation of that Act. Tex. Health & Safety Code § 164.013. This type of claim is referred to as a "tie-in statute," meaning that the statute ties into the DTPA but with greater damages. Instead of being restricted to traditional DTPA damages, "the claimant… may recover any actual damages," and if the conduct was committed knowingly or intentionally, then "the trier of fact is authorized to award a total of not more than three times actual damages." Tex. Bus. & Comm. Code § 17.50(h). Under the DTPA, "each consumer who prevails shall be awarded court costs and reasonable and necessary attorneys' fees." Tex. Bus. & Comm. Code § 17.50(d). The DTPA/Chapter 164 claims include:

**Preadmission Violations:**

i.   Advertising, expressly or impliedly, the services of a treatment facility through the use of any unsubstantiated claims. Tex. Health & Safety Code § 164.010(1)(B);

ii.  Advertising, expressly or impliedly, the availability of intervention and assessment services unless and until the services are available and are provided by mental health professionals licensed or certified to provide the particular service. Id. § 164.010(2);

iii. Failure to disclose an affiliation between a treatment facility and its soliciting agents/ contractors, before soliciting a referral source or prospective patient, to induce a person to use the services of the treatment facility. Id. § 164.010(3);

iv.  Obtaining information considered confidential by state or federal law regarding a person for the purpose of soliciting that person to use the services of a treatment facility without consent. *Id.* § 164.010(4);

v.  Failure to provide, in writing, the estimated charge with an explanation that patient will be billed separately for services provided by mental health professionals. *Id.* § 164.009(a)(1);

vi.  Failure to provide, in writing, the name of the attending physician. *Id.* § 164.009(a)(2);

vii.  Failure to provide, in writing, the current "patient's bill of rights". *Id.* § 164.009(a)(3);

viii.  Misrepresentation made to a patient, parent, guardian, or spouse, about the availability or amount of insurance coverage available to the prospective patient. *Id.* § 164.009(b); and

ix.  Any recommendation or representation that a prospective patient be admitted for inpatient treatment unless the representation is made by a licensed physician or, subsequent to evaluation by a licensed physician, by a mental health professional. *Id.* § 164.009(d).

**Postadmission Violations:**

i.  If request to leave made against medical advice, unless made by a physician or made on the written instruction of a physician who has evaluated the patient within 48 hours of the representation, facility represents to the patient that the patient will be subject to an involuntary commitment proceeding or subsequent emergency detention. *Id.* 164.009(c)(1); and

ii.  If request to leave made against medical advice, facility represents that the patient's insurance company will refuse to pay all or any portion of the medical expenses previously incurred. *Id.* 164.009(c)(2).

374.    The Defendant Hospitals failed to satisfy the requisites in total or in part, as to each Plaintiff. Such failures rise to the level of a knowing violation of the Texas Deceptive Trade Practices Act, Texas, *see* Texas Health & Safety Code §164.013; Texas Business & Commerce Code, §17.46(b); §17.50(h).

375.    For this cause of action, Plaintiffs seek actual damages, treble damages, attorney's fees, and costs.

### COUNTS IN THE ALTERNATIVE: CLAIM FOR STATUTORY DAMAGES UNDER CHAPTER 321 OF THE TEXAS HEALTH & SAFETY CODE, VIOLATIONS OF THE TEXAS MENTAL HEALTH CODE

376.    Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

377.    A patient has a private cause of action against a mental health facility that violates Texas Health & Safety Code Chapters 241, 321, 571, 572, 574, 576, and 577 or any of the rules created to further those chapters. A plaintiff who is receiving care or treatment in or from the facility and who is harmed as a result of the violation may sue for "actual damages, including damages for mental anguish," "exemplary damages," and "reasonable attorney fees". TEX. HEALTH & SAFETY CODE §  321.003(a), (b), (c), & (d).

**a.  Chapter 241 Claims**

378.    Plaintiffs have a private cause of action against the mental health facilities for violating Texas Health & Safety Code Chapter 241, the Texas Hospital Licensing Law, for failing to have policies on patient transfers (§ 241.055) and for failing to secure the informed refusal of a patient or of a person acting on the patient's behalf to a transfer or to related examination and treatment (§ 241.027(e)).

**b.  Chapter 321 Claims**

---

379.    Plaintiffs have a cause of action against the facilities that violate Texas Health & Safety Code Chapter 321, Provision of Mental Health, Chemical Dependency, and Rehabilitation Services. These claims largely pertain to "bill of rights" violations. The claims in this case are for:

     x.   Failing to ensure that within 24 hours of admission that the rights specified in the written copy of the patient's bill of rights are explained to the person and, if appropriate, to the person's parent, orally, in simple, nontechnical terms in the person's primary language. § 321.002(f);

     xi.   Failing to ensure that each patient admitted "signs a copy of the document stating that the person had read the document and understands the rights specified in the document" § 321.002(g)(1);

     xii.   Failing to ensure that "the signed copy is made a part of the person's clinical record." § 321.002(g)(2); and

     xiii.   Failing to "prominently and conspicuously post a copy of the 'bill of rights' for display in a public area of the facility that is readily available to patients, residents, employees, and visitors" that is "in English and in a second language." § 321.002(h).

### c.  Texas Mental Health Code Claims [Chapter 571 to 578 Claims]

380.    A patient has a private cause of action against a mental health facility that violates Texas Health & Safety Code Title 7 Subtitle C [Sections 571.001 et seq. to 578.001 et seq.], known as the Texas Mental Health Code.

381.    Here Plaintiffs have Chapter 571 Claims because of each facility's failure to provide prescription medication information under § 571.0066; abusive treatment methods under § 571.0065; and failure to utilize the least restrictive appropriate setting under § 571.004.

382.    Plaintiffs contend that in addition to, and in the alternative to the foregoing, every one of the various allegations of acts and omissions, separate and apart from the above, and regardless of whether or not the Defendant Hospital is negligent or has acted intentionally as to other theories of recovery, constitutes violations of Plaintiffs' general patient rights under the Texas Mental Health Code, see Tex. Health & Safety Code, Title 7, Subtitle C, and the 25 Texas Administrative Code; Chapter 404.

383.    In addition, and in the alternative, Plaintiffs contend that their rights pursuant to Title 2, Article 3, Subchapter L, of the Tex. Health & Safety Code, relative to "Abuse, Neglect and Exploitation," and specifically found at the Texas Health & Safety Code § 576.021(5); 25 TAC 404.154(3) and 404.154(24) were likewise violated by Defendants.

384.    In consideration of these various statutory and regulatory violations by the Defendant Hospitals, pursuant to Title 4, Subtitle G, Chapter 321, § 321.003 of the Tex. Health & Safety Code, Plaintiffs bring forth a private cause of action predicated upon the violation of their *Patient Rights* by each Hospital Defendant.

385.    The Defendant Hospitals, by and through its agents, contractors and employees, failed to provide Plaintiffs services commensurate with their Patient Rights, which proximately caused injury to Plaintiffs.

386.    The use of falsified medical documents in order to admit patients by falsely claiming a medical examination took place violates § 572.002 of the Texas Health and Safety

Code, which requires a preliminary examination to determine whether a patient has symptoms of a mental illness.

387.     The failure to release patients who have requested so is in violation of § 572.004 of the Texas Health and Safety Code, which requires an employee to assist a patient with writing a request for dismissal if said patient expresses a desire to leave the facility as soon as possible. The facility must then either release the patient within four hours, or, under certain circumstances, obtain a written order for further detention by 4 p.m. the following day. Here, the facilities failed to follow these requirements. They are keeping people against their will, after the patients have requested to be released, without obtaining the required order of detention.

COUNTS IN THE ALTERNATIVE: FALSE IMPRISONMENT

388.     Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

389.     Plaintiffs allege that each Defendant Hospital, acting through its directors, officers, employees and agents, and contract services, willfully admitted Plaintiffs without following the standards set forth in Texas Health & Safety Code, Chapter 164 and as such each admission to the hospital and subsequent detention was wrongful, without legal authority or justification.

390.     As a direct and proximate result of Defendant's willful, unjustified, and irresponsible detention and confinement, each Plaintiff suffered a loss of their freedom, severe humiliation, embarrassment, fear, frustration and mental anguish.

391.     As a direct and proximate result of Defendant's willful, unjustified and irresponsible detention and confinement of Plaintiffs, they have incurred unnecessary medical

expenses and have been subjected to unnecessary and unwarranted medical services and other harms and losses.

**COUNTS IN THE ALTERNATIVE: CIVIL CONSPIRACY; WILLING PARTICIPATION IN TORTIOUS CONDUCT**

392.    Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

393.    Defendants all met with each other for an unlawful purpose or in addition and in the alternative, a lawful purpose but used unlawful means, and had a meeting of the minds on these unlawful objectives, committed an overt act in furtherance of such objectives, and Plaintiffs suffered an injury as a proximate result of such wrongful act.

394.    The reason for the conspiracy between the Defendants was to increase profits for all participants, especially the corporate entity: UHS.  To effectuate the conspiracy, Defendant UHS provided financial, administrative, and technical support as well as supervision and staff training on how local staff at the hospitals and the connection could increase admissions and lengths of stay for potential patients, to the financial benefit of both Defendants and to the detriment of people like the Plaintiffs in this cause.

395.    Plaintiffs allege that the Defendants, acting in concert with each other, and with intent to commit civil conspiracy, and by and through its directors, officers, employees, agents, and contract services, willfully conspired to admit Plaintiffs without following the standards set forth in Texas Health & Safety Code, Chapter 164 and violating Section 504 of the Rehabilitation Act of 1973 thereby.

396.    Additionally, Plaintiffs alleges that the Defendants, acting in concert with each other, and with intent to commit civil conspiracy, and by and through its directors, officers, employees and agents, and contract services, willfully conspired to treat Plaintiffs without

following the standards set forth in Texas Health & Safety Code, Chapter 571-577 and Chapter 321.

397.    Plaintiffs further allege that the Defendants, acting in concert with each other, and with intent to commit civil conspiracy, and by and through its directors, officers, employees and agents, and contract services, willfully conspired to treat Plaintiffs without following the standards set forth in Texas Health & Safety Code, Chapter 571-577 and Chapter 321.

398.    Plaintiffs additionally alleges that the Defendants, acting in concert with each other, and with intent to commit civil conspiracy, and by and through its directors, officers, employees and agents, and contract services, willfully conspired to falsely imprison Plaintiffs.

399.    As a direct and proximate result of Defendants conspiracy, Plaintiffs suffered injuries.

400.    As a direct and proximate result of Defendants civil conspiracy Plaintiffs incurred unnecessary expenses.

## COUNTS IN THE ALTERNATIVE: RESPONDEAT SUPERIOR

401.    Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

402.    Each Defendant is liable for the torts committed by employees or agents under its agency or control, including ostensible agency where those people were acting in the course and scope of their employment or agency at the time of the each occurrence.

## COUNTS IN THE ALTERNATIVE: NEGLIGENCE

403.    Plaintiffs incorporate by reference all of the above related paragraphs, as well as those below, with the same force and effect as if fully set forth herein.

404.    Plaintiffs allege that each Defendant violated the applicable standard of ordinary care by failing to act as a reasonably prudent person would under the same or similar circumstances.

405.    Plaintiffs allege that the UHS Defendants failed to properly manage, staff, supervise, train, and ensure its staff knew the law.

406.    Plaintiffs allege that the Hospital Defendants, acting through its directors, officers, employees and agents, and contract services, violated the duty of care it owed to Plaintiffs to exercise that degree of care, skill, supervision, and diligence ordinarily possessed and used by other mental health treatment centers and hospitals, under the same or similar circumstances.

407.    Plaintiffs allege that each Defendant were negligent in their capacity as health care providers, to the extent that they are health care providers and providing health care. Plaintiffs allege that the Defendants, when providing inpatient mental health when it was not necessary, or beneath the operative standards of care, such failure a violation of the relevant professional standards for a reasonable and prudent mental health and substance abuse treatment facility operating in Texas.

## COUNTS IN THE ALTERNATIVE: GROSS NEGLIGENCE

408.    Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

409.    Plaintiffs allege that each Defendant's conduct, as described above and as will be more developed at trial, constitutes gross negligence as defined by Texas law. The Defendants' conduct, when viewed objectively from the Defendants' standpoint, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and the Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded

with a conscious indifference to the rights, safety and welfare of others, including Plaintiff. The Defendants' gross negligence was a proximate cause of the occurrence made the basis of this action and all of Plaintiff's resulting injuries and damages.

## COUNTS IN THE ALTERNATIVE: SEXUAL EXPLOITATION BY MENTAL HEALTH SERVICES PROVIDERS

410.     Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

411.     Plaintiff Madison Hough, Yolanda McPherson, Tiffany Young, and Jalisa Green assert claims under Texas Civil Practice and Remedies Code Chapter 81 because of the sexual exploitation, sexual contact, and therapeutic deception, that each experienced at the hands of the mental health services providers employed by Mayhill, Millwood, and Hickory Trails. More specifically, Plaintiffs seek to hold the hospitals  accountable under Section 81.003(a)(2)(B) for the acts and omissions of its employees, agents, or ostensible agents for that proximately and actually caused their actual damages, including mental anguish, exemplary damages, and reasonable attorney's fees.

## COUNTS IN THE ALTERNATIVE: EXEMPLARY DAMAGES CAP BUSTING

412.     Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

413.     Plaintiffs allege that the exemplary damage caps do not apply because Defendants' conduct was felonious and was committed knowingly or intentionally in violation of

- Texas Penal Code Section 22.04 (injury to an elderly individual or disabled individual where the conduct was not health care),

- Texas Penal Code Section 32.21 (forgery),

- Texas Penal Code Section 32.43 (commercial bribery), and

---

- Texas Penal Code Section 32.46 (securing execution of document by deception).

## VI.
## DAMAGES, COSTS, AND INTEREST

414.    Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

415.    As a direct proximate result or as a producing cause of the acts and/or omissions described above, Plaintiffs have suffered injuries and damages for which Plaintiffs seek recovery from Defendants.

416.    As applicable, Plaintiffs seek damages for injury to business or property under RICO.

417.    As applicable, Plaintiffs seek equitable disgorgement of ill-gotten gains under RICO.

418.    As applicable, Plaintiffs seek full and fair compensation for actual damages.

419.    As applicable, Plaintiffs seek attorneys' fees.

420.    As applicable, Plaintiffs seek treble damages.

421.    As applicable, Plaintiffs seek exemplary or punitive damages considering (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant.

422.    In the alternative and additionally, Plaintiffs seek personal injury damages in amounts the jury deems to be fair and reasonable consisting of the following:

- Past and future physical pain and mental anguish;

- Past and future loss of earnings and earning capacity;

- Past and future disfigurement;

- Past and future physical impairment;

- Past and future medical and healthcare expenses and mental care expenses; and/or

- Any other actual or compensatory damages allowable by law.

423.    Plaintiffs also seek recovery for all costs of court and prejudgment and post-judgment interest at the maximum rates allowed by law.

## VII.
## PRAYER

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants and award Plaintiffs the following relief:

(i)    A sum of money—as determined by a jury to be fair and reasonable—within the jurisdictional limits of this Court for the damages indicated above, at the Plaintiffs' election of remedy, to the extent applicable;

(ii)    Pre-judgment and post-judgment interest at the maximum amount allowed by law;

(iii)    Costs of suit; and

(iv)    Such other and further relief to which Plaintiffs may be justly entitled.

RESPECTFULLY SUBMITTED:


**THE LAW OFFICES OF
FRANK L. BRANSON, P.C.**

*/s/ John Tindall Burkhead*
Frank L. Branson
Texas Bar No. 02899000
John Tindall Burkhead
Texas Bar No. 24072010
*jburkhead@flbranson.com*

Highland Park Place
4514 Cole Avenue, 18th Floor
Dallas, Texas 75205
214.522.0200 [Telephone]
214.521.5485 [Facsimile]

AND

**CIRKIEL & ASSOCIATES, P.C.**

*/s/ Martin J. Cirkiel*
Mr. Martin J. Cirkiel, Esq.
State Bar No.: 00783829
1901 E. Palm Valley Boulevard
Round Rock, Texas  78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 15th day of April, 2019, the foregoing document was electronically filed with the Clerk of the Court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the Court. As a result of that filing, the electronic filing system sent a "Notice of Electronic Filing", with the foregoing document attached, to all attorneys of record.

*/s/ John Tindall Burkhead*
John Tindall Burkhead
