**IN THE U.S. DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **BARBARA MEIER,** *et al.*, | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Case No. 4:18-cv-00615-ALM** |
| | § | |
| **UHS OF DELAWARE, INC.,** *et al.*, | § | |
| **Defendants.** | § | |

**PLANTIFFS' COMBINED RESPONSE TO (1) DEFENDANT SABAHAT FAHEEM'S**
**MOTION TO STRIKE OR LIMIT THE EXPERT REPORT AND TESTIMONY OF DR.**
**MARK BLOTCKY AND (2) DEFENDANTS' JOINT MOTION TO STRIKE**
**PLAINTIFFS' PHYSICIAN-EXPERT MARK BLOTCKY, M.D.**

Plaintiffs file this response to the Motion to Strike Dr. Mark Blotcky, M.D. filed by Dr.

Faheem and the Defendants' Joint Motion to Strike Plaintiffs' Physician-Expert, Mark Blotcky,

M.D., and in support show as follows:

**1.   Blotcky's Report complies with Rule 26(a)(2)(B)**

Dr. Mark Blotcky, M.D. ("Blotcky") has been practicing and teaching psychiatry in

Texas for over forty years. Currently, he is on the forensic psychiatry faculty at UT Southwestern

Medical School. He was a medical director at a private psychiatric hospital for many years, the

same hospital that trained Dr. Gary Malone. Blotcky is highly qualified to provide opinions in

this case.[1] Blotcky personally examined each of the Plaintiffs in this case who were admitted to a

UHS psychiatric hospital and reviewed records, depositions, and other materials as stated in his

report.

---

[1] Drs. Buttar, Tao, Tom, and the Chang Defendants argue that Blotcky is not qualified to provide opinions on telemedicine. The standard of care for telemedicine is the same as it is in person[1], and the teledoctors are all doing psychiatric practice. Dkt. No. 391 at *16. Plaintiffs contend that it is the teledoctors who are not qualified to be certifying people for admission to UHS hospitals without talking to them or telling them that they are involved in the transfer.

Defendants seek to strike Blotcky's entire report, in part, because Plaintiffs described the report in its disclosure as a "preliminary report" and because Blotcky reserved "the right to add, change, or modify my opinions based on additional review of information or collection of new information." *See* Dkt. No. 391 at *4. Plaintiffs' inclusion of this standard-designation language is not a valid basis to strike an expert report that was prepared with strong efforts and that provides what is, no doubt, the lion's share of the opinions, all while extensive document discovery and depositions remain ongoing on a near daily basis.[2]

Defendants state that Blotcky's report contains a "verbatim recitation of Plaintiffs' allegations as stated in their Third Amended Complaint," prior to providing an opinion that "not one of these patients met the medical necessity for admission." Dkt. No. 391 at *4.

Blotcky's report does not do that. Blotcky first explains what he was asked to do and by whom, what he reviewed, what his qualifications are, explains that he did an individual forensic psychiatric evaluation on each plaintiff who was admitted, and then provides specific impressions and opinions as to each plaintiff. The report goes on 49 pages and describes the diagnosis of each Plaintiff before it references the opinion about medical necessity.

Defendants want to exclude Dr. Blotcky's opinion on admission standards because Blotcky does not state "what the medical necessity standard is as it relates to each individual patient based on his or her symptomology at the time of admission, as well as how and why each patient did not meet the admission criteria." Dkt. No. 391 at *5.

---

[2] For example, since Blotcky's designation, Defendants have produced over 4000 pages of documents, Plaintiffs have produced over 4000 pages of documents, and several depositions have been noticed or are expected to soon be noticed.

However, Blotcky reviews the symptomology of each plaintiff at the time of admission *in detail*.[3] Blotcky then explains that each Plaintiff who was admitted reports "very different and less serious symptoms than what the medical records reflect." *Id.* at 51. Defendants never once address the fact that the admission criteria are set out in statutes, namely ones that are included as exhibits to Blotcky's report. *See id.* *121 (572.001 Request for Admission), *143 (573.022 Emergency Admission and Detention). Indeed, Blotcky also reviewed a number of depositions and documents that state from the various Defendant's perspectives what the admission criteria is.[4]

| Behavioral Hospital of Bellaire | | POLICY / PROCEDURE |
|---|---|---|
| **DATE ISSUED** | 11/19/2010 | |
| **DATE REVISED** | 08/25/2013 | **Involuntary Admissions** |
| **DATE REVIEWED** | 3/27/15, 3/14/16, 12/17/18 | |
| **ISSUED BY** | Intake and  Admissions Department | |

    a.    The right to not be detained for more than 24 hours after the hour of initial detention unless an order for further detention is obtained, except that if the 24-hour period ends on a Saturday of Sunday or a legal holiday or before 4 p.m. on the first business day succeeding the Saturday, Sunday, or legal holiday, the period of detention shall end no later than 4 p.m. of the first succeeding business day. In the case of an extreme weather emergency of disaster, a judge may also extend the period of detention by written order for no more that 24 hours at a time.

    b.    The right to be released if the physician determines that any one of the criteria for emergency detention, as outlined in the Texas Health and Safety Code. § 573.022, no longer apply. The right to be returned to the location of apprehension, place of residence, or other suitable place if released from emergency detention, unless the person is arrested or objects to the return.

Plaintiffs do not believe that Blotcky's report is deficient in this way, but if it is, any supplementation would be harmless because many defense witnesses have stated the standard.

---

[3] Dkt. 375-2 (Creel p.12-17), Crowell p.17-22, Green p.23-25, Harvey p.25-28, Hough p.28-32, McPherson p.32-35, Meier p.35-39, Stokes p.39-42, and Young p.43-49.
[4] *See, e.g.* BHB P&P 000013-15

For example, Dr. Jamal Rafique, M.D. (psychiatrist and medical director of Defendant Behavioral Hospital of Bellaire) testified: "In my opinion, the criterias [sic.] are very clear, a risk to self-harm and others, for psychiatric admissions."[5] Dr. Bianca Mickan, Ph.D. testified "I think the rule would be if they are a harm to themself or others or psychotic in some sense where they could be a harm to themself or others."[6] Licensed Professional Counselor Jan Arnett testified that the "criterion for admission is that they are imminent risk of harm to self or others."[7] Telemedicine doctor and former anesthesiologist Timothy Tom testified that the standard of care to order an involuntary admission is "a Risk -- danger of mental illness and risk of harm to self or others, imminent risk of harm to self or others."[8] Dr. Buttar testified that the admission orders provided when a telemedicine doctor orders an admission to a UHS hospital is an auto-generated certification that "the patient presents a current or potential threat to self, others, or property due to active manifestations of the psychiatric disorder, which warrants a controlled environment for continuous skilled observation, evaluation, and care, and is only available for the level of care chosen."[9]

An application of the factors supports allowing Blotcky's testimony on whether the Plaintiffs should have been admitted. First, Blotcky's testimony is important to Plaintiffs, especially concerning the issue of whether Plaintiffs met the admission criteria. Plaintiffs have long alleged that they did not need to be in the facilities at all. Indeed, this is the foundation of many of the Plaintiffs' theories against the Defendants. Moreover, Blotcky personally examined each Plaintiff, which took a significant logistical effort, and he is the only psychiatrist that Plaintiffs have specially retained as an expert. Second, there is little to no prejudice to the

---

[5] Dkt. 414-18 PageID #: 12497 Rafique Dep. 178:2-4.
[6] Dkt. No. 414-26 PageID #: 12909 – Mickan Dep. 24:19-21.
[7] Dkt. No. 414-1 - PageID #: 11716 – Arnett Dep. 39:10-22.
[8] Dkt No. 414-13 - PageID #: 12211 – Timothy Tom Dep. 119:1-22.
[9] *See* Dkt. No. 414-13 - PageID #s: 12247-48 – Buttar Dep. 51:22 – 52:6.

Defendants that is caused by this opinion, such that allowing the testimony would be harmless. Defendants have already expressed that the Plaintiffs needed to be admitted, and Defendants have already expressed the reasons that they believe that the Plaintiffs needed to be admitted. Numerous Defendants are psychiatrists who already have testified directly as to why they believe that the Plaintiffs needed to be admitted. The Defendants will have no trouble cross examining Dr. Blotcky on this opinion. Third, any potential prejudice could be cured through allowing a request for a continuance and/or a request to amend or supplement the report, which Plaintiffs seek to the extent that it is necessary. Finally, as for the fourth factor, any omission that may exist, to the extent that any such omission needs explaining, Plaintiffs assert that the standard is so well-recognized that it goes without stating, especially to people who own and direct psychiatric hospitals.[10] Considering these factors any failure to comply with Rule 26(a)(2)(B) is harmless, justified, or curable.

## 2.   <u>The cases Defendants cited are readily distinguishable from this case.</u>

### a.   *Flores v. AT&T Corp.* (*"Flores"*)

Defendants cite *Flores v. AT&T Corp.,* No. 17-CV-00318-DB, 2019 WL 2746774, at *7 (W.D. Tex. Mar. 27, 2019), to support its assertion that the third *"Geiserman"* factor should weigh in their favor because it "hinders Defendants' ability to designate appropriate responsive experts and to probe the basis for Dr. Blotcky's opinions." Dkt. No. 391 at *10-11. Defendants cite *Flores* as an example "concluding similar prejudice occurred." *Id.* But *Flores* is not a case that deals with the disclosure of experts. In Flores, the Plaintiff asked for sanctions because (1) AT&T failed to disclose the *names* of AT&T employees who created the Plaintiff's employment records that AT&T used as a basis for terminating the Plaintiff and (2) AT&T failed to disclose

---

[10] Plaintiffs also note that Defendants have several policy and procedure manuals that comment on admission criteria, and they appear to have designed specific documents so as to justify their admissions.

*relevant data* in native format *until after the close of the discovery period*. Further, AT&T apparently made some or all of these disclosures only in response to a motion for sanctions for failing to make the disclosure in the first place. *Id.* There are no such issues here.

### b.  *Law Funder, LLC v. Munoz* ("*Munoz*")

Defendants also cite *Law Funder, LLC v. Munoz*, No. 7:14-CV-00981, 2016 WL 8461423, at *1 (S.D. Tex. Dec. 9, 2016), *aff'd sub nom, Law Funder, L.L.C. v. Munoz*, 924 F.3d 753 (5th Cir. 2019), *as revised* (June 6, 2019) as an example of a case that describes "prejudice to opposing party as including conduct that prolongs litigation, increases litigation-related expenses, and prevents effective prosecution or defense of case." Dkt. No. 391 at *10. The issues and facts in *Munoz* are nothing like this case. In *Munoz*, the Defendants failed to respond to a request for production, promised to produce documents in response to a motion to compel, were ordered to produce the documents within 14 days, two months later had still failed to produce the documents, allowed one defense lawyer to withdraw and were provided time to find new counsel, allowed new counsel more time to respond, failed to appear at a hearing, failed to respond to additional requests for production, and failed to follow multiple court orders. Further, the defendants "materially impeded the discovery process," "asserted perfunctory objections to many of Plaintiff's requests for production," and were so uncooperative in scheduling depositions that the Court "had to order Defendants to appear."[11]

Here, Plaintiffs followed the Court's order on designation of experts. Plaintiffs do not understand why Defendants believe that there is any prejudice to them. Plaintiffs note that the request for an extension of their expert witness deadline was the result of *an agreed motion* in which Defendants also obtained an extension, and this Court has not cut off the discovery period

---

[11] There is even more bad conduct in *Munoz*.

until April. Plaintiffs suggest that Defendants do not like what Dr. Blotcky has to say, so they must adopt a scorched-earth style to attack his testimony.[12]

### c. *Hamburger v. State Farm Mut. Auto. Ins. Co.* ("*Hamburger*")

Defendants cite *Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 882 (5th Cir. 2004), and suggest that Plaintiffs have violated the trial court's Scheduling Order. In *Hamburger*, the trial court's Scheduling Order required the Plaintiff to designate experts by February 1, 2002, but Hamburger did not designate Dr. Fitzgerald (a non-retained, treating doctor) as an expert until April 30, 2002. The 5th Circuit upheld Judge Lynn's exclusion of the expert.[13] In contrast, Plaintiffs designation here was timely.

### d. *Honey Love v. United States* ("*Honey-Love*")

Defendants cite *Honey-Love v. United States*, 664 Fed. App'x 358 (5th Cir. 2016), providing a pincite that is not in the opinion, and assert: "The Fifth Circuit has held that, where an expert report does not offer an opinion as to each named defendant, it failed to meet the disclosure requirements." Dkt. No. 391 at *5, 7, 9.

First, it is important to acknowledge that this is not the holding of *Honey-Love*. The *Honey-Love* case simply held: "Because the exclusion of Honey–Love's expert witness

---

[12] Plaintiffs note that they are the true victims of any conduct that has prolonged this litigation, increased litigation-related expenses, or prevented effective prosecution or defense of case. Plaintiffs have had to respond to repeated barrages of motions to dismiss, have had to repeatedly amend deposition notices because witnesses or counsel became unavailable, have had a friend and a coworker of one Plaintiff subpoenaed without being asked if it was a convenient time for them and then the Defense lawyer took down the subpoena without notifying the witness of the change. Plaintiffs have had to repeatedly ask for document and witness discovery, and on numerous occasions provided dates for Defendants to depose all of their clients (which Defendants have still not noticed). Plaintiffs received the production of almost 4000 pages of documents after their deadline to designate experts and to respond to motions for summary judgment. It was not until yesterday that Plaintiffs received the employment file of Defendant (convicted felon and former Mayhill employee) Chad Ellis (whose deposition was begun today and not finished because Ellis refused to answer any more of Plaintiffs' counsel's questions and no other parties had questions for him at that time). Indeed, there is still a large amount of information that the Plaintiffs are seeking, including ANSI 835, 837, 230, and 231 data. Plaintiffs are also still seeking the payment records related to Rafique. Plaintiffs do not yet have the claim billing data from several doctors in this case for their own claims. Many of Plaintiffs requests for relevant information are still being ignored.

[13] Besides, the *Hamburger* case was remanded on a causation issue, and the court was told it could reconsider the issue on retrial. *Id.* at n.5.

---

testimony was not an abuse of discretion and because there is no genuine dispute as to any material fact regarding Honey–Love's medical negligence claim, we AFFIRM." 664 Fed. App'x. at 359. Second, even if that were the case's holding (or even actual dicta), *Honey-Love* is an unpublished case under 5TH CIR. R. 47.5.4, which means that the case is "not precedent, except under the doctrine of res judicata, collateral estoppel or law of the case (or similarly to show double jeopardy, notice, sanctionable conduct, entitlement to attorney's  fees, or the like)."

In *Honey-Love,* the court's decision appeared driven by qualification problems. In particular, the plaintiff hired a "family practice physician" with "geriatric wound care experience, primarily in nursing homes," to testify against doctors who apparently perform "contracted surgery" on patients with "spinal cord injuries." *Id.* at 360. Remarkably, the expert alleged breaches of care by nonparties (against whom he might have been qualified to testify about, such as nurses and the VA facility itself), but the expert failed to provide any opinion on the elements of duty or breach for any providers who were actually parties. *Id.* at 362 ("While Dr. Davey's report alleges breaches of care by the VAMC and nurses, VAMC and its nurses are not parties to this case.").

Here, Dr. Blotcky is not going outside of his realm of expertise. Dr. Blotcky has been practicing and teaching psychiatry at the medical school since 1977. Dkt. 375-2 at *59. He was a medical director at Timberlawn psychiatric hospital. *Id.* Dr. Blotcky has lectured and published extensively over his career, including on topics that address providing care to patients in an inpatient setting. *See id.* at *68-79.

In *Honey-Love*, the struck report failed to "specifically reference" any medical records, failed to mention any exhibits, "because no such exhibits exist," and failed "to provide a complete list of cases as required by the rule." *Id.* Here, Dr. Blotcky cited to specific pages of

records, s*ee, e.g.*, Dkt. 375-2  at 39, and Dr. Blotcky provided a complete list of cases where he provided trial or deposition testimony in the past four years (there is only one): "Lancashire v. Barnes – Family Law Case – 11/20/19 deposition." *Id.*  at *3.

**e.   *United States ex rel. DeKort v. Integrated Coast Guard Sys.* ("*De Kort*")**

Defendants cite *United States ex rel. DeKort v. Integrated Coast Guard Sys.,* 2010 WL 11614901, at *4 n.2 (N.D. Tex. Mar. 25, 2010). Dkt. No. 391 at *11. In *DeKort*, the trial court limited a report offered on damages that did not provide any estimate on damages. *Id.* Here, Blotcky explained a number of damages for each specific plaintiff.

In *DeKort,* the relator did not dispute that the report was preliminary, which Plaintiffs here do. Plaintiffs' use of the word preliminary was intended to allow the expert to add or modify opinions as additional discovery was produced, not to indicate that the expert's current opinions were incomplete such that the opinions would not be useable.

In *DeKort,* the relator conceded that the testimony was "'relatively insignificant'" ***Id.*** Here, Plaintiffs state (and the evidence shows) that Blotcky's testimony is very significant. For example, Plaintiffs have spent almost $50,000 on Blotcky's time, and his report recounts an examination of each Plaintiff.

In *DeKort*, there was no request to move the extension of the expert designation deadline beyond what was already set. Here, all parties agreed that they needed "additional time to designate experts," and they filed a motion to modify the scheduling order. Dkt. No. 296 ¶¶ 3, 6. Plaintiffs requested, and Defendants agreed, that Plaintiffs could have until January 3, 2020 to designate its experts.[14] Here, the Parties request for a continuance was denied.[15]

---

[14] Dkt. No. 296-1 at PageID #: 7131.
[15] Dkt. No. 297

In *DeKort*, the relator waited until one day before his response to Defendants' motion to exclude was due, and three weeks after the expert designation deadline, to request additional information regarding the invoices from Defendants in the form of a set of interrogatories. Here, Plaintiffs have been pressing and repeatedly asking for additional information for approximately one year to fully examine the interlocking financial relationships and billing practices of the Defendants. Under Eastern District of Texas practice, Plaintiffs do not believe that they need to do anything beyond specifically ask for the materials, which they have done repeatedly. Plaintiffs' report is a reflection of what could be provided at the time of the report's generation. It does not mean that the report is preliminary and defective as a matter of procedure, and it does not mean that the report cannot be supplemented later specifically because of information that Plaintiffs did not have access to at the time of designation.

In *DeKort,* the expert's testimony was of a "contingent nature," and allowing his testimony would cause "further delays in a case that is well over three (3) years old." Nevertheless, the Court, recognized that "exclusion of evidence is a harsh penalty and should be used sparingly," and instead of striking the expert, instead limited the expert's testimony to the specific information contained in his preliminary report. *Id.* (quoting *Lee v. Valdez*, 2008 WL 4287730, at *3 (N.D. Tex. Sep. 18, 2008) (Fitzwater, J).

### f.  *Brimer v. Chase Bank*

Defendants cite *Brimer v. Chase Bank*, No. 7:10-CV-7-O, 2011 WL 13233317, at *1 (N.D. Tex. Jan. 13, 2011). Dkt. No. 391 at *6, 7, 18. In *Brimer*, the expert report failed to "provide any documents considered by the expert in forming the opinions." *Id.* That report was "deficient on its face." *Id.* Here, it took Blotcky over 9 pages to list out the documents that he considered and relied upon in forming his opinions. Dkt. 375-2 at *3-12.

In *Brimer*, an opportunity was provided "to amend the report to comply with the Rules," and Brimer "ultimately declined to amend or supplement the Report." Here, Defendants never provided Plaintiffs with an opportunity to amend the report or to supplement the report to address any perceived deficiencies. Defendants filed a motion to strike the entire report and said that the report could not be cured.

In *Brimer*, no response was provided to the Motion to Strike, and no justification was provided for any alleged deficiencies. Here Plaintiffs have provided a response and justifications.

**g.   *Space Maker Designs, Inc. v. Weldon F. Stump & Co.* ("Space Maker")**

Defendants also cite *Space Maker Designs, Inc. v. Weldon F. Stump & Co.*, No. CIV. 3:02-CV-0378-H, 2003 WL 21805274, at *3 (N.D. Tex. Mar. 13, 2003). Dkt 391 *6, 7, 18. In *Space Maker*, Judge Sanders struck an expert who wrote a "two-page report" where, "a full page was dedicated to questions that he would need to have answered to 'address the specific issues' raised by the Plaintiff's Expert's report." The court wrote:

> At best, Lyon's report may be considered complete if the ONLY issue that Lyon will testify to at trial is that of economic factors not taken into consideration by Soward. However, if that is the case Lyon's report suffers from a *Daubert* problem; Lyon is not qualified to testify as to the effect of economic indicators on expected profits. His resume indicates that he is a certified public accountant, licensed real estate broker, and possesses securities and insurance licenses. None of those licenses make him qualified to opine on economic trends and their likely effects on profits. Nor is there any other indicator in Lyon's resume that he is qualified to opine on economic issues.

*Id.* The expert then filed an affidavit to supplement the two page report, but the Court found that the affidavit was not a true supplement because it "addressed many issues not raised in the initial report." *Id.*

Unlike the expert in *Space Maker*,[16] and as previously explained, Dr. Blotcky is qualified to render the opinions. And further unlike the expert in *Space Maker*, Dr. Blotcky's report is more than two pages (Blotcky's report, excluding his CV and excluding exhibits, is approximately 57 pages).

**3.   The Hospital Defendants are adequately addressed in the report**

Defendants also complain that Blotcky's report fails to provide factual predicates for opinions against the Defendant Hospitals, but he does that numerous times. For example, Blotcky generally describes the following factually-driven violations (375-2 *52-54):

- "The use of a telemedicine evaluation," by a "non-psychiatrist," in order "to determine the need for admission."
- "The failure to assess need and appropriateness of admission"
- The "failure to obtain a voluntary admission document signed by a patient"
- The "failure to release patients upon request"
- The "failure to communicate with family members"
- The hospitals failed "to provide adequate treatment interventions (e. g. individual therapy and psychiatric assessment deriving a treatment plan)."

These general opinions are supported by facts that are contained in numerous places in other parts of his report, which is segregated into a number of patient-specific segments.[17]

Blotcky also describes more specific violations by the hospital defendants. For example, Blotcky describes a number of highly specific incidents that occurred at particular hospitals at particular times, to particular plaintiffs (375-2 *52-57):

- With the Houghs, physically attacking family members and filing assault charges.
- With Crowell, failure to respond to an insulin dependent diabetic in a hypoglycemic episode in any way- a potentially fatal episode. This was inhumane and inadequate

---

[16] Plaintiffs note that there were two experts in Space Maker whose reports were discussed but the citing reference in Defendants' motion to *Space Maker* included a parenthetical citation to *Sierra Club v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 571 (5th Cir.1996) (cert. denied 519 U.S. 811 (1996)), and that citation is contained in the discussion of the first expert, Lyon. Plaintiffs further note that it would not make a difference which expert were referenced because the second expert discussed, Star, failed to examine the equipment at issue in the valuation dispute. Here, Blotcky examined the Plaintiffs.

[17] *See Id.* (Creel p.12-17, Crowell p.17-22, Green p.23-25, Harvey p.25-28, Hough p.28-32, McPherson p.32-35, Meier p.35-39, Stokes p.39-42, and Young p.43-49).

treatment. He was also sent improperly into a substance abuse program when none was needed.
- With Young, she had an inadequate evaluation at admission and failed to be discharged when she asked.
- With Green, she asked to get out and was not provided a form, she was no danger, which was supported by the nursing notes and they would not let her leave.
- With Hough she was not provided the appropriate treatment setting because she was admitted to a geriatric unit and provided geriatric care which evidences that they are trying to fill a bed.
- With Crowell, Harvey, Young, Hough, Green, the facilities secured the admission documents by deception by giving them the impression that they were voluntary and upon request could leave the facility.

**4.   <u>The Doctors are adequately addressed</u>**

Defendants complain about two of Blotcky's opinions (#24 and #40) where it looks like he Blotcky did not finish his opinion. *See* Dkt. 383 *8. The first opinion, #24, contains a typographical error. It should not have included the word "with" at the end of it. The second opinion #40 is an incomplete opinion, because at the time that Dr. Blotcky made his report, the Defendants had not produced a massive amount of payment data—and Defendants have still not produced a massive amount of payment data. Blotcky should be allowed to express opinions as to whether any of the payment relationships were improper once the payment data has been produced. Defendants have the evidence, and they can provide it to an expert to say that the evidence does not prove improper payments.

Defendants argument on causation is not clear. It seems that they argue that Blotcky's report fails to address causation because it is only stated in one sentence (which is wrong), Dkt. 391 *15., and then Defendants state that Blotcky "establish[es] causation throughout his report." Dkt. 391 *15. But that is the nature of opinions, they are personal. Questions of causation of injury by a forensic psychiatric expert are an appropriate subject for cross examination. *K.W.P. v. Kansas City Pub. Sch.*, 296 F. Supp. 3d 1121, 1130 (W.D. Mo. 2017); *see also Sanford v. Russell*, 387 F. Supp. 3d 774, 779 (E.D. Mich. 2019) ("Dr. Aaron's discussion about the

plaintiff's past and present life situations, and his feelings about his prison experience, is not simply an untethered exegesis on the plaintiff's state of mind. Instead, those discussions provide the background for the opinion on damages"). Defendants also did not address whether any causation opinions would be appropriate under producing cause standards under the DTPA.

**5. Dr. Blotcky's opinions are admissible under Fed. R. Evid. 702 and _Daubert_.**

**a. Blotcky's methodology is reliable.**

Blotcky's methodology is peer reviewed.[18] According to the American Academy of Psychiatry and the Law, "forensic assessment is one of the basic building blocks that form the foundation of the practice of psychiatry and the law, in addition to report-writing and giving testimony in court." _Id._

An expert's review of medical records, as well as an in-person meeting with an injured person, is a reliable foundation on which to issue an opinion on the nature and extent of an injury or incapacity. _United States v. Lopez-Hodgson_, 333 F. App'x 347, 354 (10th Cir. 2009) (forensic psychologist reliable method); _Clark v. W&M Kraft, Inc._, 476 Fed. Appx. 612, 615-16 (6th Cir. 2012) (medical school professor was qualified to discuss brain injury impairment when board certified in forensic psychiatry and published in relevant field); _see also R.W. v. Bd. of Regents of the Univ. Sys. of Ga._, 114 F. Supp. 3d 1260, 1273 (N.D. Ga. 2015) (forensic psychiatrist qualified and utilized a reliable methodology); _R.G. by Guse v. Sch. Bd. of Seminole Cty., Fla._, No. 607CV834ORL28GJK, 2009 WL 10706044, at *6 (M.D. Fla. May 11, 2009) (numerous forensic psychiatrists had reliable methodology even where no interview with subject of testimony).

---

[18] https://www.aapl.org/docs/pdf/Forensic_Assessment.pdf

**6.  Blotcky's opinions on the ultimate issue are appropriate under FED. R. EVID. 704**

Defendants argue that Blotcky's opinions concerning violations of law are inadmissible legal conclusions. But the Federal Rules of Evidence long-ago abolished the prohibition on expressing opinions on the ultimate issue. FED. R. EVID. 704. The only exception stated in the rule concerns *mens rea* in criminal cases. *Id.* 704(b). Otherwise, "testimony in the form of an opinion or inference, otherwise admissible, is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *Id.* 704(a). Trial judges receive "a relatively wide degree of discretion in admitting or excluding testimony which arguably contains a legal conclusion." *United States v. Parris*, 243 F.3d 286, 288 (6th Cir. 2001). The 5th Circuit gives an example in the Advisory Committee Notes:

> The question "Did T have capacity to make a will?" should be excluded.
>
> The question "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" is permissible.

*Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).

A court may not be able to rule in advance as to whether "every possible question that the Defendants may ask this expert that in any way relates to" a legal conclusion: "untruthfulness." Accordingly, the offering party may ask questions under guidelines, and the Court can "rule on objections as they arise at trial." This can be handled in liminie. *Tingle v. Hebert*, No. CV 15-626-JWD-EWD, 2018 WL 2287028, at *9 (M.D. La. Apr. 23, 2018).

**7.  Defendants complaints can be addressed via cross examination**

Defendants point out many items that they believe are deficient, missing, not considered, or not stated by Blotcky. The appropriate remedy is to cross examine Dr. Blotcky. Plaintiffs explain some of how the alleged discrepancies can be addressed by cross examination. Complaints about what a particular forensic psychiatrist reviewed or did not review or consider

in forming opinions are appropriate for cross examination. *First Data Corp. v. Konya*, No. CIV.A. 04-CV-00856JL, 2007 WL 2116378, at *1 (D. Colo. July 20, 2007) ("complaints that Dr. Ziegler glossed over facts and the nature of the disease process (which First Data claims progresses slowly) is the stuff of cross-examination and rebuttal by qualified experts of First Data's choosing. It does not warrant exclusion"). Federal courts in Texas appoint forensic psychiatrists to render opinions. *See, e.g., Shadix-Marasco v. Austin Reg'l Clinic P.A.*, No. A-09-CA-891 LY, 2011 WL 2011483, at *4 (W.D. Tex. May 20, 2011) (noting areas appropriate for cross examination).

### a. Blotcky's perceived failure to address Plaintiffs claims under the Rehabilitation Act or RICO

Faheem believes that Blotcky's Report does not specifically mention or address Plaintiffs' claims under RICO or the Rehabilitation Act and that Dr. Blotcky does not purport to be an expert in evaluating claims under those statutes. Dkt. 383 ¶1 at *2. Although it is not the primary thrust of the report, Blotcky's report does address the Plaintiffs RICO claims and Plaintiffs Rehabilitation Act claims. For instance, Blotcky states "the hospital does not appear in compliance with the Rehabilitation Act," in discussing the review of documents related to Barbara Meier. Blotcky explained how Plaintiffs did not have a sense of control over their care. Blotcky explains items that should have been provided to Plaintiffs that were not. Blotcky specifically includes "RICO" and "health care fraud" in his CV as specific areas under which he provides forensic psychiatric services.[19]   Defendants can cross examine on this issue.

### b. Blotcky's perceived failure to consider three depositions

Faheem believes that because Dr. Blotcky's report does not state that he reviewed the depositions of Stokes, Hough, and Meier's daughter Cindy Roeschen, then his opinions are not

---

[19] Document 375-2 Page ID#: 9271.

valid. But these are issues for cross examination. As to Hough, Blotcky interviewed her in person. Plaintiffs' counsel also believes that Blotcky reviewed Hough's deposition but did not mention that in his report, but Plaintiffs could supplement this information if needed. Besides, Hough explained numerous times[20] in her deposition that she did not attempt suicide when she took ibproufein:

```
          17        Q.   Did you tell the paramedics that you wanted to
          18   hurt yourself?
          19        A.   No.
02:18:23  20        Q.   Did you want to hurt yourself when you took
          21   those pills?
          22        A.   Absolutely not.
```

WHEREFORE, Plaintiffs pray that the Court Deny Defendants Motions to Strike Blotcky.

---

[20] *See, e.g.*, Dkt. 414-5 - Hough Dep. 163:17-22 - PageID #:  11897.

Respectfully submitted,

/s/ *John Tindall Burkhead*
John Tindall Burkhead
State Bar No. 24072010
jburkhead@flbranson.com
THE LAW OFFICES OF FRANK L. BRANSON, P.C.
Highland Park Place
4514 Cole Avenue, 18th Floor
Dallas, Texas 75205
Tel: (214) 522-0200
Fax: (214) 521-5485

/s/ *Martin J. Cirkiel*
Martin J. Cirkiel
State Bar No. 00783829
marty@cirkielaw.com
CIRKIEL & ASSOCIATES, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas 78664
Tel: (512) 244-6658
Fax: (512) 244-6014

**ATTORNEYS FOR PLAINTIFFS**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record via the CM/ECF System on this 20th day of December, 2019.

/s/ *John Tindall Burkhead*
John Tindall Burkhead