# EXHIBIT "1-B"

# PROFESSIONAL PSYCHIATRIC ASSOCIATES
ONE WASHINGTON STREET, SUITE 302
WELLESLEY HILLS, MASSACHUSETTS 02481-1706
TEL (781) 591-5221
Fax (781) 235-6390

**Douglas G. Jacobs, MD**
E-mail: drj@djacobsmd.com

January 6, 2020

Mr. Gary Lykins
Settle Pou
3333 Lee Parkway
8th Floor
Dallas, TX 75219

*Re: Meier v. UHS of Delaware (Malone)*

Dear Mr. Lykins,

At your request, I have reviewed the following information in the above-named case:

Plaintiff's First Amended Complaint
Plaintiff's Second Amended Original Complaint
Plaintiff's Third Amended Original Complaint
Report of Mark Blotcky, MD
Deposition of Gary Malone, MD
Deposition of Troy Harvey
Medical Records of Troy Harvey:
    Arlington Counseling & Therapy Services
    USMD Hospital
    Millwood Hospital
    Military Records
    Pharmacy Records
    Texas Health Physicians
    Arlington Orthopedic Associates
    Cosco Pharmacy

Re:   *Meier v. UHS of Delaware (Malone)*

It is my opinion to a reasonable degree of psychiatric certainty based upon my review of the above-named materials, and my training and experience that the assessment of, treatment of, and discharge of Troy Harvey by Dr. Gary Malone were appropriate. In the report below, I will review my qualifications, highlight the relevant clinical history of Mr. Harvey, cite the bases for my opinion, and respond to the criticisms by plaintiff's expert of Dr. Malone.

## QUALIFICATIONS

### Professional Background: A Commitment to the Study of Suicide

I have been on the faculty of Harvard Medical School since 1975 and am currently an Associate Professor of Psychiatry, part-time at Harvard Medical School. In the very first year of my psychiatry residency in 1972, a patient I was caring for hung himself while on a suicide watch. Fortunately, he was found in time and did not suffer physical sequelae. As a psychiatric resident beginning my career, this experience was overwhelming. Yet, it has provided me with a direction in my career, which has included multiple relevant areas such as understanding, 1, the etiology of suicidal behavior 2, the appreciation of and identification of risk factors 3, clinical assessment, and 4, treatment. Every professional activity that I have engaged in since that time has been stimulated by that experience.

I have edited three books and written numerous peer reviewed articles on suicide. I have organized and led academic seminars, locally for Harvard faculty and students, and nationally for other mental health professionals, on the subject of suicide and other psychiatric topics such as depression. I currently teach suicide assessment to Harvard Medical School students and consult to an inpatient psychiatric unit on the assessment and care of suicidal patients at a Harvard affiliated psychiatric hospital.

In addition to lecturing Harvard Medical School students and faculty on the subject of suicide assessment, I edited *The Harvard Medical School Guide to Suicide Assessment and Intervention*, an official textbook of Harvard Medical School. Another highlight of my career was my appointment by the American Psychiatric Association (APA) in 2001 as Chairperson of its Work Group to develop clinical practice guidelines on suicide assessment and treatment of patients with suicidal behaviors. The Guideline was published in 2003 and is entitled The *APA's Practice*

*Guideline for the Assessment and Treatment of Patients with Suicidal Behaviors* (APA Practice Guideline). My work has continued in this area as a member of the 2015 APA Work Group for the Practice Guideline on Psychiatric Evaluation, which was charged with developing evidence-based recommendations for psychiatrists that address different aspects of the psychiatric evaluation process. Work Group members were asked to develop key clinical questions based on clinical experience and evidence-based material on areas for which they have expertise, which in my case is the assessment of individuals' risk for suicide and aggressive behaviors.

### Clinical Practice-Focus on Suicide and Suicidal Behaviors

Since completing my residency, I have had an active clinical practice in which at least 20% to 30% of my patients have been actively suicidal. I have had more than 45 years of experience evaluating, treating, and consulting about suicidal patients. For example, between 1975 and 1983, I served as Director of Psychiatric Emergency Services at The Cambridge Hospital, where I was responsible for supervising, personally evaluating, and determining whether or not a patient met medical necessity for inpatient psychiatric hospitalization of roughly 4,000 psychiatric emergencies per year, including a majority of whom were expressing suicidal ideation. As a result of this, and my extensive experience in both hospital-based psychiatric care, and private practice, I have developed expertise in examining, understanding and treating a diverse range of suicidal patients with specific emphasis about the relationship between patient safety and treatment setting.

### Medical Legal Experience

I have been qualified as an expert by numerous state and federal courts in medical/legal matters involving mental disorders, particularly depression, bipolar disorder, and suicide. I have testified in both civil and criminal cases on behalf of plaintiffs, defendants, and governmental agencies. I also have testified before Congress and the FDA on the subject of mood disorders, suicide, and principles of causation. I have never been disqualified or prohibited by any court from providing expert testimony on any topic or matter.

In terms of expert fees, I charge $650 per hour. My Curriculum Vitae and Trial/Deposition Case Listing are attached.

## BACKGROUND

In 2016, Troy Harvey was a 51-year-old married male when he presented to the Emergency Room at USMD Hospital at Arlington with a chief complaint of *"feels anxious, irritable, depression and suicidal ideation x2 weeks, and quit job impulsively."* The history that was provided by both Mr. Harvey and his wife, Becky, indicated that he was in his usual state of health until September 20, 2016, when he was prescribed a Medrol Pak by his Orthopedist, Dr. Berman, for ongoing pain in his knee that had become acute. At USMD, Mr. Harvey was assessed to have suicide intent, with a specific thought of wanting to run/crash his car into a wall. He was noted to have associated symptoms of *"depressed, angry, agitated, paranoid and aggressive but not violent."*

Mr. Harvey was cleared medically and then evaluated by a mental health clinician. It should be noted that both Mr. and Mrs. Harvey signed "universal consent for treatment" as well as the admission acknowledgment. The mental health clinician assessed Mr. Harvey after Mr. Harvey signed "the assessment services disclosure statement, and consent to assessment form." The clinician learned from Mrs. Harvey that Mr. Harvey had *"an altered mental status since Friday (September 30th). Since then, he zones out and is easily angered. Threatened to run his car into a wall. Started decompensating when he started on steroids. Quit his job impulsively."* During this assessment, Mr. Harvey acknowledged that he had depressive symptoms, sleep disturbance, eating disturbance, and was easily angered. The clinician noted that Mr. Harvey had current suicidal ideation, plan, intent and with indication of intentional serious/lethal harm. There was no history of suicide attempts. The following risk factors were checked: 45 and older, history of major depression, blunted/flat affect, organized plan with lethal intent, problems with significant others, and loss of employment. The suicide risk was determined to be **imminent** risk. Based on this assessment, the clinician recommended Level 1 which was inpatient level of care due to behavior that is imminently threatening, destructive or disturbing to self or others. Millwood Hospital was contacted, and subsequently accepted Mr. Harvey for admission. It should be noted that USMD Hospital is a medical and surgical facility that does not provide inpatient or outpatient behavioral health care. Moreover, there is no statement in the USMD record that Mr. Harvey was promised that he was being referred to Millwood Hospital for a 24-hour observation

period. It was clear that the referral for Mr. Harvey was for Level 1 care-inpatient hospitalization.

### ADMISSION TO MILLWOOD, WITH PARTICULAR ATTENTION TO DR. MALONE'S ASSESSMENT OF, TREATMENT OF & DISCHARGE OF TROY HARVEY

As part of the admission process to Millwood, Dr. Tao had a MOT with a physician at USMD. Dr. Tao documented that Mr. Harvey had a chief complaint of suicidal ideation, and in addition, had threatened to run his car into a wall, was easily angered and had altered mental status. Dr. Tao further documented that Mr. Harvey was suicidal with positive suicidal thoughts and positive plan and certified that Mr. Harvey met the medical/psychiatric necessary criteria for admission to inpatient care and that the patient's condition could be reasonably expected to improve with this level of care. The determination of the length of stay was deferred to the attending psychiatrist who was Dr. Malone. Mr. Harvey was admitted on a voluntary status with a diagnosis of bipolar disorder, current episode mixed, severe without psychotic features and was placed on suicide precautions with 15-minute checks.

During the admission process, a brief triage form was completed by nursing staff which indicated that Mr. Harvey was seeking inpatient treatment and had the following areas of concern: does not stay asleep at night, has anxiety and high levels of stress, depression and **feelings of wanting to harm self**. The nurse documented that Mr. Harvey reported that he had an adverse reaction to medication to the point of wanting to harm self. This same nurse completed the integrated intake and psychosocial assessment which concluded that Level 1 is recommended which is inpatient level of care with the following diagnosis-MDD without psychotic features. In terms of treatment program preference, adult inpatient was checked. Importantly, both of these forms are **signed** by the nurse evaluator **and Mr. Harvey** at 19:30 on 10/3/16. In addition to signing the forms, Mr. Harvey and his wife, Becky, also signed the consent for treatment as well consent to receive psychoactive medications. The relevant clinical information from the integrated intake and psychosocial assessment included but was not limited to the following: *"51-year-old male presents with altered mental status and SI. Patient reports yesterday he took Naproxen, Excedrin and steroids 6 pills total for unknown reason. Patient states last week and this AM he had a thought to crash car into a wall. Patient's wife reports*

*unusual behavior x2 weeks after starting steroids with increased impulsivity, decompensating x3-4 days. Wife reports increased irritability, mood swings, lack of self-care and impulsivity x3-4 days. Patient was instructed to stop steroids immediately but continue taking due to "I'm not sure why." Patient confused on impulsive behavior reports increased depression x2 weeks. It is noted that he "quit job today" for unknown reason."* Under the suicide risk assessment, it was noted that he *"threatened to run car into wall yesterday/this AM and last week."* **High risk factors** include clear intent, potentially lethal attempt, **no indication of prior attempts** and indicating severe current stressor. The overall assessment of suicide risk was moderate to high risk. Tobacco use screening and audit (a screen for alcohol use disorder) were negative. One of the forms that **Mr. Harvey filled out** during this admission process was the Basis-32 which is the Behavior and Symptom Identification Scale. Importantly, **he endorsed** the following areas as experiencing difficulty: work, adjusting to major life stressors, recognizing and expressing emotions appropriately, depression, hopelessness, (quite a bit), and **suicidal feelings** and behavior. He also endorsed confusion, concentration and memory, controlling temper, outbursts of anger, sexual activity or preoccupation, mood swings or unstable moods. At the bottom of the form there is a question *"what is the most important problem you would like the programs help with?"* Mr. Harvey endorsed *"thoughts of harming self and stress/anxiety."* This form is especially relevant as it counters Mr. Harvey's testimony that he was never suicidal, nor had intentional thoughts of harming himself, and did not tell any staff person that he had thoughts of suicide.

The next assessment was the initial nursing assessment which indicated that the presenting problem was SI (suicidal ideation)-potential to harm self. The 72-hour short term goal was *"patient will have no incidents of self-harm within 72 hours of admission."* This goal has particular relevance in this case given that it contradicts Mr. Harvey's belief that he was being admitted for 24-hour observation. According to the record, the patient's treatment goal was *"to get the medicine out of my body so I can get back to being me."* It is important to emphasize that the half-life of the Medrol Pack is 18-36 hours which would take approximately 8 days to be eliminated from Mr. Harvey's system. Importantly, Troy Harvey signed this form. Upon admission, both Mr. and Mrs. Harvey signed "consent for treatment."

Prior to seeing Dr. Malone on 10/4, Troy Harvey signed a request for discharge early in the morning. While being examined by Dr. Malone, Mr. Harvey discussed this form and the issue of discharge with Dr. Malone and decided to rescind his request for discharge. In addition, after the evaluation by Dr. Malone, Mr. Harvey signed the consent for treatment with psychoactive medication for the three medications that Dr. Malone had prescribed, Zoloft, Trazodone and Neurontin.

**CLINICAL ASSESSMENT & CARE OF TROY HARVEY BY DR. MALONE**

On October 3rd, when Troy Harvey was admitted to Millwood, Dr. Malone verbally relayed admission orders. During the in-person examination of Troy Harvey, on the next hospital day, Dr. Malone was aware that on the morning of admission, Mr. Harvey had threated to run/crash his car into a wall. Dr. Malone conducted an appropriate psychiatric assessment that consisted of the following sections: reason for admission, history of present illness, past psychiatric history, substance abuse history, social history, review of selective systems, mental status examination including suicide assessment, and provisional diagnosis. As was stated, Dr. Malone specifically addressed the request for discharge with Mr. Harvey who agreed to rescind the request. Dr. Malone documented that the mixed bipolar symptoms had been triggered by the steroids. Given the multiple symptoms that Mr. Harvey had presented with *"increased impulsivity, decompensating x3-4 days, increased irritability, mood swings, lack of self-care and impulsivity x3-4 days"*, Dr. Malone's provisional diagnosis was bipolar disorder. Dr. Malone testified that he specifically discussed various medications with Mr. Harvey that did include atypical antipsychotics and mood stabilizers; medications that are commonly prescribed for bipolar disorder. However, Mr. Harvey rejected these medications. Ultimately, Mr. Harvey agreed to take Zoloft and Neurontin which are appropriate medications to treat Mr. Harvey's symptomatology. On the next hospital day, Mr. Harvey indicated verbally to Dr. Malone another request for discharge. Given that this was the second consecutive day that Mr. Harvey denied suicidal ideation, Dr. Malone determined that although he believed that Mr. Harvey could benefit from further hospital care, he had no clinical basis to institute a psychiatric hold. Thus, Mr. Harvey was discharged AMA.

## ANALYSIS OF DR. MALONE'S CARE OF TROY HARVEY

Troy Harvey presented with multiple bipolar symptoms accompanied by lethal suicidal ideation. Dr. Malone was concerned about the severity of Mr. Harvey's clinical presentation which informed the basis for his judgement that Mr. Harvey could benefit from inpatient hospitalization focused on stabilization of symptoms and reduction of suicide risk. It should be emphasized that Mr. Harvey had numerous risk factors for suicide that included but were not limited to age over 45, acute onset of lethal suicidal ideation, altered mental status, impulsive negative decisions (impulsively quitting job), and psychiatric symptoms being untreated. Importantly, the number one risk factor was the presence of a mood disorder. It is known that mood disorders account for nearly 60% of all suicides. In addition, the first episode of a mood disorder carries the highest risk. Given these risk factors and the nature of Mr. Harvey's presentation, it would have been negligent for Dr. Malone not to try to dissuade Mr. Harvey from leaving the hospital on October 4th.

Although Mr. Harvey alleges that he was told that he would only be kept overnight for observation, there is no confirmation of this statement in either the USMD or Millwood Hospital records. Mr. Harvey signed a voluntary admission as well as the initial nursing assessment which indicated that there had to be at least 72 hours without any self-harm incidents before discharge.

## RESPONSE TO PLAINTIFF'S EXPERT REPORT-DR. BLOTCKY

Dr. Blotcky's account of Troy Harvey's history has a number of glaring omissions. Dr. Blotcky omits major portions of the USMD record that contain specific references to the lethal suicidal ideation and multiple problematic psychiatric symptoms that are documented in the records.

Although Dr. Blotcky states that Mr. Harvey claims (during the post-hospitalization interview) that he had reported that he had *"no intention of hurting himself."* However, this statement, is contradicted by the records of both USMD and Millwood Hospital with specific reference to the self-report form that I have highlighted previously (BASIS-32) that Mr. Harvey completed upon admission to Millwood Hospital on October 3rd. Dr. Blotcky states *"she (the mental health clinician from Behavioral Connections) referred him (Mr. Harvey) to Millwood Hospital*

*because they could not provide an overnight observation."* This statement is attributed to the mental health clinician who performed the mental health evaluation requested by ER clinicians. In fact, neither the records of the mental health clinician, nor any other clinician make any reference to consideration of "an overnight observation." The mental health clinician instead indicated that the recommendation was for inpatient level of care. Millwood Hospital was contacted and accepted Mr. Harvey for admission.[1] Dr. Blotcky incorrectly states that Mr. Harvey was admitted at 10 p.m. In fact, Mr. Harvey was admitted several hours earlier and during that assessment, acknowledged thoughts of self-harm.

In terms of the AMA discharge, Mr. Harvey had filled out the request for discharge prior to being examined by Dr. Malone. Mr. Harvey decided to rescind the discharge subsequent to the evaluation by, and at the recommendation of Dr. Malone. On the third hospital day, Mr. Harvey **verbally communicated to Dr. Malone** another request to be discharged. Dr. Malone testified that he had no basis to institute a psychiatric hold and granted an AMA discharge. Dr. Blotcky alleges a number of consequences of an AMA discharge. From both my clinical and administrative experience of over 40 years, and knowledge of evidence-based literature, there is no support for these claims about the negative consequences to a patient of an AMA discharge.

Dr. Blotcky is not critical of the diagnosis of bipolar disorder, even though Mr. Harvey claims that he has been stigmatized by the diagnosis of bipolar disorder. It is understandable why Dr. Malone considered bipolar disorder as a provisional diagnosis. Although the history indicated that the bipolar symptoms appeared to be triggered by the steroids, Dr. Malone was concerned about the severity of symptoms. Given that the majority of persons who are prescribed steroids do not experience bipolar symptoms, it was reasonable for Dr. Malone to be concerned about an underlying bipolar diathesis. It is reasonable for a clinician to consider a patient's underlying vulnerability to bipolar disorder when the clinician is rendering a provisional diagnosis.

In the opinion sections of his report, Dr. Blotcky states that *"admission consideration should address issues of medical illness, current treatment and medications and others."* Significantly,

---

[1] As was previously stated, USMD is a medical and surgical facility that does not provide behavioral health care- outpatient or inpatient.

Dr. Blotcky omits the most critical issue and basis for the majority of admissions to psychiatric hospitals-safety in the context of dangerousness to self. The issue of safety was clearly the basis for Troy Harvey's admission to Millwood Hospital. Dr. Malone was correct in his determination that Mr. Harvey needed stabilization on an inpatient unit due to safety concerns and unstable mental condition. Furthermore, Dr. Blotcky states *"not one of these patients met the medical necessity for admission."* This is patently false in regards to Troy Harvey who had the acute onset of lethal suicidal ideation in the context of an altered mental state with prominent mixed bipolar symptoms which as I have stated are considered major risk factors for suicide. In fact, Troy Harvey's clinical presentation is a classic example of meeting criteria for medical necessity.

Dr. Blotcky also alleges *"Inadequate assessment. The documents were fraudulent indicating that he attempted suicide and was suicidal when he was not."* As was outlined in my analysis of Dr. Malone's care, Dr. Malone conducted an appropriate psychiatric evaluation of Troy Harvey and documented the suicidality of Troy Harvey. Dr. Malone confirmed the clinical criteria for inpatient admission as well as prescribing appropriate medications. There is no documentation in Dr. Malone's entries nor by any other clinician that Mr. Harvey had a prior suicide attempt.[2]

Dr. Blotcky further states that there was a failure to obtain informed consent before prescribing medications. Dr. Malone had reviewed multiple medications with Troy Harvey prior to Mr. Harvey finally accepting several of the options offered by Dr. Malone. The record indicates that on October 4th Troy Harvey **signed multiple "consents" for psychoactive medications**, specifically the ones ordered by Dr. Malone.

Finally, Dr. Malone examined Troy Harvey at regular intervals. Dr. Malone was contacted on admission and provided verbal admitting orders. Dr. Malone personally examined Troy Harvey on October 4th and October 5th. Dr. Malone determined on October 5th that Troy Harvey did not satisfy criteria for a psychiatric hold even though it was Dr. Malone's opinion that Troy Harvey

---

[2] On page 56 of Dr. Malone's deposition he is asked about the discharge summary in the Millwood records. Dr. Malone acknowledges that the discharge summary was prepared by Ray Garcia. In looking back at the discharge summary, Dr. Malone realized that there was an error. It says, "recently rung his car into a wall" Dr. Malone further testified on page 56 that he did not initially catch the error and further states "if anyone read the chart, they would realize that's an error." Dr. Malone indicated that the chart is clear that Mr. Harvey did not actually run his car into a wall but had threatened to do so.

could benefit from further hospitalization. This appropriate reasoning explains the basis for Dr. Malone ordering an AMA discharge.

Importantly, there is no evidence that the assessment, and treatment of Troy Harvey by Dr Malone caused any damage to Troy Harvey. Mr. Harvey's outpatient records at Arlington Counseling and Therapy Services as well as the medical records of his primary care physician do not ever mention once the topics of hospitalization, length of stay at Millwood, nor diagnosis of bipolar disorder. Furthermore, in the first session post hospitalization on October 17, 2016, clinician Berket writes *"client is currently on medical leave. Dr. has told him the adverse effects of the medication can last up to 6 weeks or more. Client reports the following symptoms: anxiety, cloudy head, nausea, insomnia, irritability, decreased appetite and weight loss, depression, loss of pleasure, increased emotionality and vague suicidal ideation."* Over the next seven sessions his anxiety levels decreased after being responsive to both medication and cognitive behavioral therapy. Careful reading of these records do not reveal any references to Mr. Harvey's concern nor any complaints about being diagnosed with bipolar disorder or being discharged against medical advice. Further, in terms of damages, his psychosocial situation remained the same. That is, he remained married and was able to resume working at a higher paying job after refusing an offer to return to his prior position.

**SUMMARY**

It is my opinion to a reasonable degree of psychiatric certainty that Dr. Gary Malone complied with the standard of care in his assessment, care, and discharge of Troy Harvey. Mr. Harvey had presented to the emergency room at USMD in an unstable mental condition with multiple bipolar symptoms and the presence of lethal suicidal ideation. Mr. Harvey was appropriately assessed at USMD and it was determined that inpatient hospitalization was indicated. Given that USMD does not provide behavioral health care, either inpatient or outpatient, Mr. Harvey was appropriately referred to Millwood Hospital. The history provided to clinicians at Millwood by both Mr. and Mrs. Harvey was consistent with the USMD records. Dr. Malone appropriately provided verbal admission orders on the day of admission. As the attending psychiatrist, Dr. Malone examined Mr. Harvey on October 4th and was concerned about the severity of his clinical symptoms, specifically his documented suicidality. Although Mr. Harvey was requesting an early release on October 4th, Dr. Malone appropriately discussed this issue with

Mr. Harvey and encouraged him to rescind the discharge, which Mr. Harvey voluntarily did. Dr. Malone appropriately prescribed medications that were responsive to Mr. Harvey's symptomatology. As is documented in the records, Mr. Harvey signed consents for these psychoactive medications.

On October 5th, Troy Harvey verbally communicated another request for discharge. In response to this request, Dr. Malone complied with the standard of care for an attending psychiatrist who was evaluating and treating a patient who had presented in an unstable mental state and lethal suicide ideation. Dr. Malone determined that although Mr. Harvey could benefit from further inpatient care, he was safe to be discharged for follow-up treatment. In essence, Dr. Malone determined that Mr. Harvey was not in imminent danger to self and thus did not satisfy criteria for a psychiatric hold. His determination that a discharge against medical advice was entirely appropriate. There is no indication in the outpatient mental health records of Mr. Harvey, nor in the primary care records post-discharge that indicate that any emotional/psychiatric damage occurred to Mr. Harvey as a result of his treatment by Dr. Malone.

I am glad to provide a supplemental report should additional discovery affect my opinions.

Signed:

_____
Douglas G. Jacobs, M.D.