# EXHIBIT "2-B"



**SOUTHTOWN PSYCHIATRY**

Adult Psychiatry, Board Certified, ABPN

*1210 S. Alamo St.*

*San Antonio, Texas 78210*

*Referrals@SouthtownPsychiatry.com*

*(210) 802-7497*

January 4, 2019

Bertina York

Norton Rose Fullbright US LLP

Frost Tower, 111 W. Houston Street, Suite 1800

San Antonio, Texas 78205

Re: Meier, et al v U.H.S

Case No. 4:18-cv-00615-ALM

From: Jason Miller, D.O. Psychiatrist

Dear Ms. York,

     I was contacted by your office on 11/12/19 regarding completing a review of the care rendered by Gary Malone, M.D. in his treatment of Troy Harvey which is a portion of the case Meier, et al v U.H.S. As a result, I have reviewed the records given to me regarding this matter.

     I am a Board Certified in adult Psychiatry by the American Board of Psychiatry and Neurology. I am also Board Certified in Family Practice by the American Board of Osteopathic Family Practice. I complete medical school in 1999 at the University of North Texas Health Science Center in Ft. Worth Texas. I then completed a residency at Millcreek Community Hospital in Family Practice in 2002. I subsequently joined the United States Airforce where I worked as a Family Practice staff physician from 2002-2006. In 2006 I entered residency training for Psychiatry at the University of

CONFIDENTIAL

CONFIDENTIAL

Texas Health Science Center San Antonio (UTHSCSA). I completed my training in December 2009.

After completing my training in psychiatry I was asked to remain as faculty in UTHSCSA while working as a consult-liaison psychiatrist in which my primary focus was to teach resident physicians how to treat patients with both medical and psychiatric concerns and also to do emergency room consultations resulting in admission or discharge of patients presenting for treatment. I then became the Associate Program Director for the Psychiatry residency program. During this time I was deployed to Afghanistan for which I was awarded the Bronze Star. I continued to work in both the inpatient and consult-liaison domains for the remainder of my time in the military during which I was made Chief of Inpatient services at Brook Army Medical Services.

After leaving the United States Air Force in 2013 I worked for two years at Kerrville State Hospital in Kerrville, Texas which is an entirely forensic state hospital tasked with caring for and doing evaluations on individuals adjudicated not guilty by reason of insanity or incompetent to stand trial. I then worked at Southwest General Hospital where I am currently the Department Chair for Psychiatry as well as the Chief of Staff of the Hospital. I see 15-20 psychiatric inpatients per day. I daily make decisions about the appropriateness of discharge versus continued care. I also make decisions regarding voluntary versus involuntary status.

I have held faculty positions at the Lake Erie College of Osteopathic Medicine, University of Texas Health Science Center San Antonio, and I am currently the Residency Training Director for the University of Incarnate Word Psychiatry Residency Program tasked with training newly graduated physicians to become

CONFIDENTIAL

CONFIDENTIAL

psychiatrists. Additionally, I teach both residents and medical students on a busy inpatient unit. We regularly discuss matters of Emergency Detention, Orders of Protective Custody, inpatient criteria, psychiatric pathology and diagnosis, and voluntary versus involuntary status.

As a result of my training, work experience and teaching experience I believe I am an appropriate expert for this case. I am charging $400.00/hr which is my current fee for forensic consultation.

**Records Reviewed**

1.  Millwood Hospital Records for Mr. Troy Anthony Harvey, 31 pages, dated 10/03/16 to 10/05/16. PLTF 001902-001932

*PLTF 1903 Discharge Summary lists discharge diagnosis as Bipolar Disorder Type I, mixed, depressed, severe. Noted he was admitted secondary to suicidality, anger and altered mental status. It was noted that steroid use had caused difficulties. Stated that he improved despite the short stay. He was discharged AMA on 10/5/16. Date signed by Dr. Malone 10/31/16. Document completed by Rey Garcia, MA on **10/21/16**.PLTF 1905 Psychiatric Evaluation of Troy Harvey dated **10/4/16.** Notes that "he is having trouble with his knee, took steroid, he became actively suicidal and said he wanted to run his car into a wall. He is easily angered and altered mental status. He is admitted to the hospital for self-protection. He is a war veteran and possibly has post-traumatic stress disorder. PLTF 1907 provisional diagnosis of Bipolar, Type I, mixed, depressed, severe. PLTF 1910-1916 detail a normal physical exam, signature illegible dated **10/4/16.** PLTF 1917 progress note dated 10/5/16 by Dr. Gary Malone noted that Mr. Harvey had requested to leave. Notes Diagnosis of Bipolar, type I, mixed, depressed, severe and Post traumatic stress disorder. PLTF 1918-1919 MOT by Qingguo Tao, MD noted suicidal ideation and that Mr. Harvey had the made the statement that he had thought about running his car into a wall. Signed **10/3/16**. PLTF 1920 Physician*

# CONFIDENTIAL

*orders noted 10/4/16 0815 Hold for possible Commitment- telephone order from Dr. Malone. PLTF 1921 Physician orders: Zoloft 50mg by mouth in the morning and Neurontin 300mg twice daily. PLTF 1923-1925 Interdisciplinary Master Treatment plan: notes that Mr. Harvey threatened to run his car into a wall, he has increased impulsivity, increased anger, decreased self-care, increased depression, confused, decompensating. PLTF1926-1932 Integrated intake and Psychosocial Assessment. Dated 10/3/16. Stated that Mr. Harvey took 6 steroid pills, naproxen and Excedrin for unknow reasons. Stated that one week prior and on the day of the evaluation Mr. Harvey had thoughts to run his car into a wall. Noted that Mr. Harvey's wife had noticed unusual behavior for the past two weeks after starting steroids including increased irritability, mood swings, lack of self-care and impulsivity. Stated that he was supposed to stop taking the steroids 3-4 days prior but had continued use. Mr. Harvey reported increased depression for the past two weeks. Noted weight loss of ten pounds in the past 6 days. Noted that he was confused.*

2.  Millwood Hospital Medical Chart for Mr. Troy Anthony Harvey 0034-00141, 108 pages, dated 10/03/16 – 10/05/16.

*0035 Aftercare Plan/Instructions dated **10/5/16**. Lists principal diagnosis as Bipolar Disorder, Type 1, mixed, depressed, severe. He was not listed as having medications on discharge. 0037 **10/4/16** Request to leave written by Mr. Harvey noting that he felt his symptoms had resolved and "the meds" were out of his system. 0038-0057 Discharge Summary, Psychiatric evaluation, history and physical, progress note, MOT, physician orders as listed above.0058-0060 Consent to treatment with psychoactive medications signed by Troy Harvey **10/4/16** at 1400 for Zoloft, trazodone, and Neurontin. 0061 Admission Reconciliation **10/3/16**. 0062 Medication Administration record. 0063 High Risk Notification alert signed **10/3/16**. 0063-0078 Interdisciplinary treatment plan, integrated intake and psychosocial assessment (diagnosed with MDD without psychotic features signed by Troy Harvey **10/3/16**) as noted above except where noted. 0079 Adult Activities Therapy Assessment.0080 Discharge Risk Assessment **10/5/16** noted to be low risk on the date of discharge. 0081-0082 Discharge Planning Assessment. 0083 Information about suicide signed by Troy Harvey on **10/5/16**. 0084-0085 Group Therapy notes- noted to be calm but having suicidal ideation. 0086 Case Management Note signed by Desiree Richards; discussed his wife calling stating that she wanted her husband released. She tells Ms. Richard that her husband is not suicidal but then stated "wanted to run a care into the wall due to frustration but that he did not want to kill himself. Stated that Dr. Burman was trying to call Dr. Malone, timed **10/5/16** at 10:47 am. 0087 Group therapy note, noted Mr. Harvey was calm and lucid **10/4/16**. 0088 Daily Check in Sheet- stated that Mr. Harvey was happy but*

# CONFIDENTIAL

*had made poor decisions recently, denied taking any medications. Denied suicidal thoughts or thoughts to harm others, dated **10/4/16**, signed by Troy Harvey.0089 Case Management notes signed by B. Baker, dated **10/4/16**. Wife called asking for Mr. Harvey to be released. Wide stated that he had admitted to ER staff that he had thought about running his car into a wall but then stated that she didn't feel he needed to be there. AMA process described to wife.0090 Group therapy note. 009-0103 Dated **10/3/16** Initial nursing assessment: no current thoughts of self-harm, denied past psychiatric history. Denied ever saying he had wanted to harm himself. 00105- Nursing progress note. 00112 Nursing Progress Notes- **10/4/16 and 10/5/16** Noted patient asked for AMA discharge and was placed on hold for possible commitment. 00115 Nursing note 10/5/16- denied SI. Denied hallucinations, medication compliant.0018 My Safety Crisis Plan: denied SI. Signed by Troy Harvey **10/4/16**. 0019 Program Handbook Acknowledgement, signed by Troy Harvey 3 October **10/3/16** 00121-00122 Patient Bill of Rights signed by Troy Harvey **10/3/16**. 00124 Consent for treatment signed by Troy Harvey **10/3/16**. 00126-00133 Approach to least restrictive treatment interventions, discharge planning worksheet, notice of privacy, release of information, Basic rights for all patients, all signed by Troy Harvey **10/03/16**. 00134 Brief Triage Form- notes thoughts of self-harm due to adverse drug reaction. 00136- Behavior and Symptom Identification Scale noting stress at work, adjusting to major life stressors, depression, physical symptoms, anxiety signed by Troy Harvey **10/3/16**.*

3. Millwood Hospital Medical Chart for Mr. Troy Anthony Harvey TH000001-000123, 123 pages, dated 10/03/16 – 10/05/16.

*No new records noted from previously reviewed and documented.*

4. Millwood Hospital Discharge AMA Policy Statement, originated 03/2001.

5. Millwood Hospital Discharge Against Medical Advice Policy Statement, originated 01/1997.

6.   Arlington Counseling and Therapy Services Session Notes by Cynthia Burkett, M.Ed., LPC for Troy Harvey, 8 pages, dated 10-17-16, 10-24-19, 11-2-16, 11-9-16, 11-16-16, 11-22-16, 12-5-16. PLTF 001325-001332

***10/17/16*** *Ms. Burkett noted Mr. Harvey's presenting problem was "uncharacteristic behavior following medication." Ms. Burkett also noted that Mr. Harvey's orthopedic doctor prescribed high dosage of steroid (twice the usual dosage for ten days) that triggered a "psychotic" like episode with very uncharacteristic behaviors. She noted that Mr. Harvey resigned from his job twice and "went off on everybody." Ms. Burkett noted that Mr. Harvey reported the following symptoms: anxiety, cloudy head, nausea, insomnia, irritability, decreased appetite & weight loss, depression, loss of pleasure, increased emotionality & vague suicide ideation.* ***10/24/19*** *Ms. Burkett noted that Mr. Harvey reported that his anxiety levels still pretty high.* ***11/02/16*** *Ms. Burkett noted that Mr. Harvey reported he still sometimes believes people are looking or staring at him.* ***12/05/16*** *Ms. Burkett noted that Mr. Harvey stated that he has not had any recurrence of suicidal ideation and that his irritability and emotionality were considerably better.*

7.   USMD Hospital at Arlington Medical Records for Troy Anthony Harvey 00001-00028, 35 pages, dated 10/03/16 PLTF 002008-002042

*Noted date 10/3/16 noted that Mr. Harvey had just quit his job and was acting out of character. Noted suicidal ideation. Signed by Dr.Kie Lee. Nursing note dated 10/316 noted suicidal ideation, depression, anxiety and irritability. Illegible signature. CT of head: negative, noted that reason for exam was due to recent onset of suicidal ideation. Transfer note dated 10/3/16 that noted suicidal ideation.*

8.   Dictated Account of the Oral and Videotaped Deposition of Mr. Troy Anthony Harvey, 185 pages, dated 09-12-19.

CONFIDENTIAL

***Pg. 44*** *Mr. Harvey stated that he was employed at Hughes Middle School as the 8th grade assistant principal (and half of the 6th grade) during the time he went to the hospital in Arlington and was transferred to Millwood Hospital.* ***Pg. 56*** *Mr. Harvey stated that in 1989 he tore the ACL/MCL of his right knee while in an Airforce Squadron Softball Tournament. He stated that in 2013 he injured his left knee during a PT test with the Reserves. He stated that during the mile and a half run he stepped into a pothole, buckling his left knee.* ***Pg. 62*** *Mr. Harvey admitted that he did not file complaints against anyone regarding his treatment. Not with the Texas Medical Board, Texas Department of Health and Human Services, Centers for Medicare Services, United States Department of Health and Human Services, Board of Directors of UHS or any of UHS's companies.* ***Pg. 73*** *Mr. Harvey denies a family history of mental illness, he also denies ever having received outpatient or inpatient treatment for a mental illness prior to being admitted to Millwood Hospital.* ***Pg. 78*** *Mr. Harvey stated that he owned a handgun at the time he was admitted to Millwood Hospital.* ***Pg. 79*** *Mr. Harvey denied ever receiving a diagnosis of depression or attempting suicide prior to October 2016.* ***Pg. 81*** *Mr. Harvey admits to a history of migraines and insomnia.* ***Pg. 84*** *Mr. Harvey recalled that on October 3rd 2016 he submitted a typed letter of resignation, effective immediately, by hand to the school principal, Mr. Renner.* ***Pg. 88*** *Mr. Harvey stated that during that time his father was terminally ill with cancer.* ***Pg. 89*** *Mr. Harvey recalled that Mr. Renner asked him if he planned on hurting himself, to which Mr. Harvey said no, "and I said the only thing that I was frustrated with -- and I made a statement about -- running my car into a wall is because -- I said I was frustrated and I can't put my finger on why I'm feeling the way I am since I've been on that medication."* ***Pg. 92*** *Mr. Harvey again recounts the conversation with Mr. Renner and that Mr. Renner saw "I was upset, and he knew I had been deployed before, and we had worked together before and he's never seen me like this before." Mr. Harvey again recalled that he told Mr. Renner, "I'm frustrated and, you know, had that irrational thought about running my car into a wall, but that was just acting out of frustration in regard to that."*

CONFIDENTIAL

# CONFIDENTIAL

*Pg. 101 Mr. Harvey stated that he took the steroid pack as prescribed and did not take more than was prescribed. Pg. 104 Mr. Harvey stated that his wife discussed his altered mood state with the Dr. Burman, who prescribed the steroid pack, previous to October 3rd, 2016 secondary to increased agitation and irritability. Pg. 115 Mr. Harvey stated that he and his wife served as the historians for his record while at the ER in USMD Hospital in Arlington. Mr. Harvey disagreed with medical staff documenting "suicidal ideation" as one of his chief complaints but could not offer an explanation why staff would document that other than to point to his previous remark about thinking about driving his car into a wall. Pg. 118 Mr. Harvey admitted to disclosing symptoms of depression, anger, agitation, paranoia and acting out of character to ER staff. Pg. 130 Mr. Harvey stated that he recalled being asked by USMD Hospital in Arlington if he had a firearm in his home. Pg. 135 Mr. Harvey admitted that he consented to being transferred to Millwood Hospital. Pg. 140 Mr. Harvey conceded his understanding as to why health care providers, could reasonably have concern about his welfare, safety and potential harm to himself, others, and property. Pg. 158 It was noted in the psychosocial assessment that Mr. Harvey had "increased impulsivity was decompensating for three to four days. Wife reports increased irritability, mood swings, lack of self-care, impulsivity times three to four days, and patient was instructed to stop steroids immediately, but continued to take them and, quote, I'm not sure why, quote." Mr. Harvey also disclosed having increased depression over the past two weeks. Pg. 161 It was further noted in the psychosocial assessment that Mr. Harvey disclosed wanting to crash his car into a wall the week prior, the day before and earlier that day. Pg. 170 On October 4th, 2016 Dr. Malone noted that Mr. Harvey was suicidal. Pg. 171 Dr. Malone noted that Mr. Harvey wanted to run his car into a wall. Pg. 175 Mr. Harvey submitted an AMA on October 4th 2016 but signed a written document rescinding the AMA without the presence of Dr. Malone. Pg. 177 Mr. Harvey was discharged from Millwood on October 5th 2016, having been there less than 48 hrs. Pg. 185 Mr. Harvey was provided with a letter on October 5th 2016 by Amber Wilson,*

# CONFIDENTIAL

*LMSW that read: "Please accept this letter as evidence that Troy Harvey received inpatient services from Millwood Hospital from October 3, 2016 16 to October 5, 2016 under the care of Dr. Gary Malone, M.D. Per doctor's orders, Mr. Harvey is able to return to work without restrictions on Monday, October 17th, 2016. Prior to admit, Mr. Harvey had been prescribed a new medication which caused him to act out of character. While hospitalized, Mr. Harvey expressed remorse over submitting a letter of resignation. Please utilize the above information in considering of disregarding Mr. Harvey's resignation, as he was unable to think clearly at that time." Pg. 189 On October 17th, 2016, Mr. Harvey begins therapy on an outpatient basis with Cynthia Burkett, LPC at Arlington Counseling and Services. Ms. Burkett noted Mr. Harvey had uncharacteristic behavior following medication that triggered a psychotic-like episode. Ms. Burkett noted that Mr. Harvey had resigned his job twice. Pg. 192 Mr. Harvey admitted it was possible that he had told staff at USMD Hospital in Arlington and at Millwood that he had in fact resigned from his job twice. Pg. 193 Ms. Burkett noted that Dr. Berman, who prescribed the steroid pack, informed Mr. Harvey's wife that adverse effects of the steroids could last for up to six weeks. Pg. 194 Ms. Burkett documented on October 17th 2016, during their first session, that Mr. Harvey endorsed symptoms of "anxiety, cloudy head, nausea, insomnia, irritability, decreased appetite, weight loss, depression, loss of pleasure, increased emotionality, and vague suicidal ideation. Pg. 195 Ms. Burkett noted that Mr. Harvey made a verbal no harm contract with her. Pg. 205 Mr. Harvey stated that Ms. Burkett diagnosed him with an anxiety disorder with onset occurring following his discharge from Millwood. Pg. 206 Mr. Harvey stated that he was voluntarily at Millwood. Pg. 240 Mr. Harvey wrote on an intake form, "Adverse reaction to medication to the point of wanting to self-harm. Doctor [Berman] said it could be a trigger for something else"*

9. Dictated Account of the Oral and Videotaped Deposition of Mrs. Becky Cipolla Harvey, 83 pages, dated 09-13-19.

CONFIDENTIAL

***Pg. 19*** *Mrs. Harvey stated that she was face-timing Mr. Harvey while he was deployed in Afghanistan when his building was RPG.*

***Pg. 31*** *Mrs. Harvey stated that she noticed changes in Mr. Harvey such as irritability. She described Mr. Harvey as typically being "very mild-mannered, humble, even-keeled man." She stated that he began snapping at things that would just normally not even been noticed.*

***Pg. 33*** *Mrs. Harvey stated that approximately three days before Mr. Harvey went to the ER, she contacted Dr. Berman, who prescribed the steroid pack, and relayed her husbands changed behavior. She stated that Dr. Berman instructed her husband to immediately stop taking the steroids.* ***Pg. 44*** *Mrs. Harvey again stated that she called Dr. Berman because her husband's behavior seemed so far out of character. "It wasn't just a little bit. It was a lot."*

***Pg. 48*** *Mrs. Harvey described a dispute between herself and Mr. Harvey over him continuing to take the steroids even though Dr. Berman had instructed him to stop. Mrs. Harvey described Mr. Harvey as being irrational and irritated.* ***Pg. 81*** *Mrs. Harvey stated she heard her husband tell the doctors in the ER, "he was so frustrated, he felt like running his car into a wall."* ***Pg. 94*** *Mrs. Harvey reported that Mr. Harvey was feeling anxious and irritable when he arrived at the ER.*

10. Dictated Account of the Oral and Videotaped Deposition of Dr. Gary Malone, M.D., 88 pages, dated 10-24-19.

***Pg. 71*** *Dr. Malone discussed his reasoning for diagnosing Mr. Harvey with Bipolar Disorder vs Substance Induced Psychosis. Per Dr. Malone, Medrol Dosepak triggered a Bipolar Disorder episode in Mr. Harvey. He stated that he has forty years of clinical experience and has seen at least a dozen of these cases. Dr. Malone said that Mr. Harvey's symptoms were too severe to simply be a result of Medrol Dosepak.* ***Pg. 76*** *Dr. Malone explained that he intended to prescribe Depakote and Seroquel but Mr. Harvey refused. So instead he*

CONFIDENTIAL

CONFIDENTIAL

prescribed Zoloft for depression, Trazodone for sleep, Zipsor for pain and Gabapentin for neurological agitation. ***Pg. 80*** *Dr. Malone discussed the accusation that he bullied/threatened Mr. Harvey's safety by saying that if Mr. Harvey left AMA he could not ensure his safety. Dr. Malone stated that he explained to Mr. Harvey the process of a voluntary vs involuntary commitment and how a judge could potentially hold him for one to two weeks.* ***Pg. 84*** *Dr. Malone explained he released Mr. Harvey after he submitted a second letter of release because Mr. Harvey had not expressed in suicidality 48 hours and was no longer in imminent danger. Dr. Malone explains that not being in imminent danger should not be confused with being safe.* ***Pg. 86*** *Dr. Malone admitted he tried to get Mr. Harvey to stay to save his life and stated that 20% of psychiatric patients do not survive past five years secondary to inadequate care.* ***Pg. 118*** *Dr. Tao, a telemed doctor, who is not a psychiatrist, performed a MOT doc-to-doc for Mr. Harvey and provisionally diagnosed Mr. Harvey with Bipolar Disorder, Current Episode Mixed Severe without Psychotic Features.* ***Pg. 131*** *Dr. Malone explained why one cannot be detoxed from methylprednisilone.*

11. Agreed Protective Order Barbara Meier, et al., Plaintiffs, v. UHS of Delaware, Inc., et al., Defendants, in the United States District Court Eastern Division of Texas Sherman Division, 7 pages, dated 03/01/19. Doc 276

12. Order Granting Defendants Motion to Modify Scheduling Order, Barbara Meier, et al., Plaintiffs, v. UHS of Delaware, Inc., et al., Defendants, in the United States District Court Eastern Division of Texas Sherman Division, 6 pages, dated 09/12/19.

13. DOC 375 Plaintiffs Designation of Retained Experts. 5 pages

CONFIDENTIAL

14. DOC 375-1 Report of Mark Blotcky, M.D.. 239 pages- please note below discussion.

15. DOC 375-1 Report of Michael Van Amburgh. 37 pages

16. DOC 375-1 Report of Rebecca Busch. pg 1-51

17. DOC 375-1 Report of Roger Sanders. 8 pages

18. Millwood paperwork- Journal of Troy Harvey regarding his care at Millwood. PLTF 001832-001901

19. Doc 376 Plaintiffs Disclosure of Non-Retained Experts. 2 pages

20. USMD Hospital at Arlington Medical Records for Mr. Harvey8.7.19, 39 pages.

**Discussion**

**Discussion regarding psychiatric evaluation performed by Mark J. Boltcky, M.D.**

Mr. Harvey was evaluated by Dr. Blotcky for two hours on 11/2/19. Dr. Blotcky begins by identifying Mr. Harvey as a 26 year old man. Mr. Harvey is, in fact 54 years of age.

CONFIDENTIAL

*Evaluator: Dr. Jason Miller, DO*                              *Case Review Page 13 of 26*

Dr. Blotcky notes that the evaluation performed by Dr. Malone was "very skimpy" and "superficial". It is unclear in the report whether this is Mr. Harvey's words or Dr. Blotcky's.

Dr. Blotcky notes that Mr. Harvey did not consent to medications. This is factually incorrect. Medication consents were given and signed by Mr. Harvey on 10/4/16 (pg 0058-0060 Millwood Hospital Medical Chart for Mr. Troy Anthony Harvey 0034-00141, 108 pages, dated 10/03/16 – 10/05/16).

Dr. Blotcky did a 2 hour forensic retrospective evaluation of Mr. Malone for litigation purposes. Nevertheless,  Dr. Blotcky does not document a psychiatric review of symptoms which would indicate pertinent negative and positive symptoms which would lead a clinician to make an accurate psychiatric diagnosis. The review of psychiatric symptoms is the method of inquiry used to establish psychiatric diagnosis by asking about symptoms from common psychiatric conditions. While there a number of instruments which can be used to standardize this procedure the gold standard is still considered a good clinical interview which inquires about symptoms and possible symptoms. There is no documentation included which indicates that Dr. Blotcky completed a psychiatric review of symptoms in any form, nor does he document that he used any sort of standardized or scientific approach in reaching his conclusions. Dr. Blotcky seems to accept, without any evaluation, that Mr. Harvey's belief that his symptoms were entirely caused be taking a medrol dose pak was accurate.

CONFIDENTIAL

CONFIDENTIAL

Dr. Blotcky does not document a complete psychiatric history to include a history of past mental health treatment. Mr. Harvey had been seen by a marriage counselor for approximately a year which is not noted by Dr. Blotcky.

Dr. Blotcky does not document a complete social assessment which would have revealed that at the time of Mr. Harvey's hospitalization his father was being treated for terminal cancer. This stressor, if it were explored, may have offered significant insight into Mr. Harvey's mood state at the time of his hospitalization.

While Dr. Blotcky did note that Mr. Harvey had quit his job there was no explanation for why he had submitted his resignation. In trying to understand the nature of Mr. Harvey's episode of illness it is necessary to explore his motives around his unusual actions. Had Mr. Harvey resigned his position because he was angry at the administration or had he been considering resigning for some time prior to that day resigning could have been a reasonable decision, even if it was out of character. If, conversely, Mr. Harvey resigned because of a delusional reason, for example believing that his administration was trying to kill him or if he had quit for no reason that he could explain it would have shed light on Mr. Harvey's state of mind at the time. However, no such exploration of this highly unusual action was noted. The act of impulsively quitting your job would at the least be seen as a significant loss by any prudent mental health practitioner. Further it could represent a person who is highly impulsive or worse yet, a person who is attempting to terminate his mortal ties in preparation for killing himself. Resigning his job and in the same conversation stating that he was so frustrated he had thought about driving his car into a wall is ominous to a degree that cannot be overstated

CONFIDENTIAL

CONFIDENTIAL

but no explanation or exploration of this pivotal conversation was addressed in Dr. Blotcky's report.

Further, Dr. Blotcky does not address whether the admission to a psychiatric hospital was warranted. Dr. Blotcky noted that the assessment with Mr. Harvey was fraudulent because it noted that he had attempted suicide and was suicidal when he was not. However, it should be noted that Mr. Harvey admitted in his deposition that he told his principal, wife, and hospital personnel that he had thoughts of running his car into a wall. There is no mention in Dr. Malone's initial evaluation that Mr. Harvey had attempted suicide. Dr. Blotcky, therefore mischaracterizes Dr. Malone's psychiatric evaluation of Mr. Harvey on both counts. While Mr. Harvey stated that he had no intention of acting on his thought at the very least his thought to run his car into a wall represents a suicidal thought with a plan albeit without intent. In Psychiatry we discuss suicide by evaluating, at a minimum thoughts, plans, intent, prepatory behaviors and access to means. Dr. Blotcky does not attempt to characterize Mr. Harvey's statement in any standard form utilized by mental health professionals. Based on Mr. Harvey impulsively quitting his job and then telling his employer that he had a suicidal thought with a plan is ample evidence for at least a brief psychiatric admission. Mrs. Harvey clearly appreciates the gravity of her husband's situation when she asks for her husband to be observed over-night.

Dr. Blotcky concludes that Mr. Harvey's diagnosis was "Medrol side effect-irritability, less than six weeks duration". There is no such diagnosis as this listed in the DSM V. While Dr. Blotcky may have been attempting to simply describe his diagnosis this is not what was documented. The DSM refers to this as a "Substance induced mood

CONFIDENTIAL

CONFIDENTIAL

disorder or substance induced psychotic disorder". However, as Dr. Blotcky did not document a full examination of the patient it is not possible to conclude what criteria were used in reaching his diagnosis nor what other diagnosis he may have considered. Dr. Blotcky does attempt to disclose that Mr. Harvey was anxious following his hospitalization but the diagnosis given by Dr. Blotcky concludes that Mr. Harvey's symptoms were entirely due to the side effects of taking Medrol. Dr. Blotcky reaches no conclusion nor gives any diagnosis that indicated that Mr. Harvey suffered any psychiatric symptoms or emotional duress as a result of his psychiatric hospitalization. In fact, he stated that Mr. Harvey had entirely recovered from his anxiety (which his diagnosis would indicate is entirely due to the side effects of Medrol), he was able to enjoy his normal activities, continue working, and that he suffered no insomnia. He does note that Mr. Harvey's wife would have divorced him had his symptoms not improved (she does not disclose this in her deposition) but again indicates that Mr. Harvey's only diagnosis was "Medrol side effect". If Dr. Blotcky felt that Mr. Harvey's symptoms of anxiety following his hospitalization was attributable to another cause he did not document what that was or what the basis of that conclusion might have been.

Dr. Blotcky stated that the diagnosis for Mr. Harvey was severe Bipolar Depression and Post-traumatic stress disorder. It should be pointed out the final diagnosis for Mr. Harvey listed in the discharge summary was Bipolar Disorder Type I, mixed, depressed, severe. There is no mention of Post-traumatic stress disorder in this final document and Dr. Malone admits that while he initially considered this diagnosis due to Mr. Harveys military experience ( a very reasonable consideration given that Mr. Harvey was deployed to a combat region) he was not able to reach the diagnosis because Mr.

CONFIDENTIAL

CONFIDENTIAL

Harvey was too irritable to tolerate the necessary questions needed to reach this diagnosis. Further Dr. Blotcky does not discuss how or if he actually excluded a diagnosis of Bipolar Disorder nor Post Traumatic Stress Disorder. He does not document any symptoms which he inquired about relating to either diagnosis. It is not possible to conclude that any such evaluation was performed by Dr. Blotcky or that these diagnosis were excluded by any scientific method of inquiry.

Dr. Blotcky writes that Mr. Harvey was "discharged at his own initiative, and it was noted as Against Medical Advice, a stigma that can have far reaching effects including insurability, acceptance into new medical practices, and the data that health care professionals will rely on going forward." Dr. Blotcky does not explain or give reference that would indicate there is a stigma regarding an against medical advice discharge. There are many reasons a person very reasonably would seek such a discharge. Further in my clinical experience I have never witnessed a patient who was excluded from a medical practice secondary to having signed out of a hospital against medical advice. Dr. Blotcky also stated that this would affect Mr. Harvey's insurability. I can form no opinion about this as physicians are not experts in insurance matters and this would need to be deferred to an expert in these matters. Dr. Blotcky does not indicate that he has expertise in what makes a patient insurable. Dr. Blotcky does not provide information that would indicate how or why he reached that conclusion.

**Discussion Regarding Allegations made by Mr. Harvey**

CONFIDENTIAL

# CONFIDENTIAL

Mr. Harvey alleges that he did not require psychiatric admission because he was not suicidal. Mr. Harvey tells the principal of his school, Mr. Brenner, that he is having the thought to run his car in to a wall (pg 89 of Troy Harvey Deposition). In that same conversation he told him that he was quitting his job (pg 83 of Troy Harvey Deposition) and was thinking a lot about his father who was dying of cancer (pg 88 of Troy Harvey Deposition). After he had that conversation with his principal he went home. The principal was concerned enough about the conversation that he called a friend of Mr. Harvey's, Brandon Johnson, who called Mr. Harvey to ask if he was ok. Mr. Johnson also called Mr. Harvey's wife to inform her of the events. Mr. Harvey's wife talked to him and was alarmed enough that she came home from work in the middle of the day. Mr. Harvey told his wife he had thoughts to run his car into a wall when she returned to their home (pg 95 of Troy Harvey Deposition). He and his wife went to USMD Hospital at Arlington and the Triage nurse noted Suicidal ideation as part of his chief complaint. Suicidal ideation was also noted on the Memorandum of Transfer.  Mr. Harvey had a psychosocial assessment completed which also stated that he was having suicidal ideations on the day of admission and one week prior. When asked why these were noted Mr. Harvey stated that this was because of his statements regarding thoughts about running his car into a wall and taking Excedrin (pg 132 of Troy Harvey Deposition). Mr. Harvey agrees that he can see why the health care providers had a reasonable concern about his safety (pg 141 of Troy Harvey Deposition). Mr. Harvey stated that his thought to run his car into a wall was an "irrational thought out of frustration and there was no intent in harming myself or anyone else." While Mr. Harvey presently denies having had any intent to act on these thoughts he admitted to having the thought, recently acting in a way that was out of character, quitting his job on the day of having these thoughts and

# CONFIDENTIAL

CONFIDENTIAL

telling his principal that he had been thinking about his father who was very ill at that time. While Mr. Harvey presently denied having any intent to harm himself he admitted to having a thought of suicide with a plan. He also admitted that he had not been acting like himself which his wife confirmed and that he believed his behavior was being altered by a medication he was taking. Despite him stating he had no intention to act on his suicidal thought he had displayed impulsive recent behavior which, when combined with his suicidal thinking could have reasonably caused significant concern of the possibility of imminent self harm. Despite Mr. Harvey not expressing the intent to harm himself he had an alteration in his mood and behavior that were severe enough that his spouse felt he required emergency care. Further, after his episode of care at UMDS and Millwood his counselor Ms. Cynthia Burkett noted in her initial assessment that Mr. Harvey had experienced a "psychotic-like episode of very uncharacteristic behavior." She also noted that he had vague suicidal ideation. It is my clinical opinion that admission to an inpatient psychiatric facility was the least restrictive way to provide care for Mr. Harvey at that time given his impulsive behavior, stated suicidal thought which included a plan, recent stress due to his father's illness and uncharacteristic behaviors resulting from a potential adverse drug reaction.

Mr. Harvey alleges that he was harmed by his stay at Millwood Hospital and his treatment by Dr. Malone.  Mr. Harvey discusses that after he was released from Millwood he went back to his teaching job and finished his contract year (pg 45 of Troy Harvey Deposition). He further reported that the following year he moved to Brooks Wester Middle School. (pg 45 of Troy Harvey Deposition). He noted that he has continued to work there and has received a raise going into the 2019/2020 school year.

CONFIDENTIAL

# CONFIDENTIAL

(pg 48 of Troy Harvey Deposition). He felt he was capable of continuing as an assistant principal and was waiting for there to be an opening for that position in his current school district (pg 48 of Troy Harvey Deposition). Mr. Harvey denied that he and his wife were having any current financial difficulty (pg 64 of Troy Harvey Deposition). Mr. Harvey expressed that he and his wife are happy in their marriage (pg 230 of Troy Harvey Deposition). Mr. Harvey expressed that he had no plans to pursue any further mental health treatment (pg 74 of Troy Harvey Deposition). He noted that he enjoys walking, working out and working in his yard. (pg 78 of Troy Harvey Deposition). Mr. Harvey did not note any functional impairment at the time of his deposition. He did state the he believed he still had anxiety (pg 205 of Troy Harvey Deposition). Despite this, he stated that he had no intention of getting more treatment for these symptoms. Mr. Harvey did seek treatment initially after his hospitalization for lingering anxiety however per Dr. Blotcky's evaluation and Ms. Cynthia Burkett's evaluation these symptoms were due to the continued effects from taking Medrol  Mr. Harvey expressed that he had lingering anxiety regarding his stay at Millwood however he denied any further need for treatment for this and does not endorse any functional impairment in his job, marriage or hobbies. In Dr. Blotcky's evaluation of Mr. Harvey, Dr, Blotcky also does not find any current impairments in Mr. Harvey's functioning. Dr. Blotcky specifically stated that Mr. Harvey was was able to enjoy his normal activities, continue working, and that he suffered no insomnia.  Mr. Harvey agreed that he has fully recovered from all of his symptoms that he suffered as a result of his experience (pg 257 of Troy Harvey Deposition). Based on the information provided it is my clinical opinion that Mr. Harvey is not experiencing any psychiatric impairment or emotional duress of a significant degree as a result of his stay at Millwood hospital or as a result of his treatment by Dr. Malone.

# CONFIDENTIAL

CONFIDENTIAL

Mr. Harvey alleges that the diagnosis of Bipolar Disorder and post traumatic stress disorder are incorrect. Mr. Harvey asserts that he believes his symptoms were entirely due to the effects of using Medrol (methylprednisolone). Dr. Malone was only able to meet with Mr. Harvey on 2 occasions and these conversations were dominated by Mr. Harvey asking to leave the hospital. In that instance a prudent physician would only be able to formulate a working diagnosis and would need to focus their attention on the immediate safety of the patient. In fact, in Dr. Malone's initial evaluation he considers post traumatic stress disorder secondary to Mr. Harvey's veteran status but does not include it as a diagnosis. Bipolar disorder is only listed as a provisional diagnosis indicating that this may not be accurate. Further, Dr. Malone indicates that Mr. Harvey was having trouble with his knee, took a steroid and then became suicidal indicating that he was considering the possibility that the steroid taken by Mr. Harvey was, in fact, the causative agent in his case. However, in his deposition Dr. Malone indicates that he did not think that a steroid induced mood disorder or psychosis was the most likely diagnosis due to the severity of Mr. Harvey's symptoms (pg 76 Deposition by Dr. Malone). He indicated that Mr. Harvey was so agitated prior to his evaluation that staff had asked Dr. Malone if he required an escort to ensure his safety (pg 72 Deposition by Dr. Malone). Dr. Malone indicated that Mr. Harvey had symptoms of mood instability, suicidality, poor insight, altered mental state, irritability, lack of self care, impulsiveness, depression, poor judgment, sleep disturbance, decreased concentration, anxiety and out of character behavior (pg 72 Deposition by Dr. Malone). While it is possible that all these symptoms may have been explained as a substance induced (steroid induced) mood disorder, which could include a Bipolar Disorder,  Dr. Malone accurately indicates that a provisional diagnosis of Bipolar Disorder could also explain these symptoms. Both carry the same

CONFIDENTIAL

CONFIDENTIAL

risk of suicide in the acute setting. A small percent of people who take Medrol have related mood symptoms, which may include Bipolar Disorder, and some require psychiatric hospitalization as a result of these symptoms.  Conversely, Bipolar Disorder is a fairly common diagnosis on acute inpatient psychiatric units. Given the choice between a relatively rare diagnosis (though it is clear Dr. Malone was considering it) versus a common one, a prudent physician should first rule out the more common diagnosis. While Mr. Harvey had a history of recent steroid use which raised the possibility of a steroid induced mood disorder, Bipolar Disorder in that setting is a far more common diagnosis and therefore should have rationally been considered more likely. Additionally, it is also possible that Mr. Harvey's use of prednisolone triggered a first episode of mania and may have triggered a new onset of Bipolar Disorder. Bipolar Disorder is a complex disorder caused by both genetic predisposition as well as an environmental trigger. It is possible that Mr. Harvey's initial presentation was severe (as observed by Dr. Malone) because his use of a steroid was the environmental trigger which caused his Bipolar Disorder to manifest symptoms for the first time. To have concluded that Mr. Harvey's symptoms must have been due to his steroid use without considering more common diagnosis would have been irrational and imprudent. Moreover, Dr. Malone's early interaction with Mr. Harvey led him to conclude that Mr. Harvey's symptoms were too extreme to be entirely explained by an adverse drug reaction. As a result of Mr. Harvey again requesting discharge the following day Dr. Malone could only rely on his initial impression which was that Bipolar Disorder was the most likely diagnosis. It is my clinical opinion that Dr. Malone's provisional diagnosis of Bipolar Disorder and subsequent use of the same diagnosis on his discharge summary were the actions of a prudent physician and meets the standard of care of a reasonable Psychiatrist.

CONFIDENTIAL

# CONFIDENTIAL

Mr. Harvey alleges that he felt bullied into staying at Millwood by Dr. Harvey. Mr. Harvey was given the patient bill of rights and this was discussed with him shortly after he arrived at Millwood. He asked questions about being voluntary (pg 148 of Troy Harvey Deposition). Mr. Harvey subsequently requested to leave the morning of October 4, 2016. After meeting with Dr. Malone he rescinded his request. Mr. Harvey stated that Dr. Malone told him that if he did not rescind his letter asking to be released that he would have to get a court order to make him stay and that where he would be staying was a place in which Dr. Malone could not guarantee his safety (pg 261 of Troy Harvey Deposition). Dr. Malone, however, stated that he did not threaten him but just explained the process of getting court ordered treatment (pg 80 of Dr. Malone Deposition). Dr. Malone did not believe this conversation to be threatening. The parties involved in the conversation disagree about the nature of what was said.  What is not in dispute is that the following day Dr. Malone agreed that since Mr. Harvey was not expressing any further suicidal ideation that he would not file court paperwork forcing Mr. Harvey to stay and subsequently allowed him to be discharged. Dr. Malone noted that on October 5, 2016 he no longer felt Mr. Harvey was at imminent risk of self-harm and while he would have preferred that Mr. Harvey remain for further treatment he did not force him to do so by filing a court paperwork. Had Dr. Malone been attempting to coerce Mr. Harvey into remaining in the hospital and had he, in fact, attempted to bully Mr. Harvey into staying longer for some nefarious purpose Dr. Malone could have requested an Order of Protective custody which would have prolonged Mr. Harvey's stay and forced him to remain for at least 72 hours at which time a probable cause hearing would have been held. Dr. Malone has no incentive to coerce or bully Mr. Malone into voluntary treatment as Dr. Malone had the ability to force the issue for at least 72 more hours by simply filing

# CONFIDENTIAL

CONFIDENTIAL

an Order of Protective Custody. It was not to Dr. Malone's benefit to bully Mr. Harvey into an action that Dr. Malone could have easily forced. While the exact nature of their conversation is in dispute Dr. Malone's account that he simply informed Mr. Harvey of the legal possibilities is credible. Such discussions are common practice when patients are trying to determine whether they should or should not sign in voluntarily for psychiatric treatment. Further Dr. Malone kept Mr. Harvey in the hospital for less than 48 hours indicating that he kept him the minimum amount of time necessary to ensure Mr. Harvey's safety. On October 3, 2016 Mr. Harvey had made a suicidal statement and exhibited impulsive behavior to include quitting his job. Mr. Harvey disclosed these thoughts to his wife and a number of hospital personnel during the course of that day. On October 4, 2016 Mr. Harvey stated that he was not suicidal. It is prudent practice to wait 24 hours after suicidal ideation has resolved to ensure that these thoughts will not return. Dr. Malone waited until October 5,2016 to release Mr. Harvey to ensure that his thoughts of suicide would not return.  It is my clinical opinion that there is no documentation or action taken by Dr. Malone that would indicate that he somehow forced or bullied Mr. Harvey into remaining in a voluntary status. Further, it is my clinical opinion that Dr. Malone allowed Mr. Harvey to discharge as soon as it was reasonably safe for him to do so.

**Conclusion**

CONFIDENTIAL

Based on my review of the supplied information it is my clinical opinion that there is no evidence to indicate that Mr. Harvey had any significant emotional or psychiatric duress as a result of his treatment by Dr. Malone. It is my opinion that Dr. Malone acted in a reasonable manner consistent with the standard of care in psychiatry when evaluating, treating and treating Mr. Harvey. Based on my review of the provided records it is my opinion that Dr. Malone did not bully or coerce Mr. Harvey into rescinding his request for discharge. My review of the records indicate that Dr. Blotcky' evaluation contained a number of factual errors. Dr. Blotcky did not document his evaluation in a scientifically valid form and did not consider other diagnostic possibilities other than the one posited by the person he was evaluating. Dr. Blotcky's evaluation does indicate that Mr. Harvey's symptoms of distress were entirely caused by a side effect to a medication and does not indicate that Mr. Harvey was in any way damaged by the treatment that Dr. Malone provided.

My opinions are based on my education, training, and background as a board certified Psychiatrist. They are also based on complete review of all medical records supplied for this matter.  A reasonable degree of medical probability was utilized to arrive at these opinions.

I reserve the right to amend these opinions should additional information be made available to me.

CONFIDENTIAL

CONFIDENTIAL

Sincerely,


Jason Miller, D.O.
Psychiatrist, American Board of Psychiatry and Neurology