# Exhibit 2

**Wanda McCarter, RN, BSW, MS**

January 3, 2020

Attn: Kristin Mijares

Schell Cooley Ryan Campbell, LLP

5057 Keller Springs Rd. Ste 425

Addison, Tx 75001

Re:   Civil Action No.: 4:18-cv-00615-alm; *Meier, et al v. UHS of Delaware, Inc., et al;* In the United States District Court, Eastern District of Texas, Sherman Division.

Dear Ms. Mijares,

I was asked to review nine medical records on behalf of your firm to assess appropriateness of admission to various inpatient behavioral health hospitals. I will list general opinions related to broader complaints following the Documents Reviewed and Methodology sections, with case-specific observations noted at the end of each client's review.

I have been a registered nurse in the state of Indiana since 1996 with the majority of that time spent in behavioral health in inpatient settings, outpatient programs or closely related fields. In that capacity, I have had the pleasure of working with children, adolescents and adults. Furthermore, I've been employed in case management positions assisting those individuals living with HIV and those with addiction at the same service agency. I hold degrees in nursing, social work and public service administration. Since 2011, I've been employed in administrative positions at the inpatient behavioral hospital where I still serve as Director of Quality. The job duties for this role include review of medical records to assess compliance with CMS and Joint Commission documentation standards and to ensure the hospital operates in adherence to those, as well as state regulations. I am, therefore, qualified by my education, training and experience to provide opinions on the medical records provided by Schell Cooley Ryan Campbell, LLP.

1

I am compensated for my time in this matter at an hourly rate of $160.00 with a flat-rate of $1,600.00 per day for out-of-state consultation. I confirm I have no conflict of interest that affects my suitability to give objective, expert judgment in relation to matters within my expertise. I have no prior experience serving as an expert witness. These are my opinions based on the materials provided to date. I'm advised that discovery is ongoing, and additional documents are being gathered related to Plaintiffs' other medical providers. I reserve the right to supplement or amend my opinions based on additional or further information. Below are the materials I reviewed, on which I relied in forming the opinions contained within this Report, and which may be used as exhibits at trial:

## Documents Reviewed

1. Plaintiff's Third Amended Original Complaint
2. Export Report—Mark Blotcky, MD
3. B. Meier, Mayhill Medical Record
4. D. Creel, Bellaire Behavior Hospital Medical Record
5. S. Stokes, Mayhill Medical Record
6. Y. McPherson, Millwood Medical Record
7. T. Harvey, Millwood Medical Record
8. T. Young, Hickory Trail Medical Record
9. W. Crowell, Bellaire Behavior Hospital Medical Record
10. D. Creel, Bellaire Behavior Hospital Medical Record
11. J. Green, Millwood Medical Record

## Review of Individual Plaintiff Records

### BARBARA MEIER

Per the medical records, pp. 124 and 138, Ms. Meier, a 67-year-old female, reported the following at time of admission:

"Per intake staff: Pt. presents today disheveled and labile. I'm crying all the time. I'm just sick and sick and tired of crying. I know it has something to do with my MS. I went to the doctor today and he told me to come here. It's pretty cut and dry. I just don't want to cry anymore. I don't sleep, I can't turn my mind off, but I try. I just lay there. I don't care about getting up and doing anything. I got dressed today because my husband said I had to. He

helped me get dressed and then he took me to see my doctor. He said I can't go on like this. I don't want to be like this but I don't know what else to do. I'm just tired of crying all the time. Pt. denies SI, HI, and AVH."

These statements, along with other statements documented in the medical record, support the providers' decisions to admit Ms. Meier for psychiatric stabilization; indeed, her statements are indicative of a significant decline in social functioning, expressed hopelessness and a decrease in future-oriented thinking. The pre-admission assessment is electronically signed on 12/18/15 at 20:14 (see page 126) and the patient was admitted with the reason given as, "Decrease in functioning due to MDD."

Regarding allegations that staff from Mayhill failed to speak to Ms. Meier about her daily routine, I noted completion of the Admission Nursing Assessment dated 12/18/15 which initiated at 2242 and was thus completed within the statutory time period. The nursing assessment covered chronic conditions, health history, activity /mobility and her need for assistance with showering, nutrition needs, ADL assessment and other systems review. The narrative note on page 60 signed by the registered nurse shows the patient was provided a walker (her cane was placed in locked storage on the unit), her prescribed medications and extra blankets. In reference to the hospital's failure to provide her with the cane she had at admission by Mark Blotcky, MD (p.54): providing patients in inpatient behavioral health settings with walkers rather than canes is standard practice. Canes offer less stability and can easily be taken from the patient and used as a weapon.

In Plaintiff's Third Amended Original Complaint, Ms. Meier alleges the following issues were not discussed with her and/or required signatures not obtained:

1. the availability of her insurance coverage
2. expected daily costs of staying at the hospital or what part of the hospital costs she would be responsible for
3. being billed separately by the doctors or other medical professionals for services at the hospital
4. the Patient's Bill of Rights
5. agreement to the admission

3

On several documents, staff noted, "Pt says can't sign," and the employee signature is the only one present. However, this is not evidence of a deviation from the standard of care. It is standard practice that patients have the right to refuse to sign admission documents. In such instances, the staff presenting the document should note the patient's response and then sign and date the form to show the item was reviewed.  In Ms. Meier's case, a signature appears on the Consent to Treat which includes a statement of billing by separate contracting providers on pages 11 and 18, the Patient Bill of Rights on page 12, the Behavioral Health Unit Handbook Acknowledgement form on page 17, the Assessment Disclosure Statement on page 24 and the Voluntary Admission Authorization found on page 10 of the record. Consents for medication administration on pages 118-122 contain no patient signature.

The patient's depressed mood, "crying uncontrollably,"  and her overall distress is reinforced by the spouse according to documentation on the Family/Referral Source Contact Note dated 12/21/19 and found on page 104 of the medical record.

Psycho-education notes written by a Music Therapist, CTRS, LPC and LMSW document patient's attendance and active participation at various group therapy sessions on 12/19/15 (see page 52), 12/20/15, 12/21/15 and 12/22/15. (See pp. 106-113)

Regarding falls, first fall on 12/20/15 was recorded at 2305. Record reflects a nurse documented on 12/21/15 at 1558 the patient was changed from using a walker to a wheelchair due to, "falling and tripping frequently...and dependent with ADLS." Later, at 2050, Ms. Meier fell trying to get into her wheelchair. These issues were addressed according to the standard of care—the provider, House Supervisor and spouse were notified and orders received for neuro checks every four hours times three and 1:1 observation for safety related to the patient's fall risk. The narrative note also reflects the spouse's return call on 12/22/15 at 0155 requesting to visit later the same day, and the nurse's reply to call to speak with the attending physician after 0730. These notes reflect staff efforts to maintain a safe environment for Ms. Meier, as efforts were taken to prevent falls and decrease likelihood of additional falls after the initial event. The steps taken to address Ms. Meier's safety after the fall, including neuro checks, 1:1 observation, and

informing the family of the incident, evidence conformity to the standard of care for a reasonably prudent provider.

Review of the 15-minute patient round sheets revealed the mental health technicians did not document completion of hygiene over Ms. Meier's length of stay, nor did they accurately document the patient's need with assistance in certain ADLs.  Despite this issue, the care provided through the course of treatment was appropriate and met the reasonably prudent provider standard of care with no indication of negligence or discrimination on the basis of a disability whether it be real or perceived.

**THE HOUGH FAMILY CASE**

Per the Psychiatric Evaluation completed for Madison Hough, an 18-year-old female, dated 03/25/17 at 0800:

"Patient is admitted to Mayhill Hospital after she made a suicide attempt. It is reported that the patient is a college student in Denton. Living in a dorm. She is a college student in Texas Woman's University. It is reported that the patient was talking to mother on phone and had an argument with her. Mother came to know that she is using marijuana and yelled at her and made her feel like a burden. She became suicidal and took a handful or ibuprofen as a suicide attempt. The patient's friend called 911 after that. Patient also left a message for her brother who also called 911. Patient reports feeling depressed for the past 2 years with a previous suicidal attempt when she overdosed and then threw up, never told anyone. Patient has issues getting along with parents. She has been increasingly depressed and anxious, loss of interest in activities. Patient's symptoms increased over the past 3 months. She has difficulty going to sleep, has frequent awakening at night and has poor appetite. The patient is feeling hopeless, helpless and reports that she is not having enough coping skills." Patient denied being on medication at time of admission. During time of assessment, "patient denied suicidal ideation; however, she made a suicidal attempt with a handful of ibuprofen..." Mood and affect were noted as depressed. (p. 37) The Suicide Behaviors Questionnaire-Revised states patient responded that she was having thoughts that she would be better off dead.

The statements recorded in the psychiatric evaluation are congruent with the statements provided to Intake personnel at time of assessment on 03/24/17, time noted as 23[_]2:

"Patient is college student in Denton living in dorm. Patient was talking to mother on phone and had a disagreement and mother yelled at her and made her feel like a burden, so she became suicidal and took a handful of ibuprofen in a suicide attempt. Patient reports on and off depression for three years with a previous suicidal attempt where she overdosed and then threw up and never told anyone." (p.52) Judgement and impulse control assessed as "poor."

The statement is again consistent with the documentation on the Inpatient Psychosocial Assessment on page 72 dated 03/26/17 noting the following:
"Tried to OD on ibuprofen about 2 handfuls of 200mg—mom was yelling at me makes me feel like I'm a problem."  The record shows Ms. Hough identified her roommate Addison as part of her support system and wished to return to TWU after discharge. The records also state she has experienced sexual assault once, and experienced verbal abuse from her mother. During the same assessment, she noted her weakness as, "impulsive." (p.78)

The following narrative entry by the nurse upon completion of the Admission Nursing Assessment is dated 03/25/17 and timed 0200: "Pt presents to unit AAOx3. Pt is tearful, quiet, and little anxious. Pt states was mad at mother for blaming everything that goes wrong on her. Pt stated, "So I figured I would end it for her and take a handful or Motrin." Pt is anxious about hospitalization due to college classes on Monday that she can't miss. Pt denies SI, HI, A+VH at this time. Pt denies depression. Pt is cooperative and compliant. No s/s of distress, VS WNL. No Hx medical. Pt reports suicide attempt one year ago but doesn't want to share details. No other concerns voiced. Will continue to monitor."

The patient's statement regarding the intent in taking the Ibuprofen was reiterated in a PROCESS GROUP THERAPY PROGRESS NOTE dated 03/26/19 stating patient was tearful, agreeable to PHP or IOP and reported the taking of pills on 03/24/17 as a "3rd [suicide attempt]." (p.94)

A LMSW completed the FAMILY/REFERRAL SOURCE CONTACT NOTE after speaking with the patient's mom on 03/25/17 at 1800. Per the entry, mom identified what led to this hospitalization as, "patient accepted to TWU which is far from home. Pt was lonely. Met family and got job in Galveston. Left Galveston, returned to Denton. Pt was smoking a lot of pot for relaxation. Took ½ bottle of Ibuprofen. Patients mother identified the trigger for

current behaviors as, "Loneliness, conflict with family over marijuana use, "bad" influence from friends at TWU."

The Consent for Treatment and Voluntary Admission Authorization are dated 03/24/17. The Patient's Bill of Rights is initialed next to the line reading: "I received a copy of this document prior to admission." The form does not require a time, only a date. The form titled Safety Search of a Patient showing patient was informed of the wanding process and wanded prior to going to the unit was dated 03/24/17 and timed as 2355. The bottom half of the same form under the section heading, "TO BE COMPLETED UPON ARRIVAL TO THE UNIT," is dated 03/25/19 with a time of 0300. This is consistent with the form, HIGH RISK NOTIFICATION ALERT, a hand-off communication tool which was signed by Intake staff on 03/24/19 at 2330 and by the receiving RN on 03/25/17 at 01:51.

The physician progress note with an exam date of 03/26/17 states patient denied suicidal ideations and denied feeling depressed, but also expressed the provider's concern the patient was minimizing symptoms. Patient noted to continue to have difficulty with sleep. A separate hand-written note (p.47) states the patient refused to take any psychotropic medications to address mood. The entry is dated 03/25/19 and timed for 0900.

Ms. Hough signed the Request for Release at 13:48 on 03/27/17; however, the Request for Discharge/AMA Questionnaire states the date of request as 03/27/19 but the time of request for discharge as, "5-6pm." The nursing progress note dated 03/27/17 and timed for 1350 records the request for four-hour letter for AMA at that same time, 1350, stating the provider was notified and an instruction received by phone from the physician to place patient on 24-hour hold pending court proceedings. Dr. Faheem noted on that day, as well as the prior, that Ms. Hough was minimizing her symptoms and refusing medical treatment of her symptoms. Based on those findings, along with the suicide attempt, it was reasonable to hold the patient for further care to ensure she was no longer a danger to herself. At 1400, the nurse noted that the patient was agitated about the AMA Process. Another staff member was notified to assist with patient, parent and social services in Intake.  At 1415 it states the patient was escorted to Intake. Final entry on this page stated the patient would not be returning to the floor. (p. 112) A supplemental contact note dated 03/27/17 and timed for 1434 states: "House Supervisor asked therapist to meet with family members to

explain discharge process and the requirement to help a pt until evaluation by a doctor when someone is waiting to discharge AMA. Code was called before therapist made it downstairs."

Despite the time lapse of the late entry written on 04/10/17 at 0810 stating Ms. Hough had eloped, nursing staff—documented a verbal order on 03/27/17 at 1345 placing the patient on a 24 hour hold with further instructions to allow social services to meet with parents at Intake. This documentation is consistent with the nursing entry on the 27th requesting patient placement on a hold. Based on the above, the care provided met standards of care through the course of treatment and discharge with no evidence of sexual exploitation.

**SANDRA STOKES**

According to the medical records for Ms. Stokes, a 41-year-old female, the patient presented to the ER at Baylor Carrollton on May 14, 2017, with a complaint of increasing confusion, erratic behavior, impaired thinking and anxiety. Due to statements that she had left her oven on and unattended, left her front door open and walked outside without shoes at 0200 to look for her cat, patient was recommended inpatient treatment related to the high risk for self-harm and impaired functioning. A provisional diagnosis of MDD recurrent, severe with psychosis, is noted in the record (p.61). The patient completed all admission paperwork and signed the Consent to Treat, Patient Bill of Rights and Voluntary Admission Authorization on this same date.

Ms. Stokes reported to Intake personnel, nursing staff and attending physician during her psychiatric evaluation that she experienced a head injury on April 11, 2017 at which point the confusion started. She also reported a history of anxiety, with more recent social isolation related to her increased anxiety, difficulty sleeping and pulsing sensations in her fingers and face. She noted during her initial exam by the attending physician that she had been hearing voices in her ears and seeing her father when he wasn't present. As support for the notion that her condition was not caused by the injury, but rather was psychological in nature, a CT scan of her head taken prior to her arrival to Mayhill showed no intracranial bleed. The Nurse to Nurse Report received from the ER stated a CT was "clean."

A licensed social work spoke with the patient's dad on 05/15/17 and noted him as saying the patient's neurologist did not believe the behavior was related to the concussion, but

rather that the neurologist believed her symptoms were psychological in nature and referred Stokes to a psychiatrist.

On May 15th, the patient signed a Request for Discharge and completed the questionnaire at 1130. She noted her reasons for requesting discharge: "Feel much more comfortable at home, more relaxed and soothing." Patient rated her physician, nursing staff, therapy staff and Intake as, "excellent" with the recommendation to, "make it warmer and more comfortable and a clock would be great." Despite her claims she was improved, providers felt she was exhibiting bizarre behavior and continued to be a danger to herself—she was noted to wander the halls, attempt to open locked doors and seemed confused and incoherent. Accordingly, the nursing note from the same date at 2100 states patient was placed on a 24 hour hold per Dr. Faheem which would have been due to expire on 05/16/17 at 1130.

On May 16th, the CTRS noted between 1000 and 1100, patient was in and out of group, confused, anxious, resistant to attending treatment, pacing in the hallway—attempting to open locked doors. The note on page 85 of the medical record stated that patient was having extreme anxiety, unable to dial the phone, unable to speak with her father once the call was placed. The RT Intern wrote that patient stood up, shaking, trying to open the door, but was unable to do so—the intern went to assist her and noted the patient then turned red and started, "sliding down," falling quickly. Rapid Response was called to bring assistance.

Patient was transferred via ambulance to Denton Regional Medical Center (DRMC) with a diagnosis of "seizures" on 05/16/17 at 1345.

The Plaintiff's Third Amended Original Complaint argues the patient fell prior to the seizure, causing the seizure, but the record reflects the fall was a result of the seizure. Ms. Stokes did not report a history of seizures, nor history of a seizure disorder, in her intake or nursing assessments. Medical records sent by DRMC also do not reflect a history of seizures of seizure disorder. Thus the patient was not placed on close observation protocol for same.

The physician orders on page 49 of the medical record do not include a separate order for a 24 hour hold for 05/15 or 05/16/17. The physician progress note on page 48 from 05/16/17 and Discharge Summary from 05/16/17 do not mention patient signing AMA on the 15th or placement on a 24-hour hold. However, as stated earlier, a nurse documented the physician was informed of the AMA request and reflected a desire by Dr. Faheem to place a 24-hour hold.

Despite the lack of a separate documentation by the physician, a review of the record shows sufficient criteria for admission with appropriate care rendered through the course of treatment meeting the physical and psychological needs of the patient. Ms. Stokes medical history provided by DRMC and Mayhill staff is devoid of any mention of seizures, and the reasonably prudent provider standard was met when staff reacted appropriately to her sudden seizure. Emergency care was provided and she was transferred to a hospital with physicians and staff able to address the issue.

## YOLANDA MCPHEARSON

The family of Yolanda McPherson, a 54-year-old female, took her to the ER of Methodist Mansfield after she informed family she had attempted suicide by taking her prescriptions of half a bottle of Lexapro and 10-12 Clonazepam. This statement was found on the Integrated Intake and Psychosocial Assessment on page 71 of the patient's medical record.

The case was reviewed by Dr.  Buttar via tele-medicine with information provided by the RN at Methodist Mansfield, as stated, "per staff," on the Preadmission Evaluation/Management report. (p.41) The Methodist RN completed the 11-page assessment with the patient at the ER. Based on the nurse's input and available documentation, Dr. Buttar recommended inpatient treatment at Millwood Hospital.

Item 131 of the Plaintiff's Third Amended Original Complaint alleges the admission documents were not signed by Ms. McPherson, but by an employee. Although this is not the reviewer's area of expertise, review of the documents shows consistency and similarities in signatures on the following forms across the course of treatment which would indicate Ms. McPherson was the person who signed the admission documents:

1. Aftercare Plan Instructions, bottom p. 3, dated 01/31/18
2. Continuing Care Discharge Plan Order Form Instructions for Home Medicines, p.4

3. Medication Consent, p. 54, dated 01/25/18
4. Infection Prevention Admission Screen, p. 88, dated 01/23/18
5. My Safety Crisis Plan, p. 96, dated 01/24/19
6. Assessment Services Disclosure & Consent to Assessment, p. 201, dated 01/23/18
7. Limitations of Confidentiality, p. 202, dated 01/23/18
8. Notice of Privacy Practices, p. 203, dated 01/23/18
9. Release of Information, bottom of p. 214, dated 01/23/18
10. Consent to Treat, p. 216, dated 01/23/18
11. Understanding and Helping the Suicidal Individual, p. 224, dated 01/23/19

The following forms had the notation, "Patient to distress to sign," written on them and contained no patient signature or initials; however, the forms were appropriately witnessed by staff to indicate review of the document:

1. Bill of Rights, p. 208
2. Approach to Use Less Restrictive Treatment in Interventions, p. 217
3. Discharge Planning Worksheet, p. 218
4. *Duplicate* Notice of Privacy Practices, p. 219
5. Coordination of Benefits Form, p. 222
6. Financial Agreement, p. 223

As part of the complaint, Ms. McPherson stated she was not seen by a psychiatrist until less than 24 hours prior to discharge.  Review of the medical record, however, shows the following entries by physicians during the patient's course of treatment:

1. Initial Psychiatric Evaluation, p.8, dated 01/24/19 and signed by Dr. Mehta
2. Progress Note, p. 20, dated 01/25/18 and signed by Dr. Mehta
3. Progress Note, p. 22, dated 01/26/18 and signed by Dr. Mehta
4. Progress Note, p. 24, dated 01/27/18 and signed by Dr. Allawala
5. Progress Note, p. 26, dated 01/28/18 and signed by Dr. Allawala
6. Progress Note, p. 28, dated 01/29/18 and signed by Dr. Mehta
7. Progress Note, p. 30, dated 01/30/18 and signed by Dr. Mehta

The notes contain statements from the patient expressing a desire for discharge while also showing the physician's concern that the patient was minimizing symptoms, including

11

paranoia that her phone had been bugged. The notes reflect Ms. McPherson's daily progress from admission to discharge. The patient was discharged to home with instructions to follow up with appointments made to Destination Life Therapy & Wellness and Dr. Seema Haque on 01/31/18.

The notations in the record, signs and symptoms present at intake, indicate the recommendation for inpatient level of care made by Methodist Mansfield staff and Dr. Buttar was appropriate. Based on the above, the physical and mental needs of the patient were met by the interdisciplinary team, conforming to the standards of care.

### TROY HARVEY

Mr. Harvey, 51-year-old male, was admitted to Millwood Hospital on 10/03/16 at 1958 with an admission diagnosis of Major Depressive Disorder, Single Episode. According to the Integrated Intake and Psychosocial Assessment beginning on page 38 of the medical record, the patient and his wife began seeing a change in mental status, presence of suicidal ideations/depression with plan to crash his car into a wall, increased impulsivity and irritability with worsening symptoms over the previous three to four days. Mr. Harvey and his wife stated the symptoms began with the use of steroids, and, although instructed to stop use of the medication, the patient had continued to take it, stating, "I'm not sure why." This indicated disorganized thinking, impulsivity and potential for self-harm requiring 24-hour monitoring and stabilization. The record also shows that patient saying he had taken too many meds and quit his job that day [of assessment] for unknown reasons. Based on this history, as well as signs/symptoms observed by staff and assessors, inpatient treatment for the safety of Mr. Harvey was warranted.

Patient completed the Behavior and Symptom Identification Scale, Basis 32 on 10/03/16 and marked the following with a score of, "Quite A Bit" on a scale from, "No Difficulty" to "Extreme" (pp.119-120):

> Question 3, related to work, e.g. completing tasks, performance level
> Question 6, related to adjusting to life stressors, e.g. separation, new job, moving
> Question 17, related to presence of feelings of depression and hopelessness
> Question 20, pertaining to presence of feelings of fear, anxiety or panic

To question 18, which inquires as to the presence of suicidal feelings or behavior, patient marked, "Moderate."

The Psychiatric Evaluation notes the chief complaint as, "I want to kill myself." The brief history states the patient became actively suicidal after taking steroids saying he wanted to run his car into a wall, that he is easily angered and experiencing an altered mental status. Dr. Malone noted a provisional diagnosis of Bipolar, Type I, mixed, depressed, severe and also expressed concern that as a veteran he may be experiencing PTSD.

Examination of the first page of the nursing assessment shows patient denied suicidal ideations, plan or past attempts. He stated his treatment goal was to, "Get that medicine out of my body so I can get back to being me." A nursing narrative note states the patient said the medication made him irritable, anxious and depressed, but denied he ever had suicidal ideations. Signed, dated and timed: 10/03/16 at 2130.

The patient, Mr. Harvey, signed a request for discharge on 10/04/16 at 0803. A nursing note entry dated 10/04/16 and timed at 0900 states that patient signed AMA and was ready to go home. According to the entry, the nurse notified the doctor who provided instructions to place patient on hold for possible commitment. The request for discharge form shows patient rescinded the request on the same day, timed for 1105.

Case Management Note dated 10/04/16 and timed at 0913am: "Spoke with wife regarding patient status. Wife concerned because transferring ER sent patient reportedly for completing a '24-hour medical watch' that expired at 7am. Wife informed that patient had made suicidal statements in the ER and was suicide precautions upon transfer. Clarified treatment program intent at this facility. Wife agitated; stating that husband is not a risk to himself and has never had thoughts of self-harm. This staff asked for clarification on the 'crash' car statement reportedly made 1 week ago. Wife denied, stating that he told the ER once that he was so frustrated that he could crash his car but does not want to die. Wife stated patient had never made threats like that before and needed to be released. Clarified the AMA process and that the attending psychiatrist would want an evaluation prior to making a decision. Wife responded, 'that's fine. I'm not worried about that. As soon as he looks at him he'll know that my husband doesn't need to be there.' Wife asked for this staff to speak with patient and give update. This staff met with patient and clarified AMA

13

process and reason for current hold. Patient verbalized understanding and was cooperative." Importantly, no one at Millwood told Mr. Harvey he would be released promptly after a "24-hour medical watch." Standard practice allows the treating physicians to determine the appropriateness of his admission to an inpatient level of care and duration of treatment based on ongoing interdisciplinary assessments and observations.

The physician progress note dated and timed for 10/05/16 at 1320 states, "Mr. Harvey turned in another letter of release. He has been stating for 48 hours he is not suicidal. Had no option to discharge him against medical advice." The record lacks a second request for discharge. Final diagnosis: Bipolar, Type I, mixed, depressed, severe and PTSD. Mr. Harvey signed his discharge paperwork on 10/05/16 at 1330 which is congruent with last 15-minute observation documented on the same date at 1330.

Mr. Harvey stated in his complaint that he was provided a copy of the Patient's Bill of Rights but was not verbally advised of them. Review of documents show patient initialed next to the statement: "I certify that staff have explained its content to me in a language I understand prior to admission (if voluntarily committed)." (p. 100) If he was not advised of his rights, it was incumbent upon him to not sign until such was done. The fact that he signed indicated he was satisfied with staff's recitation of the rights.

Patient complaint, item 158, states the physician," explained multiple suicide attempts"; however, the record does not contain that documentation.

Based on the above, the record reflects criteria for inpatient behavioral treatment were met at the time he presented to the emergency room with appropriate and timely re-assessment by the interdisciplinary team throughout the course of treatment. Furthermore, without evidence of a second request for discharge and time signed, it does not appear the patient was held inappropriately beyond a 24-hour period due to rescinding the original request on 10/04/16 at 1105.

## TIFFANY YOUNG

Ms. Young, a 45-year-old female, was seen at Arlington Memorial Hospital in the ER for initial complaint of chest pain. Based on a review of EKGs, a physical exam and results of a urine drug screen showing positive for presence of amphetamines, the emergency room

14

providers felt an assessment of Ms. Young by a psychiatric team was warranted. The pre-admission evaluation on page 43 of the medical record, signed by Dr. Tao on 11/05/17 at 1222, with information from the Intake Psychiatric Assessment relayed by the LPC Intern (p. 59) stating the patient came to the ER, "out of desperation" with suicidal ideations and a plan to cut her wrists in the shower. Patient denied intention to act on the plan, but responded, "yes," the thoughts frightened her (p.51) Ms. Young also listed multiple current stressors. Based on the assessment performed by the psychiatric team, as well as findings from Arlington Memorial staff, it was decided Ms. Young warranted inpatient psychiatric stabilization.

According to Millwood's Psychiatric Evaluation (pp.30-35), the patient is noted as saying, "I was feeling really overwhelmed, hadn't slept well for two weeks." Under the heading History of Present Illness, she is noted to have recurrent depression for 10-15 years with antidepressants prescribed by her GP, use of an appetite suppressant called "U Brew" for 1-2 weeks (which was allegedly the cause of her testing positive for amphetamines in the Urine Drug Screen) and current financial and family stressors. Patient reported as "weepy and distraught," emotionally labile and minimizing symptoms, saying she should not have agreed to the transfer. The initial diagnosis: Major Depressive Disorder, recurrent, severe with suicidal ideations.

The clinical services note from the 1:1 meeting with Ms. Young on 11/06/07 at 1415 is congruent with other entries in the medical record regarding presence of suicidal ideations and plan at time of admission. The patient relayed details that she would slit her wrists in the shower to avoid making a mess, although she denied intent to follow through on the plan, stating she would not leave her children. The clinician explained to the patient that having such a detailed plan shows some level of intent. Clinician and patient reviewed the safety plan developed with the patient's input and the staff member documented patient's optimism and motivation to change. (p. 142)

Collateral information and safety planning were conducted by staff with the patient's husband on 11/06/17 at 1515. Per the documentation, the spouse identified a lack of sleep coupled with a difficult child and work stress left Ms. Young feeling overwhelmed. Staff charted on an Interdisciplinary Progress Note dated 11/06/17 and timed 1515 that

patient's husband would like the patient to return home. Personnel explained importance of obtaining collateral and completing the 1:1 psychosocial assessment, but would relay to the attending physician that both had been completed that day.

On 11/06/17 at 1700, the patient requested to sign AMA and was encouraged to speak with the provider before signing out and told by the therapist that if she changed her mind, she can sign out. (p. 137) On 11/07/17 at 0900, an entry stated that spouse was notified that patient may discharge this date, and that patient was in "good spirits." (p. 128)

The examination of the patient's course of treatment in the Discharge Summary (pp. 164-166) reveals the following: justification for treatment and progress made/improvement.

> "Treatment plan goals were to eliminate suicidal ideation and improve mood... Nursing notes indicate the patient remained calm and cooperative throughout her stay, was med compliant and openly spoke with the nursing staff about having a good support system at home...On the date of discharge, patient met with her physician. She was oriented x4. Her appearance was appropriate. Her behavior was engaged. Speech was normal rate and rhythm. Her mood and affect were both normal. Her thought processes were intact. Her perceptions were all within normal limits. There is no evidence of delusions or psychosis. Patient reported no ongoing suicidal ideation. No homicidal ideation. Insight and judgment both good. Patient was discharged to home with her husband and family."

Item 189 of the Plaintiff's Third Amended Original Complaint alleges the Patient's Bill of Rights was posted in the room but only in Spanish. Review of the medical record shows the patient signed and initialed the statement certifying she had received a copy of the Patient's Bill of Rights prior to admission and staff had explained its content in a language she could understand prior to admission. This form, located on page nine of the medical record, is dated for 11/05/17 and timed at 1435.

Based on the above, the patient presented with symptoms of depression indicative of the need for inpatient treatment, and she received appropriate care through the duration of her stay with the hospital. Despite allegation by Ms. Young the she was not provided an AMA form to make a written request for discharge in a timely manner, the patient was

16

released <u>less</u> than 24 hours after the verbal request which still conforms to the standard of care regarding AMA requests.

## BILL CROWELL

According to the medical record, Mr. Crowell, age 53, was admitted to Bellaire Behavioral Hospital on an Emergency Detention on 11/25/17 due to suicidal thoughts posted on social media. These were confirmed by a Peace Officer, and were noted by the officer to be related to the following stressors: chronic pain, loss of health and decreased mobility, daughter sending nasty messages, financial—due to running out of "SSRI" unable to pay child support, and filing bankruptcy due to his medical bills after his heart attack two years prior (p. 29).

A peace officer initiated the Notification of Emergency Detention on 11/24/17 (p.18-23). Importantly, he reported: "I have reason to believe and do believe that the above-named person evidences a substantial risk of serious harm to himself/herself or others based upon the following: Responded to a male who threatened suicide over social media. William stated that he has a lot of people who have been treating him [poorly] over the past several months. William stated that to end his pain he would end his life. When asked how, William stated that he had plenty of guns to do so." Based on the Officers' conversation with Mr. Crowell, their documentation and documentation from the emergency clinic at The Harris Center, it was determined that Mr. Crowell warranted involuntary psychiatric inpatient treatment.

The initial assessment at BHB notes patient's pain at time of assessment as "8 out of 10." Patient noted medical conditions of hypertension, diabetes, coronary artery disease, degenerative disc disease with lumbar herniated disc and multiple surgeries, multiple stent replacements and partial blindness in his right eye. The assessor noted the patient as depressed, anxious, lacking motivation, having difficulties with concentration, impulsive and having difficulties at home. Medications listed included Norco 10/325 with one to two tablets taken four times daily. Patient denied abuse of the pain reliever or other substances. On page 31 of the assessment, the patient is documented as saying he experienced physical and emotional abuse at the pain clinic, and in the narrative portion is quoted as saying he wished to file a complaint.

The psychosocial assessment completed by a licensed counselor dated 11/30/17 and timed as 1510 contains the following statement about Mr. Crowell's use of opiates: "Patient reports degenerative disc disease that has necessitated 15 surgeries and makes it difficult to stay away from narcotic pain medication, which is a danger. Especially when combined with patient's Klonopin." The counselor also noted patient was highly anxious and concerned about environmental factors and documented that patient had suicidal ideations with no plan or method.

Review of the Psychiatric Evaluation from 11/26/17 shows Dr. Talley ran a report of controlled prescription use with PMP Aware and noted regarding patient's Norco use, "Based on the PMP Aware System, it does not appear that he has been abusing this." The PMP Aware System also showed no issues with the patient's Klonopin use and the medication was continued for use while inpatient. Estimated length of stay noted as three to five days. The progress note written by Dr. Rafique on 11/27/17 states patient's last use of Norco, according to the patient, had been 10 days prior and had stopped due to constipation. This is in opposition to Plaintiffs' Complaint, wherein he claims he took the medicine regularly and the hospital was negligent in not providing it to him. The physician found the patient, "not cooperative...constricted affect...Minimizing his problem...poor insight and judgment." In the assessment portion of the note the provider expressed concern for the patient's risk for sudden respiratory depression from use of benzodiazepine and narcotic analgesics together; furthermore, the physician documented Mr. Crowell's previous dependence on Xanax. The doctor observed no signs of withdrawal once beginning the detox protocol which Mr. Crowell agreed upon in writing, stating he discussed it with his wide and they thought it would be best to complete the detox protocol ("Now is as good a time as any"). Expected length of stay noted as four to five days. On 11/28/17, the patient requested continued use of both the narcotic medication and benzodiazepine despite having previously verbalized understanding of the risks and agreeing to the detox protocol. The physician again expressed concern for accidental death. The doctor noted the UDS was negative for opiates, congruent with the patient's statement that he had last taken Norco 10 days prior. Although the patient's denied suicidal ideations, documentation shows the doctor viewed the patient's affect as depressed and anxious. On 11/29/17 the provider noted patient appeared in no distress or acute pain, not walking

with a cane. Detox protocol for benzodiazepines was ultimately stopped due to lack of
withdrawal symptoms. The progress note from 11/30/17 states the patient was, "still
insistent on getting opiate pain medication. He is in not any distress. He is walking
independently. He has no withdrawal symptoms." Mental status documented as,
"Somewhat angry, irritable. Looks depressed, Constricted affect." Patient denied suicidal
ideations. The portion of the final progress note titled Assessment and Progress Towards
Treatment Goals, dated 12/01/17, day prior to discharge, summarizes criteria used to
justify admission, justification for continued treatment at the inpatient level of care and
readiness for discharge through development of a plan of safety continued education:

> Patient has history of mood regulation problem, depression, anxiety. Came with
> suicidal ideation…He has extensive history of psychiatric problem, chronic pain. He
> reported that he has been taking Klonopin from the psychiatrist. He talked about his
> multiple stressors including bankruptcy and was concerned about lack of
> communication between myself and his outpatient psychiatrist. He did not report
> that he has any firearms at home and the firearms are in safe and keys had been
> given to the neighbor. Patient wanted to be discharged at that time…In the past, I
> have educated him about the risk of taking hydrocodone, narcotic analgesics with
> benzodiazepine, sudden death and respiratory depression especially when he has
> developed tolerance; he was taking low dose of benzodiazepine and he takes a
> higher dose now…Work on coping skills, stress management. Patient during my last
> interview has denied suicidal ideation. He has made some improvement. He is
> taking his medication."

Assessment of the physician orders reveal that the patient provided an egg crate and extra
pillow for comfort on 11/26/17. Nursing notes reviewed for dates 11/25/17 through
12/02/17 beginning on page 156 and extending through page 172. On 11/28/17 the nurse
noted at 1300 patient requesting to move to another unit, and a second note on the same
day timed at 1330 stating the patient was transferred to unit 8. Item 217 of the Plaintiff's
Third Amended Original Complaint alleges the patient was moved to Unit 8 in a secretive
manner; however, it was written as an order on 11/27/17 via a telephone order from Dr.
Rafique as noted on page 118 of the medical record, also. These instances are indicative of

staff attentiveness to patient needs, as well as appropriately addressing concerns regarding his cohorts by moving him to another unit.

Regarding Mr. Crowell's expressed concern in the complaint that he was in pain throughout his stay, nursing notes show patient denied pain on the evening of 11/26/18, both on day shift and evening shift of 11/27/17, on days 11/28/17 with evening pain rating not scored, and again both day and evening shift of 11/29/17, 11/30/17, 12/01/17 and on the morning of discharge on 12/02/17. This is congruent with the physician notes which stated he was able to move without difficulty.

Patient consistently noted as cooperative and calm, often interacting with peers although he declined insulin on two occasions when his blood sugar was high. No issues with cohorts documented by nursing personnel over the course of treatment.

Social services notes dated 11/30/17 and timed at 1545 contain the following entry:
> "Patient also detailed various experiences during his hospitalization including lack of attention to medical concerns, lack of communication between Dr. Rafique and out-patient physicians, and harassment by fellow patients that have made this admission anxiety-provoking for him...Therapist assured patient that therapist would make his concerns known to administration as quickly as possible."

On 12/01/17 at 1115, Mr. Crowell wrote a note addressed to Bellaire Behavioral requesting discharge "immediately," to be remanded to the custody of his wife and care of Dr. Digilova. The patient stated that his wife had secured all firearms. Discharge orders were written on 12/02/17 at 1000, which complies with the standard of care related to AMA discharge requests.

The physician discharge orders on page 97 of the record show discharge diagnosis of Major Depressive Disorder, recurrent, severe without psychosis. This diagnosis is congruent with those listed on the Discharge Summary found on page 120. No substance abuse diagnosis is present at discharge in the notes/entries, or on the coding sheet on page two of the chart despite Plaintiff's allegation in the complaint.

The complaint further alleges the patient was given antidepressant medications without his consent.  However, on pages 80-87 of the medical record, Mr. Crowell signed

medication consents for Trazadone, Remeron and Klonopin. No consent was found for Zoloft which was continued as a home medication.

He reports staff did not address his diabetes appropriately; however, review of the blood sugar checks shows staff attempted to obtain his blood sugars regularly but he refused on occasions. He also refused insulin ordered by the physician. Issues with his blood sugar were related to his refusal to comply with the ordered treatment regimen. In Dr. Blotcky's consultation notes, he noted the patient had a hypoglycemic crisis one night during his time as inpatient with refusal by the nurses to check his levels or treat the low blood sugar. A level of 78 was found in the chart on 11/30/19; however, it was at 1111 in the morning and within the normal range of 70-120 mg/dl. The next reading at 1800 was 152mg/dl. The majority of blood sugar levels throughout the patient's stay ranged from the 130's to the 170's with three readings over 200mg/dl. The patient declined his insulin on 11/30/17 (p. 161) and on 12/01/17 (p.159).

No entries in Mr. Crowell's record substantiate claims that Dr. Rafique diagnosed the patient as an, "addict," nor did he keep him under the pretext of collecting more insurance payments for substance abuse. Indeed, the detox was stopped on 11/29/17. Consistently, documentation shows anticipated length of stay of four to five days and concern for patient's depressed mood as evidenced by the provider's observations of the patient's affect and minimization of statements the patient made which led to his detainment. No entries suggest Mr. Crowell was, "being used as a raw-material in an insurance racket" (Item 208). Documentation reflects prudent and timely actions taken during the course of treatment to meet the physical and psychological needs of the patient.

## DIANE CREEL & LYNN CREEL

Ms. Creel is a 65-year-old woman admitted to BHB on 08/16/17 at 1624 on an involuntary status. Her admitting diagnosis: Major Depressive Disorder, recurrent, severe with suicidal ideations. According to the Intake Assessment (p.33), patient informed the clinician, a registered nurse, she wanted help for depression, suicidal ideations with plan to kill herself taking clonazepam with alcohol after looking it up online. She described increased irritability and a chronic history of depression with worsening depressive symptoms and presence of the following current behaviors/symptoms: anxiety, problems function at

work, racing thoughts, not sleeping, restlessness, difficulty concentrating, decreased appetite, tearful. The nurse documented the patient was experiencing the loss of relationship with her daughter the past month, writing, "They aren't talking to her, including grandchildren." (p.34)

Current medications noted as Clonazepam and Effexor, an anti-depressant and Fiorinal for migraines, which contains a barbiturate. On the sixth page of the assessment, the nurse wrote, "pt was suicidal on Friday at Memorial Hermann—Friday took 4 Klonopin and was going to drink alcohol." The document reflects the patient responded, "No" to the questions of presence of current self-injurious thoughts of threats and specific self-harm plan. However, despite her responses to those questions, the following suicide risk factors were affirmed by Ms. Creel: lack of social support, alcohol or heavy drug use, several financial difficulties, hopelessness. Additionally, the instructions are noted on the form (p.38), "Current SI or attempt within 30 days—place on Suicide Precautions." Narrative note on the last page of the intake assessment (p.42) dated for 08/06/17 and timed at 1545:

> "65yo [female] presents as a walk-in accompanied by her [husband]. On approach pt is very irritable and angry, stating she has been seeking help since Friday and had to wait 8 hrs. at Memorial Hermann without receiving help. And several other places that her wait and she left. Pt was tearful, angry with loud voice. She demanded "I want help and I want it now." She eventually calmed and complied with assessment. Related she became suicidal Friday, was going to take Klonopin [with] alcohol od but after taking 4 Klonopin noticed the kitchen needed cleaning. "I didn't want to leave my [husband] with a dirty kitchen." Pt stated "I've had suicidal depression issues at other times" Related significant losses past few [months] (death of an employee, daughters not talking to her, bill collectors calling her). Said it all became too much on Friday and she could no longer function or cope... States she is not suicidal now...Pt was going to sign in voluntarily but changed her mind and she and [husband] wanted to leave...AOC and Dr. Rafique notified. Pt admitted involuntarily per Dr. Rafique."

Nursing assessment reflects patient's refusal to complete the visual skin assessment, and several areas state patient refused to answer questions. It also notes the supervisor was asked to speak with the patient about the involuntary status. Review of documentation

shows the patient refused to sign acknowledgement of Advance Directive, Patient Handbook and Patient's Bill of Rights, Basic Rights and Medicare Discharge Rights at admission. However, the forms were appropriately witnessed by staff to demonstrate attempted review of the information.

Admitting orders included initiation of an alcohol withdrawal protocol based on patient's report of drinking two to three drinks per night since her thirties.  Home medications were continued and Ambien or Trazadone offered as-needed for sleep. Lyrica was ordered twice daily for pain.  Clonidine was ordered on 08/07/17 at 1350, one dose "now", for elevated blood pressure and Ambien discontinued. (p.90) On 08/08/17 the patient signed a Request for Change of Physician form, asking to have another provider rather than Dr. Rafique. As an appropriate redress for those issues, on the following day, a physician order was written for a second opinion from Dr. Hughes, for paperwork to be sent to a Houston hospital for transfer per patient request and for individual therapy. On 08/09/17, the detox protocol was discontinued and Clonidine ordered routinely three times daily due to fluctuating blood pressure. On 08/10/19, the Clonidine is discontinued after a BP of 88/58 and Lisinopril started for high blood pressure, instead. Trileptal, an anticonvulsant medication found beneficial in treating depression is also started this date. Note on the order sheet stated, "plan discharge tomorrow." (p.86) Per the Discharge Summary, Ms. Creel was discharged on the following medications: Aricept, a cognition-enhancing medication for memory problems, Effexor, an antidepressant and Trileptal, an anti-convulsant medication used to effectively treat mood disorders, with the last medication started the day prior to discharge.

Physician psychiatric evaluation dated 08/07/17 reiterates justification of hospitalization: increased depression and suicide attempt. The chief complaint and history of present illness as documented in the records is included below and is consistent with the information received during intake, all of which support the decision to admit Ms. Creel for psychiatric treatment and stabilization:

> "Patient came and reported that, "I want help and I want it now." She reported that she has been feeling real depressed, had a lot of losses in the last past month, "I have had suicidal depression issues at other times." She reported that on Friday, she was upset. She was crying, could not stay at work, felt hopeless, wanted to kill self, took

23

some clonazepam and alcohol. She reported that a bill collector called on Friday and patient told her that, "She would drink alcohol and overdose on pills and then her husband will collect the life insurance money and pay the bill." Patient had taken four 1 mg of Klonopin tablets before that. At that time, police came to her house for a safety check and she was taken to Methodist Hospital in Sugarland, patient report that she was there for a longtime. She was evaluated and sent home. Patient reports that on Sunday she is still was feeling sad, therefore she came to Behavioral Hospital of Bellaire. In the hospital, she was reportedly angry, irritable. Patient reported that, "It all became too much on Friday and she could no longer function or cope." She has been feeling depressed, hopeless, and has been crying. Patient reported multiple losses in the past months. She reported that one of her employees died and her daughter and grandchildren are not talking to her. She reports increase anxiety, difficulty concentrating, racing thoughts, irritability. She has not been sleeping with frequent awaking and restlessness."

"She also attempted suicide 2 days prior to coming to the hospital and she came back to the hospital within few minutes. At this time, she meets the criteria for involuntary commitment." Estimated length of stay noted as five to six days. (p.99)

In an attempt to address Ms. Creel's concerns, efforts were made by Dr. Rafique to transfer care to another provider, transfer to another facility, and to provide education regarding the reasons for admission and plan for treatment to the patient and her husband. The following entry reflects these ongoing efforts, dated 08/07/17:

"Patient with mood regulation problem and multiple stressors, presents with angry, irritable mood. She is upset that she is in the hospital. I tried to explain the reason for hospitalization and the risk factors for suicide, but patient was not willing to talk to me...We will try to work on decreasing the risk factors and provide individual therapy, group therapy. Encourage her to take her medication, watch for any withdrawal symptoms, and involve family in her treatment. At this time, we will ask Dr. Hughes for second opinion and request Dr. Hughes to accept the patient because patient is requesting a change in physician. We will also ask the discharge planner to send her paperwork to Methodist Hospital and Houston Behavioral Hospital since she is requesting a transfer to another hospital. We will follow the patient

24

accordingly until the transfer was made...I called her husband who reported that patient is upset, angry, and wants to be transferred to another hospital because "this hospital has lost her trust." Her husband reported that the patient was mistreated many years ago by psychotherapist and the patient had to go to an individual therapist for a longtime to overcome that trauma. I explained patient's husband the reason for admission and multiple risk factors..."

Dr. Rafique's note from meeting with patient on 08/09/17 shows the patient's continued displeasure with the physician, irrational thought processes and labile mood.

"She was angry, irritable, but had no hyperactivity and there was no evidence of racing thoughts. Her behavior also suggests impulse control problem."

On 08/10/19, the patient was seen by Karen Hughes, DO who also described the patient to have poor insight and judgment and multiple risk factors. She concurred with Dr. Rafique that patient remained unstable and required inpatient care:

"She is very tearful on exam, voicing sadness. She has a lot of loses recently. She lost 2 people that she works with at her office. ...and she is having hard time dealing with it. She is also estranged currently from her daughter...She is very irritable on exam. She has very poor insight. She is minimizing the situation."

Finally, on 08/11/19, patient met with Dr. Rafique prior to discharge. He noted significant improvement in mood at this encounter, reviewed remaining risk factors and need for continued treatment as evidenced in the entry:

"I had a face-to-face family session with Ms. Creel and her husband. I explained the reason for admission and the risk factors. Patient had a dramatic change in her improvement in moods and she attributed to taking Effexor. She reported that, "The Effexor have made her mood better." I told her that she had significant mood problems, depression, anxiety, anger problem even when she was taking her medications before coming to the hospital. She also attempted suicide and threatened suicide when she was on those medication...At this time, she has significant mood regulation issues and impulsive behavior, which are for short duration. Patient was more cooperative and she was not irritable. She has better insight into her problems. Her husband also reported that she has improved. She

had no side effects from medications. She was very receptive to treatment plan. I told her to discuss cognitive behavioral therapy, techniques of DBT therapy and future treatment plan. Patient was agreeable to a trial of mood stabilizer. I discussed various mood stabilizers. Patient gave consent for Trileptal. We will start her on 300 mg of Trileptal at night. She also gave me consent to talk to her therapist. During the family session, I also discussed the issues with prescription medication, safety issues, dangers of taking pain medications, benzodiazepines and mixing with alcohol was also discussed."

The physician and nursing entries show consistent justification for the length of stay as evidenced by initial description of the patient's mood as labile and reports of irrational statements and behavior, and the subsequent progress observed by both the patient and her husband, as well as physicians, during her course of treatment.

## JALISA GREEN

Ms. Green, a 22-year-old female was admitted on a voluntary status to Millwood Hospital on the evening of 04/21/18 with a diagnosis of Major Depressive Disorder, single episode, severe with suicidal ideations. She was evaluated at the hospital emergency room initially for an overdose of naproxen. Hospital staff determined Ms. Green required inpatient psychiatric observation and stabilization. The psychiatric team was contacted, and the Preadmission Evaluation/Management was completed by Dr. Tao on 04/21/18 after review of assessment information collected by the licensed social worker. Ms. Green was brought to Millwood the same day.

The integrated Intake and Psychosocial Assessment at Millwood reflects patient's attempted overdose on 10 Naproxen in an effort to end her life, and patient noting increased depression and anxiety. Mood was noted as depressed and affect sad. Patient denied current risk to herself, plan and access to means; however, patient informed the social worker she had a previous attempt to overdose more than two years prior.

Ms. Green's Discharge Summary notes the following reasons for admission: increased mood instability with suicidality, hopelessness and helplessness with attempt to overdose on Naproxen, disturbances in sleep, panic attacks and a negative and self-critical outlook.  She

was experiencing grief from the recent loss of her sister. It is also noted, "as of April 26, 2018, she was slowly working on better and more positive alternatives in dealing with stressors. She was working on trying to think of things to live for."

The physician progress note from 04/23/18 describes patient's mood as depressed, patient grieving, stressed, presenting with flat affect. The record reflects significant decline in the patient's condition from 04/23 to 04/24/18: thoughts processes went from logical to poverty of thoughts, appearance went from neat and clean to disheveled, behavior went from anxious to include defensive and guarded, associations went from intact to circumstantial and speech from normal to rambling. (pp. 22, 24) The observations for 04/25 through 04/30/19 are also consistent in concerns for depressed and anxious mood and poor self-esteem.

Social Services met with the patient's boyfriend on 04/26/18 who verified concern for patient's depression and stated patient needed referrals for continued psychiatric care (p.122). This also supports providers' opinions that Ms. Green required inpatient psychiatric stabilization and that her issues were more than a momentary crisis. The patient needed acute inpatient treatment followed by longer-term psychiatric issue management through therapy and medications.

A nursing note on 04/22/19 on page 174 of the medical record stated the patient expressed thoughts about signing herself out. The nurse reviewed the process of AMA per the entry and patient declined to sign stating she would speak with the provider the next morning. This is within the standard of care regarding AMA requests—the patient expressed concerns, staff explained the AMA process, and she opted to discuss the issue with her physicians, as is within her rights. On 04/23 on page 180 of the record, a nurse charted family as saying the patient wanted to sign herself out, but staff had not allowed her to which is incongruent from documentation the previous day which reflected Ms. Green's choice to discuss the request for discharge and deferment of the AMA paperwork. The nurse adhered to the standard of care governing AMA requests—she reviewed the process, provided the paperwork and notified the physician. Per the entry, Dr. Mehta placed an order to hold Ms. Green pending court proceedings, as she did not believe the patient psychiatrically stabilized for release. The Request for AMA Discharge was signed on

04/23/18 at 1852. Dr. Mehta began the court process to keep Ms. Green in treatment until stabilized, as evidenced by improved mood and affect, and an Application for Temporary Mental Health Services, found on pp. 285-293 is dated by the court for 04/24/18. Dr. Mehta signed The Physician Certificate of Medical Examination for Mental Illness noting patient continued to suffer from severe mental distress and still at risk for self-harm. The application was approved by the court for up to an additional 90 days of treatment which serves as further evidence that Ms. Green was not stable for discharge. The patient returned to continue treatment at Millwood.

The order was discontinued on 05/03/18 as Ms. Green's mood had significantly improved, and mood and affect were congruent showing the patient no longer met inpatient criteria. The final progress note on 05/03/18 by Dr. Mehta reflects the improved mood and states patient denies suicidal thoughts, and sleep and appetite were okay.

Review of therapist notes supports her progress through admission as well, and reflects brighter mood and affect and participation from 04/22/18 through the course of treatment. In the complaint, Ms. Green stated the groups were, "mostly coloring," but review of the record reveals topics covered included emotional triggers that impact progress, creating a work-out plan, coping skills and process groups to review treatment issues, progress and concerns.

In the complaint, item 272, Ms. Green stated she was not started on any medications until two to three days following admission. The medication administration record (MAR) on page 64 of the chart indicated the patient received the first dose of the antidepressant Lexapro on 04/22/18 at 2114 with daily doses through her length of stay. In the Plaintiff's Third Amended Original Complaint on page 25, Ms. Green stated she has exercise induced asthma, but was not provided an inhaler needed to work out in the gym. The record, however, shows administration of albuterol aerosol on 04/23/18 at 1610 and on 04/26/18 at 1536.

Item 275 of the Plaintiff's Third Amended Original Complaint states the hospital did not provide the patient with a court order by 1600 on the day of admission. However, the patient was not admitted on an involuntary status on 04/21/19; she was voluntary, and the

court order was not obtained until 04/24/19, so no court order existed on the day of admission.

Based on the above, the medical records support the appropriateness of the decisions made by providers to admit Ms. Green to an inpatient psychiatric setting. Criteria for this level of care included the patient's admitted suicidal attempt, boyfriend's concern in bringing her to the ER, her expressed thoughts of wanting to end her life, as well as the recent loss of her sister and other social stressors. The standard of care was met in actions taken to obtain the court order to keep Ms. Green in treatment until she had stabilized further. Appropriate actions were taken by the interdisciplinary team to meet the patient's physical and psychological needs during the course of admission and treatment.

## **Summary**

Based upon review of the documented symptoms reported by the Plaintiffs at time of initial evaluation, I find admission to an inpatient level of care appropriate for each. Furthermore, daily assessment of continued risk factors by an interdisciplinary team of physicians, nurses and social workers substantiate duration of the length of stay in each Plaintiff's case.

There was no evidence to support the allegations of sexual exploitation during the nursing assessment head-to-toe visualizations as alleged in Plaintiff's Third Amended Original Complaint. As documented, the nursing care provided was deemed prudent and appropriate.

Examination of the medical records produced no evidence of discrimination, deprivation of services or exploitation by the hospitals of the Plaintiffs based on disability.

## **Opinions**

1. Records reviewed reveal the presence of suicidal ideations at Intake with multiple and varying risk factors for the individuals named in the complaint except for Ms. Stokes who was hospitalized for altered mental status and decreased functioning such that she was an imminent risk to herself. According to an article published in *Lancet* in 2016, individuals who report suicidal ideations within the previous 12 months have significantly higher rates of attempts. For individuals with suicidal <u>plans</u>, the risk further increases. No one effective means to predict suicide exists, so

29

assessment of the following factors associated with increased risk of suicide facilitates the detection and determination of high-risk individuals:

- Hopelessness, helplessness are key indicators of heightened risk
- Traumatic events such as physical or emotional abuse
- Interpersonal stressors, conflict in relationships
- Loss or bereavement
- Financial difficulties
- Physical illness, especially those chronic illness such as degenerative diseases
- Sleep disturbances and insomnia even independent of depression which can contribute to increased impulsivity and poor outlook

Inpatient treatment is the appropriate level of care for those presenting with suicidal ideations. An article published by *BMC Psychiatry* in 2017 and posted on the website for the National Institutes of Health delineates the importance of treatment for individuals at risk:

> "Until we are able to detect most individuals at risk, and bearing always in mind that the prediction of suicide is impossible, probably the most intelligent intervention to decrease the daunting suicide rate are reducing access to and a population-based strategy directed to the prevention of depression in the general population by using different measures at different levels of the health system." (Parra-Uribe, et al., 2017)

Based on review of the Plaintiffs' medical records, the admission for each was appropriate and justified.

2. Denial of suicidal ideations after admission is not uncommon and not an indicator that a patient is immediately safe for discharge. According to the same *Lancet* article, fewer than one-third of suicidal patients express their suicidal intent to their treating healthcare professional. Most suicide attempters have second thoughts, and studies have concluded that a suicidal act is the result of a temporary state in the mind (Brody, 2016). This does not discount or minimize the ideations or act itself:

> "Equally if not more important to preventing successful suicide is paying attention to premonitory signs of suicidal intent and taking appropriate

action to diffuse it. People who are depressed...or are having serious relationship difficulties should be considered high risk." (Brody, 2016)

3.  Use of licensed social workers, counselors and nurses for the initial intake assessment, which lies within the scope of practice of these disciplines, with subsequent review of findings and collaboration with a psychiatrist is standard practice in emergency rooms and behavioral health settings. The psychiatrist or psychiatric nurse practitioner provides a recommendation for level of care and diagnoses after consideration of the information presented. A suicide risk assessment requires questions aimed at gaining insight into the individual's current thoughts and feelings. Elements to review for a thorough assessment include: current suicidal thoughts, intent, plans, history of attempts, family history of suicide, history of violence, intensity of depressive symptoms, current behaviors and mood, previous or current treatment regimens and response, medical history, alcohol and drug abuse patterns, psychotic symptoms, and the person's current living situation and social supports. The clinician will also need a clear understanding of the patient's life circumstances because changes in primary relationships or other life circumstances may trigger suicidal ideation.

An online search by the reviewer for Dr. Qingguo Tao, who completed a number of the Preadmission Evaluations, found him listed as an internist in Houston Texas at Memorial Hermann. A search for Dr. Timothy Tom, who signed the Certificate of Preliminary Medical Examination for Plaintiff D. Creel showed him listed as an anesthesiologist—however, the reviewer was unable to find a CMS regulation prohibiting a non-psychiatric licensed, independent practitioners (LIP) from providing a recommendation for level of care.  Indeed, the standards reference "physician". *"Psychiatric hospitals are required to be primarily engaged in providing, by or under the supervision of a psychiatrist, psychiatric services for the diagnosis and treatment of mentally ill persons, according to 42 CFR 412.23(a)."*

*"The CLINICIAN is a term used in this manual and in Pub 100-04, chapter 5, section 10 or section 20, to refer to only a physician, nonphysician practitioner or a therapist (but not to an assistant, aide or any other personnel) providing a service within their scope of practice and consistent with state and local law. Clinicians make clinical judgments*

31

*and are responsible for all services they are permitted to supervise. Services that*
*require the skills of a therapist, may be appropriately furnished by clinicians, that is, by*
*or under the supervision of qualified physicians/NPPs when their scope of practice,*
*state and local laws allow it and their personal professional training is judged by*
*Medicare contractors as sufficient to provide to the beneficiary skills equivalent to a*
*therapist for that service."* https://www.cms.gov/Regulations-and-
Guidance/Guidance/Transmittals/Downloads/R194BP.pdf

4. The Center for Medicaid and Medicare Services and Joint Commission are drivers of
   the evidence-based best practices for reduction of suicide in inpatient psychiatric
   settings. The majority of inpatient suicides resulted from hanging, most commonly
   in a bathroom or bedroom often using a door, its handle or hinge. Most behavioral
   health hospitals eliminated hospital beds with rails due to the multiple ligature
   points, and use platform-style beds with hospital-grade mattresses on top. Typically,
   the frame is anchored to the floor and wall to prevent patients from hiding
   underneath providing time for self-harm. As a result, some inpatient environments
   come across as sterile or cold.

5. Review of the records revealed no evidence of sexual exploitation. While it is
   understood that visual inspections of the body, often referred to as strip searches,
   are intrusive, safety is the primary concern. The safety of patients, visitors and staff
   on inpatient behavior health units is paramount; therefore, patients should not have
   access to items that are dangerous or may lead to harm to self or others during their
   stay. Searching a patient and their belongings serves as a means to help ensure the
   safety of patients, visitors and staff.

6. Review of the documents provided showed no evidence of discrimination or
   deprivation of benefits based on the Plaintiffs' disability per the Rehabilitating
   Section 504. https://ncd.gov/publications/2003/Feb122003

## BIBLIOGRPHY

Alfandre, D., Breener, J., Onukwugha, E. (2017, October). Things We Do for No Reason: Against Medical Advice. *Journal of Hospital Medicine*, *12*(10), 843-845. Retrieved from https://www.journalofhospitalmedicine.com/jhospmed/article/147925/hospital-medicine/things-we-do-no-reason-against-medical-advice-discharges

Arizona Department of Health Services Division of Behavioral Health Services PROVIDER MANUAL NARBHA Edition. (2006). *Intake, Assessment and Service Planning.* Retrieved from http://www.narbha.org/includes/media/docs/3-9-Intake-Assessment.pdf

Beebe, C., (2018, December). *Ligature-risk requirements.* Retrieved from https://www.aha.org/system/files/2019-01/2018-dec-hfm-ligature-risk.pdf

Brody, J. (2016) After a suicide attempt, the risk of another try. *The New York Times.* Retrieved from https://www.nytimes.com/2016/11/08/well/live/after-a-suicide-attempt-the-risk-of-another-try.html

Criteria for searches to maintain safety in an inpatient unit. https://www2.health.vic.gov.au/about/key-staff/chief-psychiatrist/chief-psychiatrist-guidelines/criteria-or-searches-maintain-safety-in-inpatient-unit-for-patients-visitors-staff

*Mental Health Intake & Evaluation Forms—APA Divisions*. Retrieved from https://www.apadivisions.org/division-31/publications/records/intake.

Parra-Uribe, I., Blasco-Fontecilla, H., Garcia-Pares, G., Martinez-Naval, L., Valero-Coppin, O., Cebria-Meca, A., Palao-Vidal, D. (2017). *Risk of re-attempts and suicide death after a suicide attempt: A survival analysis.* Retrieved from https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5415954/

Turecki, G., Brent, D. (2016). Suicide and Suicidal Behavior. *Lancet, 387*(10024), 1227-1239. doi: 10.1016/S0140-6736(15)00234-2

# CURRICULUM VITAE

## Wanda McCarter

**3619 Kensington Ave**
**Evansville, IN 47710**
**(812) 454-3220**
**wanda.mccarter@yahoo.com**

### SUMMARY

Responsible, supportive nursing administrator with over 20 years' experience in the behavioral health field. Additional experience in case management. Excellent written and oral communication skills demonstrated in hospital, nonprofit and academic settings. Detail oriented, collaborative team member with a proven track record of providing guidance and leadership in quality and performance improvement utilizing analysis of data, identification of trends, development of process-focused initiatives and monitoring of outcomes.

### EDUCATION

University of Southern Indiana; Evansville, IN
    Associate of Science in Nursing: Registered Nurse, IN License (Active)
    Bachelor of Social Work
University of Evansville; Evansville, IN
    Master's in Public Service Administration

### CAREER HISTORY

Director of Quality Assurance and Risk Management—**Brentwood Springs**—Sept. 2011 to present

- ✓ Ensure continuous compliance with policies and procedures pertaining to all regulatory bodies across all departments; monitor through monthly and timely auditing of medical records
- ✓ Facilitate monthly Quality Committee meetings
- ✓ Prepare and present quarterly reports to the Governing Board
- ✓ Prepare agenda and minutes for quarterly Medical Executive and Pharmacy & Therapeutics meetings; report summary quarterly to the Governing Board
- ✓ Responsible for Joint Commission readiness for successful triennial survey in December 2012, December 2015 and October 2018 under the CAMH/HAP and Behavioral Health Care Manuals with no conditional findings
- ✓ Support teamwork and design quality activities to elevate the performance improvement of the organization
- ✓ Developed and implemented medical staff activities to improve compliance with CMS standards prior to 2015 and 2018 surveys with Joint Commission
- ✓ Serve as Patient Advocate and address concerns/complaints with active and former patients according to The Joint Commission standards
- ✓ Monthly review of randomly sampled medical records to assess compliance with CMS, TJC and ISDH standards of care

Director of Nursing—**Brentwood Meadows/Springs**—Sept. 2011 to Feb. 2014 and again
January 2016 to April 2018   *Dual roles: DON and Dir. of Quality Sept. 2011 through Feb.*
*2014*
- ✓ Build a work environment that promoted learning and fostered teamwork
- ✓ Oversight of Infection Control/Employee Health and Staff Development
- ✓ Ensure continuous compliance with policies and procedures pertaining to all
  regulatory bodies for nursing and infection control; monitor compliance
  through audits and report to monthly Quality Committee
- ✓ Assess and identify needs on the nursing team, develop presentations and
  teaching materials to enhance compliance and/or teamwork
- ✓ Oversee scheduling and FTE management for the nursing department

Director—**Vanderburgh County Substance Abuse Council**—July 2010 to Sept. 2011
- ✓ Arrange for speakers on topics pertaining to prevention, treatment and
  substance use trends for quarterly community and monthly member
  meetings
- ✓ Responsible for agency finances, budgets and grant writing
- ✓ Evaluated and monitored reporting compliance for grants awarded via Drug
  Free Community Funds to over 25 agencies in 2010 and 2011
- ✓ Wrote annual Comprehensive Community Prevention Plan for the Governor's
  Commission for 2011

Adjunct Professor, Social Work—**University of Southern IN**—August 2010 to May 2011
- ✓ Undergrad classes on social welfare & social services, policy and social work
  practice in macro systems. Scored >4/5 on student assessments across all
  areas for each of the four classes taught during the fall and spring semesters
- ✓ Initiated required attendance in community action committees such as SAC,
  Homeless Services Council, CAGE, etc. as part of curriculum

Outpatient Program Nurse, Infection Control Nurse, Staff Development—**Brentwood**
**Meadows**—Sept. 2009 to July 2010
- ✓ Development of the Infection Control Program and initial Infection Control
  Risk Assessment; facilitate monthly Safety/Infection Control meetings
- ✓ Develop and provide educational groups for patients Monday through Friday
  on topics related to mental health and addiction
- ✓ Train new personnel on topics related to Infection Control, write quizzes and
  provide training on in-house, CLIA-waived testing
- ✓ Chaired committee which prepared the hospital for successful pre-opening
  and initial TJC surveys

Substance Abuse Counselor—**AIDS Resource Group**—Sept. 2008 to Sept. 2009
- ✓ Initial assessment of new clients, identifying biopsychosocial needs
- ✓ Work with the client to identify harm-reduction or abstinence goals and
  interventions related to substance use

- ✓ Facilitate contact with resources to assist in meeting established objectives and coordinate care with care coordinators and providers
- ✓ Meet with clients regularly to assess effectiveness of the treatment plan; revise plan based on arising needs, establish new goals and/or identify barriers to care
- ✓ Document activities with ISDH database

Care Coordinator (Case Manager)—**AIDS Resource Group**—Aug. 2002 to Sept. 2008
- ✓ In-home case management for clients in 10 southwestern IN counties
- ✓ Coordination with providers and referral to local resources for clients' biopsychosocial needs and update of treatment plans and goals
- ✓ Facilitate clients' enrollment in insurance plans—assist with applications and obtaining documents and arrange transportation to government offices

Behavioral Health RN—**Mulberry Center at Welborn Hospital**, Evansville, IN—July 1996 until closure of the inpatient Child/Adolescent Unit in November 2002.
- ✓ Oversight and provision of care to patients ages four to eighteen years, including daily education, evaluation/assessment of mental status and administration of medications
- ✓ Certified teacher of "Active Parenting Today" and "Active Parenting of Teens" providing education and guidance for parents/guardians of current patients, as well as community groups (PTAs, churches, Department of Family & Child Services)
- ✓ Commended by supervisors for handling difficult situations and providing a calming presence with patients and/or families while maintaining respect for those involved

*RELATED EXPERIENCE*

- ❑ Numerous presentations on synthetic drugs on behalf of IN Youth Institute, 2016

- ❑ Winner of "Non-conventional Nurse of the Year" category as DON after nominated by nursing staff in local radio station's annual Nurse of the Year contest, 2015

- ❑ Completed training and prerequisite experience for Community Prevention Professional certification June, 2011. (IN. Assoc. of Prevention Professionals, CPP# 2036, Expiration 12/31/2014)

- ❑ Presentations: Statewide Community Action Group Retreat, 2008, "Domestic Violence and Substance Abuse in the GLBT Community"; Faces of Change annual addictions treatment conference 2008, 2009 and 2010; Institute of Alcohol and Drug Studies 2009, 2010, and 2011; Vincennes University, "Synthetic Drugs", October 2012 and February 2013

- ❑ Member of the Board of Directors: Patoka Valley Community Action Group (2004-2009) and Tri-State Alliance (2008-2010)

- ❑ Promotion of HIV prevention efforts and agency through contact and participation on various community committees and health fairs