# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| DIANE CREEL and LYNN CREEL, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| | § | Civil Action No.  4:18-CV-00615 |
| v. | § | |
| | § | Judge Mazzant |
| DR. SAYS, LLC, et al., | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Renewed Joint Motion for Judgment as a Matter of Law (Dkts. #878, #881). Having considered the pleadings and the relevant arguments, the Court finds the motion should be **DENIED in part**.

## BACKGROUND

### I.     The Detainment of Diane Creel

When Lynn Creel ("Lynn") accompanied his wife, Diane Creel ("Diane") (collectively, "the Creels") to the Behavioral Hospital of Bellaire ("BHB") in August 2017, both hoped Diane would receive outpatient care and group therapy to help alleviate her depression. She had suffered for some time following the loss of loved ones, and regular therapy was not satisfactory on the particularly troubling days. What the Creels did not know is that the medical staff at BHB, through an elaborate scheme and conspiracy to defraud, would ignore Diane's actual feelings, falsify her symptoms, and then involuntarily commit her to confinement that resembled scenes from *One Flew Over the Cuckoo's Nest* (Dkt. #871 at p. 507).

The Creels arrived at BHB planning to receive information on the hospital's advertised "outpatient group women-centric grief counseling" (Dkt. #871 at p. 495). Upon arrival, a

receptionist called a nurse to assist the Creels. The nurse instructed that they leave their phones in a locker at reception and then took the couple to a room where she performed an assessment. One of the first questions the nurse asked was "Do you want to kill yourself?" (Dkt. #897). As the nurse continued with questions, Diane explained her medical and mental health history consistently. Among all the questions, the nurse repeatedly pressured Diane to admit herself voluntarily to the hospital as an inpatient for a multi-day period. The Creels maintained that was not the plan and resisted signing voluntary admissions forms. The nurse persisted, indicating Diane might be an alcoholic and a drug addict, but the Creels maintained their position. Not once did the nurse offer, or even mention, an outpatient therapy program.

The nurse then stepped out to make some phone calls, asking that the Creels remain in the room in the meantime. They waited for about fifteen to twenty minutes until the nurse returned. Upon her return, the Creels said they were leaving because they did not like the treatment plans that BHB had offered. To the Creels' shock, the nurse informed the couple they were not allowed to leave because BHB had "filed an emergency warrant for [Diane's] detention" and Diane would be placed under a 72-hour hold (Dkt. #897 at p. 501). Horrified, the Creels then realized the BHB medical staff had locked both the door out the front and the door to the intake room.

Diane had begun to shiver, as the room was rather cold. Lynn asked permission to retrieve Diane's jacket from their car—the only item of clothing the two had brought with them; they had not expected to need an overnight bag. When Lynn returned with the jacket, the receptionist informed him that the medical staff had already removed Diane from the meeting room and taken her to the psychiatric unit against her will. The receptionist informed him there was nothing he could do except go home and get Diane some clothes because she would be in the unit for at least three days, at which point Diane was entitled to a "72-hour hearing." At the hearing, a Justice of

2

the Peace would hear testimony to decide if Diane should be released from BHB or return to the psychiatric ward there.

Feeling confused and helpless, Lynn went home to pack a bag for Diane. He packed shoes with no laces and bras with no underwires. BHB did not even permit Diane to have toothpaste. Focused on supporting his wife, Lynn spent the next three days away from his business at Display Graphics where Diane worked in sales. Lynn contacted an attorney for assistance and prepared for Diane's upcoming hearing. Prior to the hearing, Lynn retained legal counsel for Diane and spoke to Diane on the phone a few times. BHB did not permit Lynn to visit Diane in person. The BHB phones were near the nurse's station and the calls were limited in time. BHB medical staff "cold-turkeyed" Diane off her prescribed psychiatric and blood pressure medication, replacing it with new drugs (Dkt. #897 at p. 511). In all this time, neither Lynn nor Diane ever saw the warrant for her detainment or even a shred of paperwork.

Preparing for the hearing, Lynn learned it was difficult to secure patient release unless the patient had an outside opinion to affirm her wellbeing. Lynn and the attorney had to fight for Diane's right to even attend the hearing. To be sure, BHB did not serve Diane with paperwork about the hearing until the hearing had already concluded. Diane would never have known about the hearing if Lynn and the attorney had not made her aware and advocated for her presence. At the hearing, Diane looked downcast—"like a beaten dog"—according to Lynn (Dkt. #897 at p. 515). No one from BHB bothered to show up. They simply sent documents that a county attorney referred to when asking questions to those who took the stand. When Diane took the stand, she was shocked to learn for the first time that BHB had been giving her detoxification medication to treat an alcohol addiction, even though BHB possessed no documents regarding Diane's alcohol levels. Moreover, Diane had not consumed any alcohol on the day she arrived at BHB.

Lynn and his son both testified at the hearing, indicating they had been and would continue to support Diane through her involuntary detainment. The Justice of the Peace charged with determining Diane's fate considered the testimony for all of thirty seconds before forcing Diane back into the hands of BHB. The following day, August 10, 2017, the Creels met with Dr. Jamal Rafique ("Rafique"), the medical director of BHB, for a family therapy session. At the session, Rafique informed Diane that she would be released on August 11, 2017. The Creels later learned that the county attorney from the 72-hour hearing had intervened on Diane's behalf, and accordingly, Rafique had decided to release Diane.

After her four-and-a-half-day detainment at BHB, Diane's resulting mental state was desolate, at best. More troubling, however, is that the Creels' story was not unique. It was only one piece in a puzzle designed by the Defendants in this case to defraud insurance companies.

## II.    Defendants' Underlying Scheme

The scheme underlying the Creels' experience is elaborate. It rises and falls with the business activity of Dr. Yupo Jesse Chang ("Chang"), a family physician who has spent much of his career managing other medical practices. At the time of the trial in this case, Chang owned 42 psychiatric hospitals; but, notably, Chang testified in his deposition that he is not a qualified mental health professional. He also owned a number of businesses, including MD Reliance, Inc. ("MD Reliance"); RediAnswer, LLC ("RediAnswer"); Universal Physicians, PA ("Universal Physicians"); Dr. Says, LLC ("Dr. Says"); and Office Winsome, LLC ("Office Winsome")—each a necessary component of Chang's scheme.

Prior to the events of this case, a number of Chang's companies entered into a contract with BHB relative to services that Chang's various companies provided.[1] RediAnswer operated as a

---

[1] Universal Health Services ("UHS") acquired BHB at some point prior to 2017, but BHB retained its name.

"ping" service—that is, if BHB needed a physician, it would ping RediAnswer. RediAnswer would then notify Universal Physicians that BHB needed a physician to perform telemedicine services for BHB patients. Among the physicians independently contracted by Universal Physicians was Dr. Timothy Tom ("Tom"). Tom is not a psychiatrist—he is an anesthesiologist. In fact, none of the independently contracted physicians at Universal Physicians were psychiatrists. The Universal Physicians doctors and BHB would use Dr. Says, a software platform, to document all patient records. MD Reliance performed the administrative functions for each of these entities. For the relevant time period, Chang operated each of his businesses out of Office Winsome, which was located at his primary residence.

The contracts between the entities and the hospitals contained billing specifics. If one of Chang's companies provided a service, the company provided a billing code related to that service. If a physician provided the service, he or she would indicate the level or type of service provided on a document through Dr. Says, and then Dr. Says would send the records to an administrative billing department. Importantly, Chang outsourced some of the work for administrative billing to UReliance, a company based out of Taiwan. Chang would first do the coding of the billing and then electronically send the codes to UReliance so it could generate an actual bill, which UReliance would then send to either an insurance company, the hospital, or the patient. If the insurance company paid the bill, it paid Chang's company, Universal Physicians, directly.

The hospitals in contract with Chang applied through Dr. Says for court warrants to involuntarily commit patients at their facilities. The hospital would fill out the application for involuntary commitment. It would be notarized, a physician would sign it, and Dr. Says would electronically file it with the court. The court would then issue a warrant allowing the hospital to detain the patient against their will. This would not have been possible without the work of Chang's

5

notary, Yung Husan Yao (aka Angela Yao) ("Yao")—the only notary Chang had employed across all his hospitals and businesses.

As Chang's only notary, Yao kept a detailed notary book. The physician recommending commitment of a patient signed off on the notarized documents—but the physician was never physically in front of Yao, the notary, when he or she signed the document. At trial, Chang testified that he is now aware this process violates the rules for notary publics in the State of Texas.

Relevant to this scheme are two psychiatrists who served as the consecutive medical directors of BHB: Dr. Ashok Jain ("Jain") and Rafique. While Jain served as the medical director of BHB, he wrote to the CEO to highlight some concerns about the hospital—specifically, Jain had concerns about the hospital's involuntary confinement of patients. Shortly after expressing these concerns, BHB replaced Jain with Rafique. Jain then made a complaint with the Federal Government that BHB and UHS—the entity that had acquired BHB—were involved with a false claims scheme to defraud Medicare. At his deposition for this case, he explained why he made this claim:

> When a patient . . . is admitted in the psychiatry hospital, they . . . are in a locked-in facility like a jail. They cannot go out. They cannot meet anyone. There is [sic] only limited discussions to the outside world. They cannot go on the Internet. They cannot meet their family members, except sometime very limited time. They cannot eat the food their preference could be, and lot of the freedom of speech and freedom of choice of the lifestyle they want to live is obviously totally curtailed or restricted when they are in a locked-in unit. And that is what I feel is a civil right violation for an inpatient in a psychiatry hospital.

(Dkt. #871 at p. 372). He further testified that "UHS was training the staff how to paper things up to get paid whether what was on the paper was true or not" and was "very concerned" that UHS and BHB "admit almost all Medicare patients, referrals or walk-in and then [] keep them for extended period without documented justification or medical necessity" (Dkt. #871 at pp. 374–75).

6

Jain's testimony also revealed that the telemedicine doctors who used Dr. Says "simply copied the information typed in by the [BHB] intake staff and then" recommended in the documents that BHB "admit the patient, essentially ceding medical intake decisions to a social worker on the intake staff" (Dkt. #871 at p. 378). As confirmed by both Chang and Jain, not a single physician independently contracted by Universal Physicians was a psychiatrist.

Additionally, Jain testified that Rafique was among the people involved in the hospital enterprise who was aware of the "corporate policy to admit and keep all Medicare patients" in an attempt to defraud Medicare and other government programs (Dkt. #871 at p. 383). Jain testified that on one occasion he wrote a discharge order because he believed detaining the patient any longer would be illegal. BHB administration then called him to relay that BHB had assigned Rafique to take over that patient "because that patient . . . had Medicare and could stay longer" (Dkt. #871 at p. 385). Moreover, Jain testified that doctors were expected to attend daily meetings where they received updates on patients' insurance statuses and were taught how to avoid "leaving days on the table," which essentially meant discharging a patient "from the facility before that patient met the maximum number of days that the insurance carrier would pay" (Dkt. #871 at p. 397). Jain also testified that, at any point when he raised concerns to UHS and BHB personnel, "it was frowned upon" (Dkt. #871 at p. 392).

When BHB detained Diane, Rafique had already replaced Jain as the BHB medical director. Yao's notary records for Diane included an application for involuntary commitment that Tom had signed after allegedly performing a telemedicine appointment for Diane. Nothing in Diane's record indicates that anyone was present for this telemedicine appointment—a violation of the contract between BHB and the enterprise of Chang businesses discussed above.[2] The records

---

[2] The contract stated the facility is required to provide a telepresenter to represent the patient during the telemedicine contract. No telepresenter was present.

do indicate that, if Tom did perform a telemedicine appointment, it took place during a four-minute period between 4:29 pm and 4:33 pm on August 6, 2017. However, both Diane and Lynn testified that no telemedicine appointment ever occurred while they were at BHB. Tom testified that he had no recollection of ever meeting Diane before the lawsuit commenced. He had no memory of ever having spoken with her.

As was par for the course at BHB, Tom was not present to sign the application to involuntary commit Diane in front of notary Yao. Timestamps on the documents reveal that the application to commit Diane was sent to the Justice Court in Houston, Texas ten minutes *prior to* the alleged telemedicine appointment between Tom and Diane. Further, Tom testified that he never actually wrote a report for Diane. Rather, her assessment was "basically generated" or "created" by the software system using Tom's generic inputs (Dkt. #873 at p. 891). The documents regarding Diane's "diagnosis" and "problem" reveal that Tom did not mark Diane as an immediate suicide risk, did not indicate she was in imminent harm of hurting herself, and did not mark her as having recent suicidal ideation. But elsewhere, the document says—yet Tom himself did not write—that Diane had suicidal thinking and behavior.

The notary documents reveal that in just three days between August 6 and August 10, 2017, Tom signed applications for the involuntary commitment of twelve different patients. In January 2017 alone there were 276 documented applications for involuntary patient commitments sent through one of Chang's companies. In calendar year 2017, hospitals that had contracted with Chang filed 3,955 applications "to hold human beings in psychiatric hospitals against their will" (Dkt. #875 at p. 1948). Yao notarized each of these applications.

### III.   The Lawsuit

The Creels ("Plaintiffs") took this action to trial in May of 2021, alleging various causes

of action based upon Diane's involuntary confinement and stay at BHB.[3] These causes of action

include: (1) violation of the civil Racketeer Influenced and Corrupt Organization Act ("RICO");

(2) RICO conspiracy; (3) false imprisonment; (4) medical negligence; and (5) gross negligence.

Plaintiffs sued several defendants, including Chang; Universal Physicians; Dr. Says; MD Reliance;

Office Winsome; Tom; and Yao, (collectively "Defendants").[4]

The jury found Defendants were employed or associated with a RICO enterprise, and that

each Defendant, which the exception of Rafique, participated, either directly or indirectly, in the

conduct of the affairs of the enterprise. The jury also found Defendants had participated through a

pattern of racketeering activity. The jury assessed Plaintiffs' compensatory damages at

$300,000.00 and found disgorgement in the amount of $1,320,500.00. The jury also found that all

Defendants, including Rafique, conspired together to violate RICO.

Regarding state-law claims, the jury found no liability against Rafique and Tom for false

imprisonment of Diane. The jury also determined that Rafique and BHB were medically negligent,

though Tom was not. The jury assigned 60% of the negligence apportionment to Rafique and 40%

to BHB. The jury awarded Diane damages in the amounts of: (1) $75,000.00 for physical pain and

mental anguish sustained in the past; (2) $50,000.00 for physical pain and mental anguish that, in

reasonable probability, Diane will sustain in the future; (3) $85,500.00 for loss of earning capacity

sustained in the past; (4) $104,000.00 for loss of earning capacity that, in reasonable probability,

Diane will sustain in the future; (5) $15,000.00 for medical care expenses incurred in the past; and

(6) $50,000.00 for medical care expenses that, in reasonable probability, Diane will incur in the

---

[3] At the outset of this case, there were thirteen plaintiffs and 26 defendants. Many plaintiffs settled their claims, and several defendants successfully motioned this Court for dismissal of claims against them. Ultimately, only the Creels went to trial, pursuing claims against eight defendants. Accordingly, the Court discusses parties such as BHB and UHS, despite the parties' stipulation of dismissal on the eve of trial (Dkt. #828).

[4] Relevant to this motion is non-movant Defendant Rafique.

future. Despite these findings, the jury did not impose gross negligence liability on either Rafique or Tom.

Defendants moved for judgment as a matter of law (or "JMOL") prior to the jury's verdict (Dkt. #845), and the Court took the matter under advisement. Defendants have now moved for judgment as a matter of law against the jury's findings regarding civil RICO liability, disgorgement, and RICO conspiracy and filed a brief in support of this motion (Dkt. #881).[5]

## LEGAL STANDARD

After "a party has been fully heard on an issue during a jury trial," the court may "grant a motion for judgment as a matter of law against the party" so long as "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court should properly ask whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004); FED. R. CIV. P. 50(a). "The grant or denial of a motion for judgment as a matter of law is a procedural issue . . . reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

---

[5] Rafique moved for judgment as a matter of law in a separate motion (Dkt. #885). The Court granted in part and denied in part this motion on February 14, 2022.

Fifth Circuit precedent requires a court be "especially deferential" to a jury's verdict. The court must not reverse the jury's findings unless substantial evidence does not support those findings. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelming in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 693 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court "cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted). Further, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Id.* at 151 (citation omitted).

## ANALYSIS

Defendants argue several reasons why JMOL is proper in this case: (1) Plaintiffs lack RICO standing and did not establish their right to sue under Section 1964(c) for their RICO claims; (2) Plaintiffs' RICO claims are improperly recast medical negligence claims and should be

11

dismissed; (3) no legally sufficient evidence exists to support recovery on Plaintiffs' RICO claims; and (4) no legally sufficient evidence exists to prove a RICO conspiracy. Further, Defendants argue the Court should deny recovery for equitable disgorgement. The Court will address each argument in turn.

## I.     RICO Standing

Congress enacted RICO primarily "to combat organized crime." *United States v. Uni Oil, Inc.*, 646 F.2d 946, 953 (5th Cir. May 1981); *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 481–83, 497–99 (1985). Nonetheless, the statute "imposes criminal and civil liability upon those who engage in certain 'prohibited activities.'" *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232 (1989). Specifically, a RICO plaintiff may bring "a private civil action to recover treble damages for injury 'by reason of a violation of' [RICO's] substantive provisions.'" *Sedima*, 473 U.S. at 481 (quoting 18 U.S.C. § 1964(c)). Succeeding on a RICO cause of action requires a plaintiff to prove two separate aspects: (1) substantive violation of the statute, and (2) statutory standing. *See Nolen v. Nucentrix Broadband Networks Inc.*, 293 F.3d 926, 929 (5th Cir. 2002).

The RICO standing provision is found in 18 U.S.C. § 1964(c). That subsection states:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c). In construing § 1964(c), the Supreme Court has noted that "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation"—that is, the predicate act. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Despite the acknowledgement that "RICO is to 'be liberally construed to effectuate its remedial purposes,'" *Id.* at 498 (quoting Pub.L. 91-452, § 904(a), 84 Stat. 947), damages for the commission of predicate acts must be premised upon a

12

finding that a plaintiff's business or property was harmed. *See id.* at 500. Simply, a plaintiff must demonstrate RICO injury through a "concrete financial loss." *Price*, 138 F.3d at 606; *see United States v. Hager*, 879 F.3d 550, 554 (5th Cir. 2018). "[W]hether a given party has suffered a RICO injury is a fact-heavy question." *Nat'l Enters. v. Mellon Fin. Servs. Corp. No. 7*, 847 F.2d 251, 254–55 (5th Cir. 1988).

A RICO injury must also occur "by reason of a violation of section 1962." 18 U.S.C. § 1964(c). This statutory language signifies that a defendant's substantive RICO violation must be "a 'but for' . . . [and] proximate cause" of the alleged injury. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992); *see McCampbell v. KPMG Peat Marwick*, No. 3:96-CV-3136, 1997 WL 311521, at *2 (N.D. Tex. May 30, 1997) ("Whether the predicate acts proximately caused the alleged injuries is the 'crux of the analysis' for civil RICO standing." (quoting *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*, 868 F.2d 740, 744 (5th Cir. 1989))). The court should evaluate proximate cause "in light of its common-law foundations" and determine whether there is "some direct relation between the injury asserted and the injurious conduct alleged." *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 965 (5th Cir. 2019) (internal quotation marks omitted) (quoting *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 636 (5th Cir. 2016) (en banc)).

Vital to this analysis is that RICO "standing" is not Article III standing—it does not affect the power of the Court to hear the case. As this Court discussed in its Memorandum Opinion and Order denying Defendants' Motion to Dismiss, the Fifth Circuit has stated that, "although parties and courts often referred to 'RICO Act standing' or 'statutory standing,' courts 'should avoid using that term' since it is not a question that implicates subject-matter jurisdiction" (Dkt. #381 at p. 10 (quoting *Gil Ramirez Grp., L.L.C. v. Hous. Indep. Sch. Dist.*, 786 F.3d 400, 409 n.8 (5th Cir. 2015) (citing *Lexmark*, 572 U.S. at 128 n.4))). Consequently, the Court analyzed the motion to dismiss

13

under the "usual pleading stage inquiry," finding that Plaintiffs stated plausible claims sufficient to defeat a Rule 12(b)(6) motion. *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 887 (10th Cir. 2017). Subsequently, the Court denied Defendants' motions for summary judgment, concluding that Defendants had not met their burden of demonstrating no genuine issue of material fact as to Plaintiffs' RICO standing (Dkt. #548 at p. 11). The jury then sat as the fact finder for this case and rendered a unanimous verdict. Therefore, the current procedural posture of this case requires that the Court "draw all reasonable inferences in the light most favorable to the verdict" and avoid "substitute[ing] other inferences that [the court] might regard as more reasonable." *Boh Bros. Constr.*, 731 F.3d at 451.

### A. Injury to Display Graphics

As an initial matter, the Court will dispose of Defendants' argument that neither Plaintiff has standing to sue for injury to the corporation, Display Graphics. According to Defendants, a claim for "RICO damages allegedly suffered by Display Graphics . . . belongs to the company" (Dkt. #881 at pp. 26–27). This argument is dead on arrival.

Defendants' argument relies on case law that looks appealing on the surface but is both procedurally and functionally of a different nature than the case before this Court. For example, Defendants cite to *Adams-Lundy v. Ass'n of Pro. Flight Attendants*, 844 F.2d 245, 250 (5th Cir. 1988), asserting that the Fifth Circuit in this case held a RICO action to recover for injury to the corporation "is a corporate asset, and shareholders cannot bring it in their own names without impairing the rights of prior claimants to such assets." *Id.* Defendants miss the mark. The *Adams-Lundy* Court dealt with a "struggle between two factions for control of the Association of Professional Flight Attendants, a labor union representing American Airlines flight attendants." *Id.* at 247. The Court affirmed the district court's dismissal of the "RICO claims because plaintiffs

14

were seeking to redress injuries to the union, not themselves" and "RICO would not support derivative actions." *Id.*

> The Fifth Circuit found that:
>
> . . . stockholders cannot sue in their own name for diminution in the value of their stock; a decrease in stock value does not provide sufficient direct injury for the stockholder to sue in his own right. This circuit, as well as other circuits, have declined to allow stockholders to bring individual claims under RICO for diminution in the value of the corporation. A RICO action to recover for injury to the corporation is a corporate asset, and shareholders cannot bring it in their own names without impairing the rights of prior claimants to such assets. In a RICO case an indirectly injured party should look to the recovery of the directly injured party, not to the wrongdoer, for relief.

*Id.* at 250 (internal citations omitted). Three points implicit in this quote are crucial. First, this holding prevents suits from stockholders for *diminution in the value of their stocks.* Second, RICO bars this type of suit because recovery for a select few shareholders *would impair the rights of prior claimants to such assets.* Third, this holding assumes *indirectly injured parties could recover from directly injured parties* because "[a]ny financial improprieties occurred with union funds and directly injured solely the union; appellants suffered only indirect injuries as union members." *Id.*

In the present case, Plaintiffs sued for direct harm to their business in the form of lost profits and for personal property in the form of incurred attorneys' fees—not for diminution of stock.[6] Additionally, Plaintiffs' full recovery for the alleged damages will not impair the rights of anyone else because Lynn was the only shareholder of Display Graphics. Further, the financial improprieties caused lost profits to Display Graphics, of which Lynn was entitled to 100% of the profits.[7] Unlike in *Adams-Lundy*, there is no one else from whom Plaintiffs could recover, except for each other. To be sure, the *Adams-Lundy* plaintiffs sat directly at odds with the corporation;

---

[6] *See infra*, pp. 16–23.
[7] As discussed below, Diane is entitled to lost profits because profits incurred from separate property during a marriage are themselves community property.

Lynn sits in an identical position to Display Graphics, and Diane, as his wife, is equally entitled to 100% of Display Graphic's profits incurred during their marriage.[8]

The heart of Defendants' argument is really another way of casting the argument that Plaintiffs do not have RICO standing because the lost profits are a "speculative claim . . . that derives solely from the claimed injury to his wife" (Dkt. #892 at p. 26). Indeed, in the substantive paragraphs relating to this specific argument, Defendants assert the same contentions they assert against Plaintiffs' personal RICO standing: "Plaintiffs did not establish by any competent evidence that they sustained recoverable damages by proving that those damages were directly and proximately caused by any RICO violation by any of these Defendants" (Dkt. #892 at p. 27). The Court spills much ink discussing these argument below. For these reasons, however, the Court rejects Defendants' assertion that neither Plaintiff has standing to sue for injury to the corporation, Display Graphics.[9]

## B.  Diane's RICO Standing

"[T]here is no recovery under RICO for personal injuries." *Price*, 138 F.3d at 607 n.20 (internal citations omitted). This conclusion stems from the phrase "business or property," in § 1964(c), which "retains restrictive significance" and "exclude[s] personal injuries suffered" in a RICO case. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (citing *Hamman v. United States*, 267 F. Supp. 420, 432 (D. Mont. 1967)). In fact, even "resulting pecuniary consequences" of personal injuries are insufficient to establish a "business or property" injury under § 1964(c). *See e.g.*, *Gaines v. Texas Tech Univ.*, 965 F. Supp. 886, 890 (N.D. Tex. 1997) (collecting circuit cases); *Hughes v. Tobacco Inst.*, No. 1:99-CV-163, 2000 WL 34004261, at *7 (E.D. Tex. May 5, 2000),

---

[8] *See infra*, pp. 18.
[9] Plaintiffs also argue that Defendants waived this argument by failing to bring it until after trial commenced. The Court need not and does not reach this argument.

*aff'd sub nom.* 278 F.3d 417 (5th Cir. 2001) (collecting cases). Thus, for Diane to have RICO standing, she must have proven some business or property loss that did not result from any personal injuries suffered. Put differently, something besides Diane's personal injuries must have caused her property loss.

Plaintiffs assert that Diane suffered injury to her business and property in the form of lost profits from Display Graphics and from attorneys' fees incurred to secure her release from BHB. Defendants argue that Diane cannot have suffered a business loss because she does not own Display Graphics, and each of her alleged property losses stem from the personal injury she suffered. Accordingly, Defendants conclude that the evidence is insufficient to confer RICO standing for Diane.

The Court finds, and reasons below, that Diane has standing under RICO because she suffered property loss in the form of lost profits and attorneys' fees and proved these injuries at trial with sufficient evidence to support the jury's findings. Further, these injuries were not derivative of her personal injuries.

### 1. Lost Profits

At trial, Plaintiffs presented evidence that Diane worked for her husband's business, Display Graphics in the sales department. Lynn also testified that, following Diane's stay at BHB, the sales dropped at Display Graphics (*see* Dkt. #872 at pp. 31–32). According to Lynn, sales declined because when Diane "tried to come back to work" after her stint at BHB, "[her work] became more of a problem because of her interaction with the customers" (Dkt. #872 at p. 11). Lynn testified that Diane became so "abrasive with [the customers]" he "had to actually forbid [her] from contacting some of them" (Dkt. #872 at p. 11). Other customers' interactions with Diane had to be "curtail[ed]" (Dkt. #872 at p. 11). Following the decline in sales and Diane's alleged

inability to contribute to the business, Lynn decided to merge with, and be acquired by, one of Display Graphics' customers (*see* Dkt. #872 at p. 12).

Plaintiffs argue that Diane's property loss derives from both lost profit damages and attorneys' fees spent as an attempt to secure Diane's release from BHB. As an initial matter, Diane does not own the business she claims was injured due to Defendants' actions (*see* Dkt. #871 at p. 11) (noting that Diane has "a husband who[ is] a business owner"); (*see also* Dkt. #871 at pp. 148–49) (confirming that Lynn owned Display Graphics, and Diane came to the business as a salesperson). Defendants argue that the alleged injury stems from a business interest that Diane cannot claim because the business is Lynn's separate property. Plaintiffs argue that the RICO injury stems from the loss of Display Graphics' profits, which Texas law recognizes as community property.

As a legal matter, Diane has a property interest in the lost profits of Display Graphics.[10] While "property owned by a spouse before marriage remains the separate property of that spouse during marriage," *Jensen v. Jensen*, 665 S.W.2d 107, 109 (Tex. 1984), a "basic tenet of Texas community property law" provides that "profits from both separately owned and community-owned property are themselves community property." William J. Dyer, *Community Property Rights and the Business Partnership*, 57 TEX. L. REV. 1018, 1032 (1979); TEX. FAM. CODE § 3.002 ("Community property consists of the property, other than separate property, acquired by either spouse during marriage."). Accordingly, it is immaterial to the lost profits inquiry that Lynn owned Display Graphics prior to his marriage with Diane. Profits acquired during the marriage are community property; likewise, "if a third party steals community property, surely either spouse or both can seek recovery in tort for it." *Chu v. Hong*, 249 S.W.3d 441, 445 (Tex. 2008).

---

[10] To make this determination, the Court looks to Texas law. *See Price*, 138 F.3d at 607 (noting that "courts may look to state law to determine, for RICO purposes, whether a property interest exists").

Notably, lost profits are expectancy damages. "[E]xpectancy damages may be appropriate in some RICO cases in the form of lost profits, subject to proof of proximate causation and that the damages are not speculative." *Lowe v. Eltan, B.V.*, No. 9:05-CV-38, 2018 WL 7822940, at *13 (E.D. Tex. Dec. 12, 2018) (citing *Frankford Trust Co. v. Advest, Inc.*, 943 F. Supp. 531, 534–35 (E.D Pa. 1996)); *cf. In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995) (holding that the plaintiff did not have RICO standing in part because he "ha[d] not alleged lost profits"). The evidence supporting lost profits to Display Graphics is substantial. Diane's RICO standing for lost profits turns on whether the jury awarded damages for foreseeable, concrete lost profits (as opposed to speculative profits) and whether it was reasonable for the jury to conclude that the lost profits resulted from Defendants' racketeering activity.

The jury heard evidence from both Lynn and Plaintiffs' expert on lost profit damages. The expert explained how he arrived at his final numbers and his calculation methods. The expert also testified that, in his model, he specifically did not account for Diane's loss of earning capacity— he only considered the lost profits, which he considered "a separate damage to business" (Dkt. #876 at p. 2170). The jury also heard days' worth of evidence regarding the specific activities of Defendants and the financial state of Display Graphics following Plaintiffs' entanglement with the conspiracy. Further, both the jury instructions and the verdict form delineated what the jury must consider and determine in order to award damages to Plaintiffs on the RICO claim. The Court instructed the jury:

> If you find that Defendants violated the RICO act, you must decide whether that violation caused an injury and damages to Plaintiffs. The damages that Plaintiffs may recover are damages, if any, caused by the predicate acts constituting the pattern of racketeering activity if they injure Plaintiffs' business or property. It isn't necessary that every predicate act caused damage to Plaintiffs. But Plaintiffs can only recover damages caused by predicate acts that are part of the pattern of racketeering activity. Injury to mere expectancy interests or injury to an intangible property interest, such as an injury to the value of intangible property assets, is not

19

sufficient. An unjust gain or enrichment to Defendants is also not sufficient to award damages under RICO. You may award as damages only the amount of concrete financial loss, if any, that Plaintiffs prove, by a preponderance of the evidence, that they suffered to their business or their tangible property caused by the pattern of racketeering activity.

(Dkt. #856 at p. 21). According to the verdict, the jury found that "[t]he amount of damages to Plaintiffs' business or property" was $300,000 and was "specifically and proximately caused by and attributable to Defendants' violation of RICO" (Dkt. #850 at p. 6). Further, the jury was not to "include in this amount damages, if any, that flow[ed] from Diane Creel's other claims" (Dkt. #850 at p. 6). Notably, the jury did not find any personal injury damages attributable to Defendants. Specifically, the jury did not find any Defendant liable for false imprisonment or gross negligence and did not find Tom liable for medical negligence (Dkt. #850 at pp. 7–11).

As mentioned, the procedural posture is paramount in this case. Importantly, not a single RICO case that Defendants cite in their JMOL is a decision following a jury verdict. But because determining "whether a given party has suffered a RICO injury is a fact-heavy" inquiry—and the jury is the finder of fact—the Court must be "especially deferential" to the jury's verdict and must not reverse the jury's findings unless substantial evidence does not support the findings." *Nat'l Enters. v. Mellon Fin. Servs. Corp. No. 7*, 847 F.2d 251, 254–55 (5th Cir. 1988); *Baisden*, 693 F.3d at 499. Accordingly, the Court finds that the jury reasonably awarded damages for foreseeable, concrete lost profits (as opposed to speculative profits) and determined that the lost profits resulted from Defendants' racketeering activity.

### 2. Attorneys' Fees

Plaintiffs also contend that "[t]he approximately $10,000 in attorneys' fees incurred on behalf of Diane Creel proximately caused by the Defendants['] acts and omissions are not personal injury damages but are property damages to Diane Creel and/or Lynn Creel" (Dkt. #887 at p. 6).

Diane required this specific legal assistance, not for the purposes of this lawsuit, but to secure her release from BHB. In this context, there becomes a distinction between pecuniary loss and loss resulting from personal injury. Defendants assert that "the claimed attorneys' fees paid to Plaintiffs' private attorney (to secure her release from BHB . . .) are derivative of Diane's personal injury claims arising out of her alleged improper involuntary commitment and mental health treatment" (Dkt. #881 at p. 16). This cannot be. Diane's personal injury claims had not been fully realized at the time she incurred these attorneys' fees. As Plaintiffs contend, "those court proceedings were initiated by the false warrant for Diane Creel's detention and then furthered by [] Rafique by his orders and signing of an affidavit to keep her admitted. . . . [T]hose attorneys' fees were incurred by an attorney working on behalf of Diane Creel" (Dkt. #887 at p. 4) to release her from BHB. The Court agrees.

The case Defendants rely on as "analogous" to the case at bar is factually and procedurally distinct. *See Evans v. City of Chicago*, 434 F.3d 916, 931 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). In *Evans*, the Seventh Circuit found the plaintiff's attorneys' fees were "clearly derivative of his alleged false imprisonment and malicious prosecution claims" because they were incurred as part of the defense to a resulting criminal lawsuit against him. *Id.* Diane's retained her attorney in relation to "court proceedings that were initiated by Tom, signed by Tom, signed by Yao, and automatically generated by the system that was fully under the aegis of Chang," which the jury found based on the evidence it saw and heard at trial (Dkt. #895 at p. 19). That personal injuries also resulted from this activity does not render the pecuniary harm "derivative." *See Stanissis v. Dyncorp Int'l LLC*, No. 3:14-CV-2736-D, 2015 WL 1931417, at *4 (N.D. Tex. Apr. 29, 2015).

The Court, therefore, finds that attorneys' fees in this context are sufficient to confer RICO standing. For this reason, and because the jury reasonably awarded damages for foreseeable, concrete lost profits and determined that the lost profits resulted from Defendants' racketeering activity, Diane had standing to pursue and recover on her RICO claim.

## C.  Lynn's RICO Standing

Defendants assert that "Lynn's RICO claims are legally invalid because they are entirely derivative of Diane's purported claims" (Dkt. #881 at p. 23). Plaintiffs respond that Lynn "was directly injured" by the racketeering activity "and if he was not a target himself—he was sitting next to the target, and he was taken away from his business as a result" (Dkt. #895 at p. 33).

Defendants correctly relay that the Supreme Court has held § 1964(c) bars any recovery for "harm flowing directly from the misfortunes visited upon a third party by the defendant's acts." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268–69 (1992). But the misfortunes specific only to Diane were those that caused her personal injuries. As mentioned, Diane recovered for her personal injuries under separate claims; accordingly, it is immaterial to this inquiry that Lynn suffered third-party impacts from Diane's personal injuries. Lynn does not seek to establish third-party RICO standing, and, in any case, RICO standing cannot derive from personal injury. Rather, from the Third Amended Complaint to this lawsuit (Dkt. #183), the Creels alleged injury to their business and property caused by Defendants' racketeering activity. The proper inquiry, therefore, is the same as that considered under Diane's RICO standing: Whether the jury reasonably awarded damages for foreseeable, concrete lost profits (as opposed to speculative profits) and determined that the lost profits resulted from Defendants' racketeering activity. For all the reasons previously stated, and those articulated below, Lynn had RICO standing.

Because Lynn is the owner of Display Graphics and the lost profits to the business are community property, the Court incorporates by reference its analysis supporting Diane's lost profit injuries. Further, the Court recognizes additional evidence supporting Lynn's RICO standing. Specifically, while Diane was trapped at BHB, Lynn spent time away from attending to his business at Display Graphics in an attempt to secure his wife's release. The jury heard evidence that for three days, Lynn worked with an attorney to "see what [they] could do to get her out of there" (Dkt. #871 at p. 509). Lynn researched how to help his wife in the hearing that BHB allowed after a 72-hour holding period; he fought with BHB after it refused to provide Diane with notice of the hearing (which would prevent the hearing from occurring); he then attended that hearing at the University of Texas psychiatric hospital where he had to testify on Diane's behalf (Dkt. #871 at pp. 513–15). The justice of the peace at the hearing ordered Diane back to BHB where she remained at least one more full day (Dkt. #871 at 515–521).

As discussed, the Court instructed the jury that "[t]he damages that Plaintiffs may recover are damages, if any, caused by the predicate acts constituting the pattern of racketeering activity if they injure Plaintiffs' business or property" (Dkt. #856 at p. 21). From the evidence, a jury could rationally infer that the racketeering activity caused business and property injury to Lynn. *See Mota v. Univ. of Tex. Hous. Health Sci. Ctr.*, 261 F.3d 512, 524 (5th Cir. 2001) (discussing how a jury can make rational inferences). Although much of the evidence regarding damages injured Diane in a personal capacity, Diane sought damages for that harm through other avenues—not via Lynn under a RICO conspiracy claim. There was sufficient evidence to support the jury's finding and award for RICO damages.[11]

---

[11] The Court also posits that, even assuming *arguendo* Lynn did not personally have RICO standing, the jury's findings and award could stand regardless. The jury found jointly for "Plaintiffs" and awarded $300,000 for the business and property damages sustained. On this claim, the verdict form did not distinguish between damages suffered by Lynn and those suffered by Diane. Standing alone, Diane's property damages support an award of $300,000.

### D.  Sufficiency of the Evidence as to RICO Proximate Causation[12]

To sustain the RICO damages award, the jury must have also rationally found that Defendants' racketeering activities proximately caused Plaintiffs' business and property injuries. Defendants argue that "the evidence is legally [in]sufficient to establish that the damages were directly and proximately caused by an alleged RICO violation," which § 1964(c) requires (Dkt. #881 at p. 29). Defendants contend that any injuries resulted from "other independent causes" and that "the damages were too speculative for the jury to reasonably determine what portion, if any, was the direct result of an alleged RICO violation" (Dkt. #881 at p. 29). Plaintiffs respond that they do not have to "offer evidence which positively exclude[s] every other possible cause of the" injury (Dkt. #887 at p. 21) (internal citations omitted). According to Plaintiffs, the defendant carries the "burden of proving an 'intervening cause'—something which snaps the 'causal chain' (that is, operates as a 'superseding cause,' wiping out the defendant's liability) . . . that connects the wrongful act to the [plaintiff's] injury" (Dkt. #887 at p. 21) (citing RESTATEMENT (SECOND) OF TORTS § 440 (1965)).

"[A] plaintiff may sue under § 1964(c) only if the alleged RICO violation was the proximate cause of the plaintiff's injury." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006). More broadly, "[t]he [Supreme] Court has indicated the compensable injury flowing from a violation of [§ 1962(c)] 'necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.'" *Id.* at 457 (quoting *Sedima, S.P.R.L.*, 473 U.S. at 497). Harm resulting from a § 1962(c) violation must therefore be directly related to those actions constituting

---

[12] Though the issue of proximate causation is directly related to RICO standing, the Court discusses this matter separately so as to clearly mark the analytical distinction between damages derivative of personal injury and proximate causation. The Court notes that some points in this analysis will overlap with those asserted in the previous sections.

such violation. *See id.* (noting different reasons why harm may have occurred separate and apart from any RICO violation and holding that those reasons were sufficient to establish discontinuity between the asserted harm and sought-after damages).

The Court agrees with Plaintiffs' characterization that "RICO does not impose a 'direct target' limitation" on plaintiffs (Dkt. #887 at p. 10). That is, RICO does not require that a defendant intentionally cause injury to a plaintiff's business or property. "[A] plain reading of the statute indicates that RICO does not contain any separate mens rea or scienter elements beyond those encompassed in its predicate acts." *United States v. Pepe*, 747 F.2d 632, 675–76 (11th Cir. 1984).[13] "As a result, in a § 1962(a) case, the only relevant mental state is that necessary to commit the predicate acts." Pattern Jury Charges, District Judges Association Eleventh Circuit 7.3 (2020) (citing *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1292–97 (11th Cir. 2010)). RICO conspiracy, however, "requires the additional element of agreement." *Id.* (citing *United States v. Martino*, 648 F.2d 367, 383 (5th Cir. 1981)).

With this legal backdrop, the Court considers the arguments under the relevant standard of deference. Defendants have pointed to several instances in which Lynn admitted his business suffered lost profits, both before and after Diane Creel was committed to BHB. The continued downward projection of sales did not pivot into an upward trajectory following Diane's return to work. However, Plaintiffs provided more than a "mere scintilla" of evidence that support the jury's finding of proximate causation. *Arismendez*, 493 F.3d at 606. Specifically, the jury heard evidence from both Lynn and Plaintiffs' expert on lost profit damages. The expert explained how he arrived

---

[13] The Fifth Circuit notes in its 2020 Civil Pattern Jury Instructions that "The instructions for RICO claims set out in the 2009 Pattern Jury Instructions are not included [] because the cases are so rarely tried that there is no recent set of instructions in this circuit the Committee viewed as sufficiently reliable to include in the revised Instructions." Note on Pattern Jury Charges, District Judges Association Fifth Circuit 8 (2020). For this, the Fifth Circuit suggests the Eleventh Circuit Pattern Jury Instructions (Civil Cases) as guidance.

at his final numbers and his calculation methods. The expert also testified that, in his model, he specifically did not account for Diane's loss of earning capacity—he only considered the lost profits, which he considered "a separate damage to business" (Dkt. #876 at p. 2170). Lastly, the expert testified that he found a causal link between the alleged wrongful conduct and the damages indicated in his expert report, which the Court admitted into evidence and to which the jury was able to review during deliberations (Dkt. #876 at p. 2159).

The jury also heard days' worth of evidence regarding the specific activities of Defendants and the state of Display Graphics following Plaintiffs' entanglement with the scheme. Further, the Court instructed the jury on the legal standard for proximate causation:

> In this case, you will be asked to apply the following standard of causation—proximate cause. "Proximate cause," unless otherwise specifically defined, means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

(Dkt. #856 at p. 19). According to the verdict, the jury, having been charged with the foregoing law, found that "[t]he amount of damages to Plaintiffs' business or property" was $300,000 and was "specifically and proximately caused by and attributable to Defendants' violation of RICO" (Dkt. #850 at p. 6).

Given the evidence Plaintiffs offered and the jury's explicit instructions and findings, the Court finds "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict" regarding RICO causation and resulting damages. *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004).

## II.    RICO Claims Improperly Recast Medical Negligence Claims

Defendants also argue that "Plaintiffs' RICO claims are improperly recast medical negligence claims and should be dismissed" (Dkt. #878 at p. 39). In support, Defendants assert that the claims brought under RICO actually fall under Chapter 74 of the Texas Health and Safety Code. Plaintiffs argue that the "RICO claims are not subject to dismissal due to the presence of medical negligence claims" (Dkt. #887 at p. 29). Plaintiffs invoke the Supremacy Clause to support this proposition because the clause supposedly "controls the disposition of this issue" (Dkt. #887 at p. 29).

> Boiled down to their essence in plain English, the subsections [of RICO] state:
>
> (a) a person who has received income from a pattern of racketeering cannot invest that income in an enterprise.
>
> (b) a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering.
>
> (c) a person who is employed by or associated with an enterprise cannot conduct the enterprise's affairs through a pattern of racketeering.
>
> (d) a person cannot conspire to violate subsections (a), (b), or (c).

*In re Burzynski*, 989 F.2d 733, 741 (5th Cir. 1993). "Thus, RICO claims under all four subsections necessitate: '1) a *person* who engages in 2) a *pattern of racketeering activity*, 3) connected to the acquisition, establishment, conduct, or control of an *enterprise*.'" *Id.* at 741–72 (quoting *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988), *cert. denied*, 489 U.S. 1079 (1989)) (emphasis in original). To be sure, "[a] plaintiff may not convert state law claims into a federal treble damage action simply by alleging that wrongful acts are a pattern of racketeering relating to an enterprise." *Heden v. Hill*, 937 F. Supp. 1230, 1242 (S.D. Tex. 1996)).

"Whether a cause of action falls within the definition of a 'health care liability claim' turns on the underlying nature of the claim plead[ed]." *Pena, ex rel. De Los Santos v. Mariner Health*

*Care Inc.*, No. 2010 WL 2671571, at *2 (S.D. Tex. July 1, 2020) (quoting *North Am. Specialty Ins. Co. v. Royal Surplus Lines Co.*, 541 F.3d 552, 561 (5th Cir. 2008)). "If the act or omission alleged in the complaint is an inseparable part of the rendition of health care services, then the claim is a health care liability claim." *Id.* (citing *North Am. Specialty Ins. Co.*, 541 F.3d at 561). "It is well settled that a health care liability claim cannot be recast as another cause of action to avoid the requirements of Chapter 74." *Id.* (citing *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 851 (Tex. 2005)).

As an initial matter, the Court does not recognize how the supremacy clause is applicable in any manner. The outcome on this point requires that the Court analyze the underlying nature of the RICO claim, as compared to the facts underlying the medical negligence claim, through the evidence put on at trial.

The underlying nature of both Plaintiff's RICO claims in this case is that Defendants intentionally engaged in activities involving the wires and interstate commerce to defraud the insurance companies paying for the treatment of the patients. Though Diane suffered physical harm that resulted from tortious conduct, the facts underlying the overall RICO scheme involved far more than Diane's treatment and care. It involved hundreds of false notary entries, incredulous misrepresentations about patients, and telehealth appointments that never occurred—yet records indicating they did. Witnesses testified to each of these happenings and physical documents confirmed them. Indeed, Plaintiffs produced evidence that Defendants entered into a conspiracy affecting a variety of patients over a number of years with an intent to defraud insurance companies, thereby enriching themselves. This activity caused injury to Plaintiffs' business and property.

The acts related to the RICO conspiracy that Plaintiffs proved at trial are not "an inseparable part of the rendition of health care services." *Pena*, 2010 WL 2671571, at \*2 (citing *North Am. Specialty Ins. Co.*, 541 F.3d at 561). For example, some Defendants could have committed medical negligence against Diane subject to health care liability claims without ever engaging in racketeering. Rafique could have failed to meet the standards of ordinary care in his treatment of Diane at BHB without the deliberate assistance of the other Defendants—without the elaborate web of entities and doctors engaged in a common scheme. Falsifying records, misrepresenting patient symptoms, and detaining patients without reason or explanation for the detention are not necessary actions for providing health care services.

Therefore, the Court finds that Plaintiffs' RICO claims were not improperly recast medical negligence claims. They were RICO claims separate from the claim of medical negligence—and the evidence supports their distinction. Further, the Supremacy Clause has no effect on this conclusion.

## III.   Legal Sufficiency of the Evidence for Recovery on RICO Claims/Conspiracy

Defendants also argue that no legally sufficient evidence exists to allow Plaintiffs to recover on either their RICO claims or the RICO conspiracy claim. Plaintiffs argue that they "put on a parade of evidence supporting the RICO elements and damages" (Dkt. #887 at p. 16).

Substantively, § 1962 of RICO "sets forth four specific prohibitions aimed at different ways in which a pattern of racketeering activity may be used to infiltrate, control, or operate 'an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.'" *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2097 (2016) (brackets omitted). Under § 1962(c), it is unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Under § 1962(d), it is unlawful for "any person to conspire to violate" any of § 1962's first three subsections. § 1962(d). To prevail on their RICO claims, the Plaintiffs had to prove each of the following by a preponderance of the evidence as to each Defendant individually: (1) the existence of an enterprise; (2) the enterprise engaged in, or had some effect on, interstate or foreign commerce; (3) the Defendant was employed by or associated with the alleged enterprise; (4) the Defendant participated, either directly or indirectly, in the conduct of the affairs of the enterprise; and (5) the Defendant participated through a pattern of racketeering activity. *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 523–24 (5th Cir. 2016) (quoting *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007)). "'Racketeering activity' means any of the predicate acts specified in § 1961(1)." *Zastrow v. Hous. Auto Imports Greenway Ltd.*, 789 F.3d 553, 559 (5th Cir. 2015). Two or more of these predicate acts form a "pattern of racketeering activity" when they are "(1) related and (2) amount to or pose a threat of continued criminal activity." *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009); *see* 18 U.S.C § 1961(5).

Again, the Court must defer to the jury's verdict at this point in the litigation, as the Fifth Circuit directs:

> In reviewing the sufficiency of the evidence, we must view all the evidence, direct and circumstantial, in the light most favorable to the [plaintiff], and must accept all reasonable inferences and credibility choices that tend to support the jury's verdict. The standard of review is whether a jury could reasonably find that the evidence was inconsistent with every reasonable hypothesis of liability against Defendants.

*United States v. Marx*, 635 F.2d 436, 438 (5th Cir. 1981) (internal citations omitted). The Court will first review the evidence pertaining to the substantive RICO claims.

## A. RICO Substantive Claims[14]

The Court will discuss each element of the RICO conspiracy claim, as Plaintiffs must have sufficient evidence to support each element.

### 1. Existence of an Enterprise

On this element, the Court instructed the jury:

> [A]n "enterprise" may consist of an individual, partnership, corporation, association, or other legal entity. An "enterprise" can arise from any group of people associated together for the common purpose of engaging in a course of conduct. Here, Plaintiffs must establish that the corresponding alleged enterprise qualified as an "association-in-fact enterprise." To do so, Plaintiffs must present evidence of (1) a common or shared purpose that permeates every underlying act, and (2) an ongoing organization of the enterprise's members that functioned as a continuing, cohesive unit over a sufficient duration to allow those associated with the enterprise to pursue the common purpose.

(Dkt. #856 at pp. 7–8). Plaintiffs produced evidence that showed a common, shared purpose of securing involuntary commitment warrants in order to defraud insurance companies. The jury saw and heard evidence that Chang owned 42 psychiatric hospitals in Texas and also owns several business, including the Dr. Says platform. BHB contracted with Chang to use his services, including the Dr. Says platform. Tom contracted with Chang to perform telemedicine visits within this system, specifically at BHB. Rafique oversaw the care of patients at BHB.

Further, Chang contracted with Yao for $55,000 a year to do billing communications for Chang's businesses. Yao performed notary services that were outside of the scope of her contract. Yao was, at the time, the only notary working for Chang, despite his large number of business dealings. The notary documents contain falsified information, including fake signatures, which are directly linked to the detainment of patients at BHB. For months, Chang charged BHB for his services and paid Tom a markdown of what BHB paid to Chang. As Plaintiffs correctly convey,

---

[14] The jury did not find Rafique liable for the substantive RICO claims. Any references to Rafique in this section are merely for purposes of clarity in the analysis.

"Chang explained the communications that occurred, at times in real time, between his platform and the hospital, in detail, under oath" (Dkt. #895 at p. 7).

The jury, having heard this evidence and seen the documents supporting the testimony, could have, therefore, reasonably concluded that a common or shared purpose to defraud insurance companies permeated every underlying act of these charges and invoices. Further, it could have reasonably concluded that this evidence showed an ongoing organization of the Defendants that functioned as a continuing, cohesive unit over a sufficient duration to allow those associated with the enterprise to pursue the common purpose.

### 2. Enterprise Engaged In or Had Some Effect On Interstate Or Foreign Commerce

On this element, the Court instructed the jury:

> Plaintiffs must prove that the enterprise engaged in or had an effect on interstate or foreign commerce. "Engage in or have an effect on interstate or foreign commerce" means that the enterprise either engaged in, or had an effect on commerce between two or more states, or on commerce between a state and a foreign country.

(Dkt. #856 at p. 8). Plaintiffs produced evidence that information related to Chang's charges for his services traveled internationally to Taiwan and back to the United States. This allowed Chang to receive payment for his services connected to BHB, which he then used to pay Tom. The jury, having heard this evidence and seen the documents supporting the testimony, could have, therefore, reasonably concluded that the enterprise at least had an effect on interstate commerce.

### 3. Defendants Employed By or Associated With The Alleged Enterprise

On this element, the Court instructed the jury:

> Plaintiffs must prove that the Defendant was employed by or associated with the alleged enterprise. The requirement that the Defendant be "employed by or associated with" the enterprise means they must have some minimal association with the alleged enterprise. The Defendant must know something about the alleged enterprise's activities as they relate to the racketeering activities.

(Dkt. #856 at p. 8). Plaintiffs produced evidence that Chang owned and operated MD Reliance; Universal Physicians; Dr. Says, and Office Winsome. BHB contracted with Universal Physicians and Dr. Says, wherein Universal Physicians provided telemedicine services at the request of BHB medical staff. Both the Universal Physician doctors, including Tom, and BHB medical staff used Dr. Says for electronic record keeping. Chang used MD Reliance for administrative maintenance of these businesses and operated them out of Office Winsome, which doubled as his primary residence.

BHB employed Rafique as its medical director, and he used services from Universal Physicians and Dr. Says in his practice there. Daily, BHB medical staff would request telemedicine appointments provided by Universal Physicians so that the physicians—none of whom were psychiatrists or psychologist—could evaluate prospective BHB patients for involuntary committal to the facility. The physician would not even write his or her own report about the patient; it was automatically generated by Dr. Says and then regurgitated back to BHB. Yao then falsely notarized an application for involuntary commitment to BHB and Dr. Says electronically filed the application with the court, seeking a warrant for the patient's detainment.

To describe these people and entities as connected is an understatement. Without one component of this enterprise in place, the entire scheme would fall apart. But Jain's testimony highlights the awareness Defendants had of the activity underway. He testified that it was corporate policy to squeeze every last penny out of the patient's insurance company—to allow the patient to leave early was "leaving days on the table" (Dkt. #871 at p. 397). The jury, having heard this evidence and seen the documents supporting the testimony, could have, therefore, reasonably concluded that each Defendant had minimal association with the alleged enterprise and some knowledge of its racketeering activities.

**4. Defendants Participated Either Directly or Indirectly in the Conduct of the Affairs of the Enterprise**

On this element, the Court instructed the jury:

> Plaintiffs must also prove by a preponderance of the evidence that the Defendant "participated, directly or indirectly, in the conduct of the affairs of the enterprise." To prove the Defendant "participated, directly or indirectly, in the conduct of the affairs of an enterprise," the Defendant must have some part in directing those affairs. This requires that a Defendant participate in the operation or management of the enterprise itself. The Defendant does not need to participate in, or be aware of, all of the enterprise's activities. It is sufficient if the Defendant conducted or participated in the conduct of some of the enterprise's activities through a pattern of racketeering activity.

(Dkt. #856 at p. 8). As mentioned, describing Defendants as connected to the alleged enterprise is an understatement. Without one component of this enterprise in place, the entire scheme would fall apart. Chang orchestrated the enterprise through his many businesses. A number of Chang's companies entered into a contract with BHB relative to services that Chang's companies provided. Chang's ping service would notify Universal Physicians that BHB needed a physician to perform telemedicine services for BHB patients. Tom, an anesthesiologist with no psychiatric training, performed thousands of the telemedicine appointments. Tom and the other Universal Physicians doctors and BHB used Dr. Says to document all patient records. MD Reliance performed the administrative functions for each of these entities. For the relevant time period, Chang operated each of his businesses out of Office Winsome, which was located at his primary residence.

The contracts between the entities and the hospitals contained billing specifics. If one of Chang's companies provided a service, the company provided a billing code related to that service. If a physician provided the service, he or she would indicate the level or type of service provided on a document through Dr. Says, and then Dr. Says would send the records to an administrative billing department, sometimes to Taiwan based UReliance. Chang would first do the coding of the billing and then electronically send the codes to UReliance so it could generate an actual bill,

which UReliance would then send to either an insurance company, the hospital, or the patient. If the insurance company paid the bill, it paid Chang's company, Universal Physicians, directly.

The hospitals in contract with Chang applied through Dr. Says for warrants to involuntarily commit patients at their facilities. The hospital would fill out the application for involuntary commitment, Yao would notarize it, a physician would sign it, and Dr. Says would electronically file it with the court. The court would then issue a warrant allowing the hospital to detain the patient against their will.

As Chang's only notary, Yao kept a detailed notary book. The physician recommending commitment of a patient signed off on the notarized documents—but the physician was never physically in front of Yao, the notary, when he or she signed the document, in violation of the rules for notary publics in the State of Texas. On site at BHB was Rafique who replaced Jain as BHB medical director when Jain began asking questions and expressing concerns about BHB and UHS's unethical detainment of human beings. Rafique was the only physician who ever physically saw Diane while she was detained at BHB.

The jury, having heard this evidence and seen the documents supporting the testimony, could have, therefore, reasonably concluded that each Defendant conducted or participated in the conduct of some of the enterprise's activities.

### 5.  Defendants Participated Through a Pattern of Racketeering Activity

On this element, the Court instructed the jury that "racketeering activity" includes:

> acts in violation of the federal wire fraud statute, 18 U.S.C. § 1343. An act of "racketeering activity" is also called a "predicate act." A "pattern of racketeering activity" means that the Defendant committed at least two distinct predicate acts. Distinct does not have to mean different types. But by itself, proof of two or more predicate acts does not establish a pattern under RICO.

(Dkt. #856 at p. 9). Further, "[t]o prove a pattern of predicate acts, Plaintiffs must show that the acts were related to one another and to the enterprise. Two or more acts of racketeering activity that are not related do not establish a pattern of racketeering activity under RICO" (Dkt. #856 at p. 9). The Court indicated that "[p]redicate acts are 'related' to one another if they have the same or similar purposes, results, participants, victims, or methods. Predicate acts are also related if they have common distinguishing characteristics and aren't isolated events" (Dkt. #856 at p. 9). Additionally, the Court explained that "predicate acts must demonstrate continuity or its threat," which a plaintiff can demonstrate in two basic ways (Dkt. #856 at p. 9). First, the plaintiff may "demonstrate related predicate acts extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement" (Dkt. #856 at p. 9). Second, the plaintiff may "show conduct that does not occur over a substantial period of time but, by its nature, is likely to be repeated into the future" (Dkt. #856 at p. 9).

As for the predicate act, the Court instructed the jury it must find by a preponderance of the evidence that: (1) "the Defendant knowingly devised or intended to devise any scheme to defraud"; (2) "the scheme to defraud employed false material representations, false material pretenses, or false material promises"; (3) "the Defendant transmitted, or caused to be transmitted, by way of wire communications, in interstate or foreign commerce, any writing for the purpose of executing such scheme"; and (4) "the Defendant acted with a specific intent to defraud."

The Court defined the terms as well, instructing, among other things, that:

> A "scheme to defraud" means any plan, pattern, or course of action intended to deprive another of money or property or bring about some financial gain to the person engaged in the scheme. . . . It is not necessary that the Plaintiffs prove all of the details alleged concerning the precise nature and purpose of the scheme. What must be proved is that the Defendant knowingly devised or intended to devise a scheme to defraud by means of false or fraudulent pretenses, representations, or

promises that was substantially the same as the one alleged. It is also not necessary that the Plaintiffs prove that the material transmitted by wire communications was itself false or fraudulent, or that the use of the interstate or foreign wire communications facilities was intended as the specific or exclusive means of accomplishing the alleged fraud. What must be proved is that the use of the interstate or foreign wire communications facilities was closely related to the scheme because the Defendant either wired something or used it to be wired in interstate or foreign commerce in an attempt to execute or carry out the scheme.

(Dkt. #856 at p. 11).

The purpose of Defendants' elaborate scheme was simple: defraud insurance companies for money. Defendants did not care about the emotional, psychological, and financial destruction their scheme had on victims like Diane Creel. From a bird's eye view, Defendants' racketeering activity or, predicate acts, were also simple. To get the money, Defendants had to use wire fraud. Chang outsourced administrative billing to UReliance, a company based out of Taiwan. Chang would first do the coding of the billing and then electronically send the codes, through wires, to UReliance so it could generate an actual bill, which UReliance would then send to either an insurance company, the hospital, or the patient. If the insurance company paid the bill, it paid Chang's company, Universal Physicians, directly. That the bills were not themselves fraudulent is immaterial. The fraudulent activity alleged was detaining patients against their will who should not have been detained. But the information sent across the wires allowed Defendants to capitalize on the financial gain for which this scheme was designed.

This activity happened over and over and over because using the wires to ensure payment from the insurance companies worked. Plaintiffs proffered evidence showing that, out of the 3,955 applications (just in 2017) for involuntary detainment of patients that Yao notarized, many required Chang to use UReliance for billing purposes. These events were not isolated. They had similar purposes, results, participants, victims, and methods. And the conduct of the Defendants

involved in these predicate acts extended over a period of several years, affecting a number of people that is impossible to calculate.

The jury, having heard this evidence and seen the documents supporting the testimony, could have, therefore, reasonably concluded that Defendants committed at least two distinct predicate acts of wire fraud when they sent billing codes to UReliance in Taiwan for the purpose of securing money from insurance companies. Further, the jury could have reasonably concluded that Defendants received allocations of this money for their work in the enterprise—that is, detaining human beings in mental health facilities against their will when they did not present imminent risk of harm to themselves or others.

For all these reasons, the Court finds that Plaintiffs presented sufficient evidence to support the jury's findings for each element of civil RICO liability. The Court will now assess whether the evidence supported the RICO conspiracy findings.

## B. RICO Conspiracy[15]

As mentioned, under § 1962(d), it is unlawful for "any person to conspire to violate" any of § 1962's first three subsections. § 1962(d). To demonstrate a RICO conspiracy under § 1962(d), Plaintiffs must have demonstrated "(1) that two or more people agreed to commit a substantive RICO offense and (2) that [Defendants] knew of and agreed to the overall objective of the RICO offense." *United States v. Sharpe*, 193 F.3d 852, 869 (5th Cir. 1999).

"A person cannot be held liable for a RICO conspiracy 'merely by evidence that he associated with other . . . conspirators or by evidence that places the defendant in a climate of

---

[15] The jury found all Defendants liable for RICO conspiracy, but the Court set aside the jury's verdict that Rafique conspired with all other Defendants to violate RICO. Because the jury did not find Rafique liable for the substantive RICO violation, the finding  that Rafique conspired with the other Defendants could not stand as a matter of law (Dkts. #850, #896). Accordingly, the Court will not discuss the evidence (or lack thereof) against Rafique as it pertains to RICO conspiracy.

activity that reeks of something foul.'" *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010) (quoting *United States v. Posada–Rios*, 158 F.3d 832, 857 (5th Cir. 1998)). And although "the conspirator need not expressly agree to violate the statute, [] he must have known and agreed to assist in the underlying criminal offense." *Marlin v. Moody Nat. Bank, N.A.*, 248 F. App'x 534, 538 (5th Cir. 2007) (citing *United States v. Marmolejo*, 89 F.3d 1185, 1196 (5th Cir. 1996), *aff'd sub nom.*, *Salinas v. United States*, 522 U.S. 52, 65 (1997)).

Defendants contend that "Plaintiffs did not present any evidence at trial, much less substantial evidence that would have raised a fact issue, to establish" a RICO conspiracy based on wire fraud (Dkt. #881 at p. 67). Plaintiffs argue that the jury could have reasonably concluded that each Defendant knew about the conspiracy and took acts in furtherance of it (Dkt. #887 at p. 32).

For the RICO conspiracy claim, the Court instructed that the jury must find by a preponderance of the evidence that:

> two or more persons in some way or manner came to a mutual understanding to attempt to accomplish a common and unlawful plan, that is, that while being employed by or associated with an enterprise, they engaged in activities or conducted the affairs of the alleged enterprise through a pattern of racketeering activity, in the manner charged.

(Dkt. #856 at p. 13). The jury had to also find that "a Defendant knowingly and willfully became a member of a conspiracy by objectively indicating, through their or its words or actions, their or its agreement to conduct or participate, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity" (Dkt. #856 at p. 13). Lastly, the jury had to find "[t]hat at least one of the conspirators committed at least one overt act during the existence of a conspiracy in an effort to accomplish some object or purpose of the conspiracy" (Dkt. #856 at p. 13).

The Court will discuss the jury's instructions pertaining to each of the three components

of RICO conspiracy in three separate sections but will analyze the evidence in a single, final section. Again, the Court reviews the evidence in the light most favorable to the verdict. *See Sharpe*, 193 F.3d at 867 (confirming the standard of review in a post-verdict RICO conspiracy case).

### 1.   Defendants Came to Mutual Understanding for Unlawful Plan

For this element, the Court instructed the jury that the evidence need not show a formal or express agreement nor that "all of the means or methods alleged were in fact agreed upon to carry out the alleged conspiracy" or actually "put into operation" (Dkt. #856 at p. 13). The Court further instructed the jury  that "Plaintiffs must prove by a preponderance of the evidence that the alleged conspirators agreed to conduct or participate in the conduct of the affairs of the alleged enterprise" (Dkt. #856 at p. 13).

### 2.   Knowingly and Willfully Became Member of Conspiracy

For this element, the Court instructed the jury that Plaintiffs must have proved by a preponderance of the evidence that Defendants knew "the basic object of the alleged conspiracy was conducting the alleged enterprise through a pattern of racketeering activity," which, in this case, was wire fraud under 18 U.S.C. § 1343 (Dkt. #856 at p. 14). Further, Plaintiff had to prove the Defendants "knowingly and willfully agreed to personally commit at least two acts of racketeering as a 'pattern of racketeering activity'" as defined in the RICO substantive claim (Dkt. #856 at p. 14). Lastly, Plaintiffs had to prove the Defendants "knowingly and willfully agreed to conduct or participate in the conduct of the affairs of the alleged enterprise through this pattern of racketeering activity" (Dkt. #856 at p. 14). The Court instructed the jury that a Defendant could "become a member of [the] conspiracy without full knowledge of all of the details of the unlawful

scheme or without knowledge of the names and identities of all of the other alleged conspirators" (Dkt. #854 at p. 14).

### 3.  At Least One Conspirator Committed One Overt Act During Conspiracy

For this element, the Court instructed the jury that "[a]n 'overt act' is a transaction or event, even one which may be entirely legal and innocent when considered alone, but which is knowingly committed by a conspirator in an effort to accomplish some object of the conspiracy" (Dkt. #856 at p. 15).

### 4.  Analysis of Evidence on RICO Conspiracy

As mentioned, without one component of this enterprise in place, the entire scheme would fall apart. While the events in this case are complex, the legal conspiracy boils down to the conduct of very few actors. First, Chang. Chang, as the owner of the entities, is the brains behind the activities of Universal Physicians, MD Reliance, and Office Winsome. Tom is independently contracted by Universal Physicians. Chang employed Yao as his single notary across all of his businesses. Though several people and additional entities were involved in the overall facts of this case, the jury needed only find that three people and three entities came to the mutual understanding of the unlawful plan in this case, three people and three entities knowingly and willfully became members, and one person or one entity committed an overt act. The jury so found. The Court determines that finding was reasonable.

Chang orchestrated the enterprise through his businesses. A number of Chang's companies entered into a contract with BHB relative to services that Chang's companies provided. Chang's ping service would notify Universal Physicians that BHB needed a physician to perform telemedicine services for BHB patients. For the relevant time period, Chang operated each of his

businesses out of Office Winsome, which was located at his primary residence. MD Reliance performed the administrative functions for each of these entities.

Tom, an independent contractor for Universal Physicians, performed thousands of the telemedicine appointments. In his telemedicine appointments performed at BHB, he did not even write his own reports. Dr. Says, Chang's software platform, generically produced them based on a few buttons that Tom clicked during his telemedicine appointments. Plaintiffs produced evidence that Tom was aware the applications for involuntary commitment required that he sign them in front of a notary. Tom never once set foot in BHB to sign a form—much less to physically evaluate a patient before he or she was involuntarily detained. Further, Tom has no psychiatric training. He is an anesthesiologist. To be sure, Plaintiffs produced evidence that Tom, at the very most, evaluated Diane for only four minutes before signing off on her three-day involuntary detainment. The Creels testified that Tom never conducted a telemedicine appointment—no one did. Indeed, Tom had no recollection of ever having met or spoken to Diane prior to the commencement of this lawsuit.

The contracts between the entities and BHB contained billing specifics. If one of Chang's companies provided a service, the company provided a billing code related to that service. If a physician provided the service, he or she would indicate the level or type of service provided on a document through Dr. Says, and then Dr. Says would send the records to an administrative billing department, sometimes to Taiwan based UReliance. Chang would first do the coding of the billing and then electronically send the codes to UReliance so it could generate an actual bill, which UReliance would then send to either an insurance company, the hospital, or the patient. If the insurance company paid the bill, it paid Chang's company, Universal Physicians, directly. Tom

42

received an apportionment of these payments. As previously determined, the jury could have reasonably found that the transfer of billing information was a pattern of racketeering activity.

BHB used Dr. Says to apply for court warrants to involuntarily commit patients at its facility. BHB medical staff would fill out the application for involuntary commitment, Yao would notarize it, a physician would sign it, and Dr. Says would electronically file it with the court. The court would then issue a warrant allowing the hospital to detain the patient against their will.

As Chang's only notary, Yao kept a detailed notary book. The physician recommending commitment of a patient signed off on the notarized documents—but the physician was never physically in front of Yao, the notary, when he or she signed the document, which violated the rules for notary publics in the State of Texas. On site at BHB was Rafique who replaced Jain as BHB medical director when Jain began asking questions and expressing concerns about BHB and UHS's unethical detainment of human beings. The jury could have found Jain credible when he testified that "UHS was training the staff how to paper things up to get paid whether what was on the paper was true or not" and was "very concerned" that UHS and BHB "admit almost all Medicare patients, referrals or walk-in and then [] keep them for extended period without documented justification or medical necessity" (Dkt. #871 at pp. 374–75).

The jury could have found Jain's testimony credible when he claimed the telemedicine doctors who used Dr. Says "simply copied the information typed in by the [BHB] intake staff and then" recommended in the documents that BHB "admit the patient, essentially ceding medical intake decisions to a social worker on the intake staff" (Dkt. #871 at p. 378). Additionally, the jury could have found it credible when Jain testified that the people involved in the hospital enterprise were aware of the "corporate policy to admit and keep all Medicare patients" in an attempt to defraud Medicare and other government programs (Dkt. #871 at p. 383). Moreover, the jury could

have believed Jain's testimony that doctors were expected to attend daily meetings where they received updates on patients' insurance statuses and were taught how to avoid "leaving days on the table," which essentially meant discharging a patient "from the facility before that patient met the maximum number of days that the insurance carrier would pay" (Dkt. #871 at p. 397).

The evidence did not have to be direct—in fact, much of it was circumstantial. But the jury is the finder of fact, and the jury is to draw conclusions based on the circumstantial and direct evidence. Therefore, the jury, having heard this evidence and seen the documents supporting the testimony, could have reasonably concluded that Tom, Chang, and Yao each agreed to this scheme. The jury could have also reasonably concluded that Universal Physicians, MD Reliance, and Office Winsome—all owned by Chang—agreed to this scheme. Again, the Defendants did not have to explicitly agree to break the law. They only had to agree to conduct or participate in the conduct of the affairs of the alleged enterprise.

The jury could have reasonably found that no other reason existed for Tom, an anesthesiologist with no psychiatric training, to conduct thousands upon thousands of psychiatric telemedicine appointments; or to submit documents to courts with falsified signatures; or to spend anywhere from zero to four minutes evaluating Diane before recommending her involuntary detainment to a psychiatric ward. The jury could have reasonably found that no other reason existed for Yao, Chang's only notary, to falsify nearly 3,000 applications for involuntary detainment over the course of a single year. And the jury could have reasonably concluded that at least one of the Defendants involved in this elaborate, ongoing scheme knowingly committed one transaction or event with the goal of defrauding insurance companies.

For all these reasons, the Court finds that there was sufficient evidence to uphold the jury's findings that Defendants Chang, Universal Physicians, Dr. Says, MD Reliance, Office Winsome, Tom, and Yao each conspired in violation of § 1962(d).

## IV.  Disgorgement

In addition to the $300,000 verdict for Defendants' RICO violations, the jury awarded Plaintiffs $1,320,500.00 in disgorgement. Because disgorgement is an equitably fashioned remedy, this Court informed counsel for both parties that any award determined by the jury for disgorgement was strictly advisory in nature and would require the Court to enter findings of fact and conclusions of law for any amount of the award to stand (Dkt. #877 at p. 2341); *see Nichols v. Heslep*, 273 F.3d 1098 (5th Cir. 2001).

However, despite the jury's advisory opinion, Defendants argue in the present motion that "disgorgement is not a legally recognized remedy for Plaintiffs' civil RICO or RICO conspiracy claims" (Dkt. #881 at p. 33). Alternatively, Defendants claim that "no legally sufficient evidence supports the jury's advisory opinion" (Dkt. #881 at p. 37). Plaintiffs respond that the Fifth Circuit has recognized disgorgement can be a legally recognized equitable remedy when it is awarded to deter future conduct. The Court finds that RICO does not categorically prohibit disgorgement but may only be awarded to deter future conduct.

In *Richard v. Hoechst Celanese Chemical Group*, the Fifth Circuit acknowledged it "ha[d] not decided whether equitable relief is available for a private civil RICO plaintiff," 355 F.3d 345, 354 (5th Cir. 2003) (citing *Price*, 138 F.3d at 605 n.5), but circumvented a determinative holding on that particular issue. *See id.* ("The circumstances before us do not necessitate that [the Fifth Circuit] reach this question today."). By avoiding the question, the Fifth Circuit implicitly determined that "RICO does not categorically prohibit disgorgement." *U.S. v. Rx Depot, Inc.*, 438

F.3d 1052, 1059 n.5 (10th Cir. 2006) (noting that, although the Fifth Circuit has not foreclosed disgorgement under RICO, the Fifth Circuit "went on to determine disgorgement was not appropriate under the facts of the particular case[] before [it]"). Accordingly, while the Fifth Circuit has not categorically prohibited disgorgement in civil RICO cases, it has recognized limitations.

In limiting recovery for disgorgement in RICO claims, the Fifth Circuit has aligned with the Second Circuit's reasoning in *United States v. Carson*, 52 F.3d 1173, 1181 (2d Cir. 1995). In *Carson*, the Second Circuit "interpreted § 1964(a) to mean that equitable remedies are only proper to 'prevent and restrain *future* conduct rather than to punish *past* conduct.'" *Id.* at 1181 (emphasis in original). Accordingly, to award any amount for disgorgement, this Court must determine whether Plaintiffs have shown that the disgorgement sought is to "prevent and restrain" Defendants from continuing the unlawful conduct.

For these reasons, the Court rejects Defendants' argument that disgorgement is not a legally recognized remedy for Plaintiffs' civil RICO or RICO conspiracy claims. However, the Court requests that the parties file proposed findings of fact and conclusions on this point. The Court recognizes both parties have previously filed documents that resemble proposed findings of fact and conclusions of law (Dkt. #883) but notes Defendants did "not prepare[] proposed findings or conclusions awarding any amount for disgorgement damages because their position is that . . . Plaintiffs may not recover any disgorgement damages" (Dkt. #883 at p. 7). Further, Plaintiffs proposed simply that the Court find they "presented legally sufficient evidence to support an award of disgorgement damages" (Dkt. #890 at p. 1). For a case with a docket of nearly 900 documents and a trial transcript of 2,343 pages, neither of these filings is helpful to the Court in issuing detailed findings of fact to support any amount for disgorgement for Plaintiffs. Although

the Court does not at this time determine if Plaintiffs are entitled to any amount in disgorgement, the Court requests that both parties file updated findings of fact and conclusions of law in accordance with this Memorandum Opinion and Order.

## CONCLUSION

It is therefore **ORDERED** that Defendants' Renewed Joint Motion for Judgment as a Matter of Law (Dkts. #878, #881) is **DENIED in part**.

It is further **ORDERED** that the parties submit detailed proposed findings of fact and conclusions of law with pincite citations to the docket and trial transcripts, in accordance with this Memorandum Opinion and Order, no later than fourteen days from the date of this Order.

**IT IS SO ORDERED.**

**SIGNED this 31st day of March, 2022.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE