# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| DIANE CREEL and LYNN CREEL, § § *Plaintiffs*, § § v. § § DR. SAYS, LLC, et al., § § *Defendants*. § § § § § | Civil Action No. 4:18-cv-00615 Judge Mazzant |

## MEMORANDUM OPINION AND ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having sustained the verdict against Defendants Dr. Yupo Jesse Chang; MD Reliance, Inc.; Universal Physicians, PA; Dr. Says, LLC; Office Winsome, LLC; and Yung Husan Yao (aka Angela Yao) for violations of the civil Racketeer Influenced and Corrupt Organization Act ("RICO") and RICO conspiracy, the Court must now enter its findings of fact and conclusions of law regarding equitable disgorgement. Pursuant to Federal Rule of Procedure 52(a)(1), the Court enters the following findings of facts and conclusions of law. To the extent that any of the findings of fact constitute conclusions of law, or any of the conclusions of law constitute findings of fact, they are adopted as such.

### FINDINGS OF FACT

### I.     The Detainment of Diane Creel

Plaintiff Lynn Creel ("Lynn") accompanied his wife, Plaintiff Diane Creel ("Diane") (collectively, "the Creels"), to the Behavioral Hospital of Bellaire ("BHB") in August 2017. The Creels arrived at BHB planning to receive information on the hospital's advertised "outpatient group women-centric grief counseling" (Dkt. #871 at p. 495). Upon arrival, a receptionist called a

nurse to assist the Creels. The nurse instructed them to leave their phones in a locker at reception and then took the couple to a room where she performed an assessment. One of the first questions the nurse asked was, "Do you want to kill yourself?" (Dkt. #871 at p. 497). As the nurse continued with questions, Diane explained her medical and mental health history consistently. Among all the questions, the nurse repeatedly pressured Diane to admit herself voluntarily to the hospital as an inpatient for a multi-day period. The Creels maintained that was not the plan and resisted signing voluntary admissions forms. The nurse persisted, indicating Diane might be an alcoholic and a drug addict, but the Creels maintained their position. Not once did the nurse offer, or even mention, an outpatient therapy program.

The nurse then stepped out to make some phone calls, asking that the Creels remain in the room. The Creels waited in the room for about fifteen to twenty minutes until the nurse returned. Upon her return, the Creels said they were leaving because they did not like the treatment plans that BHB had offered. The nurse informed the Creels that they were not allowed to leave because BHB had "filed an emergency warrant for [Diane's] detention" and Diane would be placed under a 72-hour hold (Dkt. #871 at p. 501–02). The Creels then realized that the BHB medical staff had locked both the door out the front of the building and the door to the intake room.

Diane was taken to the psychiatric unit against her will. The receptionist informed Lynn that there was nothing he could do except go home and get Diane some clothes because she would be in the unit for at least three days, at which point Diane was entitled to a "72-hour hearing." At the hearing, a Justice of the Peace would hear testimony to decide if Diane should be released from BHB or return to the psychiatric ward there.

Lynn went home to pack a bag for Diane. He packed shoes with no laces and bras with no underwires. BHB did not even permit Diane to have toothpaste. Lynn spent the next three days

away from his business at Display Graphics, where Diane worked in sales. Lynn contacted an attorney for assistance and prepared for Diane's upcoming hearing. Prior to the hearing, Lynn retained legal counsel for Diane and spoke to Diane on the phone a few times. BHB did not permit Lynn to visit Diane in person. The BHB phones were near the nurses' station and the calls were limited in time. BHB medical staff "cold-turkeyed" Diane off her prescribed psychiatric and blood pressure medication, replacing it with new drugs (Dkt. #871 at p. 511). In all this time, neither Lynn nor Diane ever saw the warrant for her detainment or even a shred of paperwork.

Preparing for the hearing, Lynn learned it was difficult to secure patient release unless the patient had an outside opinion to affirm her wellbeing. Lynn and the attorney had to fight for Diane's right to even attend the hearing. In fact, BHB did not serve Diane with paperwork about the hearing until the hearing had already concluded. Diane would never have known about the hearing if Lynn and the attorney had not made her aware and advocated for her presence. At the hearing, Diane appeared downcast (Dkt. #871 at p. 515). No one from BHB made an appearance; rather, BHB sent documents that a county attorney referred to when asking questions to those who took the stand. When Diane took the stand, she learned for the first time that BHB had been giving her detoxification medication to treat an alcohol addiction, even though BHB possessed no documents regarding Diane's alcohol levels. Moreover, Diane had not consumed any alcohol on the day she arrived at BHB.

Lynn and his son both testified at the hearing, indicating they had been supporting Diane through her involuntary detainment and would continue to do so. The Justice of the Peace charged with determining whether Diane would be released considered the testimony for only thirty seconds before denying Diane's release. Diane was, consequently, sent back to the psychiatric unit at BHB. The following day, August 10, 2017, the Creels met with Dr. Jamal Rafique ("Rafique"),

the medical director of BHB, for a family therapy session. At the session, Rafique informed Diane that she would be released on August 11, 2017. The Creels later learned that the county attorney from the 72-hour hearing had intervened on Diane's behalf, and accordingly, Rafique had decided to release Diane. After her four-and-a-half-day detainment at BHB, Diane's resulting mental state was desolate, at best. The Creels would later learn that they were not alone in this experience.

## II. The Defendants' Scheme

The scheme underlying the Creels' experience began with the business activity of Dr. Yupo Jesse Chang ("Chang"), a family physician who has spent much of his career managing other medical practices. At the time of the trial in this case, Chang had contracts and performed involuntary commitments for forty-two for-profit psychiatric hospitals, but Chang is not a qualified mental health professional. He also owned a number of businesses, including MD Reliance, Inc. ("MD Reliance"); RediAnswer, LLC ("RediAnswer"); Universal Physicians, PA ("Universal Physicians"); Dr. Says, LLC ("Dr. Says"); and Office Winsome, LLC ("Office Winsome")—each a necessary component of the scheme.

Prior to the events of this case, a number of Chang's companies entered into a contract with BHB relative to services that Chang's various companies provided.[1] RediAnswer operated as a "ping" service—that is, if BHB needed a physician, it would ping RediAnswer. RediAnswer would then notify Universal Physicians that BHB needed a physician to perform telemedicine services for BHB patients. The physicians were independently contracted by Universal Physicians. Among the independently contracted physicians was Dr. Timothy Tom ("Tom"). Tom is not a psychiatrist; he is an anesthesiologist. In fact, none of the independently contracted physicians at Universal Physicians were psychiatrists.

---

[1] Universal Health Services ("UHS") acquired BHB at some point prior to 2017, but BHB retained its name.

The Universal Physicians doctors and BHB would use Dr. Says, a software platform, to document all patient records. MD Reliance performed the administrative functions for each of these entities. For the relevant time period, Chang operated each of his businesses out of Office Winsome, which was located at his primary residence.

The contracts between the entities and the hospitals contained billing specifics. If one of Chang's companies provided a service, the company provided a billing code related to that service. If a physician provided the service, he or she would indicate the level or type of service provided on a document through Dr. Says, then Dr. Says would send the records to an administrative billing department. Chang outsourced some of the work for administrative billing to UReliance, a company based out of Taiwan. Chang would first do the coding of the billing and then electronically send the codes to UReliance so it could generate an actual bill, which UReliance would then send to either an insurance company, the hospital, or the patient. If the insurance company paid the bill, it paid Chang's company, Universal Physicians, directly.

The hospitals in contract with Chang applied through Dr. Says for court warrants to involuntarily commit patients at their facilities. The hospital would fill out the application for involuntary commitment. It would be notarized, a physician would sign it, and Dr. Says would electronically file it with the court. The court would then issue a warrant allowing the hospital to detain the patient against their will. This would not have been possible without the work of Chang's notary, Yung Husan Yao (aka Angela Yao) ("Yao")—the only notary Chang had employed across all his hospitals and businesses.

As Chang's only notary, Yao kept a detailed notary book. The physician recommending commitment of a patient signed off on the notarized documents—but the physician was never

physically in front of Yao, the notary, when he or she signed the document. At trial, Chang testified that he is now aware this process violates the rules for notary publics in the State of Texas.

Relevant to this scheme are two psychiatrists who served as the consecutive medical directors of BHB: Dr. Ashok Jain ("Jain") and Rafique. While Jain served as the medical director of BHB, he wrote to the CEO to highlight some concerns about the hospital—specifically, Jain had concerns about the hospital's involuntary confinement of patients. Shortly after expressing these concerns, BHB replaced Jain with Rafique. Jain then made a complaint with the federal government that BHB and UHS—the entity that had acquired BHB—were involved with a false claims scheme to defraud Medicare. At his deposition for this case, Jain explained why he made this claim:

> When a patient . . . is admitted in the psychiatry hospital, they . . . are in a locked-in facility like a jail. They cannot go out. They cannot meet anyone. There is [sic] only limited discussions to the outside world. They cannot go on the Internet. They cannot meet their family members, except sometime very limited time. They cannot eat the food their preference could be, and lot of the freedom of speech and freedom of choice of the lifestyle they want to live is obviously totally curtailed or restricted when they are in a locked-in unit. And that is what I feel is a civil right violation for an inpatient in a psychiatry hospital

(Dkt. #871 at p. 372). He further testified that "UHS was training the staff how to paper things up to get paid whether what was on the paper was true or not" and was "very concerned" that UHS and BHB "admit almost all Medicare patients, referrals or walk-in and then [] keep them for extended period without documented justification or medical necessity" (Dkt. #871 at pp. 374–75).

Jain's testimony also revealed that the telemedicine doctors who used Dr. Says "simply copied the information typed in by the [BHB] intake staff and then" recommended in the documents that BHB "admit the patient, essentially ceding medical intake decisions to a social

worker on the intake staff" (Dkt. #871 at p. 378). Again, not a single physician independently contracted by Universal Physicians was a psychiatrist.

Additionally, Jain testified that Rafique was among the people employed with Universal Physicians who was aware of the "corporate policy to admit and keep all Medicare patients" in an attempt to defraud Medicare and other government programs (Dkt. #871 at p. 383). Jain testified that on one occasion he wrote a discharge order because he believed detaining the patient any longer would be illegal. BHB administration then called him to relay that BHB had assigned Rafique to take over that patient "because that patient . . . had Medicare and could stay longer" (Dkt. #871 at p. 385). Moreover, Jain testified that doctors were expected to attend daily meetings where they received updates on patients' insurance statuses and were taught how to avoid "leaving days on the table," which essentially meant discharging a patient "from the facility before that patient met the maximum number of days that the insurance carrier would pay" (Dkt. #871 at p. 397). Jain also testified that, at any point when he raised concerns to UHS and BHB personnel, "it was frowned upon" (Dkt. #871 at p. 392).

When BHB detained Diane, Rafique had already replaced Jain as the BHB medical director. Yao's notary records for Diane included an application for involuntary commitment that Tom had signed after allegedly performing a telemedicine appointment for Diane. The Creels never received a telemedicine appointment while at BHB.

Tom was not present to sign the application to involuntarily commit Diane in front of notary Yao. Further, Tom never wrote a report for Diane. Rather, Diane's assessment was "basically generated" or "created" by the software system using Tom's generic inputs (Dkt. #873 at p. 891). The documents regarding Diane's "diagnosis" and "problem" reveal that Tom did not mark Diane as an immediate suicide risk, did not indicate she was in imminent harm of hurting

herself, and did not mark her as having recent suicidal ideation. But elsewhere, the document says—yet Tom himself did not write—that Diane had suicidal thinking and behavior. The notary documents reveal that in just three days between, August 6, and August 10, 2017, Tom signed applications for the involuntary commitment of twelve different patients.

### III.     The Lawsuit

Twelve plaintiffs brought suit against twenty-two defendants, alleging various causes of action based upon their involuntary confinement and stay at BHB. Many plaintiffs settled their claims, and several defendants successfully motioned this Court for dismissal of claims against them. Ultimately, only the Creels went to trial, pursuing claims against eight defendants. BHB and UHS entered a stipulation of dismissal on the eve of trial (Dkt. #828). The Creels' (hereinafter, "Plaintiffs") alleged causes of action included: (1) violation of the civil Racketeer Influenced and Corrupt Organization Act ("RICO"); (2) RICO conspiracy; (3) false imprisonment; (4) medical negligence; and (5) gross negligence. Plaintiffs sued several defendants, including Chang; Universal Physicians; Dr. Says; MD Reliance; Office Winsome; and Yao (collectively "Defendants").[2]

The jury found that Defendants, with the exception of Rafique, (1) were employed or associated with a RICO enterprise (2) had participated, either directly or indirectly, in the conduct of the affairs of the enterprise, and (3) had participated through a pattern of racketeering activity. The jury assessed Plaintiffs' compensatory damages at $300,000.00. The jury also found that all Defendants, including Rafique, conspired together to violate RICO.[3]

---

[2] Relevant to this Order are Defendants Rafique and Tom, who have both settled with Plaintiffs.

[3] As previously stated, Defendants Rafique and Tom settled with Plaintiffs. Therefore, this Order does not apply to them.

Regarding the state-law claims, the jury found no liability against Rafique and Tom for false imprisonment of Diane. The jury also determined that Rafique and BHB were medically negligent, though Tom was not. The jury assigned 60% of the negligence apportionment to Rafique and 40% to BHB. The jury awarded Diane damages in the amounts of: (1) $75,000.00 for physical pain and mental anguish sustained in the past; (2) $50,000.00 for physical pain and mental anguish that, in reasonable probability, Diane will sustain in the future; (3) $85,500.00 for loss of earning capacity sustained in the past; (4) $104,000.00 for loss of earning capacity that, in reasonable probability, Diane will sustain in the future; (5) $15,000.00 for medical care expenses incurred in the past; and (6) $50,000.00 for medical care expenses that, in reasonable probability, Diane will incur in the future. The jury did not impose gross negligence liability on either Rafique or Tom.

Defendants moved for judgment as a matter of law (or "JMOL") prior to the jury's verdict (Dkt. #845), and the Court took the matter under advisement. Defendants then renewed their motion for judgment as a matter of law against the jury's findings regarding civil RICO liability, disgorgement, and RICO conspiracy (Dkt. #881).

The Court denied the motion in part. Specifically, the Court upheld the jury's verdict against Defendants for violations of RICO and RICO conspiracy but declined to rule on the amount of equitable disgorgement to assess against Defendants pursuant to the RICO liability. The Court rejected Defendants' argument that disgorgement is not a legally recognized remedy for Plaintiffs' civil RICO or RICO conspiracy claims but requested that the parties file proposed findings of fact and conclusions on this point. Both Plaintiffs and Defendants filed proposed findings of fact and conclusions of law on April 28, 2022 (Dkt. #904; Dkt. #905). Defendants filed a response on May 17, 2022 (Dkt. #906).

### IV. Equitable Disgorgement

Plaintiffs have long pleaded and disclosed a claim for equitable disgorgement in this case. Pleadings for equitable disgorgement appear in the Third Amended Complaint (Dkt. #183), motions for summary judgment and responses (Dkt. #418), and Plaintiffs' supplemental responses to requests for disclosures (Dkt. #895). Plaintiffs further confirmed that they sought disgorgement in the Joint Final Pretrial Order (Dkt. #834 at p. 4).

The evidence attributed to equitable disgorgement mostly involves the medical documents that Yao falsely notarized. In January 2017 alone there were 276 documented applications for involuntary patient commitments sent through one of Chang's companies. In calendar year 2017, hospitals that had contracted with Chang filed 3,955 applications "to hold human beings in psychiatric hospitals against their will" (Dkt. #875 at p. 1948). Yao notarized each of these applications and thousands more throughout the entire relevant time period.

Yao first brought her concern to Chang about notarizing documents in violation of the law after she was served in a prior lawsuit. Chang testified at trial that he originally planned not to make any changes to the notary process until after the lawsuit concluded in this case. Although Chang clarified that he "did [not] decide to wait" that long and has "taken action to correct" the notary process (Dkt. # 875 at p. 1951), it is unclear what substantial changes actually occurred. Indeed, at the time of trial, Yao still worked as Chang's notary and was continuing to notarize documents in violation of Texas notary laws. Defendants produced no evidence to suggest they would change their activities following the lawsuit. Despite having had to pay back Medicare and private insurance companies for improper billings, Chang was still conducting his business affairs in the same manner. To date, very little adverse action has been taken against any Defendant.

The Court instructed the jury on disgorgement as follows:

> The law does not allow a person to profit by wrongdoing at the expense of another. "Disgorgement" is the act of giving up something that was unjustly obtained. If you find that Defendants benefitted from the RICO enterprise, then you may award the monetary value that you attribute to those benefits as the measure of Plaintiffs' damages. The amount subject to disgorgement is not the whole of the gain realized by Defendants but only the amount of the gain that is attributable to Defendants' misconduct. When a benefit or advantage has been realized in part as a result of misconduct and in part as a result of legitimate business activities, you may award as disgorgement only that portion of the gain that is attributable to the misconduct. If Defendants would have realized the gain in any event, or if the gain was the result of alternative causes, it is not attributable to misconduct

(Dkt. #856 at pp. 21–22).

The question presented to the jury on disgorgement (Question 7) asked, "[a]s a result of the wrongful conduct that occurred in the past, what amount of money, if any, should be disgorged from the Defendants to deter future wrongful conduct?" (Dkt. #850 at p. 6).

Defendants timely objected to Question 7 in the Verdict Form on grounds that Plaintiffs did not plead any claim for disgorgement cognizable under Fifth Circuit law and that the pleadings did not support submission of Question 7 (Dkt. #876 at pp. 2278–79). The Court overruled Defendants' objections (Dkt. #876 at p. 2282).

The jury awarded $1,320,500 on Question 7 for equitable disgorgement.

## CONCLUSIONS OF LAW

A claim for disgorgement under the civil RICO statute is an equitable remedy. *Richard v. Hoechst Celanese Chem. Grp., Inc.*, 355 F.3d 345, 354 (5th Cir. 2003). The jury's finding on equitable disgorgement under civil RICO, in answer to Question 7 on the Verdict Form (Dkt. #850), is an advisory opinion. *AMS Sensors USA, Inc. v. Renesas Electronics Am., Inc.*, 2021 WL 1196231 at *6 (E.D. Tex., March 30, 2021). The equitable nature of disgorgement requires a court to enter findings of fact and conclusions of law for any amount of the award to stand. *See Nichols v. Heslep*, 273 F.3d 1098 (5th Cir. 2001).

There is sparse and conflicting guidance in the case law on how disgorgement should apply in the RICO context. Indeed, only three circuit courts have considered whether RICO permits the disgorgement of ill-gotten gains. *Richard*, 355 F.3d at 354; *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1197 (D.C. Cir. 2005); *United States v. Carson*, 52 F.3d 1173, 1181 (2d Cir. 1995).

In *Richard*, the Fifth Circuit acknowledged it "ha[d] not decided whether equitable relief is available for a private civil RICO plaintiff," 355 F.3d at 354 (citing *Price*, 138 F.3d at 605 n.5), but "went on to determine disgorgement was not appropriate under the facts of the particular case[] before [it]." *U.S. v. Rx Depot, Inc.*, 438 F.3d 1052, 1059 n.5 (10th Cir. 2006). Specifically, the plaintiff class in *Richard* did not "seek disgorgement to 'prevent and restrain'" the defendant's unlawful conduct. Rather, the Fifth Circuit found the plaintiffs' "disgorgement claim seem[ed] to do little more than compensate for the alleged loss." *Richard*, 355 F.3d at 355.

Declining to recognize disgorgement as a proper remedy in this context, the Fifth Circuit aligned with the Second Circuit's reasoning in *United States v. Carson*. In *Carson*, the Second Circuit "interpreted § 1964(a) to mean that equitable remedies are only proper to 'prevent and restrain *future* conduct rather than to punish *past* conduct.'" *Richard*, 355 F.3d at 354 (quoting *Carson*, 52 F.3d at 1181 (emphasis in original)).

Contrarily, the D.C. Circuit has found that the reasoning in both *Carson* and *Richard* presents tension with the purpose of RICO and the typical purpose of disgorgement. The D.C. Circuit explained that RICO's statutory "language indicates that the jurisdiction is limited to forward-looking remedies that are aimed at future violations" but that "[d]isgorgement, on the other hand, is a quintessentially backward-looking remedy focused on remedying the effects of

past conduct to restore the status quo." *Philip Morris USA, Inc.*, 396 F.3d at 1198. Consequently, the D.C. Circuit has held that disgorgement is not a remedy available under RICO. *Id.*

Judge Wiener's concurring opinion in *Richard* offers some harmony to the tension among the circuits:

> disgorgement of ill-gotten gains is closely analogous to the equitable remedy of exemplary damages, as the principal purpose is not simply to punish the offending parties for having conspired to make the illicit profits but to convey a strong message, to the conspirators and to third parties alike, that there is yet another disincentive to engaging in such proscribed conduct.

*Richard*, 355 F.3d at 355 (Wiener, J., concurring in part). The Court understands this to mean that disgorgement as a RICO remedy may be forward-looking in its purpose, but as a means to achieve that purpose, the damages are tethered to the defendants' ill-gotten gains. For these reasons, the Court must first determine whether Plaintiffs have shown that the disgorgement sought is to "prevent and restrain" Defendants from continuing the unlawful conduct. The Court must then determine whether the amount awarded by the jury is appropriately tied to Defendants' ill-gotten gains.

## I.     Prevent and Restrain Future Unlawful Conduct

The Court finds that the disgorgement in this case is properly sought to "prevent and restrain" Defendants from continuing the unlawful conduct. The conduct that led to this lawsuit was egregious. As previously discussed, in calendar year 2017 alone, hospitals that had contracted with Chang filed 3,955 applications "to hold human beings in psychiatric hospitals against their will" (Dkt. #875 at p. 1948). Yao notarized each of these applications.

Chang and Yao were aware this egregious activity was unlawful. Yao first brought her concern to Chang about notarizing documents in violation of the law after she was served with a prior lawsuit. Jain made his concerns well known at BHB, but was then replaced by Rafique. Jain

then made a complaint with the Federal Government that BHB and UHS—the entity that had acquired BHB—were involved with a false claims scheme to defraud Medicare. None of this was enough to put an end to the practices.

On top of that, Defendants produced no evidence to suggest they would change their activities even after the lawsuit. At the time of trial, Yao was still notarizing documents in violation of notary laws. While Chang testified that he made some changes to the notary process, many of the same procedures remain in place—procedures that a jury determined constituted a scheme to defraud insurance companies. Despite having had to pay back Medicare and private insurance companies for improper billings, Chang was still conducting his business affairs in the same manner. Accordingly, the Court agrees with Plaintiffs that "the demeanor of the witnesses [at trial] indicated that they had no remorse and were not going to comply with the law, regardless of what the law said" (Dkt. #905 ¶ 45). To date, very little adverse action has been taken against any Defendant: the medical board did nothing, Yao maintains her notary commission, and Chang's businesses are intact.

For these reasons, the Court finds that an award of disgorgement of Defendants' ill-gotten gains will serve to prevent and restrain future illegal conduct.

Moreover, the Court finds that the jury awarded disgorgement for the purpose of preventing and restraining Defendants' future conduct. The Court instructed the jury on disgorgement as follows:

> The law does not allow a person to profit by wrongdoing at the expense of another. "Disgorgement" is the act of giving up something that was unjustly obtained. If you find that Defendants benefitted from the RICO enterprise, then you may award the monetary value that you attribute to those benefits as the measure of Plaintiffs' damages. The amount subject to disgorgement is not the whole of the gain realized by Defendants but only the amount of the gain that is attributable to Defendants' misconduct. When a benefit or advantage has been realized in part as a result of misconduct and in part as a result of legitimate business activities, you may award

14

> as disgorgement only that portion of the gain that is attributable to the misconduct. If Defendants would have realized the gain in any event, or if the gain was the result of alternative causes, it is not attributable to misconduct

(Dkt. #856 at pp. 21–22).

The question presented to the jury on disgorgement (Question 7) asked, "[a]s a result of the wrongful conduct that occurred in the past, what amount of money, if any, should be disgorged from the Defendants to deter future wrongful conduct?" (Dkt. #850 at p. 6). These instructions are devoid of any suggestions that the jury should award disgorgement to compensate Plaintiffs for past injuries. Accordingly, the Court finds that it may appropriately award Plaintiffs an amount of equitable disgorgement.

## II. Calculation of Disgorgement

Next, the Court must determine what amount of disgorgement is appropriate. "'Disgorgement' has never been a precise legal term." *SEC v. Hallam*, 42 F.4th 316, 327 (5th Cir. 2022). Disgorgement is a "profit-based measure of unjust enrichment," RESTATEMENT (THIRD) § 51, Comment a, at 204, that "reflect[s] a foundational principle: 'it would be inequitable that [a wrongdoer] should make a profit out of his own wrong.'" *Liu v. SEC*, 140 S. Ct. 1936, 1943, 207 L. Ed. 2d 401 (2020) (quoting *Root v. Ry. Co.*, 105 U.S. 189, 207 (1882)). On the other hand, the "wrongdoer should not be punished by 'pay[ing] more than a fair compensation to the person wronged.'" *Id.* (quoting *Tilghman v. Proctor*, 125 U.S. 136, 145–46 (1888)). The award is limited to "the gain made upon any business or investment, when both the receipts and payments are taken into the account." *Rubber Co. v. Goodyear*, 9 Wall. 788, 804 (1870).

Before the jury deliberated, Plaintiffs' most aggressive request for disgorgement was for the jury to multiply $75 by the number of detention warrants in Yao's notary record for 2017 (3,955). *See* (Dkt. #876 at p. 2207). In theory, this would result in a sum for just under $300,000.

15

Inexplicably, however, the jury awarded more than four times that—presumably because it was outraged at Defendants' conduct.

The Court notes it is not bound by what the Plaintiffs requested from the jury for disgorgement, just as it is not bound by what the jury awarded. "The district court has broad discretion not only in determining whether to order disgorgement but also in calculating the amount to be disgorged." *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993). That said, very little guidance exists as to how the Court should calculate disgorgement of illicit profits that is also sought to prevent and restrain future conduct. In the only two circuit court opinions that recognize disgorgement as a potential RICO remedy, no amount of disgorgement was ultimately awarded. *See United States v. Loc*. 1804-1, No. 90 CIV. 0963, 1996 WL 22377, at *1 (S.D.N.Y. Jan. 22, 1996) (on remand from the Second Circuit, the district court did not award disgorgement because "[t]he Government ha[d] not cited anything in the record that indicate[d] that the Court gave any consideration to the need to deter future conduct when it set the amount of the forfeiture").

The complex nature of the illegal enterprise in the present matter complicates the calculation of disgorgement. Chang had contracts and performed involuntary commitments for forty-two for-profit psychiatric hospitals, but only 40% of those hospitals were owned or managed by UHS. At all forty-two hospitals, the involuntary commitments were secured through court-ordered warrants, which required a physician's signature and notarization. As determined, Chang used many of his businesses—including Dr. Says, MD Reliance, and Universal Physicians—to secure these warrants at UHS and non-UHS hospitals alike. Moreover, Chang operated each of his businesses out of Office Winsome, which was located at his primary residence. Further complicating matters, Yao worked as Chang's only notary across all of his businesses and, necessarily, in connection with his work for hospitals outside of UHS. Without Yao's notarizing

each application for involuntary commitment, the warrants could not have been issued. As the Court indicated in its Memorandum Opinion and Order denying in part Defendants' Renewed Joint Motion for Judgment as a Matter of Law, "[t]o describe these people and entities as connected is an understatement. Without one component of this enterprise in place, the entire scheme would fall apart" (Dkt. #897 at p. 33).

Given this scheme, the Court recognizes that Defendants may very well have secured ill-gotten gains that meet or exceed the $1,350,500 awarded by the jury. But there is no evidence of profits that would support such an award. In their proposed findings, Plaintiffs struggle to explain how the jury arrived at its award and throw around several vague calculation methods for the Court to apply. While the Court agrees with Plaintiffs that "[t]here was overwhelming evidence of interactions and communications among [D]efendants showing a common purpose to defraud," this is not enough (Dkt. #905 at p. 21). In the end, the Court requires numbers, and Plaintiffs provide very few that are in any way relevant to Defendants' profits.

Plaintiffs' most conservative approach to calculating an award for disgorgement of "ill-gotten gains" is multiplying the cost of a telemedicine visit involving an involuntary detention by the 3,955 notary book entries for 2017. Defendants object to this calculation, asserting:

> Plaintiffs cannot rely on every single entry in Yao's notary book to compute allegedly "ill-gotten gains," as those entries do not establish the purported RICO scheme—that is, how many allegedly improperly notarized [documents], if any, actually were generated by Defendants (or expected to be generated), submitted to courts, and used to involuntarily commit patients against their will at BHB or another UHS-owned or UHS-managed facility

(Dkt. #906 at p. 3). The Court disagrees with Defendants that the scope for calculating profits be so narrow. The Court may consider profits "causally related to the wrongdoing at issue." *Allstate Ins. Co. v. Receivable Fin. Co., LLC*, 501 F.3d 398, 413 (5th Cir. 2007) (citations omitted). Such profits rise and fall with Yao's false notarizations, without which the warrants could not be issued,

17

the patients could not be detained, and the insurance money could not be collected. Additionally, these profits directly relate to the Defendants' misconduct that this Court seeks to prevent and restrain: the false notarizations, the improper confinement of alleged mental health patients, and the insurance fraud.

Therefore, for the purposes of restraining Defendants' future conduct, the Court will multiply the cost of a telemedicine visit by Yao's 3,955 notary book entries from 2017 to calculate Defendants' profits causally related to their elaborate enterprise. For each telemedicine visit involving involuntary detention, Chang received $75, which comprises a $45 base fee, $5 patient fee, and $25 warrant fee. Multiplying $75 by 3,955, the Court finds that the total profit equals $296,625. Plaintiffs presented no evidence of any other profits derived by Defendants through unlawful conduct that violated RICO, which would support a greater award of disgorgement. Further, Defendants have offered no evidence that would support a reduction in the award for Defendants' business expenses.

For all these reasons, the Court concludes Plaintiffs are entitled to recover from Defendants equitable disgorgement of profits in the sum of $296,625.

## CONCLUSION

The Court, having made its Findings of Fact and Conclusions of Law, concludes Plaintiffs are entitled to recover from Defendants equitable disgorgement of profits in the sum of $296,625.

**IT IS THEREFORE ORDERED** that Plaintiffs Diane Creel and Lynn Creel are entitled to recover from Defendants equitable disgorgement of profits in the sum of $296,625. The parties are hereby **ORDERED** to file a proposed final judgment within fourteen (14) days of entry of this Order.

**IT IS SO ORDERED**.

**SIGNED this 27th day of September, 2022.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE